Courtesy Copy
Original Filed in ECF
docket number 14-CV-5456

*To be argued by*
JONATHAN M. KRATTER
*(10 Minutes)*

# New York Supreme Court

### APPELLATE DIVISION -- SECOND DEPARTMENT

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

- *against* -

ABU KHAN,

*Defendant-Appellant.*

*TO BE HEARD ON THE ORIGINAL RECORD*

Queens County
Ind. No.  2147/06
A.D. No.  07-07185

## BRIEF FOR DEFENDANT-APPELLANT

LYNN W. L. FAHEY
Attorney for Defendant-Appellant
2 Rector Street, 10th Floor
New York, NY 10006
(212) 693-0085

JONATHAN M. KRATTER
*Of Counsel*
March, 2011

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 5531 . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . 2

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . 3

     Introduction . . . . . . . . . . . . . . . . . . . . 3

     <u>Molineux</u> Ruling . . . . . . . . . . . . . . . . . . . 4

     Prosecutor's Opening Statement . . . . . . . . . . . . . 5

     Photographs of the Complainant as a Young Girl . . . . . . 6

     Testimony of the Complainant and Her Family . . . . . . . 6

     Investigation and Expert Witnesses . . . . . . . . . . . 12

     Appellant's Testimony . . . . . . . . . . . . . . . . . 13

     Prosecutor's Summation . . . . . . . . . . . . . . . . 15

     Charge and Verdict . . . . . . . . . . . . . . . . . . 16

     ARGUMENT

          WHERE APPELLANT WAS CHARGED WITH ONE FIRST-
          DEGREE RAPE AND SEVERAL LESSER SEX CRIMES, THE
          HIGHLY PREJUDICIAL ADMISSION OF ALLEGATIONS
          THAT HE HAD RAPED THE DAUGHTER OF HIS
          GIRLFRIEND, PRIOR TO THE CHARGED RAPES, "VERY
          FREQUENT[LY]" DURING A PERIOD OF POSSIBLY MORE
          THAN THREE YEARS, AND ALSO OF SYMPATHY-
          INDUCING PHOTOGRAPHS OF THE GIRL AT AGES FIVE
          TO SEVEN, MANY YEARS PRIOR TO TRIAL WHEN THE
          LESSER SEXUAL ASSAULTS ALLEGEDLY BEGAN, DENIED
          APPELLANT HIS RIGHT TO A FAIR TRIAL.   U.S.
          CONST., AMEND. XIV; N.Y. CONST., ART. I, §6.  . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 33

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT
----------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,     :

                Respondent,     :

                -against-     :

ABU KHAN,     :

                Defendant-Appellant.     :

----------------------------------------x

### STATEMENT PURSUANT TO RULE 5531

1. The indictment number in the court below was 2147/06.

2. The full names of the original parties were People of the State of New York against Abu Khan.  There has been no change of parties on appeal.

3. This action was commenced in Supreme Court, Queens County.

4. This action was commenced by the filing of an indictment.

5. This appeal is from a judgment convicting appellant, after a jury trial, of rape in the first degree, course of sexual conduct against a child in the second degree, endangering the welfare of a child, and sexual abuse in the second degree.

6. This is an appeal from a judgment of conviction rendered July 24, 2007.

7. Appellant has been granted permission to appeal as a poor person on the original record.  The appendix method is not being used.

1

PRELIMINARY STATEMENT

This is an appeal from a judgment rendered in the Supreme Court, Queens County, on July 24, 2007, convicting appellant, after a jury trial, of rape in the first degree [P.L. §130.35(4)], course of sexual conduct against a child in the second degree [P.L. §130.80], endangering the welfare of a child [P.L. §260.10], and sexual abuse in the second degree [P.L. §130.60(2)].   Appellant received determinate sentences of 14 and 5 years, as well as two one-year definite sentences, all to run concurrently (Hollie, J., at trial and sentence).[1]

Appellant filed a timely notice of appeal, and on July 30, 2009, this Court granted him leave to appeal as a poor person and assigned Lynn W. L. Fahey as appellate counsel.

Appellant is currently incarcerated pursuant to the judgment. No stay has been sought.

---

[1]While the trial court initially, and mistakenly, imposed sentences based on convictions of B, C, and D felonies and a misdemeanor, the Sentence and Commitment Sheet and CRIMS Appearance History show the correct convictions and legal sentences imposed for those counts.

## QUESTION PRESENTED

Whether, where appellant was charged with one
first-degree rape and several lesser sex
crimes, the highly prejudicial admission of
allegations that he had raped the daughter of
his girlfriend, prior to the charged rapes,
"very frequent[ly]" during a period of
possibly more than three years, and also of
sympathy-inducing photographs of the girl at
ages five to seven, many years prior to trial
when the lesser sexual assaults allegedly
began, denied appellant his right to a fair
trial. U.S. Const., Amend. XIV; N.Y. Const.,
Art. I, §6.

## STATEMENT OF FACTS

Introduction

Ashley Martinez, born in 1992, testified at the March 2007

trial that beginning in 1997, appellant, her mother's live-in

boyfriend, who was otherwise a wonderful substitute for the

biological father she never knew, began touching her and making her

touch him sexually when the family lived in Queens County. These

acts were continuing when, in May 2001, the family moved to

Florida.   In November 2004, when appellant was in Queens

temporarily for employment purposes, Ashley came to Queens the day

before he returned to Florida.   She claimed that appellant had

sexual intercourse with her that night.   For his acts, appellant

was charged with, and convicted of, second-degree course of sexual

conduct against a child committed between 1997 and 2000, and with

first-degree rape, endangering the welfare of a child, and second-

degree sexual abuse committed on November 30, 2004.

The prosecution was permitted to present evidence that during most of the years that the family lived in Florida, appellant had sexual intercourse with Ashley on at least a weekly basis. The prosecution was also permitted to place in evidence two photographs of 14-year-old Ashley taken when she was five to seven years old. Defense counsel objected to the admission of all of this evidence.

Molineux Ruling

Consistent with the times periods stated in the indictment, the prosecutor informed the court that the crimes charged in this case allegedly occurred between 1997 and 2000, then were suspended due to the family's move to Florida, only to resume in November 2004, "the last time anything ever happened." The prosecutor asked permission to introduce evidence that appellant raped the complainant in Florida during the intervening years so that the jury would not "be left to speculate," "as background material," and to show the "pattern of escalating sexual conduct." She contended that this information would "explain[] the relationship between [appellant] and the complainant [and] place[] the event . . . in a believable context." She maintained that this evidence was particularly relevant because appellant was likely to make "a major issue of the [complainant's] delay in reporting . . .

4

the criminal conduct."  In support of her position, the prosecutor cited People v. Rosario, 34 A.D.3d 370 (1st Dept. 2006) (7-9, 13).[2]

Defense counsel argued that the proposed evidence was "totally unnecessary" and would "totally prejudice" the jury.  He explained that the prejudice would greatly "outweigh any probative value to the issues" in the case and asserted that "the continuity issue could be satisfied" by evidence that appellant and the complainant continued to live in the same household, without any "allegations of sexual misconduct" (10-11).

The court ruled that the prosecution could present evidence of the Florida rapes, but did not state a specific purpose for permitting the evidence.  The court offered to instruct the jury that appellant was not being charged with those crimes but that the evidence was being "offered for a limited purpose of showing a pattern that would explain the gap in time between the year 2000 . . . in New York and the new complaint in New York [in] November of 2004" (13-14).

Prosecutor's Opening Statement

In her opening, the prosecutor argued that after the family moved to Florida, appellant's acts

> escalated.  And he started having sex with her.  He put his penis into her vagina.  Going late at night into her room.  When everybody else was asleep in the house.  Touching her

---

[2]Numbers in parentheses refer to pages of the trial minutes.

where she shouldn't have been touched. Doing
what he wanted to do for his own sexual
gratification. Putting his penis into her
vagina over and over and over again (336-337).

## Photographs of the Complainant as a Young Girl

Prior to the complainant's testimony, the prosecutor requested permission to introduce two photographs of her between the ages of five and seven to show that she was under age 11 and what "she looked like at the time that the crime started." Defense counsel objected and offered to stipulate to the complainant's age, which was not in dispute. He stated that admission of the photographs was an attempt to elicit sympathy and that they were "not relevant to any material issue" (421-423). The court agreed to admit the photos "as probative of what the victim looked like at the age that she is alleged to have been a victim" (424).

## Testimony of the Complainant and Her Family

Leslie Martinez's oldest child, Ashley Martinez, born in April 1992, and 14 years old when she testified, did not know her biological father (Leslie: 355, 388-389, 409-410; Ashley: 460, 463). Ashley identified two photographs of herself when she was about six and seven years old, and they were received in evidence and were published to the jury (492-495).[3]

---

[3]Appellant counsel will provide copies of the photographs to the Court as exhibits in this appeal.

Leslie subsequently married Michael Benn and had a child named Jaeshawn Benn, who was born about two years after Ashley (355, 388). Leslie and Benn never divorced (389, 393).

In 1996, when she was about 21 years old, Leslie and appellant, Abu Khan, whose families had known each other in Trinidad, began flirting at parties (357). She was no longer in love with Benn and felt she had "nothing in common with" him. She and appellant, eight or nine years her senior, "started seeing each other." They soon moved in with Leslie's mother, Ann Martinez, in Queens, and in 1999 moved into their own Queens residence (Leslie: 357-359, 389; Ann: 428, 431-433). Appellant was "very family oriented" and they "did everything together." He was "very kind and sweet," he "took care of" Leslie and her kids, and he was "a good provider" (360). Ashley and Jaeshawn called him "Daddy," he was their father, and Leslie loved him for most of the eight years they were together (Leslie: 374, 409; Ashley: 461).

She claimed that one night in 1997, a couple of months after appellant moved in with them, she had trouble sleeping and asked her mother and appellant for help. Appellant came to her bedroom, and as he was telling her a story, he put her hand on the outside of his boxers and made her rub his penis (464-468, 496). From that incident until to 2000, appellant either made her touch his penis or touched her "breasts and around [her] body," where "nobody should touch" her, between five and 10 times (468-469).

7

Leslie and appellant had two children together, in December 1998 and June 2000 (Leslie: 360-361; Ann: 433).  Leslie said that her relationship with appellant changed for the worse when their first child was born, and worsened further after the birth of their second child (360-363).  In 1999 and 2000, Ashley became careless with her personal hygiene and argumentative (Leslie: 363-364).

In May 2001, the family moved to Florida because Leslie believed the weather was "perfect" there, and she "just wanted to get away from New York" (Leslie: 364-365, 389-390; Ann: 433-434; Ashley: 461).  Ashley maintained that when she was nine or 10 years old, in Florida, appellant began "having sex" with her, putting his penis inside her vagina, "very frequent[ly]" (469-471).[4]  She tried to "blank out everything" and imagine she was at her grandmother's, but she still felt "nasty and degraded."  She did not tell anyone about it because she doubted her mother would believe her, did not know what to think, and was scared, having seen appellant push Leslie, argue with her, and call Leslie and herself "fat" and Jaeshawn "a little faggot."  Ashley was afraid of the fight that would ensue if she accused appellant; she had seen him cut his head and chest with a bottle and believed that he might attack someone else (470-473).

---

[4]On cross-examination, Ashley said this happened "every week" (498-499).

8

During this period, Ashley and her mother used to argue frequently. Ashley gained weight, had low self-esteem, felt "nasty," and received failing grades in school (Leslie: 365-367; Ashley: 472, 512).

Appellant was unable to find a permanent job in Florida, so he went to New York about three times for two to four months to work for the company that had previously employed him, staying with Leslie's mother when he did so (Leslie: 367-370; Ann: 434-435). Leslie was unhappy about having to take care of the children by herself and "wanted to move on" from her relationship with appellant since she was "doing it by [her]self anyway" (368-369). In August 2004, she told appellant that if he went to New York again she would leave him, although she recognized that his going was "not a bad thing" because he was "taking care of his family." He returned to New York regardless, and she believed he did not take what she said "seriously" (369-370).

That November, 12-year-old Ashley was suspended from school after getting failing grades and cursing at a teacher. She had no friends, was often by herself, "devoured" her food, and argued frequently with her mother (Leslie: 371-373; Ashley: 472-473, 500). Ashley said she wanted to live with Leslie's mother for a few years, and Leslie and Ann agreed after Leslie spoke to appellant. Ashley flew to New York on November 30, aware that appellant was staying with Ann at the time. Only when she arrived did she find

out that he was leaving the next day to return to Florida (Leslie: 373-376, 407-408; Ann 435; Ashley: 474, 505-507).

At about 11:00 p.m. that night, appellant entered her bedroom and began touching her arm and breasts.  She asked him to leave her alone and went to the living room, but he followed and touched her again (476-478).  She was scared and tried to "tune him out" as if "nothing was happening," but hoped Ann or her husband would come and save her.  Appellant took off her clothes, put his penis inside her, moved back and forth, and ejaculated onto a napkin (478-482). That was the last time he touched her inappropriately (483).

The next day, appellant drove back to Florida (Leslie: 394; Ann: 440).  Leslie told him he had to move out of the household, and he did so after a couple of days (Leslie: 394-395).

Leslie's new boyfriend, Nigel, with whom she was still involved at the time of the trial, did not move in with her for a few months after appellant left, but they saw each other often before living together (406, 409).  After Christmas 2004, appellant came to the house at 5:00 a.m. and found the two in bed.  Leslie claimed that appellant knocked her down and put a gun, that she had seen him with on other occasions, to Nigel's face.  But she admitted that although appellant remained there until the police, whom she called, arrived, the police made no arrests after searching unsuccessfully for a gun (395-397, 400, 413-416).

After that, Leslie and appellant were "no longer talking," but when they spoke, she asked for child support, which, she claimed, he failed to send. She denied receiving money from him and would have sued him had she known where to serve papers (377-378, 401-402). She considered it "an insult" to her that he did not see the kids more and asserted that when "the relationship did not go the way [appellant] wanted it to go [he] just up and left" (411-412, 415).

Ashley did not tell anyone what appellant had done while she stayed in Queens or after she rejoined the family in Florida in August 2005. Ashley maintained that appellant got angry at her when she told him that what they were doing was wrong but did not threaten her. He told her that Leslie would not believe her, and Ashley accepted that and said she "just didn't know how to approach people" and was waiting for the right time to disclose what appellant had done (Leslie: 397; Ann: 440-441; Ashley: 485-486, 497, 500, 512). Leslie said that her daughter's behavior was "better" after she returned from Florida (376).

On March 19, 2006, Leslie encountered appellant at a fair. As soon as she saw him, at a distance, she took the children and went home because he was not supporting or visiting the children (Leslie: 402-405; Ashley: 519-520).

Just under a month later, on Easter 2006, Ashley and Leslie argued, and when Leslie asked why Ashley hated the family, fought

11

constantly, and did badly in school, and whether she had ever been mistreated, Ashley said she had and told her mother about appellant's alleged actions.  Her mother took her to the police (Leslie: 378-386; Ashley: 483-484).

Ashley denied ever having a boyfriend.  However, she admitted telling a doctor who examined her that she had had one (497-498, 510-511).

Investigation and Expert Witnesses

In July 2006, Dr. Jamie Hoffman-Rosenfeld, an expert in pediatric medicine and child sexual abuse, performed a detailed examination of Ashley's genitalia using an instrument with magnification and bright lights (521-531, 557-559).  She found no signs of injury or trauma, but said that that was consistent with a history of sexual assaults like that to which Ashley had testified because the tissues are elastic and may not suffer injury and, if they do, they can heal over time.  She cited a study in which a majority of pregnant teens had no visible genital injury (562-569, 572-585).  Ashley admitted to Hoffman-Rosenfeld that she had had a boyfriend (572).

Don Lewittes, a clinical psychologist and expert in child sexual abuse, had not met Ashley and did not provide a clinical diagnosis (590-595, 623).  He discussed child sexual abuse syndrome, a pattern of behavior that results from the sexual abuse of a child, in the abstract.  He opined that delayed disclosure of

12

such abuse was common due, <u>inter</u> <u>alia</u>, to shame, fear, and, where the abuse is by a stepfather, to a concern about whether the mother will believe the child (595-596, 601-602).  Delay is more likely when the stepfather has good qualities and when the child has seen his anger against others or even himself (603-607, 611-612).  The delayed disclosure may continue even when the child is separated from the abuser (607-608, 610-611).  In addition, instead of talking about her anger, a child may behave in an angry manner towards adults (609-610).

Lewittes admitted that accusations of child sexual abuse are sometimes false.  Reasons for false accusations include suggestibility, revenge, and the influence of child custody battles, although he claimed that these reasons applied only to children below the age of seven (624-625).

Detective <u>Luz Figueroa</u> testified that appellant was born in 1966.  He was 5' 11" tall (456-457).

Appellant's Testimony

Forty-year-old appellant <u>Abu Khan</u> moved to the United States from Trinidad and Tobago in 1986.  He served four years in the Marines, was honorably discharged, and went to college for two years.  His only arrest resulted in his release the same day (630-629, 651).

Appellant had known Leslie since she was 14 years old due to the relationship between their families.  Their sexual relationship

13

began in October 1997 when she was married to, and living with, Michael Benn. Within a couple of weeks, appellant and Leslie were living together in Leslie's mother's house (630-632). He loved her and accepted her children, Ashley and Jaeshawn, as his own, and then they had two children together (652). Ashley loved him, looked up to him, and regarded him as her father, and he loved her as well (667). In 1999, the family moved into their own residence in Queens, and in May 2001 they moved to Florida (632-633). Appellant denied ever having sexual contact with Ashley (647-648, 684).

Appellant had several jobs in Florida, and at one point worked in Tennessee because the money was "good." In September 2004, his previous employer in New York contacted him and offered work for a few months at a "good salary." He discussed the offer with Leslie and the children, and they all decided he should go because it was temporary. Appellant denied that Leslie told him their relationship would end if he went to New York. He stayed with Ann Martinez while in New York (634-635, 679-680).

On November 30, he picked Ashley up at the airport, having just heard that she was coming to live with Ann. The next day, he registered her for school and began his drive to Florida. He did not have sex with Ashley (635-642, 670-671). When he arrived at the Florida house where the family lived, he found it had been

14

"pretty much trashed," with nobody home and the doors wide open (642-643).

On December 10, 2004, at 5:00 a.m., he went to the house where Leslie was living, without advance notice, in hopes of rekindling their relationship.  But he found Leslie in bed with Nigel and lost his desire to continue the relationship.  Appellant denied having a gun or ever owning one.  Appellant and Leslie both called the police, and appellant waited for them to arrive.  They searched everywhere for a gun but there was none (644-645, 649-650, 676-682).

In March 2006, appellant heard that Leslie and the children were at a fair and went there.  But when she saw him, she "snatched" the children from other family members, "made a smart comment," and left (646-647).

Appellant sent Leslie checks for $175 each week to care for his two children.  Although she wanted more, she never went to court.  When the checks began coming back in the mail and he lost contact with her, he stopped sending them (647, 671-676).

Prosecutor's Summation

The prosecutor told the jury that appellant "started raping Ashley" when she was eight or nine years old and the family was living in Florida.  She argued that the problems Ashley had at school, at home, socially, and with her weight while the family lived in Florida were the result of appellant's raping her.  The

15

prosecutor added that in November 2004, Ashley wanted to move away from her family to avoid contact with appellant, but at her age she lacked the resources to delay her departure until after appellant left New York, figuring that it was worth seeing him one last time to be rid of him (721-723).

The prosecutor maintained that Ashley's delay in accusing appellant of the crimes did not undermine her credibility because she as she had seen appellant's anger and was scared, she did not want to break up the family, and she did not think Leslie would believe her. The prosecutor also referred to Lewittes's testimony that child sex abuse victims sometimes do not make prompt disclosure (726-728). But she did not assert that the rapes in Florida explained the delayed accusation.

Charge and Verdict

The court told the jury that appellant was not "being charged in this trial" with the "alleged sexual contact" that occurred in Florida between 2001 and 2004. The court explained that the

> reference in this trial to those alleged incidents was permitted solely to aid you in evaluating the reasons surrounding Ashley Martinez's delayed reporting [of] the crimes charged in this indictment (747).

The court submitted to the jury the crimes charged in the indictment: first-degree rape, endangering the welfare of a child, and second-degree sexual abuse, all based on the alleged events of

16

November 30, 2004, and second-degree course of sexual conduct against a child committed between 1997 and 2000 (750-758).

The jury convicted appellant of these crimes (783-786).

### ARGUMENT

> WHERE APPELLANT WAS CHARGED WITH ONE FIRST-DEGREE RAPE AND SEVERAL LESSER SEX CRIMES, THE HIGHLY PREJUDICIAL ADMISSION OF ALLEGATIONS THAT HE HAD RAPED THE DAUGHTER OF HIS GIRLFRIEND, PRIOR TO THE CHARGED RAPES, "VERY FREQUENT[LY]" DURING A PERIOD OF POSSIBLY MORE THAN THREE YEARS, AND ALSO OF SYMPATHY-INDUCING PHOTOGRAPHS OF THE GIRL AT AGES FIVE TO SEVEN, MANY YEARS PRIOR TO TRIAL WHEN THE LESSER SEXUAL ASSAULTS ALLEGEDLY BEGAN, DENIED APPELLANT HIS RIGHT TO A FAIR TRIAL.   U.S. CONST., AMEND. XIV; N.Y. CONST., ART. I, §6.

Appellant was denied a fair trial by the improper admission, over objection, of highly prejudicial evidence that vilified him and elicited sympathy for the complainant.  While the charges against appellant included one instance of first-degree rape and lesser sexual crimes relating to a particular date and to a period several years earlier, the court permitted the prosecution to elicit allegations that appellant had repeatedly raped the complainant during those intervening years while the family lived in Florida. Any limited legitimate probative value this evidence might have had was overwhelmed by the prejudice inherent in such testimony.  In addition, the admission of two sympathy-inducing photographs of the complainant when she was five to seven years old, much younger than when she testified at trial, served no legitimate purpose.  The

17

effects of these two rulings deprived appellant his right to a fair trial.

## Uncharged Crimes

Evidence of prior bad acts is inadmissible if offered solely to show a defendant's criminal propensity. People v. Arafet, 13 N.Y.3d 460, 464-465 (2009); People v. Alvino, 71 N.Y.2d 233, 241 (1987); People v. Molineux, 168 N.Y. 264, 291-94 (1901). The rule was fashioned to counteract the common tendency to believe that one "who has committed, or is suspected of committing one offense is likely to commit another, and, therefore, be guilty of the one charged." People v. Fitzgerald, 156 N.Y. 253 (1898); see also People v. Vargas, 88 N.Y.2d 856, 858 (1996). It also seeks to "eliminate the risk that the jury, not fully convinced of the defendant's guilt of the crime charged, may, nevertheless, find against him because his conduct generally merits punishment." People v. Allweiss, 48 N.Y.2d 40, 46 (1979). See People v. Arafet, 13 N.Y.3d at 465; People v. Rojas, 97 N.Y.2d 32, 36-37 (2001)("It is axiomatic that propensity evidence invites a jury to misfocus, if not base its verdict, on a defendant's prior crimes rather than on the evidence . . . relating to the case before it").

The starting point for analysis is the "premise that uncharged crimes are inadmissible." People v. Resek, 3 N.Y.3d 385, 389-90 (2004). Evidence of prior bad acts is admissible only when "probative of a defendant's guilt." People v. Rojas, 97 N.Y.2d at

18

37.   But even when relevance to a material issue has been shown, "the decision whether to admit evidence of a defendant's prior bad acts rests upon the trial court's discretionary balancing of probative value and unfair prejudice." People v. Dorm, 12 N.Y.3d 16, 19 (2009).   Accord, People v. Hudy, 73 N.Y.2d 40, 55 (1988); People v. Wilkinson, 71 A.D.3d 249, 254 (2d Dept. 2010).   Thus, even if probative of a material issue, prior bad act evidence should be excluded when it is possible the jury may use it to "draw the impermissible inference" of propensity to commit the crimes charged or to "resolve any doubts it might otherwise have" about the credibility of a complaining witness.   People v. Hudy, 73 N.Y.2d at 56.   See People v. Kise, 273 A.D.2d 849 (4th Dept. 2000)(improper to admit evidence that the defendant had "an ongoing sexual relationship with the 11-year-old complainant" in order "to enhance the credibility of the complainant").

It is improper to admit Molineux evidence without a "proper balancing of their probity versus their prejudice," People v. Westerling, 48 A.D.3d 965, 968 (3d Dept. 2008), so that "admissibility . . . must be adjudged on a case-specific basis." People v. Wlasiuk, 32 A.D.3d 674, 677 (3d Dept. 2006).   Trial courts have been cautioned to "parse the testimony . . . relating to evidence of uncharged crimes." People v. Sayers, 64 A.D.3d 728, 732 (2d Dept. 2009).   See People v. Ventimiglia, 52 N.Y.2d 350, 381 (1981); People v. Wlasiuk, 32 A.D.3d at 678.   Thus, in People v.

19

Resek, 3 N.Y.3d at 390, a drug possession case in which the prosecution presented evidence that a car the defendant was driving was stolen, the Court of Appeals reversed because an instruction that the stop was lawful would have "sufficed" in place of the prejudicial evidence.   Similarly, in People v. Stanard, 32 N.Y.2d 143, 146 (1973), that court explained that the introduction of "background testimony" "must be carefully monitored."

Under limited circumstances, some bad act evidence may be admitted when "inextricably intertwined" with the facts of the charged crime, People v. Vails, 43 N.Y.2d 364 (1977), or to "complete the narrative" or provide "background material," which are essentially the same thing.   People v. Resek, 3 N.Y.3d at 389-390 & fn. 2.   In "appropriate instances," such evidence is admissible so that the jury will not "'wander helpless' trying to sort out ambiguous but material facts."   Id. at 390.

But this basis for admissibility "should not be interpreted as automatically allowing the prosecution to introduce evidence of uncharged crimes merely because the evidence is said to complete the narrative or furnish background information."   Id.   See People v. Wilkinson, 71 A.D.3d at 255.   Evidence of the relationship between the defendant and the victim, a form of background evidence, is inadmissible unless it is material and more probative than prejudicial.   People v. Wlasiuk, 32 A.D.3d at 677-678.   Cf. People v. Cook, 93 N.Y.2d 840, 841 (1999)(prior violent acts towards victim

admissible because relevant to forcible compulsion); <u>People</u> v. <u>Workman</u>, 56 A.D.3d 1155, 1156-1157 (4th Dept. 2008)(admissible as to delayed outcry and an escalating pattern of sexual abuse); <u>People</u> v. <u>Archbold</u>, 40 A.D.3d 403, 404 (1st Dept. 2007)(relevant to forcible compulsion, delayed outcry, and the context of the relationship); <u>People</u> v. <u>Negrette</u>, 218 A.D.2d 751, 752 (2d Dept. 1995)(probative of complainant's state of mind and lack of consent).

In <u>People</u> v. <u>Lewis</u>, 69 N.Y.2d 321, 327-328 (1987), the Court of Appeals held that evidence of prior sexual intercourse in a father-daughter incest case "carried no probative weight" because the "amorous design" theory was inapplicable, no specific intent had to be proved for an incest conviction, and "a witness cannot buttress her own testimony by making further unsubstantiated accusations." Similarly, in <u>People</u> v. <u>Vargas</u>, 88 N.Y.2d 856, 858 (1996), involving the admission of prior sexual assaults against other victims, the court deemed the evidence "unnecessary" to prove intent, since that element could "be easily inferred from the commission of the act itself." <u>Compare</u> <u>People</u> v. <u>Dorm</u>, 12 N.Y.3d at 19 (uncharged assaults on same victim admissible to show, <u>inter alia</u>, motive and intent). Citing <u>Lewis</u>, the First Department reversed due to the testimony of a statutory rape victim that the defendant had raped her on a previous occasion because the evidence was "superfluous" insofar as it was admitted to explain her "failure to make an immediate outcry" and could not be used to buttress the

21

complainant's credibility.  People v. Sosa, 145 A.D.2d 306, 306-307 (1st Dept. 1988).

In People v. Leeson, 12 N.Y.3d 823, 826-827 (2009), the court affirmed despite the admission of uncharged sexual assaults against same victim and during same period, describing them as "background information on the nature of the relationship."  This variation in outcomes reflects not only the fact-based nature of these determinations, but that the Leeson court's review of the balancing of prejudice against probative value was limited to determining that there was no "abuse of discretion."  Id. at 827.  In contrast, this Court has factual and interest of justice review powers.  See C.P.L. §§470.15(3), 470.35(2).

The factual diversity of cases has been reflected in Appellate Division decisions as well.  This Court has reversed because the complainant was permitted to testify that her father sexually assaulted her many times in the years prior to the period covered by the indictment, People v. Singh, 186 A.D.2d 285, 287-288 (2d Dept. 1992), and where the prejudice from admitting uncharged sexual assaults on another girl outweighed the probative value, which was minimal since "intent is easily inferrable" in sexual assaults. People v. McDonald, 150 A.D.2d 805, 806-708 (2d Dept. 1989).  See People v. Bruce A., 141 A.D.2d 736, 738 (2d Dept. 1988).  See also People v. De Vito, 21 A.D.3d 696, 697-699 (3d Dept. 2005)(defendant's admission to other sexual acts with victims

22

inadmissible on People's direct case, but possibly admissible on rebuttal); People v. Kise, 273 A.D.2d 849 (reversal due to evidence of "ongoing sexual relationship with the 11-year-old complainant"). But in People v. Rosario, 34 A.D.3d 370 (1st Dept. 2006), cited by the prosecutor in the Molineux colloquy, the First Department held that the admission of a "pattern of escalating sexual conduct toward the child victim" was an appropriate exercise of discretion because it "had little prejudicial effect" and was probative of the context of the events and delayed outcry. See also People v. Cardona, 60 A.D.3d 493 (1st Dept. 2009) (proper to admit evidence that defendant showed complainant pornographic pictures as evidence of "increasingly serious sexual conduct" and to explain their relationship).

In this case, the court failed to engage, on the record, in any balancing of the probative value and prejudice from admission of uncharged crime evidence, and the conviction should be reversed for that reason alone. See People v. Westerling, 48 A.D.3d at 968. In any event, even if the court did engage in balancing, the evidence it permitted, that appellant repeatedly raped the complainant over a period of several years, overwhelmed its limited probative value.

The complainant, born in April 1992, maintained that appellant began raping her when she was nine or 10 years old, which would have been shortly after the family moved to Florida in May 2001. She claimed that appellant raped her frequently, at least weekly, until

23

November 2004, when she moved to Queens to live with her grandmother. Thus, according to the complainant, the rapes occurred innumerable times over what could have been three and one-half years. In contrast, the indictment here charged one first-degree rape, one D felony, and two misdemeanors. Thus, the evidence of uncharged crimes was astronomically greater than the actual charges against appellant, and the prejudice from this testimony must have distorted the jury's consideration of the counts submitted to it by leading it to conclude that appellant was generally deserving of punishment due to his criminal propensity. See People v. Singh, 186 A.D.2d at 287-288 (error to admit evidence that defendant sexually abused his daughter many times prior to the commission of the charged crimes); People v. Sosa, 145 A.D.2d at 307 (allegation of one prior rape of same child victim resulted in prejudice "so substantial as to overcome any probative value").

While the court instructed the jury that this highly prejudicial evidence was to be used only as relevant to the complainant's reasons for her "delayed reporting [of] the crimes," instructions to ignore the prejudicial uses to which bad acts evidence might be put are often ineffective "in view of the questionable effectiveness of cautionary instructions in removing prior crime evidence from consideration by the jurors." People v. Ventimiglia, 52 N.Y.2d at 361-362. Accord, People v. Matthews, 68 N.Y.2d 118, 122 (1986); People v. Sandoval, 34 N.Y.2d 371, 377

24

(1974) (recognizing danger that jury will consider evidence of prior similar conduct as proof of commission of charged crime "despite the most clear and forceful limiting instructions to the contrary"); People v. Stanard, 32 N.Y.2d at 148 ("Truly prejudicial evidence cannot be erased from a juror's mind by the court's instructions").

Moreover, the court's limiting instruction highlights just how limited the probative value of this evidence was in comparison to its immense prejudicial impact. Under the instruction, the only use to which the bad acts evidence could have been put, and the only probative value it could have had, was to clarify the reasons for the complainant's delayed reporting of the crimes. But in this case, the probative value of these rapes in explaining the delayed outcry was minimal, since this evidence was entirely "unnecessary" to explain the outcry. People v. Vargas, 88 N.Y.2d at 858; see People v. Resek, 3 N.Y.3d at 390. Lewittes, a psychologist and expert in child sexual abuse, was called for the specific purpose of explaining why delayed reporting of child sex abuse is common, and he provided numerous reasons for such delay. Indeed, in summation, the prosecutor relied on Lewittes's testimony, but not the Florida rapes, to explain Ashley's delayed outcry. Thus, there was no need for the objected-to, highly prejudicial evidence of the multitudinous uncharged rapes.

The portion of the delayed outcry most in need of explanation was that following the final alleged act, the rape in Queens,

because after that, the complainant no longer lived with, or ever saw or had contact with, appellant.  First, she lived in Queens with her grandmother while appellant was in Florida but was permanently barred form the complainant's mother's household.  Then the complainant rejoined her mother in Florida, but still had no contact with appellant.  The earlier, uncharged, rapes would have had little, if any, probative value in explaining this delay, since appellant was no longer part of the complainant's life.

Further, as defense counsel suggested, the court could have required that the testimony be "parse[d]," see People v. Resek, 3 N.Y.3d at 390; People v. Sayers, 64 A.D.3d at 732, by permitting only testimony that the complainant lived in the same household as appellant, without mention of any sexual abuse.  That would have sufficed to make clear his potential continuing influence over her and the difficulties in accusing someone in the position of a stepfather.  The gain in probative value from admitting the alleged rapes as compared to parsing the testimony as suggested by defense counsel did not outweigh the prejudice.

In addition, the key issue in this trial was one of credibility:  whether the jury believed that the complainant's testimony, although directly contradicted by that of appellant, constituted proof beyond a reasonable doubt of the charged crimes. But the uncharged crimes evidence, about which only the complainant testified, could have probative value only if the jury concluded

26

that the complainant's credibility met this standard of proof. Thus, the complainant's allegations concerning uncharged crimes could not make her testimony "more credible because a witness cannot buttress her own testimony by making further unsubstantiated accusations." People v. Lewis, 69 N.Y.2d at 328. See People v. Vargas, 88 N.Y.2d at 858 ("prior misconduct evidence was relevant only to  . . . credibility" and "therefore was improperly ruled admissible"); People v. Hudy, 73 N.Y.2d at 56; People v. Kise, 273 A.D.2d 849. Thus, the real impact of this evidence was to bring the multitudinous rapes before the jury so that it would think twice, or many times, about acquitting appellant, not to provide probative, non-propensity evidence of guilt.

Also, the uncharged crimes evidence was not material or probative to explain the allegedly escalating sexual conduct, as it was in People v. Rosario, 34 A.D.3d 370, cited by the prosecutor below, or in People v. Cardona, 60 A.D.3d 493, since the pattern of escalation was not an issue here. According to the complainant's testimony, at some point, appellant's conduct changed from sexual touching to intercourse. She did not assert any gradual form of escalation that needed explanation. It was of no probative value to prove that that the change in the seriousness of the sexual assaults occurred years earlier, rather than at the time of the charged rape itself.

Nor was the evidence admissible for the other reasons specified by the prosecutor, namely as background, to show the relationship between the complainant and appellant, or to create a context. Ample evidence of the family relationships was presented to provide context or background for the crimes, and any clarification provided by the admission of the immensely prejudicial evidence would have been minimal. This was clearly not a case where the jury was going to "'wander helpless' trying to sort out ambiguous but material facts" without the <u>Molineux</u> evidence. <u>People</u> v. <u>Resek</u>, 3 N.Y.3d at 390.

Furthermore, background evidence is not an element of the crime and is not "automatically" admissible. <u>Id.</u> Rather, its admissibility is dependent upon its probative value as to elements the prosecution was required to prove. Yet, during the <u>Molineux</u> colloquy, the prosecutor failed to explain what specific probative value the background/relationship/context evidence could have. Any such probative value, as compared to the non-prejudicial evidence that they lived together as family members in Florida, would have been minimal and could not outweigh the immense prejudice that would inevitably result from the admission of this evidence. Thus, it was not admissible for mere purposes of background or context.

Photos of Ashley as a Young Child

Photographs of a homicide victim taken before the crime are inadmissible. People v. Stevens, 76 N.Y.2d 833, 835 (1990). Photos of a child sex crime victim taken years prior to trial, when the first alleged crimes occurred, should be treated similarly. Indeed, as a general rule, photos of a young child are even more likely to induce inappropriate sympathy than those of a homicide victim, and, therefore, are all the more inadmissible. In both situations, the appearance of the victims is immaterial and does not justify admission of photographs likely to elicit sympathy.

In People v. Stevens, 76 N.Y.2d at 836, the Court of Appeals declared that photographs of a homicide victim taken while he or she was alive may "arouse the jury's emotions . . . and thus should not be admitted unless relevant to a material fact to be proved at trial." In particular, the Stevens court found that admission of the photo because it was a "fair and accurate representation of what the victim looked like . . . before the murder" was "clearly erroneous" because "the victim's appearance prior to the assault was not relevant to any issue at trial." Id. Since Stevens, numerous Appellate Division cases have held improper the admission of a photograph of a homicide victim taken while he or she was alive. See People v. Wilson, 71 A.D.3d 799, 800 (2d Dept. 2010); People v. Thompson, 34 A.D.3d 852 (2d Dept. 2006); People v. Feuer, 11 A.D.3d 633, 635 (2d Dept. 2004); People v. Rodriguez, 1 A.D.3d 386 (2d

Dept. 2003); People v. Timmons, 245 A.D.2d 123 (1st Dept. 1997); People v. Kershaw, 238 A.D.2d 523 (2d Dept. 1997); People v. Dove, 233 A.D.2d 751 (3rd Dept. 1996); People v. Stuart, 216 A.D.2d 682 (3rd Dept. 1995); People v. Daughtry, 202 A.D.2d 686 (2d Dept. 1994). In People v. Donohue, 229 A.D.2d 396, 397-398 (2d Dept. 1996), this Court reversed because the trial court admitted into evidence a wedding photograph of the victim that was "clearly irrelevant" and could only have "inflame[d] the jury's emotions."

In this case, the prosecutor offered two photos of Ashley, taken when she was between the ages of five and seven, purportedly to show her age. While her age was an element of the crimes, it was not disputed by the defense and was more accurately established by her and her mother's testimony about her date of birth and when the events described occurred. Indeed, defense counsel offered to stipulate to her age. The prosecutor's claim that the photos were also admissible to show what the complainant "looked like at the time that the crime started," for which purpose the court admitted them, shows how directly the court's ruling contravened the Stevens rule that admission of a photograph as "fair and accurate representation of what the victim looked like" was improper. The prosecution's motive was clearly to inflame the jurors by presenting a victim who was much younger than the nearly 15-year-old girl who testified at trial. In addition, the prosecutor gave no justification for showing the jury two photos, rather than just one.

30

&ast;     &ast;     &ast;

These errors cannot be considered harmless, as they injected both a large dose of extremely prejudicial propensity evidence about appellant and sympathy for the complainant into a close case that was completely dependent on the latter's uncorroborated credibility compared to that of appellant, an honorably-discharged ex-Marine who gave plausible testimony.  Notably, an extremely detailed medical examination failed to provide any corroboration of the sexual assaults the complainant described.  Her credibility was also undermined by her delayed outcry, which came nearly a year and a half after the last incident, and after she stopped living, or having anything to do, with appellant.  Lewittes's opinion that delayed outcry is not unusual, may have minimized, but could not eliminate, the damage to her credibility. Further, the complainant's problems with her mother, friends, school and hygiene are not that unusual among children entering adolescence and certainly do not constitute specific support for her allegations.  Her credibility was also undermined by the lie she told on the stand about never having a boyfriend, although she had previously told Dr. Hoffman-Rosenfeld about him.

Any support Leslie, the complainant's mother, tried to lend to the prosecution's case was undermined by her negative feelings about appellant, which could have affected her own testimony and led her to influence her daughter.  Leslie was no longer talking to

31

appellant, she fled with the children when she saw him at a fair, and she accused him of failing to comply with her requests for money.  She even considered it an "insult" to herself that appellant did not see the children more.  In addition, she myopically blamed him for going to New York to make more money to support the family and claimed he "just up and left" the relationship, although she admitted barring appellant from the house when he returned from New York, and she apparently began seeing Nigel while appellant was away.   Further, Leslie's own dishonesty was evident, as she apparently twice began a new relationship with a man without telling the one she was living with at the time.

Thus, this case was a close one that could easily have been decided by the prejudice from the voluminous uncharged crimes evidence and the sympathy elicited for the complainant.   The prosecutor referred to the evidence of the Florida rapes in both her opening and in summation, asserting that appellant had intercourse with the complainant "over and over again" (337), thereby greatly exacerbating the prejudice.  Tellingly, the prosecutor did not argue that the rapes explained the delayed outcry, although that was the only purpose for which the court told the jury they could be used.

These errors were preserved for review by defense counsel's specific objections to admission of the Florida rape evidence as unnecessary and more prejudicial than probative, including his contention that the prosecution's concerns could be met by evidence

32

of appellant's continued residence in the household in Florida (10-11), and by his objection to the photos as an attempt to elicit sympathy and as irrelevant since the complainant's age was undisputed (422-424).

For all these reasons, admission of the Florida rape evidence and inflammatory photos was improper and prejudicial.  As a result, appellant's conviction should be reversed and a new trial ordered.

<div align="center">CONCLUSION</div>

FOR THE REASONS STATED ABOVE, APPELLANT'S CONVICTIONS SHOULD BE REVERSED AND A NEW TRIAL ORDERED.

Respectfully submitted,

LYNN W. L. FAHEY
Attorney for Defendant-Appellant

JONATHAN M KRATTER
    Of Counsel
March, 2011

CERTIFICATE OF COMPLIANCE
PURSUANT TO 22 NYCRR §670.10(f)


The foregoing brief was prepared on a computer.  A monospaced
typeface was used, as follows:

        Name of typeface: Courier
        Point Size: 12
        Line spacing: Double

The total number of words in the brief, inclusive of point
headings and footnotes and exclusive of pages containing the
table of contents, table of citations, proof of service,
certificate of compliance, or any authorized addendum containing
statutes, rules, regulations, etc. is 7377.


                                       Jonathan M. Kratter

Courtesy Copy

NOT FOR PUBLIC
INSPECTION
CIVIL RIGHTS LAW §50-b

Original Filed in ECF
docket number 14-CV-5456

*To be argued by*
JILL GROSS-MARKS
TIME REQUESTED: 10 MINUTES

# New York Supreme Court

## Appellate Division--Second Department

---

### AD No. 07-7185

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*against*

ABU KHAN,

*Defendant-Appellant.*

---

## BRIEF FOR RESPONDENT

---

RICHARD A. BROWN
District Attorney
Queens County
*Attorney for Respondent*
125-01 Queens Boulevard
Kew Gardens, New York  11415
(718) 286-5882

GARY FIDEL
JILL GROSS-MARKS
   Assistant District Attorneys
      *Of Counsel*

MAY 23, 2011

---

Queens County
Indictment Number 2147/06

# TABLE OF CONTENTS

**Page No.**

PRELIMINARY STATEMENT ..................................................... 1

INTRODUCTION ...................................................................... 2

      The *Ventimiglia* Hearing ...................................................... 3
      School Photographs of the Victim ...................................... 6

THE TRIAL ........................................................................... 6

      The People's Evidence ....................................................... 6
      Defendant's Evidence ...................................................... 36
      The Jury Instructions ...................................................... 45

ARGUMENT

      EVIDENCE OF DEFENDANT'S UNCHARGED CRIMES
      AGAINST THE CHILD-VICTIM AND PHOTOGRAPHS
      SHOWING HER AGE WHEN THE SEXUAL ABUSE
      BEGAN WERE PROPERLY ADMITTED ...................................... 46

      A.    The Court Properly Permitted the Prosecutor to
             Elicit The Victim's Testimony That Defendant
             Started Raping Her in Florida ................................. 49

      B.    The Court Properly Admitted Black and White
             Copies of Photographs Depicting the Child's
             Appearance ........................................................... 59

CONCLUSION ...................................................................... 64

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,   :

                              Respondent,   :

                -against-   :

ABU KHAN,   :

                  Defendant-Appellant.   :

-------------------------------------------------------------------X

## BRIEF FOR RESPONDENT

## PRELIMINARY STATEMENT

Defendant Abu Khan appeals from a July 24, 2007 judgment of the Supreme Court, Queens County (Hollie, J.). By that judgment, defendant was convicted after a jury trial of Rape in the First Degree (Penal Law § 130.35[4]), Course of Sexual Conduct Against a Child in the Second Degree (Penal Law § 130.80), Endangering the Welfare of a Child (Penal Law § 260.10[1]), and Sexual Abuse in the Second Degree (Penal Law 130.60[2]). He was sentenced to concurrent determinate prison terms of fourteen years for rape, ten years for sexual conduct, five years for endangering and one year for sexual abuse, plus post-release supervision. Defendant is currently incarcerated pursuant to this judgment.

## INTRODUCTION

On numerous occasions in 1997 to 2000, defendant had sexual contact with his five to eight year old daughter AM at their home in Queens County. Defendant's sexual contact with AM escalated to rape on numerous occasions between 2001 and 2004 when the family was living in Florida. On November 30, 2004, defendant raped twelve-year old AM at her grandmother's home in Queens County. The next day, defendant went to Florida, but was estranged from AM's mother; AM stayed with her grandmother for the school year, returning home to Florida in August 2005. The following Easter, AM disclosed the rape to her mother.

For these crimes, defendant was charged with Rape in the First Degree (Penal Law § 130.35[4]),  Course of Sexual Conduct Against a Child in the Second Degree (Penal Law §130.80), Endangering the Welfare of a Child (Penal Law § 260.10[1]), and Sexual Abuse in the Second Degree (Penal Law § 130.60[2])(Queens County Indictment Number 2147/06).

Prior to trial, the court granted the People's *Ventimiglia* application to present evidence of defendant's uncharged crimes against AM when the family lived in Florida between 2001 and 2004 – a temporal gap in the indictment. Defendant then proceeded to trial before Justice Ronald D.

2

Hollie, Supreme Court, Queens County, and a jury.  At the conclusion of the trial, defendant was found guilty of all counts and sentenced as noted above.

Upon this appeal, defendant raises the sole meritless and largely unpreserved claim that he was denied a fair trial by the admission of uncharged Florida crime-evidence and photographic portraits of the child at the ages of five to seven.  But the uncharged crime evidence was relevant to explain the father/daughter relationship between defendant and the victim, to complete the temporal gap in the narrative of the charged crimes, and to rebut the defense claim that the victim's delayed disclosure was a fabrication.  And the school photographs of the child were relevant to establish the victim's age and state of mind when the abuse started ten years before trial.  The trial court exercised sound discretion in concluding the evidence was far more probative than prejudicial and defendant's conviction should be affirmed.

## The *Ventimiglia* Hearing[1]

Prior to trial, the People made an application for permission to introduce evidence that defendant's sexual conduct towards AM escalated to

---

[1]*People v. Ventimiglia,* 52 N.Y.2d 250 (1981).

rape in Florida between 2001 and 2004 (Proceedings: 13).[2] Defendant was charged with touching five to eight-year-old AM's breasts and forcing her to touch his penis between 1997 and 2000 when the family lived in Queens, and with raping twelve-year-old AM in 2004 during an overnight visit to her grandmother's home in Queens.

As the prosecutor explained to the court, evidence that defendant's conduct escalated to rape in Florida was background information, necessary to explain the relationship between the parties, to complete the narrative, to place the events in context, to avoid speculation by the jury, and to rebut defendant's claim of fabrication based on the child's delay in reporting (Proceedings: 6-10). Defendant objected, contending that the allegations of defendant's "misconduct" in Florida were more prejudicial than probative (Proceedings: 11) and that the People could address the "continuity" in the relationship with evidence that "the parties were living together" without mentioning the misconduct (Proceedings: 10).

Following colloquy with the prosecutor, the court parsed the evidence, ruling that the People would be permitted to elicit AM's allegations that defendant raped her in Florida prior to 2004, but nothing

---

[2]References in parentheses are to the minutes of trial.

4

about his sexual abuse of AM's younger brother or the pendency of criminal proceedings in Florida (Proceedings: 12, 13-14). In addition, at defendant's request, the court ordered the People to redact from AM's medical records references to abuse of the brother (Proceedings: 14-15). *Sua sponte*, the court ruled it would issue a limiting instruction (Proceedings: 13-14).

The People also sought to elicit evidence that defendant verbally abused the mother, brother and AM, and at times also physically abused the mother (Proceedings: 15-16). The prosecutor explained this evidence of the home "environment" bore on AM's state of mind and further helped explain AM's delayed outcry (Proceedings: 15-16). Defendant objected, denying the truth of these allegations (Proceedings: 18). The court ruled the People would be permitted to ask AM why she withheld notifying the authorities of defendant's attacks and that AM's reasons could include "defendant's abusive behavior" (Proceedings: 19).

Before AM testified, the court granted the prosecutor's amended application to elicit AM's observations of defendant's acts of self-directed violence that heightened AM's fear of defendant (Proceedings: 425).[3]

---

[3]The hearing need not occur before trial commences. *People v. Small*, 12 N.Y.3d 732 (2009), and is proper if done just before the witness testifies. Id.

5

### School Photographs of the Victim

Prior to presenting its case, the People made an application to introduce black and white photocopies of two school photographs of AM between the ages of five and seven years old, when defendant began touching her sexually. At trial, AM was just shy of fifteen years of age; apart from being ten years older, she had become significantly overweight. The People argued that the pictures were relevant to show the jury what the victim "looked like at the time that the crime started" and to establish that the victim was under the age of eleven for purposes of course of sexual conduct count (Proceedings: 421-422). Over defendant's objections that the photographs were being used to elicit "sympathy from the jury" and the child's age was not in dispute, the court ruled the photographs were "probative" of the victim's appearance "at the age that she is alleged to have been a victim" and admissible (Proceedings: 422-424).

## THE TRIAL

### The People's Evidence

In October 1996, twenty-nine year-old defendant Abu "Jimmy" Khan began dating LESLIE MARTINEZ, a woman nearly ten years his junior who was married with two small children (Leslie: 357-358, 387) – a

6

four-year old daughter AM and a two-year son JB (Leslie: 355, 359; AM: 462).[4]  In 1997, defendant, Leslie, and her children began living together as a family, moving into the three-bedroom duplex condominium in College Point (Leslie: 359-360; Ann: 428, 432) owned and occupied by Leslie's mother, ANN MARTINEZ, and her common-law husband, Hubert Chan (Leslie: 355, 359; Ann: 431-432; AM: 462). Ann had known defendant's family from Trinidad (Leslie: 356).

Leslie felt defendant was "kind," "sweet," "a good provider," and a "father figure" to her two children.  AM, who did not know her biological father, was "very close" with defendant; he treated her like a daughter and she called him "Daddy" (AM: 461, 463), as did JB, her brother (Leslie: 363, 409).  When they moved into her grandmother's home in Queens, AM was a few months shy of five years old (People's Trial Exhibits 1 and 2; AM: 493-494).

One night defendant "started touching [AM] in a way that [she] did not like" (AM: 464).  She had been having nightmares after watching a "scary movie" named "Candyland" and was having trouble falling asleep. AM descended the spiral staircase from the loft she shared with JB to her

---

[4]AM's birthday is April 26, 1992 and JB's is February 9, 1994 (Leslie: 362; AM: 462).

7

parents' bedroom below and asked if one of them would come upstairs and help her get to sleep. Her mother was sleeping and defendant was watching wrestling on television (AM: 465-466). Defendant took AM up to the loft and told her a story about a little girl trying to put a star on a Christmas tree. During the story, defendant took her hand, placed it on top of his boxer shorts, and made her touch and rub his penis, which she could feel through the boxers (AM: 465-467). AM did as she was told and did not say a thing because she "loved" and "trusted" defendant "so much" (AM: 467-468). The whole time, defendant kept telling the story (AM: 468)

After that night, defendant forced AM to touch his penis about five to ten more times while the family was living in Queens (AM: 468). On those occasions, defendant also touched AM's breasts and other places on her body that she "did not want to be touched" (AM: 468).

In December 1998, Leslie gave birth to a daughter, and the following year, defendant and Leslie moved with their three children into a place on 130-18 117th Street in the South Ozone Park area of Queens. (Leslie: 358-359, 360, 362; AM: 462, 464). On June 26, 2000, Leslie gave birth to a son (Leslie: 361; AM: 462).

As the family was expanding, Leslie felt her relationship with

8

defendant "took a turn" and "wasn't the same" (Leslie: 361-362). By the time their son was born in 2000, Leslie felt things were "rocky" but "did what [she] had to do to take care of [her] children and keep [the] family together" (Leslie: 363). During this period, Leslie also noticed behavioral changes in AM who became "mouthy" and "defiant" and "would not listen" (Leslie: 363). She would "constantly bicker" and "argue" and ignore her personal hygiene (Leslie: 363). Leslie thought AM, age six or seven, was a bit young to be rebelling (Leslie: 382, 383).

In May 2001, defendant and Leslie moved to Florida with their four children; defendant had family there and Leslie preferred the Florida weather (Leslie: 364-365, 367, 390).[5] Initially they lived in an apartment complex in Lauderhill; later that year they purchased a house in Lauderdale with help from Leslie's uncle (Leslie: 364, 367).

In Florida, AM continued to have problems in school and at home. The teachers called Leslie "complaining" that AM was receiving failing grades, would not stop talking in class and would not listen to the teachers (Leslie: 365, 372). AM "could not get along with anyone" (Leslie:

---

[5]Initially, Leslie testified the move was in May 2000, but she corrected her testimony to May 2001 (Leslie: 364, 365, 366, 390). Defendant agreed the move was in May 2001 (Defendant: 633). Except for the November 30, 2004 rape, defendant was convicted for his conduct in Queens between January 1, 1997 and December 31, 2000, and the evidence of those dates is not in question.

9

371, 372).  AM had no friends (Leslie: 372), no boyfriends (Leslie: 393) and could not get along with anyone at home (Leslie: 372).  She "tended to stay to herself" in her room (Leslie: 372).  AM's eating habits were "horrible" (Leslie: 369, 372) -- she did not use a fork or spoon and "kind of devoured her food". (372).  When Leslie tried to talk to AM about anything, AM would "argue" and "fight" (Leslie: 372).  AM also "put on a lot of weight" (Leslie: 365).  When the family first moved to Florida, AM weighed about sixty-five pounds – "a little bit chunkier than normal" (Leslie: 366).  Within two years, AM's weight more than doubled – by 2003, eleven-year-old AM weighed one hundred and forty pounds (Leslie: 366).[6]  During this period, AM entered adolescence and "sprouted . . .in all directions" (Leslie: 367).

During this period, defendant started coming into AM's bedroom and "having sex" with her (AM: 469) – "putting his penis in her vagina" (AM: 473).  The sex was "very frequent" (AM: 471).  AM responded by trying to "block out everything that was happening to her" (AM: 469).  AM wanted her mother to know but she was too "scared" to say anything (AM: 469, 470).  AM was very young when defendant started touching her in New York, and she had "no idea" whether defendant's

---

[6]And she was even bigger at trial in 2007 (Leslie: 367).  At AM's medical examination in June 2006 she was "obese" -- she weighed 240 pounds and stood 56 3/4 inches (People's Trial Exhibit 3).

actions were "right or wrong" (AM: 469).   Defendant would tell AM he was

making her a woman and that he would have done the same thing had she

been his real daughter (AM: 469).   Even after AM got older and began to

realize it was "wrong," she was too "scared" to stop him (AM: 469).   When

AM tried to reason with defendant, saying what they were doing was

"wrong" and she wanted to "wait until [she was] married," defendant got

"really mad at her" and AM was upset by that (AM: 469, 486).   All the years

of abuse by defendant had made AM feel "nasty" and "degraded" (AM:

512).   Her "self-esteem level dropped," she gained a lot of weight, did

poorly in school (AM: 512).   AM felt "it depressed [her] life a lot" (AM:

512).   AM wanted  "acceptance so bad" (AM: 469).   Plus, defendant told

AM that if she said anything nobody, not even her mother, would believe her

(AM: 469).   Defendant said that AM's mother would think AM was "lying

and making it up" (AM 469), and AM believed him (AM: 472).   So even

though AM wanted her mother "to know what was going on" with defendant

and wanted "to tell her mother" what defendant was doing, AM did not

know how to talk to her mother. Additionally, AM was "scared" of what

defendant might do to her and the family (AM: 472).   AM had seen

defendant yell at her mother, tell her to shut up, call her "fat" and other harsh

11

names, tell her nobody else would want her, and push her around  (AM: 469-470).   Defendant was a "jealous" person and would tell her mother she was not allowed to wear certain things or go certain places (AM: 470-471). Defendant called the children names also – he called AM a "fat ass" (AM: 471) and JB "little faggot"  (AM: 471).   AM believed that despite defendant's mistreatment, her mother would take defendant's side if AM said anything (AM: 472, 486-487).  So AM had nobody in whom to confide at home and did not trust anybody at school either  (AM: 472).

When defendant and Leslie were living in Florida, Leslie was working (Leslie: 391) but defendant was unable to "find" or "keep" a good "job" (Leslie: 367).  On three or four occasions, defendant traveled to New York to work for his former employer (Leslie: 367, 368; Ann: 434) and stayed North for about two to four months (Leslie: 367).  Defendant lived at his mother-in-law's home in College Point rent-free (Leslie: 377; Ann: 434) so he could help support the family in Florida (Leslie: 369, 370). Ann and defendant had a "good" relationship – she considered defendant her son-in law and he called her "Mom" or "Mommy"  (Ann: 430-431).

One day in August 2004, defendant told Leslie he was going to travel to New York for employment again. Leslie told defendant he should

stay in Florida and "try to make it work" between them and that if defendant went to New York again, she would not "stay with him" (Leslie: 369, 370). Leslie did not think defendant took her "seriously" because he went to New York anyway (Leslie: 369). But Leslie had been unhappy with the relationship for some time and defendant's extended absences provided "the opportunity" for her "to move on" (Leslie: 368).

In November 2004, twelve-year-old AM was suspended from school for "cursing out" a teacher (Leslie: 373; AM: 473) and told Leslie she wanted to go to New York to live with her grandmother (Leslie: 372-374). Leslie, who knew that AM was "miserable" (Leslie: 376), wanted what was best for her daughter (Leslie: 372-374), and after talking with Ann (Leslie: 374; Ann: 435) and defendant (Leslie: 374), decided that AM would live with Ann and attend school in Queens (Leslie: 372-374). Defendant or Ann booked AM's flight for November 30, 2004 (Leslie: 375; Ann: 435; AM: 506).

AM and Leslie knew that when AM arrived in New York, defendant would be there and that he would be leaving New York to drive to Florida shortly after that, in time for Christmas (Leslie: 407, 408; AM: 473, 474). And AM, unaware of Leslie's plan to separate from defendant,

13

thought defendant would be rejoining the family in Florida. AM did not want to be around defendant (AM: 473, 474, 506) and did not want to be in Florida when he got home in December (AM: 473). After AM was suspended and it was agreed she would go to New York, AM informed Leslie she would be staying with her grandmother in New York indefinitely – through high school and possibly college (Leslie: 375-376).

According to AM, before she got suspended from school, defendant had made arrangements with Ann and Leslie for AM to fly to New York, visit her grandmother, and then accompany defendant on the long drive back to Florida  (AM: 506). As it turned out, after AM was suspended from school, she flew to New York as planned, but instead of accompanying defendant to Florida, she stayed in New York to attend school and defendant drove to Florida alone (AM: 473, 474, 497, 506). Thus, although AM had no say in her flight schedule, and overlap with defendant in Queens for one night, that was the last time defendant touched her (AM: 506-507).

Defendant met AM at the airport and defendant drove her to her grandmother's home. That afternoon, they ate Chinese food and went shopping in the neighborhood (AM: 475-476). Around 7:00p.m., after Ann

14

arrived home from the office and greeted AM, Hubert drove defendant to Long Island to return defendant's work truck to his employer, and AM went along for the ride (Ann: 438). When they returned around 9:00 or 10:00 p.m., Ann was in bed and did not see her granddaughter again that night (Ann: 439).

At about 11:00 p.m., AM was watching television in the lower part of the loft bedroom when defendant entered and began "touching" her "breasts and arms" (AM: 476-477). AM told defendant to "leave her alone" and went downstairs to the living room to watch television alone (AM: 477, 482 ). Defendant followed AM downstairs, sat down next to her on the couch (AM: 477), and again began to touch AM's breasts and arms (AM: 478). AM felt "nasty and degraded" (AM: 478) and she "badly" wanted "somebody to come downstairs and save [her]" (AM: 479) but she was "too scared" to scream out (AM: 479). AM wanted to avoid the "big fight and argument" in the family that she believed would ensue (AM: 480) and was scared of defendant's "reaction" (AM: 479). She thought defendant might hurt her or the family (AM: 479). She had seen defendant get drunk at a Halloween party and use a broken bottle to "cut himself" in the head and chest (AM: 480). AM felt that if defendant was "capable" of doing that to

himself, he was capable of hurting somebody else "ten times worse" (AM: 480).

Instead, as defendant was touching AM, she continued to watch television "trying to tune him out," "act as if nothing was happening" (AM: 478) and hope she could "blank everything out of [her] head" (AM: 478). That was how she had handled defendant's sexual contact in the past (AM: 478). Sometimes she would imagine she was at her grandmother's home, "safe and away from harm" (AM: 479).

That night on the couch, took off his t-shirt and boxers, took off her t-shirt and shorts and "had sex with her" (AM: 481). AM was on her back and defendant climbed on top of her, faced her, "put his penis inside her body. . .in her vagina" and moved "back and forth" (AM: 481, 482). AM felt "nasty" and "hurt" (AM: 481, 482). "Emotionally it hurt. Mentally it hurt. Physically it hurt" (AM: 481). After a while, defendant took his penis out of her vagina and ejaculated into a napkin (AM: 482) – AM saw the "white stuff coming out of him . . . out of his penis" (AM: 482). Defendant washed off and went upstairs without a word to AM (AM: 482). AM put her clothes back on and "sat there and acted like nothing ever happened" (AM: 483).

16

The following day, December 1, 2004, Ann and defendant took AM to register for school and then they went shopping in Brooklyn (Ann: 440).  Defendant left that evening for Florida (Ann: 434, 440).

When defendant arrived in Florida on December 2d or 3d, Leslie told him the relationship was over and he was not welcome in the house.  Defendant stayed anyway, but left after a couple of days with Leslie and the three younger children, moving in with his sister, who lived nearby (Leslie: 394, 395).  About a week later, on December 10, 2004, defendant entered Leslie's home at five o'clock in the morning "in a drunken state," and confronted Leslie in the bedroom where she and her new boyfriend Nigel were sleeping (Leslie: 395, 396).  As the children watched, defendant pulled a gun from his pocket, pointed it at Nigel, and knocked Leslie to the floor (Leslie: 396, 413).  Leslie had seen defendant's gun before that (Leslie: 396, 413).  Leslie called 911.  After finding no gun, the police told defendant to leave the property but made no arrest (Leslie: 397).

Subsequently, defendant returned North and found a place to live in the Bronx (Leslie: 377).  Defendant stopped providing financial support for the children, and Leslie did not sue him for it (Leslie: 378, 401).

AM finished the school year in Queens (Leslie: 376; Ann 440-

17

441).  In July 2005, the two youngest children were visiting their grandmother in Queens and defendant asked to take them to a park (Leslie: 377; AM: 507, 519).  AM went along, at the request of her mother and grandmother (AM: 508) and her great-grandmother also went (AM: 509, 519).  In August 2005, AM returned home to Florida for school (Leslie: 376; Ann 440-441). AM knew defendant "was out of the picture" (AM: 512).

AM had learned about Leslie's separation from defendant when she was in New York, and knew she could "tell" what defendant had done to her, but did not know "how" (AM: 512).  AM had not forgotten what defendant had done, and was still feeling all the effects of his acts, but she did not know "how to come out and say it" and was "waiting for the right time" (AM: 512).

That spring, on or about March 16, 2006, Leslie was at a local fair with the four children (Leslie: 403-404; AM: 520) when she saw defendant approaching (Leslie: 403-404).  Leslie took the children left (L: 403-404; AM: 520).  Defendant had not been making any effort to maintain a relationship with his children – he had not even called to say he was in Florida – and Leslie felt a casual greeting at a public event was not appropriate (Leslie: 405, 411-412).

18

On Easter Sunday, April 16, 2006, Leslie and the four children celebrated with a traditional home-cooked meal (Leslie: 379). As Leslie and AM were cleaning up the kitchen after dinner, Leslie confronted AM about an inappropriate comment AM had made about Nigel, who was visiting family in Atlanta. (Leslie: 380; AM: 483). During the ensuing argument (AM: 484), Leslie asked AM why she hated everyone, why she was constantly fighting, and why she could not do well in school (Leslie: 381). AM, who was just shy of fourteen, told her mother, "You don't know me" (Leslie: 381). Leslie asked AM what was wrong, and whether someone had "hurt" her (Leslie: 381; AM: 484). Without turning from the sink, AM said, "yes, someone hurt [her]" (Leslie: 382; AM: 484). At that, Leslie asked AM if she had been "raped" (Leslie: 383; AM: 484). AM said "yes, Mommy" (Leslie: 382; AM: 484). Leslie asked by who, and AM said, "Jimmy" (AM: 484). AM was "shocked" that she finally "said something" (AM: 485). To Leslie, the moment was "surreal"(Leslie: 382).

AM was sobbing as she blurted it out (Leslie: 382). Leslie took AM into her arms and for a while they held each other and cried on the floor of the small kitchen (Leslie: 384; AM: 484). Leslie realized she had "neglected" her daughter and had not seen AM's pain, even though it had

19

been right in front of her (Leslie: 382, 383). Leslie told AM that she was her mother, she loved AM, and that AM should have come to her (Leslie: 384). AM said she did not think Leslie would have believed her (Leslie: 384; AM: 485). From AM's standpoint, she "never up to that point had a relationship with her mom" where they "sat down and talked" (AM: 486). AM believed that her mother "still" loved defendant – the father of her children – and that Leslie would think AM was "lying" and "making it up"(AM: 486). Leslie and AM held each other, talked, and cried into the night. It was "pretty dramatic" (Leslie: 384).

Leslie asked AM if she wanted to file a police report and AM said she did, so the following morning they went to the local police precinct and reported defendant's crimes (Leslie: 385; AM: 485). Subsequently, AM underwent a complete sexual assault examination at the Broward County Sexual Assault Treatment Center in Florida (AM: 487); AM said that when the metal tool was placed inside her, it "hurt a lot" (AM: 488)

Florida forwarded the report to Queens County (Leslie: 385) and NYPD Detective LUZ FIGUEROA of the Queens County Child Abuse Squad was assigned to investigate the case against defendant (Figueroa: 450, 451, 453). On June 13, 2006, Figuero interviewed AM and her grandmother

in New York (Figueroa: 453; AM: 488). On June 15, 2006, Figuero arrested defendant (Figueroa: 456-457).[7]

On June 16, 2006, fourteen-year-old AM was interviewed by a Queens County prosecutor (Figueroa: 459; AM: 488) and on June 21, 2006, she underwent a assault examination at the Queens Child Advocacy Center (AM: 489; Hoffman-Rosenfeld 552-553). AM was examined by the medical director, Dr. JAMIE HOFFMAN-ROSENFELD, expert in the field of pediatrics and child sexual abuse (Hoffman-Rosenfeld: 531) with thirty years of experience (Hoffman-Rosenfeld: 566). AM told Hoffman that she had been "sexually abused" (Hoffman-Rosenfeld: 551) and that she had a boyfriend but they had never had sex (Hoffman-Rosenfeld: 586). AM reported that she had begun menstruating at the age of ten (People's Trial Exhibit 3). Hoffman examined AM and took blood and urine samples, but could not complete the genital and anal examination that day (AM: 489; Hoffman-Rosenfeld: 552-553).

On July 5, 2006 returned to the medical center to complete the examination (AM.: 489, 490; Hoffman-Rosenfeld: 553-554). AM was placed on her back, her feet were placed in stirrups, and her knees were

---

[7]Defendant was born on December 12, 1966 (Figueroa: 456)., a man just shy of forty, weighing 179 pounds and standing 5'11" tall

dropped to the sides. A "speculum" was placed inside her vagina (Hoffman-Rosenfeld: 554) and that "hurt really bad" (AM: 490). The doctor used the larger of the two adult speculums (People's Trial Exhibit 5) because AM "clearly" had the size and stature of an adult woman and "developmentally" had "adult genitalia" (Hoffman-Rosenfeld: 554, 555) The doctor also used a "colopscope"– an instrument that provides "a powerful light and magnification to examine the genitalia of children who have been suspected of being sexually abused" (Hoffman-Rosenfeld: 537, 548, 559). The doctor took genital and anal samples and determined that AM did not have any sexually transmitted diseases (AM: 490: Hoffman-Rosenfeld: 561-562). Hoffman-Rosenfeld observed that AM was at the "most advanced stage of puberty" – meaning she was an adult female with a "pale pink estrogenized hymen" (Hoffman-Rosenfeld: 558). AM had a "symmetric" "uninterrupted, narrow hymenal rim" with "no visible injury" or scars (Hoffman-Rosenfeld: 558, 562, 563). These findings, Hoffman-Rosenfeld stated, were "absolutely" and "without question" consistent with AM's allegation of sexual abuse (Hoffman-Rosenfeld: 564) and "absolutely not" inconsistent with a penetration of AM's vagina by a penis (Hoffman-Rosenfeld: 563).

AM's "normal" exam, as the doctor first stated in her written

22

report of July 5, 2006, particularly given that AM was a fully pubertal female, did not negate the possibility of sexual abuse including vaginal penetration.   The pubertal hymen is elastic and can stretch to allow for penetration with an object without injury.   Additionally, injuries that may have been sustained in the past can heal without permanent visible indicia". (People's Trial Exhibit 3).

On March 12, 2007, AM was examined again at the Queens medical facility, this time by Dr. Rosenfeld and another doctor (AM: 492; Hoffman-Rosenfeld: 560). Rosenfeld used the same large speculum but employed a different technique to "really stretch the [hymenal] membrane to make sure she had seen everything" (Hoffman-Rosenfeld: 560-561). AM felt the examination "hurt a little more" than the last time but understood it was "because [the doctor] wanted to make sure" (AM: 492).   The doctor was spreading apart the lips on her vagina, sticking the "plastic thing" inside her vagina,  opening it up so she could get a better view, taking pictures and (AM: 492) collecting genital and anal samples (Hoffman-Rosenfeld: 561-562).   Hoffman-Rosenfeld's examination yielded no new information (Hoffman-Rosenfeld: 562, 563), as she first stated in her second report, dated March 12, 2007.   There, Hoffman reiterated that AM had a thin uninterrupted hymenal membrane without "identifiable" transection and that

23

the absence of a complete transection does not negate abuse or penetration since AM's vaginal opening and the elastic nature of the thin hymen is "more than adequate to enable penetration to occur without trauma to the hymen" (People's Trial Exhibit 3).

Doctor Hoffman-Rosenfeld explained that the hymen is the "membranal tissue that surrounds the opening of the vagina" and must be passed "through" before entering the "vaginal canal" (Hoffman-Rosenfeld: 540, 546, 547). Hoffman debunked the "myth" that the presence of an opening in the hymen of a female means there has been penetration (Hoffman-Rosenfeld: 543; 569-570), explaining that the opening is present at the time of birth (Hoffman-Rosenfeld: 543). An "imperforate" hymen – without an opening – is an "abnormality" that must be corrected surgically (Hoffman-Rosenfeld: 544, 545).

In a young girl the hymen is "very thin" and almost transparent (Hoffman-Rosenfeld: 544, 545). A couple of years before menstruation, estrogen – the female hormone responsible for puberty – causes the hymenal tissue to become "boggy," "stretchable," "elastic, and resilient" (Hoffman-Rosenfeld: 541). The hymenal tissue is "required to stretch with penetration of the vagina" and the introduction of estrogen during pre-pubescence allows this stretching to occur without "break[age]" or other injury

24

(Hoffman-Rosenfeld: 545-546, 563). Estrogen is very "powerful" and can also "obliterate an old trauma" (Hoffman-Rosenfeld: 545-546). Because of these estrogen effects, whether there has been sexual trauma may be "difficult if not impossible" to detect visually "once the girl goes through puberty" (Hoffman-Rosenfeld: 546).

Hoffman stated "the average age" girls begin puberty is "around eight or nine" (Hoffman-Rosenfeld: 542). At that time, the female hormones begin to cause changes (Hoffman: 541, 542) in girls, typically the growth of "breast buds" and hair in the armpits and genitalia, and "changes to the hymenal tissue" (Hoffman: 540-542). The first menstrual period, and development of adult features, normally occurs within two to three years after the onset of puberty (Hoffman: 542).

Because of the estrogen effects, the hymen is "not a structure that necessarily gets injured" with sexual abuse, sexual assault, or voluntary sex" (Hoffman-Rosenfeld: 569-570). After intercourse, the hymen does not necessarily have any "visible injury [of being] torn or broken" or any other "physical evidence of [the] penetrating trauma" of intercourse (Hoffman-Rosenfeld: 569). "Many, many women never bleed with first intercourse" (Hoffman-Rosenfeld: 569-570) and the majority of teenagers and women who report sexual activity – whether consensual or non-consensual – "have

no evidence of traumatic injury" to the "hymenal tissue" (Hoffman-Rosenfeld: 563). As one example, Hoffman described a study of thirty pregnant teenagers who were examined for "any evidence of traumatic injury to the genitalia, specifically the hymen, and in the majority of these cases their hymen had no visible injury" (Hoffman-Rosenfeld: 569). The girls had "visible hymens that looked like they had not been traumatized in any way" (Hoffman-Rosenfeld: 569). Even when the woman is examined in the "acute period" there may be "no visible physical medical evidence of injury to the genitalia because of the unique nature of the tissue" – its ability to stretch and its resilience (Hoffman-Rosenfeld: 565). By the same token, when there is injury, it can heal over time and "leave absolutely nothing visible to be seen" (Hoffman-Rosenfeld: 563). And the healing can occur within a matter of days (Hoffman-Rosenfeld: 563-564). So when there is any delay between the event and the examination, the "healing can be complete without any visible residual" (Hoffman-Rosenfeld: 563-564). As Hoffman remarked, this is simply a function of the "fabulous" ability of the human body to heal (Hoffman-Rosenfeld: 565). For these reasons, tt is simply not possible to determine whether an adult female has had intercourse by examining her hymen (Hoffman-Rosenfeld: 543; 569-570) and the "absence of any clear visible injury" on the day of the examination

26

does not mean there was no "alteration" or "injury" to the hymen (Hoffman-Rosenfeld: 568).

Hoffman testified that, if an adult male had placed his penis inside AM when she was twelve, moved it in and out of her vagina, and then removed it, and if AM was examined one and one-half years later with a visible hymen and no visible injury or scarring, there was "absolutely nothing about that scenario that is inconsistent with allegations of sexual assault" (Hoffman-Rosenfeld: 567). Hoffman's answer was the same if the scenario changed, and the intercourse had started when AM was eight, and continued weekly for one or two years (Hoffman-Rosenfeld: 583-586).

Dr. Don Lewittes, an expert in the fields of clinical psychology and child and adolescent sexual abuse testified about the "child sexual abuse syndrome or accommodation syndrome" – a "well-accepted concept" based on a study of "many, many cases" of known sexual abuse of children (Lewittes: 594, 596). [8] Lewittes did not meet any of the parties (596).

Lewittes explained that the syndrome has five phases: engagement, sexual interaction, secrecy, disclosure and repression (Lewittes: 597, 600). During "engagement,"the adult engages the child privately in a

---

[8]The use of expert testimony to describe the pattern of "secrecy, helplessness, entrapment [and] accommodation, delayed disclosure, and recantation as common characteristics in children who report sexual abuse" *People v. Spicola,* 2011 N.Y. Lexis 505 (March 31, 2011)(delay of six to seven years).

normal parent/child behavior, such as a bedtime routine.  Next, in the "sexual interaction" phase, the adult tries to obtain sexual gratification from the child (Lewittes: 597).  The adult has the authority and power in the relationship and the child becomes passive and submissive (Lewittes: 597).  Children are confused by the sexual abuse -- they get no gratification from it (Lewittes: 611-612).  Often there is a "long period of time before a child is even understanding the total complexity of sex and family and understanding what was done to them from a prospective of being a victim" (622).

During the "secrecy" stage, the child is "confused" and "isolated," with nobody to tell (Lewittes: 598).  The child feels "guilt-ridden, humiliated and ashamed" by the sexual activity and believes it must be kept "secret;" she does not want to talk about something "as upsetting as being sexually abused" and is unsure know how the information would be received (Lewittes: 598).  The secrecy may be enforced with threats from the abuser (Lewittes: 598). The child is "frightened" and can go "a long period of time" being "submissive"(Lewittes: 598).

Disclosure, the next phase, is often delayed, sometimes for months or years, and in some cases, never happens (Lewittes: 598-599).  "Delayed disclosure" is a particularly "common phenomenon" in the

28

"intrafamilial" context, when the perpetrator is a father figure, such as the mother's boyfriend, with control over the child and other family members (Lewittes: 601, 615-616),   The child wants "normal" family relationships and the child "fears" that disclosure would "interfere" with the "family life" in "multiple" ways   (Lewittes: 601, 602, 615, 616).   A child might be concerned about the mother's reaction and how that would effect the child (Lewittes: 601).  Disclosure also has "ramifications for future punishment or reward"(Lewittes: 601) and could make the child "even more vulnerable" to the perpetrator (Lewittes:  602).  In addition, the child is concerned about the effect of disclosure on the perpetrator's conduct towards other family members whom the child loves and disclosure would effect all of them (Lewittes:  615-616).  This  potential  "crescendo"  effect  creates  added pressure on the child (Lewittes: 601, 602).

The child is conflicted about disclosure -- wanting love, acceptance, and other "normal" kinds of attention yet feeling scared or frightened (Lewittes: 603, 611). The child has to "weigh the consequences of disclosure," knowing that she will also be deprived of "the positive side of the relationship" (Lewittes: 603, 615).  The mixed messages from the abuser impede the child's ability to "go forward and talk about it" (Lewittes: 615-616) and a child can "compartmentalize" the positive feelings for a long

29

period without disclosing (Lewittes: 611, 622).

An abusive parent may hold out the good parts of the relationship as the reason for non-disclosure (Lewittes: 603). Threats or warnings from the abuser, the "more powerful" figure in the relationship, and the one with "resource control," would "intimidate the child" even without any physical force (Lewittes: 603-604).

Witnessing family violence is very "frightening and overwhelming" to a child (Lewittes: 607). When the abuser directs verbal or psychological abuse at others, the child is "vicariously" intimidated (Lewittes: 605). When the parent's style of communicating is "angry" and "hostile," the child may "shy away" from "speaking up" rather than risk more "bouts of anger" (Lewittes: 605). If the child witnesses physical abuse of the mother, the household becomes a "pressure cooker" (Lewittes: 605). The child may feel "protective" of the mother or "identify" with the victimization (Lewittes: 605). The child will hesitate to "address any issue" that might "incur the anger of the adult who has already had access and opportunity to sexually abuse them" (Lewittes: 605) and who could "create more violence" in the family (Lewittes: 607).

This would include a situation where the child witnesses the abuser inflict violence on himself, although that is "not the most common

30

form of experience" (Lewittes: 606).    That type of conduct demonstrates the abuser is "out of control" and would be "very intimidating" to a child, who might think she is "next in line" (Lewittes: 606).

With "incest," "the entire foundation [of] what a family does for a child is taken away from them" (Lewittes: 602). "They are isolated at a young age with a horrible experience not knowing. . . how to protect themselves . . or talk about it" (Lewittes: 602).  Even if the child has a trusting relationship with another adult, the child is unable to build the "bridge" from secrecy to disclosure  -- the child does not "feel they will be loved and have a better life just because they tell" (Lewittes: 613).  To the contrary, the child may be disinclined to talk for various reasons:   to "maintain a positive face," to avoid "tarnish[ing]" the "good" part of the relationship, get "drawn into the dirt," or labeled as a rape victim.  The child may also feel some "guilt" that they have done something to draw the adult into the sexual relationship (Lewittes: 612-613).

When a child is unable to express a feeling in a positive communication, the child may "act out" the feeling, by becoming angry, for instance, instead of talking about the anger (Lewittes: 609).  This might manifest itself by problems with authority in school (Lewittes: 609).  The acting out often exacerbates the child's situation --  the child incurs the anger

31

of the adults and feels even less likely to talk (Lewittes: 610).

During the "repression and suppression" stage (Lewittes: 599), instead of talking about the abuse, the child pushes the "uncomfortable" experience inside (Lewittes: 599), tries to "minimize" the abuse and "sweep it under the carpet" (Lewittes: 607).   Even if the child is geographically separated from the abuser or the mother, the child still "does not feel comfortable and capable" of talking it.   The child wants to avoid the "big notoriety" and "negative attention" that will inevitably flow from "blowing the whole thing up"(Lewittes: 607, 608).   Removal from the day to day abuse "might actually discourage the child from reaching out" (Lewittes: 610-611) --  the child may try to "minimize the psychological baggage they are carrying around," and feel the abuse is "over" and nothing is to be gained from talking about it (Lewittes: 610).

The child might return to the place of abuse for many reasons.  A Children cannot "control" their "circumstances" the way adults do and do not want to "raise a red flag" by changing their schedule or routine, fearing it will create questions (Lewittes: 608).  Denial may also play a factor – the child may "make up a rationalization in their head that it won't happen this time" (Lewittes: 609).  This may be prompted by some change or perceived change – the child may have "gotten older," "gained weight, or simply

32

"believe the [abuser] has gained some sanity" (Lewittes: 609).

Disclosure is normally triggered by some type of event or milestone that provides the child with an "emotional platform," for instance, age and increased self-confidence, or some type of "tragic, emotional, or upsetting" event helps the child to "break out of the silence" (Lewittes: 614). If the child is in a family situation where "they finally trust and feel they can let it out, what usually happens is they will be upset and crying and really show emotion" (Lewittes: 612).

Upon disclosure, the child will not necessarily remember details and dates of the abuse, for several reasons (Lewittes: 617). First, the lack of attention at the time. When upset and frightened, a person will tend to "zone in" on the "central action" and zone out the "peripheral" action. What was said and who did what to whom would be central events, but dates, time, and clothing are all peripheral details that are not necessarily put into memory (Lewittes: 618-619).

Also, the child is not going to "focus" on the penis because that is the "thing that is hurting them" (Lewittes: 618-619). Instead, the child will "try to distract" herself during the act hoping that it goes away as fast as possible (620). This is especially true with a child who has been abused over time (620) and is a natural and "primitive" human reaction to pain --

33

looking for an "out of body experience" if the "reality is too strong" (620)
The human mind tries to "detach" from the body and not concentrate on
what is causing the pain (620). Even after disclosure, the child does not like
to think about, talk about, or remember the events that occurred when she
was being abused (Lewittes: 600).

The child's ability to recall details in a delayed disclosure may
also be hampered by the potential decrease in memory due to the delay. This
is particularly true with dates. If a child is very young -- five to seven --
when the abuse starts, the child would not be marking the dates on a
calendar. Over time memory decreases, and without a "specific peg" to
trigger the details, a delay in disclosure would further reduce the ability to
recall details (Lewittes: 617).

Memory is also adversely effected by the "blending effect"
when there are multiple incidents over a period of time (Lewittes: 617). If
the child is young and there are multiple similar incidents of abuse without a
"peg" to make them "unique" -- a birthday or a trip to Disney -- "it is hard to
retrieve all the specifics of each event or occurrence" (Lewittes: 618). The
similarity and frequency of the events – same perpetrator, circumstances,
and room – tends to "blur the memory" and make everything seem
somewhat similar (621). The child or adolescent tends to "blend those

34

events" and when they "come out" they have "merged together" (Lewittes: 618). Because of the blending effect, a child who has been "touched a lot" will categorize it in her mind "as one experience." What causes the child to remember is if something changes – "if suddenly there is an escalation" in the perpetrator's demand for interaction" (621). Moving from from "touching or fondling to penetration "would definitely create a notation in the mind (621).

A child might remember the first and last times something happened due to a memory dynamic in called "primacy and recency effects" -- primacy being the first time something happened that was novel and recency is the closest or last in time – in which the mind will "peg" these occasions. The first time has "a note in the mind" that causes the child to remember, and the most recent time causes the child to go back and focus on the earlier note (Lewittes: 620-621).

False claims of abuse are seen in children who are "very disturbed" because of some "organic brain damage or chemical influence" (Lewittes: 624, 626). In "normal" children, the three major categories of false claims are confusion, revenge, or suggestibility (624, 626). Suggestibility is most often seen in younger children, below the age of seven, involved in custody battles (624-625). Confusion means the child

35

may not have really understood that the touching was not sexually motivated
– they heard if someone touches you there it would be abuse.  In a child,
being "malicious or having revenge" (624) is "unusual but the child may feel
that this gives them power" – "a way to get back at somebody who they are
angry at" (625).

When a child tells talks about the abuse in an "emotional" way,
this suggests the child wants to "get it off [her] chest" -- there is something
"therapeutic about sharing or being able to tell someone when you have been
hurt" (613).   Tactical disclosure involves "telling" and expecting "that
person to do something" -- telling a doctor or police officer is tactical
because one is "expecting an exam or investigation (613).

### Defendant's Evidence

Defendant, born on December 12, 1966, was a permanent
resident of the United States, having immigrated from Trinidad and Tobago
in September 1986 (Defendant: 628, 648, 651).  Defendant served in the
USMC for four years and stated he was honorably discharged (Defendant:
628),  denying he was dishonorably discharged due to an incident at a bar
(Defendant: 648-649, 650).  In 1993, while working for a rental car agency,
defendant was arrested for unauthorized use of one of the rental cars
(Defendant: 629-630).

36

When defendant was twenty-three, he met fourteen-year-old Leslie at a family wedding (Defendant: 630-631).   On October 12, 1997, when defendant was around thirty, their relationship became sexual. Defendant remembers the date because it was his mother's birthday (Defendant: 631).  At the time, Leslie, a "younger woman" of about twenty-one (Defendant: 651), was married with children so defendant and Leslie had sexual relations in defendant's car (Defendant: 631).

Later that year, defendant, Leslie, and her two children, AM and JB, moved into Leslie's mother's home in College Point (Defendant: 632).  In 1998, defendant and Leslie had a child together, and in 1999, they moved with the three children to South Ozone Park, where they stayed for about one year (Defendant: 632).  During this time, defendant was working as an air conditioner technician for Phoenix Refrigeration (Defendant: 630). After their son was born in 2000, defendant was "pretty much happy" because he received "a large [salary] increase" and had his "first biological son" (Defendant: 657-658).  During Leslie's pregnancies and the birth of the two younger children, defendant did not feel life was "hectic" or "stressful" (Defendant: 656), although Leslie, who was home taking care of the children, "complained a lot" (Defendant: 655).  Defendant noticed that sexual relations between him and Leslie decreased after the birth of the

37

children in 1998 and 2000, but he "was burnt out" and did not miss it (Defendant: 657, 659).

Defendant was the man of the house (defendant: 683) and AM's father figure (Defendant: 668, 683) from the time AM was age five or six (Defendant: 668). Defendant "loved [AM] very much" and AM looked up to him, adored him (Defendant: 667), called him "Daddy" and wanted to accompany him everywhere (Defendant: 668).   AM would "basically" do whatever defendant asked (Defendant: 683).   That was not the case with Leslie, whom defendant could not control (Defendant: 683).

Defendant denied inappropriately touching the breasts of AM or putting his penis in her hands between 1997 and 2000 when they lived in Queens (Defendant: 647-648).   Defendant stated he "never disrespected any of [his] kids" (Defendant: 684) and denied ever doing "anything" to AM (Defendant: 685).   Defendant never discussed sex with AM (Defendant: 685) , never told her a story, tucked her in at night, or went up to her bedroom at night (Defendant: 661-662).   Defendant said he is not a storyteller and does not know the story AM mentioned about a girl and a Christmas tree (Defendant: 667).   Defendant stated he was at times alone in the house with AM, but does not recall ever being alone with AM in the loft of the bedroom.   Defendant volunteered he was never alone "with AM or

38

JB" in the loft (Defendant: 664).

       In May 2001, after visiting a cousin in Florida, defendant and Leslie decided to move the family there, initially taking an apartment at the cousin's complex in Lauder Hill (Defendant: 633).   Defendant had previously lived in Florida and felt the job market there was not as good as in New York (Defendant: 634).  For the first two years defendant used his experience as an air conditioning technician to secure work, at times working without benefits and other times traveling out-of-state (Defendant: 680).  In 2003, defendant secured a position with medical benefits with a large air conditioning company in Florida (Defendant: 633-634).   After about one year, in September 2004, defendant's prior employer offered him a temporary but lucrative assignment in New York -- just until Christmas (Defendant: 634-635).   Phoenix was short on manpower and was prepared to pay defendant "whatever [he] wanted" (Defendant: 634-635).  Although "the money was good" and Florida was a "pretty hard [place] to live . . . with four kids and a wife," defendant was "tired of going out of state" (Defendant: 679-680).  Defendant left the decision to his family whether he "should go or stay" and played no role in the decision at all (Defendant: 634, 680).  Defendant was "shock[ed]" when Leslie and the four children told him to go because it was only "temporary" and the "salary" was "good"

39

(Defendant: 679-680).  Leslie did not tell defendant that she did not want to have anything more to do with him (Defendant: 679).

Defendant took a leave of absence from his company in Florida and on September 17, 2004 defendant went to New York.  There, defendant stayed with Ann Martinez, his mother-in-law, in Queens (Defendant: 635), calling home every morning at 6:00AM to speak to Leslie and the children and make sure they were getting ready for school   (Defendant: 635). Defendant continued to contribute to the mortgage and the car payments, and was also saving money so he and Leslie could purchase the house from her Uncle (Defendant: 675).

Defendant was planning to return to Florida on December 1, 2004 (Defendant: 636). In late November 2004, Leslie told defendant that AM had been having problems at school, that she was going to live with Ann and attend school in Queens, and that AM would be flying to New York on November 30, 2004 (Defendant: 635).   Defendant picked AM up at the airport (Defendant: 636). They had Chinese food for lunch and did some shopping in the neighborhood (Defendant: 636). Defendant claimed they purchased "personal hygiene female products" for AM because it was "her time of the month" (Defendant: 636).  They returned home around 4:00p.m. Hubert arrived within the hour  (Defendant: 636-637).  Shortly after that,

Ann got home and went straight upstairs to see greet AM -- they were "hugging and kissing" – "grandmother granddaughter stuff" (Defendant: 638).

At around 7:00p.m, defendant drove out to Mineola in Long Island to return the company truck to his employer; Hubert and AM followed in Hubert's car and brought defendant back to the house at around 9:00p.m. (Defendant: 639). At that time, defendant asked to borrow Hubert's car to visit with a friend, and went out, returning around 11:00 or 11:30p.m. (Defendant: 640), closer to 11 (Defendant: 670) They had planned to play pool but the place was closed so they just had dinner (Defendant: 640). Around 10:30 or 10:45p.m. (Defendant: 640), defendant dropped his friend at home, off Jamaica Avenue on the corner near the Van Wyck Expy (Defendant: 670). When defendant got home, everybody was sleeping and defendant went straight to bed – they "had a busy day the next day for the registration of AM" (Defendant: 640). Defendant did not go into AM's room, wake her up, chase her downstairs (Defendant: 640), nor did he have sexual relations with her that night (641). Defendant did not see AM until the following morning (Defendant: 671).

The next morning, defendant was awakened by Ann, had some coffee and went to register AM for school in Queens (Defendant: 641).

41

Afterwards, they did some shopping in Brooklyn (Defendant: 641).  Later that day, Ann rented a car for defendant to drive to Florida; defendant did not have a credit card (Defendant: 642).  Defendant left on the night of December 1 and the drive to Florida took him "exactly sixteen hours" (Defendant: 642).

When defendant arrived at home on December 2, 2004, nobody was there and the house had been "trashed" (Defendant: 642-643).  Defendant said it "broke his heart" and he "took pictures" because on one occasion when he called home "a guy by the name of Nigel" was in his bedroom"(Defendant: 643).

Defendant did not move in with Leslie.  She said she "needed space" (Defendant: 644) and did not want to continue the relationship, so defendant stayed with his sister in Fort Lauderdale (Defendant: 644, 676).  After a few days, defendant tried, unsuccessfully, to "rekindle" the relationship with Leslie.  Then, a few days later, on the morning of December 10, 2004, defendant went to the house at 5:00 AM to again "try to rekindle . . .[his] relationship with Leslie" (Defendant: 644) Defendant did not tell Leslie in advance, she did not invite him, he did not call first, he simply used his keys to enter (Defendant: 678). Upon entering the house, defendant saw his children sleeping and Leslie and Nigel on his bed

42

(Defendant: 644).  Defendant knew Nigel, who was a cousin by marriage (Defendant: 677).  Although it was a "tense" situation (Defendant: 678), defendant denied pulling out a gun (Defendant: 644) or starting an argument (Defendant: 644, 678).  Defendant walked into the bedroom, turned on the lights, and Leslie said "what the obscene language are you doing here" Defendant said "I still live here. What is he doing here?" (Defendant: 678). Defendant was "more hurt than angry" (Defendant: 681).  He expected this while he was in New York, but not once he returned (Defendant: 681) He was jealous, "like everyone else to a point" (Defendant: 681)

Defendant was trained in using a gun during his time with the MC (Defendant: 649), and knew how to operate a gun (Defendant: 650) but he"never owned a gun in [his] entire life" (Defendant: 644).  Leslie and defendant both called the police, and defendant waited for the police to arrive (Defendant: 644).  The police searched and did not recover a gun (Defendant: 645).  Defendant and Leslie did not live together after that (Defendant: 645).  Defendant did not want to get back with Leslie after he found her bed with someone else (Defendant: 676).

In January 2005, defendant returned to New York. Defendant did not have any family in New York; they were all in Florida, so he got some money together and got an apartment in the Bronx (Defendant: 645).

43

In early 2005, between January and March, defendant began a romantic relationship with Maria Echeveria (Defendant: 659), his cousin's ex-girlfriend, with whom she has two children (Defendant: 660). Defendant traveled to Florida every month to visit his children (Defendant: 645) – his two biological children, Ariel and Andrew, and the two children from a prior marriage, AM and Jaeshaw; defendant said he "basically brought them up when they were little" (Defendant: 646).

For about two or two and one-half months beginning in January 2005, defendant was supporting the children financially, sending $175.00 per week by money order (Defendant: 647). This money was for school after-care for Andrew and Ariel (Defendant: 672). Defendant "got over" Leslie but spoke with her because of the kids (Defendant: 671); Leslie wanted more money (Defendant: 674) but she relocated, changed her telephone number and the mail started coming back and defendant had no way of contacting her. He tried to contact her through the great grandmother (Defendant: 647). When Leslie called him, she used a restricted number (Defendant: 674) and did not sue him for child support (Defendant: 674-675).

In March 2006, defendant was visiting his sisters and their families in Florida and, at the suggestion of one of Leslie's cousins, they met

44

at a fair. There, defendant was informed by a friend that defendant's children were at the fair  (Defendant: 646).  Defendant walked over and made eye contact with Leslie from about nineteen feet away.  According to defendant, Leslie "snatched the kids . . .made a smart comment and walked away" (Defendant: 646-7).

## The Jury Instructions

During the pre-charge conference, the court reiterated it would be instructing the jury that the Florida evidence could not be considered on the question of defendant's guilt (Proceedings: 689).  During its final charge, the court instructed the jury: "In this trial there were references to alleged sexual contact between the defendant and [AM] in Florida between the years 2001 and 2004.  He is not being charged in this trial with those acts.  The reference in this trial to those alleged incidents was permitted solely to [aid] you in evaluating the reasons surrounding [AM's] delay reporting the crimes charged in this indictment" (Proceedings: 747).  Additionally, the court informed the jury that the purpose of the trial was to reach a "fair and just" result (Proceedings: 734) based on the evidence, which consisted of testimony and exhibits (Charge: 740), and that evidence should be considered without regard to "sympathy, prejudice or passion". (Charge: 735).  Defendant neither took exception nor made any further requests to

charge (Proceedings: 765).

## ARGUMENT

### EVIDENCE OF DEFENDANT'S UNCHARGED CRIMES AGAINST THE CHILD-VICTIM AND PHOTOGRAPHS SHOWING HER AGE WHEN THE SEXUAL ABUSE BEGAN WERE PROPERLY ADMITTED

The trial court properly exercised its discretion in allowing the People to present uncharged-crime evidence that defendant began raping his stepdaughter when she was around nine years old and the family lived in Florida and two old photographs depicting her age when defendant began to sexually abuse her ten years before trial. Defendant argues admission of that evidence denied him a fair trial, but he is wrong.

The indictment charged that defendant sexually abused his stepdaughter AM when she was between five and eight years old and they were living in Queens and raped her when she was twelve and they stayed overnight in Queens. During the gap-period, when the family was living in Florida, defendant's conduct escalated to rape. Evidence of the uncharged Florida rapes was relevant to complete the narrative and avoid speculation about the gap-period, as background information about the father/daughter nature of defendant's relationship with the victim, and to rebut the defense

46

claim that AM's delayed disclosure evinced fabrication.  And as AM's age was an element of the sexual abuse charge and relevant to her behavior and state of mind over the many years of secrecy, two neutral school photographs were properly admitted to show her age and appearance at the time the abuse started.  The court properly exercised its discretion in determining that the probative value of the challenged evidence outweighed its potential for prejudice and the conviction should be affirmed.

Relevant evidence is admissible unless the trial court determines that its probative value is substantially outweighed by the potential for unfair prejudice. *People v. Scarola*, 71 N.Y.2d 769.  Following this principle, evidence of a defendant's prior bad acts or uncharged crimes is admissible when offered to prove a fact relevant to an issue at trial, other than defendant's criminal propensity.  *People v. Dorm*, 12 N.Y.3d 16, 19 (2009); *People v. Alvino*, 71 N.Y.2d 233, 241-42 (1987); *People v. Holden*, ___ A.D. 3d ___, 2011 N.Y. App. Div. LEXIS 1952 (2d Dept 2011). Uncharged crime evidence may be relevant as background material or to complete the narrative of the crime charged, *People v. Till*, 87 N.Y.2d 835, 837 (1995), and is frequently admitted in cases of domestic abuse or where the victim is a child and the crime occurs "in the privacy of the home." *People v. Lugo*, 34 A.D.3d 842, 842 (2d Dept. 2006), *citing People v.*

47

*Henson* 33 N.Y.2d 63, 72 (1973).

Once it is determined that the uncharged crime evidence is relevant to a "nonpropensity" matter, its admissibility rests on the trial court's discretionary balancing. *People v. Dorm*, 12 N.Y.3d at 19; *people v. Leeson*, 12 N.Y.3d 823 (2009); *People v. Hudy*, 73 N.Y.2d 40, 54-55 (1988); *People v. Alvino*, 71 N.Y.2d 233, 241-42 (1987); *People v. Holden*, ___ A.D.3d ___, 2011 N.Y. App. Div. LEXIS 1952.   The relevance determination is a question of law, but the determination whether the evidence is more probative than prejudicial is entrusted to the discretion of the trial court. *People v. Till*, 87 N.Y.2d 835, 837 (1995); *People v. Hudy*, 73 N.Y.2d 40, 55 (1988); *People v. Alvino*, 71 N.Y.2d at 233 (1987). Absent a clear abuse of discretion, the trial court's decision will not be disturbed on appeal. E.g. Holden.

The admissibility of photographic evidence is governed by the same principles. Photographs of a victim are admissible at trial if they tend to prove or disprove a disputed material issue, to illustrate or elucidate other relevant evidence, or to corroborate other evidence. *People v. Wood*, 79 N.Y.2d 958 (1992); *People v. Stevens*, 76 N.Y.2d 833 (1990); *People v. Allan*, 41 A.D.3d 737 (2d Dept. 2007).   Once relevance has been demonstrated, whether the jury should be permitted to view photographs of

48

the victim is within the sound discretion of the trial court. *People v. Stevens*, 76 N.Y.2d at 835.   But a relevant photograph should not be excluded unless the court determines that "its sole purpose is to arouse the emotions of the jury and to prejudice the defendant" *People v. Pobliner*, 32 N.Y.2d 356, 370 *cert denied* 416 U.S. 905 (1973); *accord People v. Wood*, 79 N.Y.2d at 960.

Applying these principles here, the trial court acted well within its discretion in admitting the contested testimony and exhibits into evidence.

### A.   The Court Properly Permitted the Prosecutor to Elicit The Victim's Testimony That Defendant Started Raping Her in Florida

The child's testimony that defendant began to rape her in Florida when she was around eight or nine was highly probative information.  The testimony provided important background evidence about the relationship between defendant and the victim, placed the charged events in a believable context, and provided reasons for the child's delayed disclosure in response to the defense claim of fabrication. E.g. *People v. Wilkinson,* 71 A.D.3d 249 (2d 2010)  Leeson, 12 N.Y. 3d 823; Dorm, 12 N.Y. 3d at 19.  Evidence that when the family moved to Florida, defendant's sexual conduct toward the child escalated to rape was necessary to complete the narrative. *People v. Dorm*, 12 N.Y.3d at 19, *People v. Howard* (2d Dept

49

2001)(in homicide trial, defendant's prior assault of victim/girlfriend admissible to place relationship in context). Without the uncharged crime evidence, the jury would have been left to speculate about what occurred between defendant and AM during that gap period in Florida. The uncharged crime evidence that while living in Florida between 2001 and 2004, defendant raped AM on numerous occasions, placed the earlier and later crimes in Queens in a believable context. In this regard, the People were entitled to inform the jury that when defendant raped his daughter in Queens, in 2004, that was not the first time at all -- defendant began to rape the child in 2001, coinciding with the time the child entered puberty.

For instance, in *People v. Leeson,* at the defendant's trial for sodomizing and sexually abusing a twelve-year-old female neighbor, the trial court properly admitted defendant's uncharged acts of sodomy and sexual abuse of the girl in another jurisdiction because "it provided "'necessary background information on the nature of the relationship' between defendant and the victim" and placed the charged crime in context. *Id.;* accord *People v. Wilkinson,* 71 A.D.3d 249 (2d 2010) Leeson, 12 NY3d 823; Dorm, 12 NY3d at 19; Cook, 93 NY2d at 841).

And the uncharged Florida crimes were relevant to help the jury understand the reason for AM's secrecy and delayed disclosure. *People v*

*Rosario* 34 A.D.3d 370 (2006)(In domestic violence cases, the uncharged crime evidence may be necessary "to place the events in question in a believable context and explain the victim's delay in reporting defendant's conduct" ) *lv denied* 8 NY3d 949; *accord People v. Haidera* - 65 A.D.3d 974 (1st Dept. 2009)(course of sexual conduct against a child); *People v. Bryron*, __ A.D.3d __, 2009 N.Y. App. Div. Lexis 8851 (2d Dept. Dec. 1, 2009) (evidence that victim feared defendant properly admitted to explain why witness did not come forward earlier).

Although the sexual abuse began when AM was around five and ended when she was twelve, AM kept it a secret until she was thirteen. And the relationship went undetected because defendant took advantage of the trusting and loving father-daughter relationship he established with AM - - a relationship highly valued by AM and condoned by her mother and grandmother. AM explained the gamut of emotions she experienced due to defendant's abuse of his position – beyond the shame and hurt, AM was confused and afraid of the adverse consequences of disclosure. Indeed, AM believed her mother loved defendant so much that she would not believe AM even if she told. Thus, despite AM's deep pain, she was too and humiliated and scared to confront defendant, the man of the house whom her mother deeply loved. AM felt powerless to resist defendant and compelled

AM -- she became a loner, gained a lot of weight, and was angry all the time. These symptoms, as the expert testimony established, were typical of children who had been sexually abused or raped by a family member. The People were entitled to elicit from AM, in her own words, that AM's secrecy, accommodation, and delayed disclosure were consistent with the behavior of exhibited by known child-victims of sexual abuse, and recognized by experts as part of the intrafamial child abuse syndrome. Indeed, AM's behavior wholly squared with Dr. Lewittes' expert testimony about the child sexual abuse accommodation syndrome. But since Lewittes had never met AM, the People were also required to demonstrate AM's personal experience as a victim of intrafamilial sexual abuse. In this regard, defendant's suggestion that the expert alone would have been sufficient is simply not true. The jury needed AM's first hand account that being sexually abused and raped by defendant – the only father she knew – left her feeling confused, ashamed, helpless, and afraid.

And the jury was cautioned about the uncharged crime evidence with limiting instructions, which the jury is presumed to have understood and followed. *See People v. Berg*, 59 N.Y.2d 294, 299-300 (1983); People v. Davis, 58 N.Y.2d 1102 (1983); People v. Ebanks, 203 A.D.2d 199 (1st Dept. 1994). The court instructed that defendant was not

52

A.D.2d 199 (1st Dept. 1994). The court instructed that defendant was not charged with the acts that occurred in Florida between 2001 and 2004 and that the jury should consider "those alleged incidents" "solely" to assist it "in evaluating the reasons surrounding [AM's] delay reporting the crimes charged in this indictment" (Proceedings: 747). These instructions alleviated any potential prejudice resulting from the admission of the evidence. *see* e.g. *Cook*, 93 NY2d at 840; *Holden*, ___ AD3d ___, 2011 N.Y. App. Div. LEXIS 1952; *People v Basir*, 179 A.D.2d 662, 664 (2d Dept1992), *Haidera* - 65 AD3d 974 (1st 2009).

And after carefully considering the evidence, the trial court properly determined the probative value of the evidence outweighed its potential for prejudice. The court's questioning of the prosecutor during the *Ventimiglia* hearing, parsing of the evidence proffered by the People, and cautionary instructions to the jury leave no doubt that it balanced the value of the evidence against its potential for prejudice and took action to minimize that potential, and defendant simply errs in suggesting otherwise. For instance, while permitting the People to elicit evidence that defendant raped AM in Florida, the court precluded the People from presenting allegations that defendant sexually abused AM's younger brother and that a criminal case was proceeding against defendant in Florida for the acts his

53

children, and ordered the redaction from AM's medical records of references

to abuse of the brother (Proceedings: 12, 13-15). Similarly, the court

permitted the People to elicit from AM testimony that she was afraid of

defendant because he was "abusive" but precluded the People from

questioning any other witness about defendant's abuse (Proceedings: 15-16,

19).

Thus, the uncharged crime evidence was relevant to a number

of non-propensity issues and its admission was not unfair. *E.g. Henson* 33

N.Y.2d at 72; *Holden*, ___ A.D. 3d ___, 2011 N.Y. App. Div. LEXIS 1952.

Defendant claims that the prosecutor failed to explain the probative value of

the evidence, the delayed outcry was adequately addressed with expert

testimony, the court failed to engage in the probative/prejudicial balancing,

and its limiting instructions were insufficient to cure the prejudice

(Defendant's Brief at 23, 24, 25, 27, 28). None of these claims are preserved

for review. See C.P.L. § 470.05; *People v. Taylor*, 2 A.D.3d 1306 (4th Dept.

2003) appeal denied 2 N.Y.3d 746(2004). Defendant erroneously suggests

(at pp. 32-33) that his general trial objection was sufficient to preserve his

specific appellate claims. Indeed, defendant conceded the uncharged Florida

crime evidence was probative and relevant and never objected to the court's

instruction (Proceedings: 11). For all these reasons, defendant's new claims

54

are either waived or unpreserved for appellate review as a matter of law. E.g. *People v. Bethea*, 34 A.D.3d 489 (2d Dept. 2006)(no appellate review of unpreserved claims regarding the admissibility of uncharged-crime evidence); *People v. Cody*, 149 A.D.2d 722 (2d Dept. 1989)(same).

In any event, defendant's claims are meritless. Defendant contends the prosecutor could have explained "the continuity" in defendant's relationship with the family without mentioning the uncharged crimes. To be sure, evidence that defendant continued to act as the father figure in AM's household was relevant to explain AM's fear and secrecy. But without the additional evidence that defendant raped AM during this period, the jury would have been left to speculate why defendant suddenly stopped having sexual contact with her, only to take it to the next step – rape – when they stayed overnight in Queens. The court parsed the evidence as much as possible without stripping the prosecution of evidence that was essential to place the charged crimes in the proper context, and defendant's contrary suggestion simply ignores important pieces of the child abuse syndrome.

Similarly, defendant's errs in complaining that his sexual conduct here did not escalates as in *People v. Rosario*, and thus the People's reliance on that case at trial to establish the escalation of defendant's sexual conduct was improper. But there can be no serious dispute about AM's

testimony that defendant's sexual demands on her increased over time. Defendant started by forcing her to touch his penis over the boxers, then he added touching her breasts and other places she did not want to be touched, and ultimately took off all their clothes, inserted his penis in her vagina, and moved back and forth.   Defendant complains her testimony does not mention "escalating" sexual conduct.   But AM's testimony unequivocally portrayed an increase in the sexual demands defendant was making, and the People were entitled to inform the jury that the escalation paralleled other changes, such as the diminution of marital sexual activity, AM's pubertal development, and the various emotional and adjustment problems AM was having at home and at school.   That the escalation itself was not at issue is not dispositive, and defendant's attempt to distinguish *People v. Rosario,* on this ground should be rejected.

Defendant's related claim, that the only relevant period of delay began after the last rape in 2004, could not be further from the truth.   The child abuse syndrome evidence addresses why a child sexually abused by a parent or parent substitute might not report the crime immediately after it occurs.   Here, defendant was charged with sexually abusing his daughter, starting around 1997.   AM testified that defendant began touching her around that time, but she did not tell anyone, for various reasons, until

almost ten years later. That defendant's criminal sexual activity ceased in 2004 does not limit the period of the victim's reporting delay to the post-2004 period. To the contrary, AM maintained the secrecy from about the age of five and the People were entitled to prove that AM's behavior from that age, including her submissiveness, passivity, accommodation, and failure to disclose was consistent with the child sexual abuse accommodation syndrome. To be sure, AM's reasons for non-disclosure may well have changed after 2004 – when she was no longer in defendant's clutches she may have been trying repressing the memories rather than tuning them out, but all of the reasons for her behavior were relevant and probative of her state of mind and properly admitted.

Equally without merit is defendant's related contention that since the court instructed the jury it could only consider the uncharged crime evidence in evaluating AM's delayed disclosure, the evidence was not admissible – as the People had contended – as background on the relationship or to complete the narrative. The unchallenged expert testified that disclosure by a child or adolescent who has been raped or abused by a father may never occur, and when it does, it is typically delayed, sometimes for years. To decide whether AM's disclosure was delayed because she was suffering from the child sexual abuse accommodation syndrome, the jury

had to consider whether AM's family circumstances, and in particular her relationship with defendant, resembled those of known abuse victims as described by the expert. Of necessity, the jury had to examine defendant's sexual interactions with AM to make that evaluation. Defendant's attempt to confine the evidence to the delayed disclosure *per se* rather than evaluate the disclosure in context ignores the dynamics of this well-accepted syndrome.

Nor is there any merit to defendant's contention (at pp 23-24) that because defendant allegedly raped AM in Florida countless times but was charged with raping her in Queens only once, the uncharged evidence was more prejudicial than probative and the court's balancing was flawed. But it was defendant who elicited the now challenged testimony from AM during cross-examination, and having failed to tarnish her credibility, defendant cannot now complain that this defense tactic prejudiced his case. During the People's case, after AM testified that defendant had sex with her in Florida, the prosecutor asked AM how many times it occurred, and AM testified it was "very frequent" (AM: 471). Having successfully elicited evidence that defendant's sexual demands on AM had increased, the prosecutor moved to another area. During cross-examination, however, the defense pressed AM to for details about the frequency. When AM could not be specific, the defense persisted. Thus, it was only in response to leading

58

questions from the defense, asking AM whether the sex occurred on a "weekly basis" for "more than a year or two" that AM answered "yes" (AM: 499). Having intentionally tried to paint AM as not credible because she could not remember certain details, defendant can hardly now complain that it was prejudiced by this evidence.

Thus, the court properly exercised its discretion in permitting the prosecutor to elicit testimony from the victim about the uncharged rapes in Florida. The evidence was unquestionably relevant, and, as discussed below, defendant could not have been unduly prejudiced by its admission because the evidence of defendant's was so strong.

**B.  The Court Properly Admitted Black and White Copies of Photographs Depicting the Child's Appearance**

The court properly exercised its discretion by admitting into evidence the two contested photographs of AM at the age of five or seven because they were relevant to issues of fact at trial. The photographs demonstrating AM's age when defendant began abusing her were probative to illustrate and corroborate the age element of the crime of sexual conduct, demonstrated the prosecution's theory that AM was a victim of intra familial sexual abuse, and were responsive to the defense claim of fabrication.

Defendant began abusing AM when she was about that age, and

the pictures were relevant to establish AM was under eleven for purpose of the charged crime of course of sexual conduct. P.L. § 130.80. The statute requires the People to prove the victim was unable to consent because she was less than eleven years of age and the photographs were unquestionably probative of her age. Although defendant complains that AM's age was undisputed, that does not negate the People's prerogative to prove their case. *See People v. Scott* 294 A.D.2d 661, 663 (3d Dept. 2002)(photograph of deceased victim's two-year old child was relevant to establish the "age and appearance" of the murder victim's child, "who was present in the house throughout the ordeal but was too young to testify" and court did not abuse its discretion in admitting the photograph).

Moreover, photographs of a victim are admissible to corroborate and illustrate the testimony of a doctor and other witnesses. *E.g. People v. Stephens,* 3 A.D.3d 57 (1st Dept. 2003), *People v. Sims,* 110 A.D.2d 214, 222 (2d Dept. 1985). Here, the photocopies of AM's school portrait illustrated that AM fit within the sexually abused child syndrome – a matter the jury may have had trouble envisioning from the observing the fifteen year old young woman standing over five feet six inches tall and weighing over two hundred and forty pounds who testified at trial. Just as in *People v. Stephens,* 3 A.D.3d 57 (1st Dept. 2003)(homicide of child

60

abused under defendant's care), the "before" photograph, which was taken before defendant began abusing AM, and certainly before he began raping her,  and "which depicts her as smiling and healthy," was "necessary to demonstrate the drastic change that took place" after she became a victim of defendant's abuse. *Id.* at 64; *accord People v. Manon*, 226 A.D.2d 774 (3d Dept. 1996)(photographs of infant in his bassinet prior to his death were properly admitted as they confirmed the physician's testimony concerning the infant's "physical manifestations of dehydration and undernutrition" and probative of the conditions under which he was living under defendant's care).

Defendant complains the photographs were sympathy-inducing and for the first time on appeal questions the need for multiple photographs. But, the two photographs were simply neutral black and white photocopies of standard school portraits. And as AM was unsure of her exact age when the abuse started, and had pegged the incident by remembering it occurred when she had the loft bedroom at her grandmother's home, the People properly selected two photographs representing AM's two-year age span at that time.  Defendant's contrary position is unpreserved for appellate review and without merit. *See* C.P.L. § 470.05(2).

Nor is there any merit defendant's claim that the photographs

61

should not have been admitted because they were introduced to elicit sympathy. For one thing, photographic evidence should only be excluded if its "sole" purpose is to inflame the jury, and that, as discussed, is not the case here. *E.g. People v. Pobliner*, 32 N.Y.2d at 370. Indeed, far from being inflammatory or emotionally charged, the exhibits were relatively neutral, black and white photocopies of the type of school portrait familiar to most jurors and pale in comparison to the types of photographs properly admitted in cases of child abuse. For instance, in *People v. Sims*, 110 A.D.2d 214, 222 (2d Dept. 1985) twelve photographs depicting burns and scars on various parts of the child's body were properly admitted. The evidence had multiple purposes: the burn pattern illustrated and corroborated the physician's testimony that the burns were not accidental, and the scars from prior injuries corroborated the prosecution's theory that the child had been abused over time and discredited the defense notion that the child's injuries were accidental. *People v. Sims*, 110 A.D.2d 214, 222 (2d Dept. 1985). The photographs displayed here were equally probative and far less prejudicial than those.

Moreover, any tendency the photographs may have had to arouse the jury's sympathy was adequately addressed by the court throughout trial. Commencing in voir dire and continuing through its final

62

charge, the court informed the jury that it should decide the case by applying its common-sense to the evidence, and that sympathy should play no role in its deliberations (Proceedings: 120, 312, 739, 740). The defense echoed that theme during its remarks (Defendant's Opening: 351; Defendant's Summation: 694).

Thus, the court properly admitted the two neutral photographs as they corroborated and illustrated the other evidence and the court's instructions ensured that the jurors did not let the photographs inflame their passions.

And given the strong evidence of defendant's guilt, defendant's errs in claiming that admission of the uncharged crime evidence and photographs unfairly prejudiced the jury. See *People v. Crimmins*, 36 N.Y.2d 230 (1975); *People v. Diaz*, 277 A.D.2d 235 (2d Dept. 2000). AM's testimony fit squarely within the child sexual abuse accommodation syndrome described by Dr. Lewittes. AM exhibited behavior that was consistent with the set of symptoms commonly associated with child-victims of intrafamial child sexual assault: secrecy, helplessness, entrapment, accommodation, and delayed disclosure. The perforation in her hymen and lack of any visible injury in the tissue were perfectly normal and consistent with the genitalia of a post-pubertal female who had engaged in sexual

intercourse, voluntary or involuntary.  The reasons for AM's delayed outcry were exhaustively detailed by the expert and candidly described by AM in her own words.  Indeed, although the defense makes much of AM's decision to stay overnight in Queens in November 2004 when she knew defendant would be there, AM schedule was dictated by the adults.  AM had no knowledge of her mother's intention to separate from defendant, and believed defendant was returning to Florida in December.  And it was AM's conduct at school that caused her family to send her to Queens.  Thus, although AM was forced to overlap with defendant in Queens for one last fateful night, that was the last time defendant touched her.

## CONCLUSION

For the reasons set forth above, defendant's judgment of conviction should be affirmed.

Respectfully submitted,

**RICHARD A. BROWN**
District Attorney
Queens County

GARY FIDEL
JILL A. GROSS-MARKS
    Assistant District Attorneys
 of Counsel

May 23, 2011

## CERTIFICATE OF COMPLIANCE

I certify the following in compliance with section 670.10.3 of the Rules of this Court:

1. The foregoing brief was prepared on a computer.

2. The typeface used is Times New Roman.

3. The point size of the text is 14 point, except for footnotes, which are 12 point.

4. The brief is double spaced, except for the Table of Contents, point headings, footnotes, and block quotes.

5. The brief contains 13,943 words, exclusive of the Table of Contents, proof of service, and the certificate of compliance, based on the word count of the word-processing system used to prepare this brief.

Dated:      Kew Gardens, New York
            May 23, 2011


                                    _____
                                    Assistant District Attorney




Courtesy Copy
Original Filed in ECF
docket number 14-CV-5456

# Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

D32653
G/kmb

_____AD3d_____

Argued - October 4, 2011

MARK C. DILLON, J.P.
RUTH C. BALKIN
RANDALL T. ENG
JEFFREY A. COHEN, JJ.

2007-07185

DECISION & ORDER

The People, etc., respondent,
v Abu Khan, appellant.

(Ind. No. 2147/06)

Lynn W. L. Fahey, New York, N.Y. (Jonathan M. Kratter of counsel), for appellant.

Richard A. Brown, District Attorney, Kew Gardens, N.Y. (Gary Fidel and Jill A. Gross-Marks of counsel), for respondent.

Appeal by the defendant from a judgment of the Supreme Court, Queens County (Hollie, J.), rendered July 24, 2007, convicting him of rape in the first degree, course of sexual conduct against a child in the second degree, endangering the welfare of a child, and sexual abuse in the second degree, upon a jury verdict, and imposing sentence.

ORDERED that the judgment is affirmed.

The Supreme Court providently exercised its discretion in permitting the prosecution to elicit evidence that the defendant, charged with sexually touching the younger-than-11-year-old victim from 1997 to 2000 while the family lived in Queens, and with one rape of the victim in Queens in November 2004, raped the victim on frequent occasions between 2001 and 2004 while the family lived in Florida. The evidence was properly admitted to demonstrate the defendant's pattern of escalating sexual conduct toward the victim during the period between the charged crimes, and as relevant background information to enable the jury to understand the defendant's relationship with the victim and to place the events in question in a believable context, particularly since the defendant raised the issue of the victim's delayed

October 25, 2011

Page 1.

disclosure of the charged criminal conduct (*see People v Leeson*, 12 NY3d 823, 826-827; *People v Haidara*, 65 AD3d 974; *People v Cardona*, 60 AD3d 493, 493-494; *People v Workman*, 56 AD3d 1155, 1156-1157; *People v Rosario*, 34 AD3d 370).   Moreover, the probative value and the need for the evidence outweighed any potential prejudice to the defendant, particularly in light of the Supreme Court's limiting instruction to the jury as to the proper use of the uncharged crimes evidence (*see People v Cook*, 93 NY2d 840, 841; *People v Holden*, 82 AD3d 1007, 1008; *People v Rock*, 65 AD3d 558, 559; *People v Melendez*, 8 AD3d 680, 681)..

Contrary to the defendant's contention, the Supreme Court providently exercised its discretion in admitting into evidence two photographs depicting the victim at ages five and seven to illustrate the victim's age when the sexual contact allegedly began and to corroborate testimony regarding the change in the victim's physical appearance (*see People v Stevens*, 76 NY2d 833, 835-836; *People v Sampson*, 67 AD3d 1031, 1032).   The fact that there was other evidence available with respect to these matters did not require the exclusion of the photographs (*see People v Stevens*, 76 NY2d at 835-836; *People v Hamilton*, 66 AD3d 921, 922).

DILLON, J.P., BALKIN, ENG and COHEN, JJ., concur.

ENTER:

*Matthew G. Kierkaniernan*
Clerk of the Court

October 25, 2011                                                                                                         Page 2.

# APPELLATE ADVOCATES

2 RECTOR STREET - 10TH FLOOR, NEW YORK, NEW YORK 10006
PHONE: (212) 693-0085     FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
  LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-CHARGE
  BARRY S. STENDIG

SUPERVISING ATTORNEYS
  WINSTON MCINTOSH
  DAVID P. GREENBERG
  ERICA HORWITZ
  PAUL SKIP LAISURE
  LISA NAPOLI

SENIOR ATTORNEY
  WILLIAM G. KASTIN
    STUDENT INTERN COORDINATOR

STEVEN R. BERNHARD
ERIN R. COLLINS
DENISE A. CORSI
A. ALEXANDER DONN
RACHEL A. DUBIN
JONATHAN GARVIN
JOHN GEMMILL
ALLEGRA GLASHAUSSER
LEILA HULL
KENDRA L. HUTCHINSON
JONATHAN M. KRATTER
WARREN S. LANDAU
JOSHUA M. LEVINE
KATHERINE A. LEVINE
JESSICA M. MCNAMARA
ANNA PERVUKHIN
DENICE POWELL
KATHLEEN E. WHOOLEY

OF COUNSEL
  ANDREW E. ABRAHAM
  ALEXIS A. ASCHER
  ELLEN FRIED
  MELISSA S. HORLICK
  WILLIAM A. LOEB
  REYNA E. MARDER
  MICHELLE VALLONE

Courtesy Copy
Original Filed in ECF
docket number 14-CV-5456

November 9, 2011

Honorable Jonathan Lippman
Chief Judge
Court of Appeals
Court of Appeals Hall
Eagle Street
Albany, New York 12207

Attn: Andrew W. Klein, Esq.

Re: People v. Abu Khan   2147 - 06

Your Honor:

Pursuant to Criminal Procedure Law, Section 460.20, I am submitting this letter as an application for permission to appeal to the Court of Appeals in the above-entitled case. An application has not been made to a justice of the Appellate Division.

On October 25, 2011, the Appellate Division, Second Department, affirmed with opinion a judgment rendered on July 24, 2007, by the Supreme Court, Kings County, convicting appellant of first-degree rape, second-degree course of sexual conduct against a child, second-degree sexual abuse, and endangering the welfare of a child.

Appellant had no co-defendants.

Appellant was charged with second-degree course of sexual conduct against a child, a D felony, based on actions between 1997 and 2000 and with first-degree rape and two misdemeanors based on actions that occurred on November 30 2004. The complainant, the child of the woman

with whom appellant lived, was 14 years old when she testified. She and her mother both told the jury that she was born in April 1992, and her age was not disputed by the defense.

This case presents two issues that merit consideration by the Court. The trial court abused its discretion when it admitted two photographs of the complainant when she was between five and seven years old to prove that she was under age 11 between 1997 and 2000 and "as probative of what the victim looked like at the age that she is alleged to have been a victim." Clearly, photographs of this nature are highly likely to evoke sympathy for the complainant, prejudicing the jury's deliberations. Moreover, what the complainant looked like when the course of sexual conduct began was not relevant, and there was no dispute that she was well under 11 years old at the time of this crime. Further, the Court has apparently never written about the admissibility of photographs of a child victim at the time of the crimes and has not considered the admissibility of photographs in homicide cases, the most closely analogous issue, in nearly 20 years. See People v. Wood, 79 N.Y.2d 958 (1992); People v. Stevens, 76 N.Y.2d 833 (1990).

In addition, the court permitted the prosecution to elicit from the complainant that appellant had raped her "very frequently" in another state to which the family moved over what could have been a three and one-half year period from 2001 until 2004. Thus, this prior crimes evidence greatly outweighed the actual crimes at issue, and for the court to admit them for such vague purposes as to show the relationship between appellant and the complainant, for context or background, or to show how appellant's conduct escalated constituted an abuse of discretion by the trial court. People v. Molineux, 168 N.Y. 264, 291-94 (1901).

I am enclosing copies of the briefs filed in the Appellate Division and that Court's order. Also enclosed are pages 419-424 of the minutes of March 26, 2007, containing the colloquy about the admission of the photographs and pages 5-14 of the minutes of March 19, 2007, containing the Molineux colloquy. We request that this Court consider and review all state and federal constitutional issues outlined in appellant's brief. I do not expect to send a follow-up letter in support of the application.

Respectfully,

Jonathan M. Kratter
Appellate Counsel
(212) 693-0085, ext. 245

cc: Jill Gross-Marks, Esq., Queens County District Attorney's Office

2



**DISTRICT ATTORNEY**
**QUEENS COUNTY**
125-01 QUEENS BOULEVARD
KEW GARDENS, NEW YORK 11415-1568

**Courtesy Copy**
Original Filed in ECF
docket number 14-CV-5456

(718) 286-6000
www.queensda.org

**Richard A. Brown**
District Attorney

Honorable Robert S. Smith
Judge of the Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, NY  12207-1095

January 6, 2012

Re:     People v. Abu Khan
        Queens County Indictment Number 2147/06

Your Honor:

        The People oppose defendant's application, through counsel, for permission to appeal to this Court from an October 25, 2011 order of the Appellate Division, Second Department, affirming defendant's conviction of rape in the first degree, course of sexual conduct against a child in the second degree, endangering the welfare of a child, and sexual abuse in the second degree.  *People v. Khan* 88 A.D.3d 1014 (2d Dept. 2011).

        Defendant raises two evidentiary issues, but neither presents a question of law warranting the Court's review. Rather, as discussed fully in Respondent's Brief, the admission of evidence is vested in the discretion of the trial court and in this case, the trial court properly exercised that discretion in allowing the People to present testimonial evidence from the stepdaughter/victim that defendant began raping her in Florida when she was around nine years of age, and demonstrative evidence, namely two old school photographic portraits, depicting her age when defendant's abuse began about ten years earlier.

        Defendant sexually abused his stepdaughter when she was between five and eight years old and the family lived in Queens, and defendant raped his stepdaughter when she was twelve and they stayed overnight in Queens.  During the gap-period, defendant's conduct towards his stepdaughter escalated to rape, but the family was living in Florida.  The People of the State of New York were unable to charge defendant with those Florida rapes,

*People v. Abu Khan*                                                        Page 2

but the evidence that they occurred was relevant to complete the narrative of events between defendant and his stepdaughter, avoid speculation by the jury about defendant's conduct during the gap-period, and to rebut the defense claim that the victim's delayed disclosure evinced fabrication. *E.g. People v. Dorm*, 12 N.Y.3d 16, 19 (2009); *People v. Leeson*, 12 N.Y.3d 823 (2009); *People v. Alvino*, 71 N.Y.2d 233, 241-42 (1987). And as AM's age was an element of the sexual abuse charge and relevant to her secretive behavior and state of mind over the many years of entrapment, *see, e.g., People v. Spicola,* 16 N.Y.3d 441 (2011), two neutral school portrait photographs of the child at the time the abuse started were properly admitted to show her age and appearance at that time. *E.g. People v. Wood*, 79 N.Y.2d 958 (1992); *People v. Stevens*, 76 N.Y.2d 833 (1990). The court properly exercised its discretion in determining that the probative value of the challenged evidence outweighed its potential for prejudice, e.g. *People v. Scarola*, 71 N.Y.2d 769, *People v. Leeson*, 12 N.Y.3d 823, *People v. Pobliner*, 32 N.Y.2d at 370, and nothing defendant now rehashes in his application changes the propriety of that ruling.

In sum, defendant fails to present a question that warrants review by the Court. Defendant's application should be denied summarily and his conviction affirmed.

Respectfully submitted,

Jill A. Gross-Marks
Assistant District Attorney
(718) 286-5882

cc:    Appellate Advocates
       Jonathan M. Kratter, Esq.,
       2 Rector Street, 10th Floor
       New York, NY 10006



Courtesy Copy
Original Filed in ECF
Docket number 14-CV-5456

# State of New York

# Court of Appeals

BEFORE:  HON. ROBERT S. SMITH,
_____ Associate Judge

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

    -against-

ABU KHAN, **2147-06**

                     Appellant.

**ORDER
DENYING
LEAVE**

_____

      Appellant having applied for leave to appeal to this Court pursuant to Criminal Procedure

Law § 460.20 from an order in the above-captioned case;*

      UPON the papers filed and due deliberation, it is

      ORDERED that the application is denied.

Dated: *January 19, 2012*
       *New York, NY*

_____
                 Associate Judge

*Description of Order:  Order of the Supreme Court, Appellate Division, Second Department,
entered October 25, 2011, affirming a judgment of the Supreme Court, Queens County, rendered
July 24, 2007.

**Courtesy Copy**

Original Filed in ECF
docket number 14-CV-5456

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
----------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK

                    Respondent,

    -against-                                    Ind. No.: 2147/06

ABU KHAN

                    Defendant.
----------------------------------------x

CRIMINAL PROCEDURE LAW § 440.10 et seq.
MOTION TO VACATE JUDGMENT - DEFENDANT

Date 29th November, 2011

                              ABU KHAN, [07A4685]
                              Green Haven C.F.
                              P.O. Box 4000
                              Stormville, N.Y. 12582

## INDEX

**Page:**

NOTICE OF MOTION TO VACATE JUDGMENT................................. 2

AFFIDAVIT IN SUPPORT............................................... 4

PRELIMINARY STATEMENT.............................................. 6

HISTORY OF CASE.................................................... 7

PARTIES INVOLVED.................................................. 8

CONSTITUTIONAL PROVISIONS......................................... 9

JURISDICTIONAL PROVISIONS......................................... 10

TABLE OF AUTHORITIES.............................................. 11

ARGUMENT PRESENTED:

    POINT 1:

        NEWLY DISCOVERED EVIDENCE................................. 13

    POINT 2:

        PROSECUTORAL MISCONDUCT.................................. 14

    POINT 3:

        INEFFECTIVE TRIAL COUNSEL................................ 17

CONCLUSION OF ARGUMENTS........................................... 18

VERIFICATION OF PLEADINGS......................................... 19

AFFIDAVIT OF SERVICE BY MAIL...................................... 20

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
------------------------------------------x
The People Of The State Of New York,

                        Respondent,

                                              NOTICE OF MOTION
                                              TO VACATE JUDGMENT

           -against-
                                              Ind. No.: 2147/06

Abu Khan,

                        Defendant.
------------------------------------------x


        1. PLEASE TAKE NOTICE, that upon the annexed affidavit of <u>ABU KHAN</u>, duly

affirmed on the 28th day of November, 2011, a motion will be made in the

Court of Queens County, at a term thereof, at the Courthouse located at 125-

01 Queens Boulevard, Kew Gardens, New York 11415, on the 4th day of January,

2012, 9:30 A.M. or as soon thereafter as the Presentor or his Counsel can be

heard, for an Order pursuant to Criminal Procedure Law § 440.10 et seq.,

vacating the judgment of conviction on the following grounds:

           A. THE COURT DID NOT HAVE THE PROPER JURISDICTIONAL AUTHORITY TO
              HEAR;

           B. THE JUDGMENT WAS A PRODUCT OF MISREPRESENTATION;

           C. THE MATERIAL EVIDENCE ADDUCE AT TRIAL, WAS MISLEADING AND FALSE;

           D. THERE WAS IMPROPER AND PREJUDICIAL CONDUCT NOT APPEARING IN THE
              RECORDS THAT WOULD WARRANT A RECUSAL BY THE STATES DESIGNATED
              AGENT;

           E. THE PRESENTOR HAS OBTAINED NEWLY DISCOVERED EVIDENCE, THAT WOULD
              CHANGE THE OUTCOME OF THE TRIAL, IF PRESENTED BEFORE HIS JURORS.

        And for such other and further relief as the Court may deem just and

proper.

Affirmed before me this

_28th_ day of November, 2011

_Ellen A. Bohlmann_
Notary Public

ELLEN A. BOHLMANN
Notary Public, State of New York
No. 0342485
Qualified in Dutchess County
Term Expires Oct. 31, 2012

De Jure,

_Alan M._ Sui Juris

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
————————————————————————————x
The People Of the State Of New York,

                              Respondent,

                                                        AFFIDAVIT IN SUPPORT
                                                        OF MOTION TO VACATE
                                                        JUDGMENT

        -against-
                                                        Ind. No.: 2147/06


ABU KHAN,

                              Defendant.
————————————————————————————x

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF DUTCHESS   )


    2. ABU KHAN, duly affirms under penalty of perjury, deposes and says:

    3. I am the Presentor, ABU KHAN, and I make this affidavit in support of

a motion to Vacate Judgment pursuant to Criminal Procedure Law § 440.10

(a)(b)(c)(d)(f)(g)(h), on the grounds of:

> A. THE COURT DID NOT HAVE THE PROPER JURISDICTIONAL AUTHORITY TO
>    HEAR;
>
> B. THE JUDGMENT WAS A PRODUCT OF MISREPRESENTATION;
>
> C. THE MATERIAL EVIDENCE ADDUCED AT TRIAL, WAS MISLEADING AND
>    FALSE;
>
> D. THERE WAS IMPROPER AND PREJUDICIAL CONDUCT NOT APPEARING IN THE
>    RECORDS THAT WOULD WARRANT A RECUSAL BY THE STATES DESIGNATED
>    AGENT;
>
> E. THE PRESENTOR HAS OBTAINED NEWLY DISCOVERED EVIDENCE, THAT WOULD
>    CHANGE THE OUTCOME OF THE TRIAL, IF PRESENTED BEFORE HIS JURORS.

    4. THEREFORE, LET ALL RECORDS EVEN FURTHER REFLECT, the to wit

Presentor,has given Seasonably Notice under the Rules and Laws of this State,

that he will be seeking JUDICIAL INTERVENTION, and he is also seeking that

the Respondent or his Designated Agent place before this Court and its Bar,

why INJUNCTIVE RELIEF should not be granted herein, in a POINT FOR POINT

REBUTTAL or CONCEDE thereof.

5. THEREFORE, LET IT BE SO ORDERED AND ADJUDGED, the Respondent or his Designated Agent, come forth before this Court on the 4th day of January, 2012, or thereinafter with GOOD, FAIR or JUST CAUSE or REASONING why these to wit pleading, should not be so heard or granted.


Affirmed before me this

28th day of November, 2011

*Ellen A. Bohlmann*
Notary Public

ELLEN A. BOHLMANN
Notary Public, State of New York
No. 0342485
Qualified in Dutchess County
Term Expires Oct. 31, 20___

De Jure,

_____ Sui Juris

---
PRELIMINARY STATEMENT
---

6. LET IT BE SO NOTED, <u>ABU KHAN</u>, is herein going to present GOOD, FAIR and JUST CAUSE before this Bar on the REASON or REASONING that will warrant Notice by its Judicial Authority, on Points of Law, redressed within these pleadings.

7. For the Presentor feels and believes, that due to the issues that will be presented in a COLORABLE manner, this Bar will meet both its LEGAL and MORAL OBLIGATION it owes to not only the PEOPLE, but this Presentor, under a contention, he will present FACTS through Parol Evidence.

8. For the issues that are going to be raised are as follows:

    A. THE COURT DID NOT HAVE THE PROPER JURISDICTIONAL AUTHORITY TO HEAR;

    B. THE JUDGMENT WAS A PRODUCT OF MISREPRESENTATION;

    C. THE MATERIAL EVIDENCE ADDUCED AT TRIAL, WAS MISLEADING AND FALSE;

    D. THERE WAS IMPROPER AND PREJUDICIAL CONDUCT NOT APPEARING IN THE RECORDS THAT WOULD WARRANT A RECUSAL BY THE STATES DESIGNATED AGENT

    E. THE PRESENTOR HAS OBTAINED NEWLY DISCOVERED EVIDENCE, THAT WOULD CHANGE THE OUTCOME OF THE TRIAL, IF PRESENTED BEFORE HIS JURORS.

-----------------------

### HISTORY OF CASE

-----------------------

9. The herein Presentor was FALSELY ACCUSED and ARRESTED on the 15th day of June, 2006, for the alleged offense of: Penal Law 130.35(4) [Count One], 130.80 [Count Two], 260.10(1) [Count Three], and 130.60 [Count Four].

10. On the above encapsulated day, he was thus arraigned and enter a plea of NOT GUILTY and held over for Trial Proceedings thereinafter.

11. On the 22nd day of March, 2007 he was presented before a Jury of this States Peers for the above encapsulated alleged offenses and was FOUND GUILTY thereof.

12. Presentor was sentenced to, by Hon. Roland D. Hollie, to a determinate sentence of 14 years with 5 years PRS.

13. Notice of Appeal was given on the 24th day of July, 2007.

## PARTIES INVOLVED

REPRESENTING THE STATE OF NEW YORK
HON. RICHARD A. BROWN
QUEENS DISTRICT ATTORNEY

---

REPRESENTING THE DEFENDANT
Abu Khan
PRESENTOR

---
## CONSTITUTIONAL PROVISIONS
---

14. By taking notice of first this States Constitutional Article, we can see that under Article 1 § 6 & 11, one is afforded a Right to Redress and thus invoke his Substance Due Process of Law, Rights to a Proper and Fair hearing.

15. By also noting the Constitutional Articles and Amendments of the UNITED STATES, we can see that under Article 4 § 2, one is entitled to the same or equal protections as all other people.

16. Now by applying this to Amendments 1, 5, 9, & 10, we can see the harmony that runs within them. For one gives the Right to Redress, the other gives Due Process of Law, and the furtherance of cause.

17. Herein giving the proper and legal authority and power to present and redress in accord to both this State and the Federal States, ·in an attempt to preserve what the Trial Counselor had failed thereof.

---
JURISDICTIONAL PROVISIONS
---

18. Within this Argument, there is only two things one may invoke, the first being VENUE, while the other is JURISDICTION, and to apply both in a harmonic manner, one only needs to understand the proper Statute and Provisions which this Bar really need not have cited.

19. But to cover ones Right and Remedies, he shall thus point this Courts Bar to that of CPL and CPLR through the use of the Uniformed District Court Acts [hereinafter UDCA] § 2102, which states in part that all Laws relevant to that of ones cause or in the aid of the Court, one may cite or invoke the warranted Jurisdictional Authorities thereof.

20. Thus giving rise to CPLR § 470.15(3)(d) and CPL § 1012(a)(2) by applying § 5701(a)(2)(v).

21. Whereby giving this Bar the Right to hear and to accept in accord manner thereof as in warranted herein.

```
————————————————
TABLE OF AUTHORITIES
————————————————
```

CASES CITED:                                                    Page:

Eze v. Senkpowski, 321 F.3d 110, 112.............................    17

In re Winship, 397 U.S. 358......................................    14

Jackson v. Virgina, 443 U.S. 307.................................    15

Kimmelman v. Morrison, 477 U.S. 365..............................    17

Moore v. Johnson, 194 F.3d 586...................................    17

Pavel v. Hollins, 261 F.3d 210, 222 n.3, 223 n.4.................    17

People v. Baba Ali, 179 A.D. 2d 725..............................    17

People v. Donovan, 184 A.D. 2d 654...............................    17

People v. Droz, 39 N.Y.2d 457....................................    17

People v. Jackson, 78 N.Y.2d 638, 578 N.Y.S.2d 483, 585 N.E.2d 795.  15

People v. LaBree, 34 N.Y.2d 257, N.Y.S.2d 412, N.E. 26 730........    17

People v. Smith, 237 A.D. 388, 655 N.Y.S.2d 416..................    17

Spencer v. Donnelly, 193 F.Supp.2d 718...........................    17

Strickland v. Washington, 466 U.S. 668...........................    17

U.S. v. Adams, 870 F.2d 1140, 1145...............................    15

U.S.v. Bayles, 923 F.2d 70, 72...................................    15

U.S. v. Brown, 9 F.3d 1374, 1375.................................    15

U.S. v. Mastroianni, 749 F.2d 900, 911...........................    15

U.S. v. Redondo-Lemos, 27 F.3d 439, 444..........................    16

CONSTITUTIONAL ARTICLES AND AMENDMENTS:

STATE OF NEW YORK CONSTITUTIONAL ARTICLE 1 § 6...................    09

STATE OF NEW YORK CONSTITUTIONAL ARTICLE 1 § 11..................    09

UNITED STATES CONSTITUTIONAL AMENDMENT 4 § 2.....................    09

TABLE OF AUTHORITIES

CONTINUED:                                                          Page:

UNITED STATES CONSTITUTIONAL AMENDMENT 1.........................     09

UNITED STATES CONSTITUTIONAL AMENDMENT 5.........................     09

UNITED STATES CONSTITUTIONAL AMENDMENT 9.........................     09

UNITED STATES CONSTITUTIONAL AMENDMENT 10........................     09


STATUTORY PROVISIONS:

CRIMINAL PROCEDURE LAW AND RULES § 5701(a)(2)(iv)(v)..............     10

CRIMINAL PROCEDURE LAW AND RULES § 470.15(3)(d)..................     10

CRIMINAL PROCEDURE LAW AND RULES § 1012(a)(2)....................     10

NEW YORK STATE PENAL LAW § 130.35(4).............................   07,18

NEW YORK STATE PENAL LAW § 130.60................................     07

NEW YORK STATE PENAL LAW § 130.80................................   07,17

NEW YORK STATE PENAL LAW § 210.15................................     13

NEW YORK STATE PENAL LAW § 260.10(1).............................     07

UNIFORMED DISTRICT COURT ACT § 2102..............................     10

---
ARGUMENT PRESENTED
POINT 1
NEWLY DISCOVERED EVIDENCE
---

22. In this argument the Presentor will be submitting papers to question the fact of Perjured Testimony, Misleading and False Document and the intent for Malicious and Vindictive prosecution, thus within a Nexus Test.

23. The States witness committed the Act of Perjury [PL § 210.15], by admitting not receiving any financial support from the Presentor for his children [Note Exhibit C ], where it clearly shows, her name and signature, among other information.

24. A.D.A. stated on Record that Presentor was Dishonorably Discharge from the United States Marine Corps. for a bar fight [Note Exhibit B ], where the Court will see that the Presentor has an Honorable Discharge along with a citation from the Secretary of Defense.

25. The Presentor will show that there was a brief relationship with A.D.A. in the past, that ended bad, thus the reason for the Malicious and Vindictive prosecution [Note Exhibit D ].

---
ARGUMENT PRESENTED
POINT 2
PROSECUTORIAL MISCONDUCT
---

26. Upon Notice being taken, if we reflect upon what the UNITED STATES SUPREME COURT [hereinafter High Bar] had held within In re Winship, 397 U.S. 358, we can see it held in part, in order to provide CONCRETE SUBSTANCE FOR THE PRESUMPTION OF INNOCENCE [the bedrock axiomatic and stance for the presumption of innocence], this axiomatic and elementary principle whose enforcement lies at the foundation of our Criminal Laws and Due Process of Law. We must come to terms that there is more at stake than bring one before the Bar's or Justice to face any alleged allegations. id.362.

27. For here we have the stigmatizing of one, by a conviction, as the lost of ones good name, or the lost of ones liberties, just to name a few. But if we turn our full attention to some simple facts, the facts will paint a different picture. A picture which is probative enough, to not only support, but prove beyond a reasonable doubt, an INNOCENT MAN now sits in a Prison Cage for a crime he did not commit.

28. Now the onerous burden, is PROOF BEYOND A REASONABLE DOUBT, can fall before many doors, for in some, we have MENS REA to that of ACTUS REUS. But first we need to try and understand what the Jury heard and what they did not hear.

29. And to do this end, all we need to do, is note the Original Records [Note Exhibit A ], and we can see the Jury was lead to a subjective state of facts, which held no bearing, due to the fact, most were misleading [Note Exhibit B and C ], and one of a reasonable mind would of though differently, if they would have heard the facts in a truthful manner and not in a

- 14 -

misleading way as the case is here. For by Noting Jackson v. Virginia, 443 U.S. 307, which had held such in part on their Jurors. id. 315-16.

30. Or if this Bar would note, if the evidence used by the State was of misleading nature, it should have never been introduced at Trial, thus warranting it to be suppressed. [Note Exhibit A & B ] but was not, due to the fact, the States Jural Agent fully knew. Thus giving case to try and paint a picture of lies and misleading facts. [Note Exhibits B & D ].

31. For here the States Jural Agent, had stated there was a DISHONORABLE DISCHARGE FROM SERVICE, and this was a lie, or there was a PRIOR ARREST and CONVICTION. But when the Bar had requested a CERTIFICATE OF CONVICTION, the State jural Agent could not bring forth one, to support their claim.

32. Or we can note Exhibit E which supports a few facts as self breaching of hymen by tampons, no tearing or damage, no visible injuries, no physical evidence to support these allegations through scientific evidence.

33. For if this Bar would reflect on the Record, the Prosecutor used Prejudicial Remarks as referring to this Presentors name to Arabic ties, thus demonstrating Improper and Prejudicial Conduct. People v. Jackson, 78 N.Y.2d 638, 578, N.Y.S.2d 483, 585 N.E.2d 795.

34. There are limits to a prosecutor's discretion, note U.S. v. Mastroianni, 794 F.2d 900,911, prosecutorial discretion limited by requirement not to violate fundamental conceptions of Justice, U.S. v. Adams, 870 F.2d 1140,1145, prosecutorial discretion may not be reaction to defendant's exercise of protected statutory rights, U.S. v. Bayles, 923 F.2d 70,72, prosecutorial discretion may be reviewed to ensure decisions not based on prohibited criteria such as race or speech, U.S. v. Brown, 9 F.3d 1374,1375.

- 15 -

35. And the judiciary responsibility to protect individuals from prosecutorial conduct that violates Constitutional Rights, U.S. v. Redondo - Lemos, 27 F.3d 439,444, Court has a duty to closely scrutinize evidence of invidious discrimination. Improper purpose entails selection that was "deliberatly based upon an unjustifiable standard such as race, religion or other arbitrary classification".

ARGUMENT PRESENTED
POINT 3
INEFFECTIVE TRIAL COUNSEL

36. In this argument, there is a set of facts this Bar needs to come to terms with, and this is. Failure to present adequate defense, where the Record revealed a complete lack of investigation and preparation on part of defense counsel, so as to amount to a total failure, to present cause of this Presentor in any fundamental respect, reversal of conviction is required. People v. LaBree, 34 N.Y.2d 257, 357 N.Y.S.2d 412, N.E.2d 730, also note Pavel v. Hollins, 261 F.3d 210, 222 n.3, 223 n.4, Eze v. Senkpowski, 321 F.3d 110, 112.

37. The evidence adduced [Note Exhibit F ], the Trial Attorney on Record Mr.Robert Jonhston, this Presentor, never met before the day of Trial, overwhelmingly demonstrated the defense counsel's lack of preparation and his failure to understand the applicable law, communicate with this Presentor, investigate the facts of the case and prepare this Presentor to testify, thereby depriving this Presentor of Effective Counsel. People v. Smith, 237 A.D. 2d 388, 655 N.Y.S. 2d 416, also see Spencer v. Donnelly, 193 F.Supp.2d 718, Moore v. Jonson, F.3d 586, People v. Donovan, 184 A.D.2d 654, falling within Kimmelman v. Morrison, 477 U.S. 365, also see Strickland v. Washington, 466 U.S. 668 and People v. Droz, 39 N.Y.2d 457

38. Trial counsel effectiveness for lack of investigation would of found that the Indictment was a defective Instrument, on the account of, Count Two PL § 130.80, which states "Five years after the commission of the crime".

39. Counsel failed to produce Expert Witness for defense, [Note People v. Baba Ali, 179 A.D.2d 725], which would have affected the outcome of the Trial.

- 17 -

------------------------------
CONCLUSION OF ARGUMENT
------------------------------

40. For once the Court place all which had been redressed herein and review under its proper lighting, [Nexus Test] we see there is relief which can be granted herein.

41. when evidence is not legally sufficient when corroboration required by law is absent. Note Penal Law § 130.35 - When he engages in sexual intercourse with a female. But Scientific Evidence [Medical Records] by a well known Physician also a Professor at Albert Ein-stein School of Medicine found no Physical Evidence nor Visible Physical Injuries to colloborate with the alleged accusations.

42. This Court must also take notice of the A.D.A.'s personal feelings towards this Presentor, for a past relationship that went bad, thus giving cause for her improper and prejudicial conduct, constitutes to a violation of this Presentors Constitutional Rights and Protections.

43. The Ineffectiveness of Trial Counsel not providing Expert Witness, lack of preparation, failure to investigate the facts of the case and not objecting to important issues.

44. Therefore, for the reasons stated herein this Presentors' Motion to Vacate Judgment should be granted or any other of further relief this Court deems just and proper therein.

Affirmed before me this

_25th_ day of November, 2011

_Ellen A. Bohlmann_
Notary Public

Dē Jure,

_____ Sui Juris

ELLEN A. BOHLMANN
Notary Public, State of New York
No. 0342485
Qualified in Dutchess County
Term Expires Oct. 31, 20_13_

- 18 -

---------------------------------
VERIFICATION OF PLEADING
---------------------------------

01. LET IT BE SO NOTED, by the placing a pen to hand, I am herein affirming that all herein is TRUE, CORRECT and COMPLETE, except where I so stated under information and belief, and there I do believe it to be TRUE, CORRECT and COMPLETE therein.

02. Therefore, under the Pains and Penalties of Perjury, I do affirm herein that all is TRUE, CORRECT and COMPLETE.

Affirmed before me this

_28th_ day of November, 2011

_Ellen A. Bohlmann_
Notary Public

ELLEN A. BOHLMANN
Notary Public, State of New York
No. 0342485
Qualified in Dutchess County
Term Expires Oct. 31, 20_13_

De Jure] _____ Sui Juris

- 19 -

## AFFIDAVIT OF SERVICE
## BY MAIL

01. LET THE RECORDS SO REFLECT, the herein Presentor is so stating that on the day he placed a pen to hand, he has thus served the herein NOTICE OF MOTION TO VACATE JUDGMENT under CPL § 440.10 et seq., and an AFFIDAVIT, upon the following listed People and Places:

PRINCIPAL CLERK OF THE COURT
CHAMBERS OF HON. ROLAND D. HOLLIE
125-01 QUEENS BOULEVARD
KEW GARDENS, NEW YORK 11415

HON. RICHARD A. BROWN
DISTRICT ATTORNEY'S OFFICE
125-01 QUEENS BOULEVARD
KEW GARDENS, NEW YORK 11415

By placing in a Receptacle which has been designated for outgoing mail by the Principal of the Prison I am being held within.

02. Therefore, under the Pains and Penalties of Perjury, hereto affirm that Service has been Honorably met, is defined by the Rules of the Bar and thus have complete my legal obligation therein.

Affirmed before me this

28th day of November, 2011

_Ellen A. Bohlmann_
Notary Public

De Jure: _____

_____ Sui Juris

ELLEN A. BOHLMANN
Notary Public, State of New York
No. 0342485
Qualified in Dutchess County
Term Expires Oct. 31, 20 13

- 20 -

## MASTER EXHIBIT SHEET

EXHIBITS:

A – COVER PAGE OF INDICTMENT LISTING COUNT TWO;

B – MILITARY DISCHARGE AND CITATION;

C – TRACERS OF MONEY ORDERS;

D – PHOTO OF A.D.A.;

E – MEDICAL REPORT;

F – TRIAL ATTORNEY RETAINER RECEIPT.

Note: Exhibit E – Medical Records is Part of Court Exhibits and cannot be copied due to broken copy machine at present time.



**DISTRICT ATTORNEY**
**QUEENS COUNTY**
125 01 QUEENS BOULEVARD
KEW GARDENS, NY 11415-1568
(718) 286-6000

Richard A. Brown
District Attorney

Date: August 9, 2006

# NOTICE OF VOTED INDICTMENT

| DEFENDANT: | ABU KHAN | DOCKET #: | 2006QN039857 |
|---|---|---|---|
| INDICTMENT #: | 2147/2006 | DATE VOTED: | August 7, 2006 |

I hereby certify that the aforementioned instrument has been voted upon by the Grand Jury of Queens County pursuant to Section 180.80 of the Criminal Procedure Law.

**ERICA ROSENGARTEN**
ASSISTANT DISTRICT ATTORNEY
Special Victims BUREAU

EXHIBIT

A



## FIRST COUNT

THE GRAND JURY OF THE COUNTY OF QUEENS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF RAPE IN THE FIRST DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT ABU KHAN, ON OR ABOUT NOVEMBER 30, 2004, IN THE COUNTY OF QUEENS, BEING EIGHTEEN YEARS OLD OR MORE, ENGAGED IN SEXUAL INTERCOURSE WITH ASHLEY MARTINEZ, A PERSON LESS THAN THIRTEEN YEARS OLD.

## SECOND COUNT

THE GRAND JURY OF THE COUNTY OF QUEENS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF COURSE OF SEXUAL CONDUCT AGAINST A CHILD IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT ABU KHAN, ON OR ABOUT AND BETWEEN JANUARY 01, 1997 AND DECEMBER 31, 2000 IN THE COUNTY OF QUEENS, OVER A PERIOD OF TIME NOT LESS THAN THREE MONTHS OF DURATION KNOWINGLY AND INTENTIONALLY ENGAGED IN TWO OR MORE ACTS OF SEXUAL CONDUCT, TO WIT: DEFENDANT DID PLACE HIS HAND ON THE BREAST AND PLACE HIS PENIS IN THE HAND OF ASHLEY MARTINEZ, A CHILD LESS THAN ELEVEN YEARS OLD.



**UNITED STATES MARINE CORPS**
AT (TOW) COMPANY, 8TH TANK BATTALION
4TH MARINE DIVISION, FMF, USMCR
NAVAL AND MARINE CORPS RESERVE TRAINING CENTER
10650 N. W. 62ND AVENUE
HIALEAH, FLORIDA 33016-6009

FILE COPY

1500
IN REPLY REFER TO:
ADHIN
JAN 0 6 1994

From:   Inspector-Instructor
To:     Commandant of the Marine Corps, (MMSR-4)

Subj:   DISCHARGE OF LANCE CORPORAL ABU H. KHAN, 090 72 7730/0352
        USMCR BY REASON OF PHYSICAL DISQUALIFICATION

Ref:    (a) CG, MARRESFOR ltr 6120 7AA of 22 Nov 93, Endorsement
            of CO/I-I, ltr 6000 MED/rdh of 01 Oct 93
        (b) MCO P1900.16D (MARCORPSEPMAN)

1.  All provisions of references (a) and (b) were complied with
and completed on __JAN 0 6 1994__.

2.  Lance Corporal Khan was discharged from the Selected Marine
Corps Reserve on __JAN 0 7 1994__.

3.  As required by references (a) and (b) the following
information is provided.

    a.  Type of Separation:       Administrative

    b.  Character of Service:      Honorable

    c.  Separation Authority:      CG MARRESFOR ltr 7AA of 10 Nov 93

    d.  Separation Code:           JFR3

    e.  Reenlistment Code:         RE-3P

R. D. ANGEL

Copy to:
CG, MARRESFOR (7R)

| | INT |
|---|---|
| I-I | |
| 1STSGT | |
| ADCHF | w |
| PD | 003-940107 |
| SRD | iv |
| FILES | |

EXHIBIT

B



# CERTIFICATE OF RECOGNITION

## ABU H. KHAN

*In recognition of your service during the period of the Cold War (2 September 1945 - 26 December 1991) in promoting peace and stability for this Nation, the people of this Nation are forever grateful.*



SECRETARY OF DEFENSE

MONEY ORDER

REQUEST TYPE- 001   TRACER REQUEST

R/S ID NBR  - 12

V023    08/15/07   08.59.46

CLR PT      CLEARED DATE       ITEM SEQ NBR
  MN           03/23/05          00005483086

SERIAL NUMBER        AMOUNT
0458-6391-972         175.00

REPORT ANY DISCREPANCIES WITHIN 90 DAYS

ABU KHAN
25 ROXBURY LN
PALM COAST          FL   32164

H1A

EXHIBIT

C



111B





MONEY ORDER

V023    08/15/07    09.00.11

REQUEST TYPE- 001   TRACER REQUEST       CLR PT     CLEARED DATE    ITEM SEQ NBR
                                          MN          03/30/05       00001360377
R/S ID NBR  - 12

                                                   SERIAL NUMBER         AMOUNT
                                                   0458-8605-657         175.00

REPORT ANY DISCREPANCIES WITHIN 90 DAYS

        ABU KHAN
        25 ROXBURY LN
        PALM COAST              FL  32164











EXHIBIT

D

PLEASE TAKE NOTE
MEDICAL RECORDS WAS INTRODUCE AS
PEOPLE'S EXHIBIT 3
Under CPLR § 4518

EXHIBIT

E

101

[illegible]

Agreement in the handwriting of Samuel Viruet to Represent Abu Khan for $6,000- This was Later raised to $7,000 Paid in Full See other documents.

EXHIBIT A

To:     PRINCIPAL CLERK OF THE COURT
        CHAMBERS OF HON. ROLAND D. HOLLIE
        125-01 QUEENS BOULEVARD
        KEW GARDENS, NEW YORK 11415


To:     HON. RICHARD A. BROWN
        DISTRICT ATTORNEY'S OFFICE
        125-01 QUEENS BOULEVARD
        KEW GARDENS, NEW YORK 11415


From:   ABU KHAN [07A4685]
        P.O. BOX 4000
        STORMVILLE, NEW YORK 12582


Re:     ENCLOSED AND AFFIXED SET OF PLEADINGS


Su:     PEOPLE v. ABU KHAN  Ind. No.: 2147/60


Dated:  NOVEMBER 28th, 2011


        PRINCIPALS:

        Enclosed and Attached, you will find the following papers:

            [] - NOTICE OF MOTION TO VACATE JUDGMENT

            [] - AFFIDAVIT IN SUPPORT

            [] - PRELIMINARY STATEMENT

            [] - HISTORY OF CASE

            [] - PARTIES INVOLVED

            [] - CONSTITUTIONAL PROVISIONS

            [] - JURISDICTIONAL PROVISIONS

            [] - AFFIDAVIT OF SERVICE BY MAIL

        Please file and record accordingly.

cc:file

                                        De Jure,

                                        _____  Sui Juris

Courtesy Copy
Original Filed in ECF
docket number 14-CV-5456

SUPREME COURT OF THE STATE OF NEW YORK
QUEENS COUNTY:  CRIMINAL TERM: PART K-20
-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,               :          Return Date:
                                                                                                      April 12, 2012

                                               Respondent,           :

                                                                                   :          AFFIRMATION IN
                                                                                                      OPPOSITION TO
                                                                                   :          DEFENDANT'S
                        -against-                                       :          MOTION
                                                                                                      TO VACATE
                                                                                   :          CONVICTION

ABU KHAN,                                                           :

                                                                                   :          Queens County
                                                                                                      Indictment Number
                                               Defendant.            :          2147/06

-------------------------------------------------------------------x

EDWARD D. SASLAW, an attorney admitted to practice law in the State of

New York, affirms the following statements to be true under the penalties of perjury:

1.          I am an Assistant District Attorney, of counsel to Richard A. Brown, the

District Attorney of Queens County.    I am submitting this affirmation in opposition to

defendant's *pro se* motion to vacate his judgment of conviction. I make the statements in this

affirmation upon information and belief, based upon my review of the records and files of

the Queens County District Attorney's Office.

2.          In October 1996, the defendant, then 29 years old began dating Leslie

Martinez, a woman nearly ten years his junior who was married with two small children –

a four-year old daughter AM and a two-year son JB. In 1997, defendant, Ms. Martinez, and

her children began living together as a family, moving into the three-bedroom duplex

condominium in College Point owned and occupied by Ms. Martinez' mother, Ann

Martinez, and Hubert Chan. Ann Martinez had known defendant's family from Trinidad.

3.     Leslie Martinez felt defendant was "kind," "sweet," "a good provider,"

and a "father figure" to her two children. AM, who did not know her biological father, was

"very close" with defendant; he treated her like a daughter and she called him "Daddy", as

did JB, her brother.  When they moved into her grandmother's home in Queens, AM was a

few months shy of five years old.

4.     One night defendant started touching AM in a way that she did not like.

She had been having nightmares after watching a "scary movie" named "Candyland" and was

having trouble falling asleep. AM descended the spiral staircase from the loft she shared with

JB to the adult's bedroom below and asked if one of them would come upstairs and help her

get to sleep.  Her mother was sleeping and defendant was watching wrestling on television.

Defendant took AM up to the loft and told her a story about a little girl trying to put a star

on a Christmas tree. During the story, defendant took her hand, placed it on top of his boxer

shorts, and made her touch and rub his penis, which she could feel through the boxers. AM

did as she was told and did not say a thing because she "loved" and "trusted" defendant "so

much".  The whole time, defendant kept telling the story.

5.     After that night, defendant forced AM to touch his penis about five to

ten more times while the family was living in Queens. On those occasions, defendant also

touched AM's breasts and other places on her body that she "did not want to be touched".

7.     In December 1998, Leslie Martinez gave birth to a daughter, and the following year, she and defendant and moved with the three children to 130-18 117th Street in the South Ozone Park area of Queens.   On June 26, 2000, Leslie Martinez gave birth to a son.

8.     As the family was expanding, Leslie Martinez felt her relationship with defendant "took a turn" and "wasn't the same" .  By the time their son was born in 2000, Leslie felt things were "rocky" but "did what [she] had to do to take care of [her] children and keep [the] family together."   During this period, Leslie also noticed behavioral changes in AM who became "mouthy" and "defiant" and "would not listen."   She would "constantly bicker" and "argue" and ignore her personal hygiene.  Leslie thought AM, age six or seven, was a bit young to be rebelling.

9.     In May 2001, defendant and Leslie moved to Florida with the four children; defendant had family there and Leslie preferred the Florida weather.  Initially they lived in an apartment complex in Lauderhill; later that year they purchased a house in Lauderdale with help from Leslie's uncle.

10.    In Florida, AM continued to have problems in school and at home.  The teachers called Leslie "complaining" that AM was receiving failing grades, would not stop talking in class and would not listen to the teachers.  AM "could not get along with anyone." AM had no friends, no boyfriends and could not get along with anyone at home. She tended

to stay to herself in her room. AM's eating habits were "horrible" -- she did not use a fork or spoon and "kind of devoured her food." When Leslie tried to talk to AM about anything, AM would "argue" and "fight". AM also "put on a lot of weight". When the family first moved to Florida, AM weighed about sixty-five pounds – "a little bit chunkier than normal". Within two years, AM's weight more than doubled – by 2003, eleven-year-old AM weighed one hundred and forty pounds. During this period, AM entered adolescence and "sprouted . . .in all directions".

11.     During this period, defendant started coming into AM's bedroom and, as she ut it later, " having sex" with her . – "putting his penis in her vagina". The sex, AM later testified, was "very frequent". AM responded by trying to "block out everything that was happening to her" . AM wanted her mother to know but she was too "scared" to say anything. AM was very young when defendant started touching her in New York, and she had "no idea" whether defendant's actions were "right or wrong". Defendant would tell AM he was making her a woman and that he would have done the same thing had she been his real daughter. Even after AM got older and began to realize it was "wrong," she was too "scared" to stop him. When AM tried to reason with defendant, saying what they were doing was "wrong" and she wanted to "wait until [she was] married," defendant got "really mad at her" and AM was upset by that. All the years of abuse by defendant had made AM feel "nasty" and "degraded." Her "self-esteem level dropped," she gained a lot of weight, did poorly in school. AM felt "it depressed [her] life a lot." AM wanted "acceptance so bad."

4

Plus, defendant told AM that if she said anything nobody, not even her mother, would believe her . Defendant said that AM's mother would think AM was "lying and making it up" , and AM believed him. So even though AM wanted her mother "to know what was going on" with defendant and wanted "to tell her mother" what defendant was doing, AM did not know how to talk to her mother. Additionally, AM was "scared" of what defendant might do to her and the family. AM had seen defendant yell at her mother, tell her to shut up, call her "fat" and other harsh names, tell her nobody else would want her, and push her around. Defendant was a "jealous" person and would tell her mother she was not allowed to wear certain things or go certain places. Defendant called the children names also – he called AM a "fat ass" and JB "little faggot". AM believed that despite defendant's mistreatment, her mother would take defendant's side if AM said anything. So AM had nobody in whom to confide at home and did not trust anybody at school either.

12.     When defendant and Leslie were living in Florida, Leslie was working but defendant was unable to find or keep a good job. On three or four occasions, defendant traveled to New York to work for his former employer and stayed for about two to four months. Defendant lived at Ann Martinez' home in College Point rent-free so he could help support the family in Florida. Ann Martnez and defendant had a "good" relationship – she considered defendant her son-in law and he called her "Mom" or "Mommy."

13.     One day in August 2004, defendant told Leslie he was going to travel to New York for employment again. Leslie told defendant he should stay in Florida and try

5

to make it work between them and that if defendant went to New York again, she would not "stay with him". Leslie did not think defendant took her seriously because he went to New York anyway. But Leslie had been unhappy with the relationship for some time and defendant's extended absences provided the opportunity for her to move on.

14.    In November 2004, twelve-year-old AM was suspended from school for "cursing out" a teacher and told Leslie she wanted to go to New York to live with her grandmother. Leslie, who knew that AM was miserable, wanted what was best for her daughter, and after talking with her mother and defendant, decided that AM would live with Ann and attend school in Queens. Defendant or Ann booked AM's flight for November 30, 2004.

15.    AM and Leslie knew that when AM arrived in New York, defendant would be there and that he would be leaving New York to drive to Florida shortly after that, in time for Christmas. And AM, unaware of Leslie's plan to separate from defendant, thought defendant would be rejoining the family in Florida. AM did not want to be around defendant and did not want to be in Florida when he got home in December. After AM was suspended and it was agreed she would go to New York, AM informed Leslie she would be staying with her grandmother in New York indefinitely – through high school and possibly college.

16.    According to AM, before she got suspended from school, defendant had made arrangements with Ann and Leslie for AM to fly to New York, visit her grandmother,

6

and then accompany defendant on the long drive back to Florida. As it turned out, after AM was suspended from school, she flew to New York as planned, but instead of accompanying defendant to Florida, she stayed in New York to attend school and defendant drove to Florida alone. Thus, although AM had no say in her flight schedule, the overlap with defendant in Queens for one night was the last time defendant touched her.

17.    Defendant met AM at the airport and defendant drove her to her grandmother's home. That afternoon, they ate Chinese food and went shopping in the neighborhood. Around 7:00p.m., after Ann arrived home from the office and greeted AM, Hubert drove defendant to Long Island to return defendant's work truck to his employer, and AM went along for the ride. When they returned around 9:00 or 10:00 p.m., Ann was in bed and did not see her granddaughter again that night.

18.    At about 11:00 p.m., AM was watching television in the lower part of the loft bedroom when defendant entered and began touching her breasts and arms. AM told defendant to leave her alone and went downstairs to the living room to watch television alone. Defendant followed AM downstairs, sat down next to her on the couch , and again began to touch AM's breasts and arms . [start] AM later said she felt "nasty and degraded" and she "badly" wanted "somebody to come downstairs and save [her]" but she was too scared to scream out. AM wanted to avoid the "big fight and argument" in the family that she believed would ensue and was scared of defendant's reaction. She thought defendant might hurt her or the family. She had seen defendant get drunk at a Halloween party and use

7

a broken bottle to cut hmself in the head and chest. AM felt that if defendant was capable of doing that to himself, he was capable of hurting somebody else "ten times worse."

19.    Instead, as defendant was touching AM, she continued to watch television trying to tune him out, act as if nothing was happening and hope she could blank everything out of her head. That was, after all, how she had handled defendant's sexual contact in the past. Sometimes she would imagine she was at her grandmother's home, safe and away from harm.

20.    That night on the couch, defendant took off his t-shirt and boxers, took off her t-shirt and shorts and, as she put it later, "had sex" with her. AM was on her back and defendant climbed on top of her, faced her, put his penis inside her body. . .in her vagina and moved back and forth. AM felt nasty and hurt. As she later testified, "Emotionally it hurt. Mentally it hurt. Physically it hurt." After a while, defendant took his penis out of her vagina and ejaculated into a napkin – AM saw what she described as the "white stuff coming out of him . . . out of his penis." Defendant washed off and went upstairs without a word to AM. AM put her clothes back on and in her words "sat there and acted like nothing ever happened."

21.    The following day, December 1, 2004, Ann and defendant took AM to register for school and then they went shopping in Brooklyn. Defendant left that evening for Florida .

22.    When defendant arrived in Florida on December 2d or 3d, Leslie told

8

him the relationship was over and he was not welcome in the house. Defendant stayed anyway, but left after a couple of days moving in with his sister, who lived nearby. About a week later, on December 10, 2004, defendant entered Leslie's home at five o'clock in the morning "in a drunken state," and confronted Leslie in the bedroom where she and her new boyfriend Nigel were sleeping. As the children watched, defendant pulled a gun from his pocket, pointed it at Nigel, and knocked Leslie to the floor. Leslie had seen defendant's gun before that. Leslie called 911. After finding no gun, the police told defendant to leave the property but made no arrest (Leslie: 397).

23.     Subsequently, defendant returned north and found a place to live in the Bronx. Defendant stopped providing financial support for the children, and Leslie did not sue him for it.

24.     AM finished the school year in Queens. In July 2005, the two youngest children were visiting their grandmother in Queens and defendant asked to take them to a park. AM went along, at the request of her mother and grandmother and her great-grandmother also went. In August 2005, AM returned home to Florida for school. AM knew defendant "was out of the picture."

25.     AM had learned about Leslie's separation from defendant when she was in New York, and knew she could tell what defendant had done to her, but did not know how. AM had not forgotten what defendant had done, and was still feeling all the effects of his acts, but she did not know "how to come out and say it" and was "waiting for the right

9

time."

26.    That spring, on or about March 16, 2006, Leslie was at a local fair with the four children when she saw defendant approaching . Leslie took the children and left. Defendant had not been making any effort to maintain a relationship with his children – he had not even called to say he was in Florida – and Leslie felt a casual greeting at a public event was not appropriate.

27.    On Easter Sunday, April 16, 2006, Leslie and the four children celebrated with a traditional home-cooked meal . As Leslie and AM were cleaning up the kitchen after dinner, Leslie confronted AM about an inappropriate comment AM had made about Nigel, who was visiting family in Atlanta.  During the ensuing argument, Leslie asked AM why she hated everyone, why she was constantly fighting, and why she could not do well in school. AM, who was just shy of fourteen, told her mother, "You don't know me."  Leslie asked AM what was wrong, and whether someone had hurt her.  Without turning from the sink, AM said, "yes, someone hurt [her]."  At that, Leslie asked AM if she had been raped. AM said "yes, Mommy."  Leslie asked by who, and AM said, "Jimmy." AM was "shocked" that she finally said something.  To Leslie, the moment was "surreal"(Leslie: 382).

28.    AM was sobbing as she blurted it out . Leslie took AM into her arms and for awhile they held each other and cried on the floor of the small kitchen.  Leslie realized she had neglected her daughter and had not seen AM's pain, even though it had been right in front of her. Leslie told AM that she was her mother, she loved AM, and that AM

10

should have come to her. AM said she did not think Leslie would have believed her. From AM's standpoint, she "never up to that point had a relationship with her mom" where they "sat down and talked." AM believed that her mother "still" loved defendant – the father of her children – and that Leslie would think AM was lying and "making it up." Leslie and AM held each other, talked, and cried into the night. It was. Lesie later said "pretty dramatic."

29.    Leslie asked AM if she wanted to file a police report and AM said she did, so the following morning they went to the local police precinct and reported defendant's crimes. Subsequently, AM underwent a complete sexual assault examination at the Broward County Sexual Assault Treatment Center in Florida ; AM said that when the metal tool was placed inside her, it "hurt a lot."

30.    Florida forwarded the report to Queens County and NYPD Detective LUZ FIGUEROA of the Queens County Child Abuse Squad was assigned to investigate the case against defendant. On June 13, 2006, Detective Figuero interviewed AM and her grandmother in New York. On June 15, 2006, Detective Figuero arrested defendant.

31.    Defendant was charged with Rape in the First Degree (Penal Law § 130.35[4]), Course of Sexual Conduct Against a Child in the Second Degree (Penal Law §130.80), Endangering the Welfare of a Child (Penal Law § 260.10[1]), and Sexual Abuse in the Second Degree (Penal Law § 130.60[2])(Queens County Indictment Number 2147/06).

32.    Defendant proceeded to trial before the Honorable Ronald D. Hollie, a Justice of this Court and a jury. At the conclusion of the trial, defendant was found guilty

11

of all counts and sentenced to concurrent determinate prison terms of fourteen years for rape, ten years for sexual conduct, five years for endangering and one year for sexual abuse, plus post-release supervision.

33.   On appeal to the Appellate Division, Second Department, defendant argued, through counsel, that he was denied a fair trial when the trial court received evidence of uncharged Florida crimes and photographic portraits of the child at the ages of five to seven.   By decision and order dated October 25, 2011, however, the Appellate Division affirmed defendant's conviction holding that the trial court "providently exercised its discretion in permitting the prosecution to elicit evidence that the defendant, charged with sexually touching the younger-than-11-year-old victim from 1997 to 2000 while the family lived in Queens, and with one rape of the victim in Queens in November 2004, raped the victim on frequent occasions between 2001 and 2004 while the family lived in Florida. The evidence was properly admitted to demonstrate the defendant's pattern of escalating sexual conduct toward the victim during the period between the charged crimes, and as relevant background information to enable the jury to understand the defendant's relationship with the victim and to place the events in question in a believable context, particularly since the defendant raised the issue of the victim's delayed disclosure of the charged criminal conduct." *People v. Khan*, 88 A.D.3d 1014, 1014-1015 (2d Dept. 2011).   Moreover, the Appellate Division held, "the probative value and the need for the evidence outweighed any potential prejudice to the defendant, particularly in light of the Supreme Court's limiting

12

instruction to the jury as to the proper use of the uncharged crimes evidence." *Id.*

34. By letter, defendant's counsel sought leave to appeal to the Court of Appeals to appeal the Appellate Division's decision, but that application was denied on January 19, 2012. *People v. Khan*, 18 N.Y.3d 884 (2012) (Smith, J.). A *pro se* application to the Court of Appeals was dismissed on December 12, 2011, *People v. Khan*, 18 N.Y.3d 859 (2011) (Smith, J.), and *pro se* motion for reargument in the Appellate Division denied by order dated April 6, 2012.

35. Defendant now seeks an order vacating his judgment of conviction pursuant to section 440.10 of the Criminal Procedure Law largely based on an attack on the quality and sufficiency of the evidence as well as a broad claim that his trial attorney was ineffective, that he had a "prior relationship that went bad" with the Assistant District Attorney assigned to his indictment and a completely unspecified claim of newly discovered evidence. This motion should be summarily denied because (1) it is, for the most part based on the record of the proceedings in this Court and a motion to vacate cannot be used as a substitute for a direct appeal and (2) allegations of facts essential to support the additional aspects of the motion are made solely by the defendant and unsupported by any other affidavit or evidence, and there is no reasonable possibility that these unsupported allegations are true, C.P.L. § 440.30(4)(d).

**WHEREFORE**, defendant's motion to vacate his judgment of conviction must be summarily denied without a hearing.

Dated: Kew Gardens, New York
April 11, 2012

Edward D. Saslaw
Assistant District Attorney
(718) 286-5802

To:    Abu Khan
       07-A-4685
       Green Haven Correctional Facility
       P.O. Box 4000
       Stormville, N.Y. 12582

SUPREME COURT OF THE STATE OF NEW YORK
QUEENS COUNTY: CRIMINAL TERM: PART K20
-----------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,                        :

                                                           :      **MEMORANDUM OF LAW**

                    -against-                               :

                                                           :

                                                           :      Queens County
ABU KHAN,                                                  :      Indictment Number
                                                                  2147/06
                                        Defendant.         :
-----------------------------------------------------------------------x

## ARGUMENT

### SINCE DEFENDANT'S MOTION IS LARGELY BASED ON THE RECORD OF HIS TRIAL AND HE CANNOT ESTABLISH ALLEGATIONS OF FACT ESSENTIAL TO SUPPORT HIS CLAIMS, IT SHOULD BE DENIED WITHOUT A HEARING.

Defendant bases most of his motion on an attack on the witnesses and evidence presented against him at trial. He alleges, with no or quite suspect support, that a witness against him committed perjury and that an Assistant District Attorney also said things at trial which defendant claims to be untrue.

These claims are completely insufficient to entitle defendant to a hearing, much less any further relief, on his motion. It is, instead, subject to summary denial since the "facts in support of the ground or issue raised upon the motion could with due diligence by the

15

defendant have readily been made to appear on the record in a manner providing adequate basis for review of such ground or issue upon an appeal from the judgment, the defendant unjustifiably failed to adduce such matter prior to sentence" C.P.L. § 440.10 (3)(a) and defendant can not show that it "could not have been produced by the defendant at the trial ... with due diligence on his part" as required by C.P.L. § 440.10 (1)(g)

Hence, insofar as sufficient facts appear on the record of the proceedings for the Appellate Division to have decided these claims on defendant's direct appeal, his motion must be summarily denied under the provisions of C.P.L. § 440.10(2)(c). *See e.g,* Defendant's Motion, ¶¶ 29-33, 41. The Court of Appeals has specifically held that the purpose of subdivisions (2)(b) and (2)(c) is to prevent section 440.10 "from being employed as a substitute for direct appeal" and that a motion to vacate must be denied where the issues raised by the defendant could have but were not raised on defendant's direct appeal. *People v. Cooks*, 67 N.Y.2d 100, 103 (1986).

The rest of defendant's motion, including his veiled, yet scurrilous allegation about an Assistant District Attorney are also subject to summary denial. The Court of Appeals long ago held that on a defendant's motion to vacate a conviction, "defendant is not entitled to a hearing on charges lacking factual support. Due process does not require a court to accept every sworn allegation as true." *People v. White*, 309 N.Y. 636, 640-641 (1956). In codifying such motions, the current article 440 of the Criminal Procedure Law adopted the *White* formulation, *see, e.g. People v. Session*, 34 N.Y.2d 254, 255, 256 (1974)

16

to provide for the summary denial of the motion where, as here, it is "made solely by the defendant and .. unsupported by any other affidavit or evidence, and ... under these and all the other circumstances attending the case, there is no reasonable possibility that such allegation is true." C.P.L. § 440.30(4)(d). Affidavits that are both conclusory and self-serving fall far short of the objectivity necessary to establish the facts upon which his motion are based, including his vague claims of ineffectiveness on the part of his trial counsel. *People v. Fernandez*, 5 N.Y.3d 813 (2005); *see also People v. Rodgers*, 8 A.D.3d 888, 890-891 (3d Dept. 2004).

The necessity of a such a limitation on motions of this sort can be seen from the papers submitted on this claim. There is, for instance, no support within defendant's motion for critical components of defendant's allegations concerning what he describes as "misleading and false" evidence or "improper and prejudicial conduct not appearing in the records [sic]" (Defendant's Motion Papers at 06).

A judgment of conviction is presumed valid, and a defendant challenging its validity has the burden of coming forward with allegations sufficient to raise a triable issue of fact. *People v. Brown*, 56 N.Y.2d 242, 246-247 (1982); *People v. Session*, 34 N.Y.2d 254, 256 (1974). Defendant has failed to meet that burden by sufficiently establishing facts that would entitle him to a hearing on this claim. *See People v. Fernandez*, 5 N.Y.3d 813 (2005); *People v. Rodgers*, 8 A.D.3d 888, 890-891 (3d Dept. 2004).

Moreover, while a defendant has a constitutional right to receive reasonably

17

effective assistance of counsel, gauged by prevailing professional norms, *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), to establish that counsel was ineffective he is required to demonstrate first, that his attorney committed errors so egregious that he did not function as counsel within the meaning of the constitutional guarantee, and, second, that counsel's deficient performance actually prejudiced the defendant. *Id.* In attempting to make such a showing, the defendant must overcome the strong presumption that defense counsel rendered effective assistance. *See People v. Myers*, 220 A.D.2d 461 (2d Dept. 1995).

Under the New York Constitution, defendant was entitled to "meaningful representation." *See People v. McDonald*, 1 N.Y.3d 109 (2003), quoting *People v. Henry*, 95 N.Y.2d 563, 565-66 (2000); *see also People v. Benevento*, 91 N.Y.2d 708, 712 (1998); *People v. Baldi*, 54 N.Y.2d 146, 147 (1981). Since what constitutes effective assistance is not and cannot be fixed with precision, but varies according to the particular circumstances of each case," *People v. Rivera*, 71 N.Y.2d 705, 708 (1988); *see also Strickland*, 466 U.S. at 693, 689 ("representation is an art" and "there are countless ways to provide effective assistance in any given case"), a reviewing court's scrutiny of counsel's action should be "highly deferential." *Strickland*, 466 U.S. at 689. Unless a defendant demonstrates "the absence of strategic or other legitimate explanations" to pursue a trial strategy, defense counsel is presumed to have rendered adequate assistance to the defendant. Id. at 709; will be presumed to have rendered adequate assistance to the defendant. *Id.* at 709; *see People v. Caban*, 5 N.Y.3d 143, 152 (2005); *People v. Taylor*, 1 N.Y.3d 174, 177 (2003); *People*

18

*v. Ryan*, 90 N.Y.2d 822, 823 (1997); *People v. Tonge*, 93 N.Y.2d 838, 840 (1999).

In short, defendant's claims, including those alleging that counsel was ineffective should be denied without a hearing.

## **CONCLUSION**

For the reasons set forth above and in the accompanying affirmation, defendant's motion to vacate the judgment of conviction should be summarily denied.

Respectfully submitted,

RICHARD A. BROWN
District Attorney
Queens County

GARY FIDEL
EDWARD D. SASLAW
    Assistant District Attorneys
        of Counsel

April 11, 2012

Courtesy Copy
Original Filed in ECF
docket number 14-CV-5456

SUPREME COURT
CRIMINAL TERM-PART K-20 QUEENS COUNTY
125-01 QUEENS BLVD., KEW GARDENS, NY 11415

P R E S E N T:

HON. RONALD D. HOLLIE,

JUSTICE

-------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ABU KHAN

Defendant.

-------------------------------------------------------------X

The following papers numbered
1 to 3 submitted on this motion.

Ind. No. 2147/06

:

Motion: To Vacate Judgment

CPL § 440:10

:

Abu Khan, Pro Se
For The Motion

Richard A. Brown, D.A.
A.D.A. Edward D. Saslaw
Opposed

Notice of Motion, and Affidavits Annexed............... ......1 - 2....
Answering and Reply Affidavits.............................. ...... 3 ......

The defendant's motion pursuant *CPL § 440:20* is denied.   See the accompanying
memorandum

Dated: July 10., 2012

RONALD D. HOLLIE,  J.S.C.

## MEMORANDUM

SUPREME COURT: QUEENS COUNTY

CRIMINAL TERM: PART K-20

---

THE PEOPLE OF THE STATE OF NEW YORK :     BY: RONALD D. HOLLIE, J.S.C.

- against -                                :     DATED: July 12, 2012

                                                 MOTION: To Vacate Judgment
                                                 C.P.L § 440.10

ABU  KHAN                                        IND. NO.: 2147/06

                                          :

                        Defendant.

---                                       :

The defendant's pro se motion pursuant to C.P.L § 440.10 to Vacate Judgment is denied.

On March 29, 2007 the  defendant was convicted after jury trial before this Court of Rape in the First Degree, Course of Sexual Conduct Against a Child in the second Degree. Endangering the Welfare of a Child ans Sexual Abuse in the Second Degree. The defendant was sentenced to concurrent determinate terms of incarceration of fourteen years for the conviction of rape, ten years for sexual conduct, five years for endangering the welfare of a child. and one year for sexual abuse with a additional period of post release supervision.

On October 25, 2011, the Appellate Division, Second Department affirmed the defendant's conviction. *People v. Khan, 88 A.D.3d 1014.* The Court of Appeals denied the defendant leave to appeal his conviction on January 19, 2012. See *People v. Khan, 18 N.Y.3d 884.* The defendant by this pro se motion seeks to vacate the judgment. The People filed opposition to the instant motion by affirmation.

The defendant has failed, to set forth sufficient newly discovered evidence of such a nature that if said evidence had been received at trial, the verdict would have been more favorable to the defendant.. Additionally, with respect to issues which defendant failed to raise on appeal and those issues which he raised on appeal and were denied, he is now barred from raising the issues in the instant motion.

Accordingly, the defendant's motion is denied in all respects.

Dated: July 12, 2012

RONALD D. HOLLIE, J.S.C.

**Courtesy Copy**
Original Filed in ECF
docket number 14-CV-5456

*Soslaw*
*Fidel*

Abu Khan  DIN:  07A4685
Green Haven Correctional Facility
P.O. Box - 4000
Stormville, New York 12582 - 4000

July 30, 2012

Chief Justice of the Court
Appellate Division - Second Department
45 Monroe Place
Brooklyn, New York 11201

Re:  People v. Abu Khan,  Ind. No.: 2147/2006

Your Honor:

Pursuant to Criminal Procedure Law, Section 460.15(1), I am submitting this letter as an application for permission to appeal to the Appellate Division in the above-entitled case, no other application has been made.

On July 12, 2012, the Supreme Court of Queens County, denied defendants' CPL 440.10, with opinion a judgment rendered on July 24, 2007, convicting defendant of first-degree rape, second-degree course of sexual conduct against a child, second-degree sexual abuse, and endangering the welfare of a child.

The defendant was charged with first-degree rape, based on actions that occurred on November 30, 2004. Notably, an extremely detailed medical examination failed to provide any corroboration of sexual assaults the complainant described, trial counsels' failure in lacking investigation and preparation, failure to consult or call an expert medical expert for defense, falls within ineffective assistance of counsel. See People v. Richard R, 31 Misc. 3d 1212A, (April 12, 2011), also See Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005). Denied defendant his right to a fair trial. U.S. Const., Amend. XIV; N.Y. Const., Art. I, § 6.

Prosecutor's prejudicial remarks, expressing to the jury that defendants' name is of Arabic, producing false documentation stating that defendant was dishonorably discharge from the United States Marine Corps., for

a bar fight, also stating that defendant did not financially supported his children, this was a blunt assassination of defendants' character.

Complainant's mother LM committed the acts of perjury, by admitting not receiving any financial support from the defendant for his children. All supporting documents were submitted to support all allegations.

This defendant request that this Court consider and review all state and federal constitutional issues outlined in defendants' request, seeking leave to appeal under CPL § 460.15(1) from a judgment denying his CPL § 440.10 motion to vacate his state conviction.

Note, attached to this application is a statement that no prior application for leave to appeal has been made, an affidavit of service and a copy of the order from the criminal court.

cc: Appellate Division
    District Attorney Office
    File

Matthew J. Farrand
Notary Public State of NY
No. 01FA6249046
Qualified in Dutchess County
My Comm. Expires 9/26/2015

Respectfully Submitted,

Sworn to before me this
30th day of July, 2012

Notary Public

## STATEMENT OF TRUTH


The defendant is stating and affirming under the Pains and Penalties of Perjury, that by the placement of his legal mark upon this document he is stating that no prior application for leave to appeal has been made and he is so affirming ALL is TRUE, CORRECT and COMPLETE, except where he has so stated under information and belief, and there he believes it to be TRUE, CORRECT and COMPLETE by his reading and understanding of what he has read therein.

Ergo, the defendant is herein affirming, that the above depicted statement is TRUE, CORRECT and COMPLETE.


cc: Appellate Division
    District Attorney Office
    File


Matthew J. Farrand
Notary Public State of NY
No. 01FA6249046
Qualified in Dutchess County
My Comm. Expires 9/26/2015

Respectfully Submitted,


Sworn to before me this
30th day of July, 2012

Notary Public

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION - SECOND DEPARTMENT
----------------------------------------
The People of the State of New York

                         Plaintiff

         - against -

ABU KHAN,

                         Defendant.
----------------------------------------

STATE OF NEW YORK      )
                       )ss:
COUNTY OF DUTCHESS     )

AFFIDAVIT OF SERVICE
BY GENERAL MAILING

DIN: 07A4685

Ind. No.: 2147/2006


        1. LET IT BE SO RECORDED, by the placement of the herein legal mark on
this affixed document to these pleadings, I placed these documents within the
mail-box here at GREEN HAVEN CORRECTIONAL FACILITY to be processed and served
upon:

                   CHIEF JUSTICE OF THE COURT
              APPELLATE DIVISION - SECOND DEPARTMENT
                       45 MONROE PLACE
                    BROOKLYN, NEW YORK 11201

                            and

                   HON. RICHARD A. BROWN
              DISTRICT ATTORNEY OF QUEENS COUNTY
                   DISTRICT ATTORNEY OFFICE
                     125-01 QUEENS BLVD.
                  KEW GARDENS, NEW YORK 11415

in accordance with its Rules of its' Court.

        2. Ergo, the herein defendant is affirming service upon all parties
involved in this matter, to be TRUE, CORRECT and COMPLETE as prescribed by the
principal of law.


cc: Appellate Division
    District Attorney Office
    File


                                          Respectfully Submitted,

                                          _Abu K_

Sworn to before me this
_30th_ day of _July_, 2012

_Matthew J. Farrand_
Notary Public

Matthew J. Farrand
Notary Public State of NY
No. 01FA6249046
Qualified in Dutchess County
My Comm. Expires _9/26/2015_

Courtesy Copy

Original Filed in ECF
docket number 14-CV-5456

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,        :

                         Respondent,        :

    -against-        :

                                :

                                :

ABU KHAN,        :

               Defendant.        :
------------------------------------------------------------------x

**AFFIRMATION IN
OPPOSITION TO
LEAVE TO APPEAL
DENIAL OF MOTION
TO VACATE JUDGEMENT
OF CONVICTION**

Queens County
Indictment Number
2147/06
AD No.  2012-08127

      **EDWARD D. SASLAW**, an attorney admitted to practice law in the State of

New York, affirms the following statements to be true under the penalties of perjury:

      1.     I am an Assistant District Attorney, of counsel to Richard A. Brown, the

District Attorney of Queens County.  I am submitting this affirmation in opposition to

defendant's motion for leave to appeal the Supreme Court, Queens County order dated July

12, 2012 denying his motion to vacate the judgment of conviction pursuant to section 440.10

of the Criminal Procedure Law.  I make the statements in this affirmation upon information

and belief, based upon my review of the records and files of the Queens County District

Attorney's Office  that pertain to this case.

      2.     In October 1996, the defendant, then 29 years old began, dating Leslie

Martinez, a woman nearly ten years his junior who was married with two small children – a four-year

old daughter, AM, and a two-year son , JB.  In 1997, defendant, Ms. Martinez, and her children

began living together as a family, moving into the three-bedroom duplex condominium in College Point owned and occupied by Ms. Martinez' mother, Ann Martinez, and Hubert Chan. Ann Martinez had known defendant's family from Trinidad.

3.  Leslie Martinez felt defendant was "kind," "sweet," "a good provider," and a "father figure" to her two children.  AM, who did not know her biological father, was "very close" with defendant; he treated her like a daughter and she called him "Daddy", as did JB, her brother. When they moved into her grandmother's home in Queens, AM was a few months shy of five years old.

4.  One night defendant started touching AM in a way that she did not like.  She had been having nightmares after watching a "scary movie" named "Candyland" and was having trouble falling asleep. AM descended the spiral staircase from the loft she shared with JB to the adult's bedroom below and asked if one of them would come upstairs and help her get to sleep. Her mother was sleeping and defendant was watching wrestling on television.  Defendant took AM up to the loft and told her a story about a little girl trying to put a star on a Christmas tree.  During the story, defendant took her hand, placed it on top of his boxer shorts, and made her touch and rub his penis, which she could feel through the boxers.  AM did as she was told and did not say a thing because she "loved" and "trusted" defendant "so much".  The whole time, defendant kept telling the story.

5.  After that night, defendant forced AM to touch his penis about five to ten more times while the family was living in Queens.  On those occasions, defendant also touched AM's breasts and other places on her body that she "did not want to be touched".

2

6.      In December 1998, Leslie Martinez gave birth to a daughter, and the following year, she and defendant moved with the three children to 130-18 117th Street in the South Ozone Park area of Queens.  On June 26, 2000, Leslie Martinez gave birth to a son.

7.      As the family was expanding, Leslie Martinez felt her relationship with defendant "took a turn" and "wasn't the same" .  By the time their son was born in 2000, Leslie felt things were "rocky" but "did what [she] had to do to take care of [her] children and keep [the] family together."  During this period, Leslie also noticed behavioral changes in AM who became "mouthy" and "defiant" and "would not listen."   She would "constantly bicker" and "argue" and ignore her personal hygiene.  Leslie thought AM, age six or seven, was a bit young to be rebelling.

8.      In May 2001, defendant and Leslie moved to Florida with the four children; defendant had family there and Leslie preferred the Florida weather.   Initially they lived in an apartment complex in Lauderhill; later that year they purchased a house in Lauderdale with help from Leslie's uncle.

9.      In Florida, AM continued to have problems in school and at home.  The teachers called Leslie "complaining" that AM was receiving failing grades, would not stop talking in class and would not listen to the teachers.  AM "could not get along with anyone."   AM had no friends, no boyfriends and could not get along with anyone at home. She tended to stay to herself in her room.  AM's eating habits were "horrible" -- she did not use a fork or spoon and "kind of devoured her food." When Leslie tried to talk to AM about anything, AM would "argue" and "fight".  AM also "put on a lot of weight".  When the family first moved to Florida, AM weighed about sixty-five pounds – "a little bit chunkier than normal".  Within two years, AM's weight more than doubled

3

-- by 2003, eleven-year-old AM weighed one hundred and forty pounds. During this period, AM enters adolescence and "sprouted . . .in all directions".

10.    During this period, defendant started coming into AM's bedroom and, as she put it later, " having sex" with her -- "putting his penis in her vagina". The sex, AM later testified, was "very frequent". AM responded by trying to "block out everything that was happening to her." AM wanted her mother to know but she was too "scared" to say anything. AM was very young when defendant started touching her in New York, and she had "no idea" whether defendant's actions were "right or wrong". Defendant would tell AM he was making her a woman and that he would have done the same thing had she been his real daughter. Even after AM got older and began to realize it was "wrong," she was too "scared" to stop him. When AM tried to reason with defendant, saying what they were doing was "wrong" and she wanted to "wait until [she was] married," defendant got "really mad at her" and AM was upset by that. All the years of abuse by defendant had made AM feel "nasty" and "degraded." Her "self-esteem level dropped," she gained a lot of weight, did poorly in school. AM felt "it depressed [her] life a lot." AM wanted "acceptance so bad." Plus, defendant told AM that if she said anything nobody, not even her mother, would believe her. Defendant said that AM's mother would think AM was "lying and making it up" , and AM believed him. So even though AM wanted her mother "to know what was going on" with defendant and wanted "to tell her mother" what defendant was doing, AM did not know how to talk to her mother. Additionally, AM was "scared" of what defendant might do to her and the family. AM had seen defendant yell at her mother, tell her to shut up, call her "fat" and other harsh names, tell her nobody else would want her, and push her around. Defendant was a "jealous" person and would tell her mother she was not allowed to wear certain things or go certain places. Defendant called the children names also -- he

4

called AM a "fat ass" and JB "little faggot". AM believed that despite defendant's mistreatment, her mother would take defendant's side if AM said anything. So AM had nobody in whom to confide at home and did not trust anybody at school either.

11.     When defendant and Leslie were living in Florida, Leslie was working but defendant was unable to find or keep a good job. On three or four occasions, defendant traveled to New York to work for his former employer and stayed for about two to four months. Defendant lived at Ann Martinez' home in College Point rent-free so he could help support the family in Florida. Ann Martnez and defendant had a "good" relationship – she considered defendant her son-in law and he called her "Mom" or "Mommy."

12.     One day in August 2004, defendant told Leslie he was going to travel to New York for employment again. Leslie told defendant he should stay in Florida and try to make it work between them and that if defendant went to New York again, she would not "stay with him" . Leslie did not think defendant took her seriously because he went to New York anyway. But Leslie had been unhappy with the relationship for some time and defendant's extended absences provided the opportunity for her to move on.

13.     In November 2004, twelve-year-old AM was suspended from school for "cursing out" a teacher and told Leslie she wanted to go to New York to live with her grandmother. Leslie, who knew that AM was miserable, wanted what was best for her daughter, and after talking with her mother and defendant, decided that AM would live with Ann and attend school in Queens. Defendant or Ann booked AM's flight for November 30, 2004.

14.     AM and Leslie knew that when AM arrived in New York, defendant would be there and that he would be leaving New York to drive to Florida shortly after that, in time for

5

Christmas. And AM, unaware of Leslie's plan to separate from defendant, thought defendant would be rejoining the family in Florida. AM did not want to be around defendant and did not want to be in Florida when he got home in December . After AM was suspended and it was agreed she would go to New York, AM informed Leslie she would be staying with her grandmother in New York indefinitely – through high school and possibly college.

15.     According to AM, before she got suspended from school, defendant had made arrangements with Ann and Leslie for AM to fly to New York, visit her grandmother, and then accompany defendant on the long drive back to Florida. As it turned out, after AM was suspended from school, she flew to New York as planned, but instead of accompanying defendant to Florida, she stayed in New York to attend school and defendant drove to Florida alone.  Thus, although AM had no say in her flight schedule, the overlap with defendant in Queens for one night was the last time defendant touched her.

16.     Defendant met AM at the airport and defendant drove her to her grandmother's home. That afternoon, they ate Chinese food and went shopping in the neighborhood. Around 7:00p.m., after Ann arrived home from the office and greeted AM, Hubert drove defendant to Long Island to return defendant's work truck to his employer, and AM went along for the ride. When they returned around 9:00 or 10:00 p.m., Ann was in bed and did not see her granddaughter again that night.

17.     At about 11:00 p.m., AM was watching television in the lower part of the loft bedroom when defendant entered and began touching her breasts and arms.  AM told defendant to leave her alone and went downstairs to the living room to watch television alone.  Defendant followed AM downstairs, sat down next to her on the couch, and again began to touch AM's breasts

6

and arms . AM later said she felt "nasty and degraded" and she "badly" wanted "somebody to come downstairs and save [her]" but she was too scared to scream out. AM wanted to avoid the "big fight and argument" in the family that she believed would ensue and was scared of defendant's reaction. She thought defendant might hurt her or the family. She had seen defendant get drunk at a Halloween party and use a broken bottle to cut hmself in the head and chest. AM felt that if defendant was capable of doing that to himself, he was capable of hurting somebody else "ten times worse."

18.     Instead, as defendant was touching AM, she continued to watch television trying to tune him out, act as if nothing was happening and hope she could blank everything out of her head. That was, after all, how she had handled defendant's sexual contact in the past. Sometimes she would imagine she was at her grandmother's home, safe and away from harm.

19.     That night on the couch, defendant took off his t-shirt and boxers, took off her t-shirt and shorts and, as she put it later, "had sex" with her. AM was on her back and defendant climbed on top of her, faced her, put his penis in her vagina and moved back and forth. AM felt nasty and hurt. As she later testified, "Emotionally it hurt. Mentally it hurt. Physically it hurt." After a while, defendant took his penis out of her vagina and ejaculated into a napkin – AM saw what she described as the "white stuff coming out of him . . . out of his penis." Defendant washed off and went upstairs without a word to AM. AM put her clothes back on and in her words "sat there and acted like nothing ever happened."

20.     The following day, December 1, 2004, Ann and defendant took AM to register for school and then they went shopping in Brooklyn. Defendant left that evening for Florida .

7

21.     When defendant arrived in Florida on December 2d or 3d, Leslie told him the relationship was over and he was not welcome in the house. Defendant stayed anyway, but left after a couple of days moving in with his sister, who lived nearby. About a week later, on December 10, 2004, defendant entered Leslie's home at five o'clock in the morning "in a drunken state," and confronted Leslie in the bedroom where she and her new boyfriend Nigel were sleeping. As the children watched, defendant pulled a gun from his pocket, pointed it at Nigel, and knocked Leslie to the floor. Leslie had seen defendant's gun before that. Leslie called 911. After finding no gun, the police told defendant to leave the property but made no arrest.

22.     Subsequently, defendant returned north and found a place to live in the Bronx. Defendant stopped providing financial support for the children, and Leslie did not sue him for it.

23.     AM finished the school year in Queens. In July 2005, the two youngest children were visiting their grandmother in Queens and defendant asked to take them to a park. AM went along, at the request of her mother and grandmother and her great-grandmother also went . In August 2005, AM returned home to Florida for school. AM knew defendant "was out of the picture."

24.     AM had learned about Leslie's separation from defendant when she was in New York, and knew she could tell what defendant had done to her, but did not know how. AM had not forgotten what defendant had done, and was still feeling all the effects of his acts, but she did not know "how to come out and say it" and was "waiting for the right time."

25.     That spring, on or about March 16, 2006, Leslie was at a local fair with the four children  when she saw defendant approaching . Leslie took the children and left. Defendant had not been making any effort to maintain a relationship with his children – he had not even called to say he was in Florida – and Leslie felt a casual greeting at a public event was not appropriate.

8

26.     On Easter Sunday, April 16, 2006, Leslie and the four children celebrated with a traditional home-cooked meal . As Leslie and AM were cleaning up the kitchen after dinner, Leslie confronted AM about an inappropriate comment AM had made about Nigel, who was visiting family in Atlanta.  During the ensuing argument, Leslie asked AM why she hated everyone, why she was constantly fighting, and why she could not do well in school. AM, who was just shy of fourteen, told her mother, "You don't know me."  Leslie asked AM what was wrong, and whether someone had hurt her.  Without turning from the sink, AM said, "yes, someone hurt [her]." At that, Leslie asked AM if she had been raped. AM said "yes, Mommy."  Leslie asked by who, and AM said, "Jimmy," meaning the defendant.  AM was "shocked" that she finally said something.  To Leslie, the moment was "surreal."

27.     AM was sobbing as she blurted it out . Leslie took AM into her arms and for awhile they held each other and cried on the floor of the small kitchen.  Leslie realized she had neglected her daughter and had not seen AM's pain, even though it had been right in front of her. Leslie told AM that she was her mother, she loved AM, and that AM should have come to her.  AM said she did not think Leslie would have believed her. From AM's standpoint, she "never up to that point had a relationship with her mom" where they "sat down and talked."  AM believed that her mother "still" loved defendant – the father of her children – and that Leslie would think AM was lying and "making it up."  Leslie and AM held each other, talked, and cried into the night.  It was, Leslie later said, "pretty dramatic."

28.     Leslie asked AM if she wanted to file a police report and AM said she did, so the following morning they went to the local police precinct and reported defendant's crimes. Subsequently, AM underwent a complete sexual assault examination at the Broward County Sexual

9

Assault Treatment Center in Florida; AM said that when the metal tool was placed inside her, it "hurt a lot."

29.     Florida forwarded the report to Queens County and NYPD Detective LUZ FIGUEROA of the Queens County Child Abuse Squad was assigned to investigate the case against defendant. On June 13, 2006, Detective Figuero interviewed AM and her grandmother in New York. On June 15, 2006, Detective Figuero arrested defendant.

30.     Defendant was charged with Rape in the First Degree (Penal Law § 130.35[4]), Course of Sexual Conduct Against a Child in the Second Degree (Penal Law §130.80), Endangering the Welfare of a Child (Penal Law § 260.10[1]), and Sexual Abuse in the Second Degree (Penal Law § 130.60[2])(Queens County Indictment Number 2147/06).

31.     Defendant proceeded to trial before the Honorable Ronald D. Hollie, a Justice of this Court and a jury. At the conclusion of the trial, defendant was found guilty of all counts and sentenced to concurrent determinate prison terms of fourteen years for rape, ten years for sexual conduct, five years for endangering and one year for sexual abuse, plus post-release supervision.

32.     On appeal to this Court, defendant argued, through counsel, that he was denied a fair trial when the trial court received evidence of uncharged Florida crimes and photographic portraits of the child at the ages of five to seven. By decision and order dated October 25, 2011, however, this Court affirmed defendant's conviction holding that the trial court "providently exercised its discretion in permitting the prosecution to elicit evidence that the defendant, charged with sexually touching the younger-than-11-year-old victim from 1997 to 2000 while the family lived in Queens, and with one rape of the victim in Queens in November 2004, raped the victim on frequent occasions between 2001 and 2004 while the family lived in Florida. The

10

evidence was properly admitted to demonstrate the defendant's pattern of escalating sexual conduct toward the victim during the period between the charged crimes, and as relevant background information to enable the jury to understand the defendant's relationship with the victim and to place the events in question in a believable context, particularly since the defendant raised the issue of the victim's delayed disclosure of the charged criminal conduct." *People v. Khan*, 88 A.D.3d 1014, 1014-1015 (2d Dept. 2011). Moreover, this Court held, "the probative value and the need for the evidence outweighed any potential prejudice to the defendant, particularly in light of the Supreme Court's limiting instruction to the jury as to the proper use of the uncharged crimes evidence." *Id.*

33.   By letter, defendant's counsel sought leave to further appeal to the Court of Appeals, but that application was denied on January 19, 2012.  *People v. Khan*, 18 N.Y.3d 884 (2012) (Smith, J.).  A *pro se* application to the Court of Appeals was dismissed on December 12, 2011, *People v. Khan*, 18 N.Y.3d 859 (2011) (Smith, J.), and a *pro se* motion for reargument in this Court  was denied by order dated April 6, 2012.

34.   In the meantime, defendant also moved in the trial court for an order vacating his judgment of conviction pursuant to section 440.10 of the Criminal Procedure Law largely based on an attack on the quality and sufficiency of the evidence as well as a broad claim that his trial attorney was ineffective, that he had a "prior relationship that went bad" with the Assistant District Attorney assigned to his indictment and a completely unspecified claim of newly discovered evidence.

35.   In response, by papers annexed to these as Exhibit A, the People argued that the motions should be summarily denied because (1) for the most part it was  based on the record of the proceedings in this Court and a motion to vacate cannot be used as a substitute for a direct appeal and  (2) allegations of facts essential to support the additional aspects of the motion were

11

made solely by the defendant and unsupported by any other affidavit or evidence, and there is no reasonable possibility that these unsupported allegations are true, C.P.L. § 440.30(4)(d).

36.    By decision and order dated July 12, 2012, annexed hereto as Exhibit B, Supreme Court (Hollie, J.) denied defendant's motion holding that defendant had not "set forth sufficient newly discovered evidence of such a nature that if said evidence had been received at trial, the verdict would have been more favorable to the defendant" (Decision and Order of July 12, 2012 at 2). The Court also found that he was barred from raising issues in support of a motion to vacate "which defendant failed to raise on appeal and those issues he raised on appeal and were denied" (*Id.*)

37.    By his current motion, defendant seeks leave to appeal to this Court from that order of the Supreme Court. As discussed in the People's opposing affirmation and Memoranda of Law, filed below and attached hereto, defendant's motion does not present any question of law that warrants further review. Accordingly, defendant's leave application should be denied.

12

WHEREFORE, and for the reasons in the court's decision and in the People's opposition to defendant's motion, defendant's application for leave to appeal to this Court should be denied.

Dated:     October 4, 2012
             Kew Gardens, New York

                                                EDWARD D. SASLAW
                                              Assistant District Attorney
                                              (718) 286-5803

To:    Abu Khan
       07-A-4685
       Green Haven Correctional Facility
       P.O. Box 4000
       Stormville, N.Y. 12582

**Courtesy Copy**
Original Filed in ECF
docket number ⎺14-CV-5456

# Supreme Court of the State of New York
## Appellate Division : Second Judicial Department

M145089
L/

JOHN M. LEVENTHAL, J.

2012-08127

DECISION & ORDER ON APPLICATION

The People, etc., plaintiff,
v Abu Khan, defendant.

(Ind. No. 2147/06)

Application by the defendant, pursuant to CPL 450.15 and 460.15 for a certificate granting leave to appeal to this Court from an order of the Supreme Court, Queens County, dated July 12, 2012, which has been referred to me for determination.

Upon the papers filed in support of the application and the papers filed in opposition thereto, it is

ORDERED that the application is denied.

_____
JOHN M. LEVENTHAL
Associate Justice

October 19, 2012

PEOPLE v ABU KHAN

Courtesy Copy

Original Filed in ECF
docket number 14-CV-5456  JGM

Suslaw / Castellano

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
----------------------------------------
THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,                        NOTICE OF MOTION FOR
                                                       WRIT OF ERROR CORAM
                                                       NOBIS
      -against-

ABU KHAN,
                                                       Queens County
                                                       Indict. No. 2147/06
              Defendant-Appellant.
----------------------------------------

        PLEASE TAKE NOTICE, that upon the annexed affidavit of ABU KHAN, sworn to

on the 5th day of November, 2012, and all the papers and proceedings

heretofore and herein, Appellant will move this Court at a term thereof, to be

held at the Appellate Division, Second Department Courthouse, located at, 45

Monroe Place, Brooklyn, New York 11201, on the 27th day of November 2012, at

10:00 o'clock in the forenoon of that day for an Order vacating the Judgment,

Decision and Order of this Court affirming his conviction, and granting such

other and further relief as may be just upon the ground that he was denied his

right to the effective assistance of counsel under the Fifth, Sixth and

Fourteenth Amendments of the United States Constitution, and Article 1, §6 of

the New York State Constitution on his direct appeal to this Court because:

(a) the assistance provided by his appellate counsel was so nominal it

amounted to the substantial equivalent of being assigned no counsel at all;

and/or (b) if the assistance of appellate counsel was something more than

nominal, it still did not reach a level of performance sufficient to satisfy

an objective standard of reasonableness, and there is a 'reasonable

probability' that but for counsel's deficient performance, the outcome of the

appeal would have been different.

- 01 -

PLEASE TAKE FURTHER NOTICE, this motion is in the nature of Error Coram Nobis, and the answering papers, if any, shall be filed with proof of service on the undersigned in accordance with the provisions of 22 N.Y.C.R.R. § 670.2 sub.(d). This motion is submitted on the papers and personal appearance in opposition to the motion is neither required nor permitted.

Dated:

Respectfully Submitted,

Abu Khan #07A4685
Appellant. Pro Se

TO:  Richard A. Brown
     Queens County District Attorney

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
----------------------------------------
THE PEOPLE OF THE STATE OF NEW YORK,

      Respondent,      AFFIDAVIT SUPPORTING
                MOTION FOR A WRIT OF
                ERROR CORAM NOBIS

  -against-

ABU KHAN,           Queens County
                Indict. No. 2147/06
      Defendant-Appellant.
----------------------------------------

STATE OF NEW YORK  )
          )ss.:
COUNTY OF DUTCHESS  )

   I, ABU KHAN, having first been duly sworn, depose and say that:

   1. I am the above named appellant, am 18 years of age or older, and am currently incarcerated in the Green Haven Correctional Facility, located at Post Office Box 4000, Stormville, New York 12582.

   2. I make this affidavit in support of instant motion for a Writ of Error Coram Nobis to vacate the Judgment, Decision and Order of this Court affirming defendant's conviction in the above matter. The basis of this motion is that the defendant was deprived of his right, under the 5th, 6th, and 14th Amendments of the United States Constitution and Article 1, §6 of the New York State Constitution, to the effective assistance of counsel upon his direct appeal to this Court from a judgment of conviction entered against him in the Supreme Court, County of Queens, on July 24, 2007, in that: (a) the assistance provided by his appellate counsel was so nominal it amounted to the substantial equivalent of being assigned no counsel at all; and/or (b) if the assistance of appellate counsel was something more than nominal, it still did not reach a level of performance sufficient to satisfy an objective standard

of reasonableness, and there is a 'reasonable probability' that but for counsel's deficient performance, the outcome of his direct appeal would have been different.

### PROCEDURAL HISTORY

3. ABU KHAN, hereinafter, the defendant in this matter, in connection to Indictment Number 2147/2006, was tried by jury, before Honorable Roland D. Hollie.

4. I, ABU KHAN, after a jury trial was found guilty of rape in the first degree [ P.L. §130.35(4)], course of sexual conduct against a child in the second degree [ P.L. §130.80], endangering the welfare of a child [ P.L. §260.10], and sexual abuse in the second degree [ P.L. §130.60(2)].

5. On July 24, 2007, Judge Roland D. Hollie, sentenced defendant to concurrent determinate prison terms to fourteen years for rape, ten years for sexual conduct, five years for endangerment and one year for sexual abuse, plus five years post release supervision.

6. The defendant filed a timely notice of appeal and poor person application, and this Court assigned Lynn W. Fahey, to perfect the appeal on defendant's behalf.

7. The Appellate Division affirmed the defendants' conviction in a published opinion dated October 25, 2011, People v. Khan, 88 A.D.3d 1014, 1014-1015 (2d Dept. 2011). The defendant applied to the New York State Court of Appeals for leave to appeal from this Court's Order of affirmance. That application was denied on January 19, 2012, People v. Khan 18 N.Y. 3d 884 (2012).

8.    No prior application has been made to any Court to review the adequacy of the representation the defendant received upon his direct appeal to this Court.

## FACTS

### Inadequacy Of Filed Brief

9.    As previously set forth, the appeal herein was perfected by assigned counsel. During the period between the date counsel was assigned and the date upon which the appeal was perfected, the defendant assigned counsel did not discuss the specific issues which would be included in the brief nor did he incorporated meritorious arguments that was requested by the defendant, (See Exhibit A) which was all based on the record, nor was the defendant given the opportunity to review the brief prior to its submission to the Court. The brief, as submitted, did not present well-reasoned arguments to this Court. The fact that no medical expert was consulted with, to rule out that any penetration occurred when after numerous examinations were performed, and, there was no physical or visible injuries that was found to the hymenal membrane, no scars, no bruising, no tears and a symmetric, initerrupted, narrow hymenal rim.

*addressed by Counsel*

*omitted issue*

### Meritorious Issues Ignored By Appellate Counsel:

10.    Assigned counsel did not only inadequately represented the defendant upon appeal by making poorly drafted arguments, but also omitted meritorious arguments upon which a reversal of the conviction could of been obtained. These issues were supported by both the facts in the record and

prior decisional law in this jurisdiction. In some instances the arguments should have been obvious from even a casual reading of the record, but were ignored on appellate brief.

## MERITORIOUS ISSUES:

On June 16, 2006, then 14 year old Ashley Martinez (step-daughter and alleged victim) was interviewed by the Queens County Prosecutor (see T.T. pgs; 459-488) and on June 21, 2006, Ashley underwent an assault examination at the Queens Child Advocacy Center (see T.T. pgs; 489, 552-553) where Ashley was examined by Medical Director (Dr. Jamie Hoffman-Rosenfeld) alleged to be an expert in the field in pediatrics and child sexual abuse (see T.T. pg; 566).

On July 5, 2006, Ashley returned for further medical examinations, the doctor took genital and anal samples and determined that Ashley did not have any sexually transmitted diseases. Furthermore, said doctor observed that Ashley was at the most advance stage of puberty -- meaning she was an adult female with pale pink estrogenized hymen. The doctor also observed that Ashley had a symmetric, uniterrupted, narrow hymenal rim with no visible injury or scars (see T.T.pgs; 527-564).

On March 12, 2007, Ashley was again examined at the Queens Medical Facility, this time by Dr. Rosenfeld and another doctor (see T.T. pgs; 492, 560) the same large speculum was used and a different technique was employed to really stretch the [Hymenal] membrane to make sure the doctor's had seen everything (see T.T. pgs; 560-561) Ashley felt the examination hurt a little more than the last time, but understood it was because [the doctor] wanted to make sure (see T.T. pg; 492). The examination yielded no new information, as she first stated in her second report, dated March 12, 2007. There, Dr.

Hoffman-Rosenfeld reiterated that Ashley had a thin uniterrupted hymenal membrane without "indentifiable" transection and that the absence of a complete transection does not negate abuse or penetration since Ashley's vaginal opening and the elastic nature of the thin hymen is "More adequate to enable penetration to occur without trauma to the hymen" (see trial people's exhibit 3 ).

Doctor Hoffman-Rosenfeld went on to testify that "In a young girl the hymen is "very thin" and almost transparent (see T.T. pgs; 544, 545) that a couple of years before menstruation, estrogen -- the female hormone responsible for puberty -- causes the hymenal tissue to become "Boggy, stretchable, elastic, and resilient," (see T.T. pg; 541), that the hymenal tissue is "required to stretch with penetration of the vagina, and the introduction of estrogen during per-pubescence allows this stretching to occur without "breaking" or other injury (see T.T.pgs; 545, 546, 563) that estrogen is very "powerful" and can also "obliterate" an old trauma, because of these estrogen effects, whether there has been sexual trauma may be "difficult if not impossible to detect visually once the girl goes through puberty".

Doctor Hoffman-Rosenfeld also testified that after intercourse, the hymen does not necessarily have any visible injury [of being] torn or broken, or any other evidence of the penetrating trauma of intercourse (see T.T. pg; 569), when asked about scars, bruises, scrapes and scratches, Dr. Hoffman-Rosenfeld stated; "There was nothing on physical exam, there was no physical evidence". (see T.T. pgs; 573-574, 585).

Moreover, the prosecution called Dr. Don Lewittes as an expert witness, a New York State Licensed Psychologist, whom testifies on behalf of the prosecution concerning "Child Sexual Abuse Accommodation Syndrome" and as to the impact of traumatizing events on memory the "blurring effect" et al the

onset of adolescence could trigger disclosure of child sexual abuse because it increases a child's awareness of her own sexuality. The defendant-appellant contends that if counsel would have at minimum investigated and or consulted with an expert in the field of Psychology, concerning what the prosecution's expert witness testified about, then counsel would have found that at least once before the prosecution's expert Psychologist testified in a similar case (426 F.3d 588,600, Gersten v. Senkowski, [C.A. 2 N.Y.] 2005) where one Doctor John C. Yuille, a Forensic Psychologist and Professor at the University of British Colombia, submitted an affidavit reviewing Dr. Lewitte's testimony (similar to that which he gave in the case at bar). Dr. Yuille is a member of various professional associations for forensic psychologist and the author of over seventy published journal articles, six texts, and twenty one text chapters on topics related to the psychology of child sexual abuse. Dr. Yuille's work has included training law enforcement in evaluation of the credibility of allegations of child sexual abuse, and he has testified as an expert on the psychology of child sexual abuse in numerous judicial proceedings in the United States and Canada. In vast majority of these cases he testified on behalf of the government. In the Gerstern v. Senkowski case, dr. Yuille stated that "In point for point of fact, what was once known as 'Child Sexual Abuse Accommodation Syndrome' is no longer regularly accepted in the child sexual abuse research community". He further reported that the inventor of the theory, Dr. Roland Summit, "has retreated from this position of classifying it as a 'Syndrome', and that "research in the field reveals that the 'Symptoms' which were alleged components of the syndrome do not occur regularly enough in those who truly have been the victims of sexual abuse to call it a syndrome". Dr. Yuille concluded that "Dr. Lewittes' testimony with regard to the Child Sexual Abuse Accommodation Syndrome and its alleged five components has no validity and is not regularly accepted in the scientific

community". Furthermore, regarding Dr. Lewittes testimony as to the impact of traumatizing events on the memory – the "Blurring effect" Dr. Yuille stated bluntly that, after a distinguished career focused on understanding "issue of suggestibility, memory and child sexual abuse", he could state with some assurance that Dr. Lewittes' opinion that trauma 'blurs' memory is erroneous, and that "the best research in the field of child sexual abuse, memory and suggestibility uniformly reveals that trauma, has varying effects on memory, ranging from memory enhancement to diminishment". Moreover, regarding Dr. Lewittes' testimony that the onset of adolescence could trigger disclosure of child sexual abuse, because it increases a child's awareness of her own sexuality, Dr. Yuille reported that "In his years of research in this field, he never encountered this proposition", in short "this theory has no scientific validity in the field of child sexual abuse". Dr. Yuille concluded that had he been consulted by the defense prior to trial, he would have offered the opinion contained in an affidavit he provided, and had he been called to testify, he would have given testimony contained in his affidavit (Cf; 426 F.3d 588, *601).

In regards to the expert testimony of Dr. Hoffman-Rosenfeld, and her allegation that no physical evidence of sexual abuse, and or penetration does not negate the claim of sexual abuse. The defendant affirms that in the case of Gersten v. Senkowski, 426 F.3d 588 (C.A.2 (N.Y.) 2005) where a defendant was accused of sexually assaulting his daughter between the years 1990, 1995 and 1998 at ages 5-13, one doctor, Jocelyn Brown, specializing in pediatric medicine and the founding and then current director of the Child Advocacy Center at Columbia Presbyterian Hospital, submitted an affidavit (in that case) reviewing the medical evidence. Dr. Brown primarily concerns forensic medicine in the area of child sexual abuse, and her practice frequently

involves close cooperation with law enforcement. Dr. Brown had testified as an expert witness in New York State criminal proceedings in approximately 80 cases, in 78 of these she testified on behalf of the government. In her affidavit submitted upon reviewing the prosecutor's medical experts' testimony and medical records and slides of the magnified photographs taken during the examination through the colposcope, Dr. Brown found that the clefs at the 5, 9, and 11 o'clock position on the alleged victims' hymen, reported by one Dr. Silechia (expert witness for the prosecution in the Gersten v. Senkowski case) Dr. brown noted a number of erroneous aspects of Dr. Silechias' testimony. First, Dr. Brown stated that Dr. Silechia was incorrect in stating that "Clefs" and "Notches" referred to as the same thing. Unlike Clefs, "Notches are 'V shape' interruptions of the hymen tissue". Moreover, "Notches are commonly found on the hymenal tissue of adolescents and are not indicative of penetrating trauma to the hymen". That on the other hand "Clefs, are 'V shape' and are transsections in the hymenal tissues beginning from its edge, or rim, to its base, are indications of penetrating trauma". Furthermore, Dr. Brown's review of the colposcopic slides did not reveal any clefs at the reported locations. Rather, these magnified photographs of the alleged victim's hymen revealed only one notch at the 4 o'clock position, and no clefs.

The defendant-appellant argues that counsel's failure to investigate the prosecution's evidence led said counsel to decide not to challenge what was clearly the most significant corroborative evidence (the medical expert's testimony).

Furthermore, all other physical observations relied on in concluding that penetration had taken place, infact provided no support for that conclusion. The defendant-appellant affirms that such a lack of physical evidence of  penetration would cast serious doubt on the alleged victim's story of sexual

abuse over a period of years. Furthermore, if assigned counsel had adequately represented defendant upon appeal by making meritorious drafted arguments, a reversal of the conviction could of been obtained.



WHEREFORE, it is respectfully requested that an Order issue from this Court vacating the prior Decision and Order of this Court affirming the conviction of defendant-appellant upon the grounds that he was deprived of the Effective Assistance of Appellate Counsel, and granting such other and further relief as may be just in the premises.

Respectfully Submitted,

Abu Khan 07A4685
Pro Se

Subscribed and sworn to before me this

6th day of November, 2012.

Ellen A. Bohlmann
Notary Public

ELLEN A. BOHLMANN
Notary Public, State of New York
No. 0342485
Qualified in Dutchess County
Term Expires Oct. 31, 20__

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
----------------------------------------
THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

    -against-

ABU KHAN,

             Defendant-Appellant.
----------------------------------------

MEMORANDUM OF LAW

Queens County
Indict. No. 2147/2006

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted in support of Appellant's motion for a Writ of Error Coram Nobis. The motion is based upon the ground that appellant was denied his State and Federal Right to the Effective Assistance of Appellate Counsel during his direct appeal to this Court from a judgment of conviction, entered in the Supreme Court, County of Queens, for the crimes of rape in the first degree, course of sexual conduct against a child in the second degree, endangering the welfare of a child and sexual abuse in the second degree.

## STATEMENT OF FACTS

The facts which provide the basis for the arguments contained within this Memorandum of Law have already been detailed in appellant's affidavit submitted herewith and in support of the instant motion. In the interest of brevity, appellant does not reprint them here. Instead, appellant incorporates those facts into this Memorandum of Law by reference, and re-alleges them as

if set forth here. Numbers in parenthesis preceded by "A" and "B" refer to the "Appellant's Exhibits A and B submitted herewith.

## POINT 1

### THE APPELLANT HAS THE RIGHT TO CHALLENGE THE INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Appellant has the right to challenge the Ineffective Assistance of Appellant Counsel collaterally by bringing a motion for a Writ of Error Coram Nobis in the Appellate Court where the ineffective assistance occurred. People v. Bachert, 69 N.Y.2d 593, 516 N.Y.S.2d 623 (9187). There is no time limit on the filing of collateral attacks on judgments of conviction. Cf. People v. Jackson, 78 N.Y.2d 638, 578 N.Y.S.2d 483 (1991). Appellant's appeal was heard and disposed of in the Appellate Division Second Department. Therefore, this Court can properly hear appellant's challenge based on the ineffective assistance of his appellate attorney.

## POINT II

### APPELLANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON HIS STATE COURT DIRECT APPEAL WAS VIOLATED WHEN HIS ASSIGNED APPELLATE COUNSEL OMITTED SIGNIFICANT AND OBVIOUS ISSUES WHILE PURSUING ISSUES THAT WERE CLEARLY AND SIGNIFICANTLY WEAKER

It is well established that every State criminal defendant has a Due Process Right to the effective assistance of counsel on direct appeal in a criminal case. See Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830 (1985); See also Strickland v. Washington, 466 U.S. 688, 104 S.Ct. 2052 (1984).

This requires appellate counsel to act as an advocate, not merely as amicus curiae, and to marshal legal arguments on appellant's behalf in order that he might have a full and fair resolution and consideration of his appeal.

Anders v. California, 386 U.S. 738, 743-44, 87 S.Ct. 396 (1967); Douglas v. California, 372 U.S. 253, 83 S.Ct. 814 (1963); Ellis v. United States, 356 U.S. 674, 78 S.Ct. 974 (1958). This also "requires that he support his client's appeal to the best of his ability" (Anders v. California, supra at 744), and the brief he submits must reflect more than "a detached evaluation of the appellant's claim". See Evitts v. Lucey, supra at 394.

A.  Two - Part Test For Resolving Ineffective Assistance Of Appellate Counsel Claims.

In order to prevail on a claim of ineffective assistance of appellate counsel, a two-part test must be satisfied. First, appellant "must show that his attorney's performance 'fell below an objective standard of reasonableness Strickland v. Washington, 466 U.S. 668, 686 (1984), and second, he must show that there is a reasonable probability' that but for counsel's error, the outcome would have been different, Strickland, 466 U.S. at 687-88, 693-94". Mayo v. Henderson, 13 F.3d 528, 533 (2nd Cir. (1994).

To satisfy the first part of the test, appellant must show that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker". Id. at 533. This must be evaluated according to the facts of the case in conjunction with counsel's failure to present a particular claim as of the time of the direct appeal, and hindsight to second-gust his strategy choices may not be used.

However, the omission of a meritorious claim cannot be excused simply because an intermediate appellate court would have rejected it. Id. at 533-534.

To satisfy the second part of the test, appellate counsel's failure to present the particular claim in question must sufficiently "undermine confidence in the outcome" of the direct appeal. "This determination may be

made with the benefit of hindsight". Mayo v. Henderson, supra, 534.

B.  Weakness of the Issues Raised By Appellant's State Appellate Counsel:

Appellant's appellate counsel completely failed in his duty to present meritorious arguments on appellant's behalf during the direct appeal, even though, based upon the law in existence at the time of the direct appeal, he could have. As a result, appellate counsel did not afford appellant the quality of representation to which he was constitutionally entitled. While ignoring that meritorious issue, appellate counsel proceeded to raise issues that were clearly and significantly weaker. (the testimony that I rape the complainant in Florida and the photos of her as a young girl were improperly received in evidence). No attempt was, nor could have been made to provide this Court with a reason for reviewing then in the interest of justice.

C.  Meritorious Not Raised By Appellate Counsel:

Assigned counsel did not only submit poorly drafted arguments, but also completely failed in his duty to marshal arguments on appellant's behalf, and as a result, did not afford appellant the quality of representation to which he was constitutionally entitled. Most notably, appellate counsel did not raise a solidly meritorious argument regarding consultation with medical experts. This argument, grounded in State and Federal case law in existence at the time of appellant's direct appeal, would have won appellant reversal on his appeal.

## CONCLUSION

For the above stated reasons, appellant's motion for a Writ of Error Coram Nobis should be granted and this Court should, upon the record herein, reverse the conviction and remand the matter for a new trial.

Dated:

Respectfully Submitted,

Abu Khan #07A4685

Appellant, Pro Se

Green Have Correctional Facility
P.O. Box 4000
Stormville, N.Y. 12582

To:  Richard A. Brown
     Queens County District Attorney

- 14 -

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-------------------------------------------
THE PEOPLE OF THE STATE OF NEW YORK,

              Respondent,

    -against-

ABU KHAN,

          Defendant-Appellant.
-------------------------------------------

STATE OF NEW YORK    )
                 )ss.:
COUNTY OF DUTCHESS  )

       **AFFIDAVIT OF SERVICE**
           **BY MAIL**

       Queens County
       Indict. No. 2147/2006

    I, ABU KHAN, having first been duly sworn, depose and say that:

1.   I am the above named appellant, am 18 years of age or older, and am currently incarcerated in the Green Haven Correctional Facility, located at P.O. Box 4000, Stormville, New York 12582.

2.   On the below indicated date of notarization, I served a true and correct copy of the herewith Notice of Motion, Supporting Affidavit and Exhibit "A" on opposing counsel, Queens County District Attorney, by placing said documents in a properly addressed envelope with postage prepaid and placing said envelope in the prison mailbox.

                    Respectfully Submitted,

                    _____

Subscribed and sworn before me this

5th day of November 2012

_Ellen A. Bohlmann_

        **ELLEN A. BOHLMANN**
       Notary Public, State of New York

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT
----------------------------------------
THE PEOPLE OF THE STATE OF NEW YORK,

              Respondent,

      -against-

ABU KHAN,

          Defendant-Appellant.
----------------------------------------

Queens County
Indict. No. 2147/2006

------------------------------------

        APPELLANT'S   EXHIBIT   A

------------------------------------

To:    Jonathan M. Kratter
       Attorney-At-Law
       Appellate Advocates
       2 Rector Street - 10th Floor
       New York, NY 10006

From:  Abu Khan #07A4685
       Appellant
       Green Haven Correctional Facility
       P.O. Box 4000
       Stormville, New York 12582

                                Date: Oct. 12th, 2010

                          Re: APPEAL ISSUES - TO BE
                               BRIEFED ON DIRECT APPEAL

Dear Mr. Kratter:

     Good day to you, I'm writing you this letter, in regards to my
Actual Innocence, setting forth issues I feel should be incorporated
within the main brief ( on Direct Appeal ) so that I may receive a
full and fair review by the court. I acknowledge the <u>Jones v. Barnes</u>
463 U.S. 745, standards et al ruling as articulated and applied by the
Appellate Division ( 2nd Department ) where at it was ruled:
"Counsel does not have to raise any or every non frivulous issue(s)".

     However, I have been incarcerated for some time now, and I have
been researching quite afew issues on my own and although I am a layman
to the law and no way near as experience in law as you are, I was
hoping that you would except the small information pack that I have
gathered and I pray that you would be able to use the information to
assist you in proving my innocence.

     Enclosing I would like to add if you would be so kind as to inform
me of any and all findings before and any briefs and or motions have
been submitted. Please observe research below;

1. ACTUAL INNOCENCE: This issue results from the testimony of Dr.
   Rosenfeld ( TT: 572, 574 )

(a) An Uniterrupted Posterior Hymen Rim

(b) No Defects in Hymen

(c) No Scaring

(d) No Transition ( no tear )

(e) No Ecchymosis ( no bruising )

(f) No Abrasion ( no scrape or no strach )

(g) No Laceration ( )

(h) Blood Work ( no evidence of sexually transmitted disease )

(i) There was no Physical Evidence


2. INEFFECTIVE COUNSEL: Counsel, did not seek medical expert testimony on my behalf...PEOPLE V. BABA ALI 179 A.D. 725, 729, which was crucial in this case, nor did counsel review the Grand Jury Testimony which he had in his possession for almost a year, until the first day of trial...PEOPLE V. SULLIVAN 209, A.D. 558, 558-59.


3. OFFICIAL MISCONDUCT: The Prosector committed Misconduct when she " (1) used a prior conviction which had no relevance to the issue at hand...(2) produce false Military Documents...(3) uncharge bad acts & evidence irrelevant to the case...(4) made remarks about my name that implied Islamic beliefs..." " Note observation that Abu is an Arabic name. It is known that Arabic males believe in womanizing the females of the Arabic Nation, they are second class citizens. So, for the Prosecutor to indicate that the name of the defendant is Arabic was to discredit, and label him a false and negative image! ( Misconduct, Malicious prosecution, Vendictive prosecution.


4. PERJURED TESTIMONY: My ex Leslie Martinez, Perjured herself as to child support payments ( TT: 401 ). I have proof should you need it to support this issue.


I thank you for your time, and look forward to hearing from you.


Very truly yours,

# APPELLATE ADVOCATES

2 RECTOR STREET - 10TH FLOOR, NEW YORK, NEW YORK 10006
PHONE: (212) 693-0085    FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
  LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-
CHARGE
  BARRY S. STENDIG

SUPERVISING ATTORNEYS
  WINSTON MCINTOSH
  DAVID P. GREENBERG
  ERICA HORWITZ
  PAUL SKIP LAISURE

October 15, 2010

SARAH J. BERGER
STEVEN R. BERNHARD
ERIN R. COLLINS
DENISE A. CORSI
A. ALEXANDER DOES
JONATHAN GARVIN
JOHN GEMMILL
ALLEGRA GLASHAUSER
LEILA HULL
KENDRA L. HUTCHINSON
WILLIAM G. KASTIN
JONATHAN M. KRATTER
WARREN S. LANDAU
JOSHUA M. LEVINE
KATHERINE A. LEVINE
JESSICA M. MCNAMARA
LISA NAPOLI
ANNA PERVUKHIN
DENICE POWELL
KATHLEEN E. WHOOLEY

OF COUNSEL
  ANDREW E. ABRAHAM
  RACHEL ALTSTEIN
  MELISSA S. HORLICK
  REYNA E. MARDER
  MICHELLE VALLONE

Mr. Abu Kahn
07-A-4685
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Dear Mr. Kahn:

   I am writing in response to your recent letter.  I will evaluate the issues you are suggesting when I have begun to work on your case and become familiar with the appellate record, particularly the transcript.  I will write and tell you about the issues I decide to raise and will explain why I am not raising any issues you have suggested that I do not include in the brief. Finally, I will send you a copy of the brief when I file it.

   One thing I want to make clear is that an appeal must be based only on the appellate record, which consists essentially of the transcript, exhibits admitted in evidence, and some of the court papers. I cannot use proof of Leslie Martinez's perjury that is not part of the record. Nonetheless, you should tell me what proof you have and, if it is not too difficult, send me a copy of any documents.

Yours truly,

Jonathan M. Kratter, Esq.

To:     Jonathan M. Kratter
        Attorney-At-Law
        Appellate Advocates
        2 Rector Street - 10th Floor
        New York, NY 10006

From:   Abu Khan #07A4685
        Appellant
        Green Haven Correctional Facility
        P.O.Box 4000
        Stormville, New York 12582

                       Dated: October 20 2010

                       Re: RESPONSE TO YOUR LETTER OF
                             OCTOBER 15 2010

Dear Mr. Kratter:

    I am in receipt of your most recent letter, informing me you will look into what I am requesting you to present within my brief. But I have a few question, I feel warrants notice and a response.

    For as you have so pointed out, an Appeal is based on a record and what was presented therein. But there are things which had transpired outside of the records my Trial Counsel did not want to raise or point out to the Trial Court. Which is that by noting the enclose copy of the Photograph, you will see I know the A.D.A., and by such, there is and was a conflict of interest, if you review the record under a cumulative manner. For there is an appearance of different things transpiring that would support, here is a person, which a personal grudge for being jolted and having a relationship go bad.

    For as I have pointed out in my last letter, there are facts which were false and very misleading, and due to this, there is a cause which should be pointed out within your brief, if you are to protect my Rights and Remedies for further review if warranted.

    I will await your response, and I am sorry for the blotchiness of the enclosed photocopy, for this was the best I could obtain in short notice.

cc: file.

                       Very Truly Yours,

# APPELLATE ADVOCATES

2 RECTOR STREET - 10TH FLOOR, NEW YORK, NEW YORK 10006
PHONE: (212) 693-0085    FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
  LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-
CHARGE
  BARRY S. STENDIG

SUPERVISING ATTORNEYS
  WINSTON MCINTOSH
  DAVID P. GREENBERG
  ERICA HORWITZ
  PAUL SKIP LAISURE

SARAH J. BERGER
STEVEN R. BERNHARD
ERIN R. COLLINS
DENISE A. CORSI
A. ALEXANDER DONN
JONATHAN GARVIN
JOHN GEMMILL
ALLEGRA GLASHAUSSER
LEILA HULL
KENDRA L. HUTCHINSON
WILLIAM G. KASTIN
JONATHAN M. KRATTER
WARREN S. LANDAU
JOSHUA M. LEVINE
KATHERINE A. LEVINE
JESSICA M. MCNAMARA
LISA NAPOLI
ANNA PERVUKHIN
DENICE POWELL
KATHLEEN E. WHOOLEY

December 1, 2010

OF COUNSEL
  ANDREW E. ABRAHAM
  RACHEL ALTSTEIN
  MELISSA S. HORLICK
  REYNA E. MARDER
  MICHELLE VALLONE

Mr. Abu Kahn
07-A-4685
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Dear Mr. Kahn:

    I apologize for the delay in responding to your last letter, but I have been out of the office for most of this time.  I received the enclosed information and will look at it when I work on your brief.  Of course, in a brief on a direct appeal, I can only consider information that is part of the appellate record, such as the transcripts, exhibits, and relevant court papers.

Yours truly,

Jonathan M. Kratter, Esq.

# APPELLATE ADVOCATES

2 RECTOR STREET - 10TH FLOOR, NEW YORK, NEW YORK 10006
PHONE: (212) 693-0085     FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-CHARGE
BARRY S. STENDIG

SUPERVISING ATTORNEYS
WINSTON MCINTOSH
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE

SENIOR ATTORNEYS
WILLIAM G. KASTIN
   STUDENT INTERN COORDINATOR
LISA NAPOLI
   RE-ENTRY PROGRAM COORDINATOR

STEVEN R. BERNHARD
ERIN R. COLLINS
DENISE A. CORSI
A. ALEXANDER DONN
JONATHAN GARVIN
JOHN GEMMILL
ALLEGRA GLASHAUSSER
LEILA HULL
KENDRA L. HUTCHINSON
JONATHAN M. KRATTER
WARREN S. LANDAU
JOSHUA M. LEVINE
KATHERINE A. LEVINE
JESSICA M. MCNAMARA
ANNA PERVUKHIN
DENICE POWELL
KATHLEEN E. WHOOLEY

OF COUNSEL
ANDREW E. ABRAHAM
ELLEN FRIED
MELISSA S. HORLICK
WILLIAM A. LOEB
REYNA E. MARDER
BONNIE H. STEIN
MICHELLE VALLONE

February 23, 2011

Mr. Abu Kahn
07-A-4685
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

## BY SECOND DAY MAIL

Dear Mr. Kahn:

As you requested, I am enclosing with this letter a draft of the brief I will file in your appeal. The brief is not in completely final form but is close to that. If you want to make comments before the brief is filed I must hear from you by March 7, 2011.

In the brief I have argued that the testimony that you raped the complainant in Florida and the photos of her as a young girl were improperly received in evidence, and I attacked the credibility of the prosecution's witnesses in the harmless error analysis. One reason I have not raised some of the issues you suggested in your correspondence is that an appeal must be based only on the record of the trial, without reference to other material. Thus, for example, I cannot use other means of attacking Leslie Martinez's credibility. Nor can I argue that your attorney was ineffective in the ways you suggested since the record does not show what a defense medical expert would have said, how many times your attorney met with you, or whether he read the Grand Jury minutes. I note that I did some internet research and it did provide support for the medical testimony that the absence of evidence of physical damage to the complainant's private parts does not mean that she could not have been sexually assaulted. Also, it is proper to use the prior conviction of a witness, such as yourself, for impeachment. Finally, the brief mention that your name was Arabic is not sufficiently prejudicial to raise an issue, particularly since the jury would have known it was Arabic even had the District Attorney not mentioned it, and a court will not reason that a brief mention of a person's apparent origin is so prejudicial as to prevent a fair trial

Again, I must receive any comments you have about the brief by March 7.

Yours truly,

Jonathan M. Kratter, Esq.

To:     MR. JONATHAN M. KRATTER, ESQ.
        APPELLATE ADVOCATES
        2 RECTOR STREET - 10TH FLOOR
        NEW YORK, NEW YORK 10006

From:   ABU KHAN # 07A4685
        GREEN HAVEN CORRECTIONAL FACILITY
        P.O. BOX 4000
        STORMVILLE, NEW YORK 12582

Date:   6th, FEBRUARY, 2012

        Dear Mr. Kratter,

            I received your letter dated January 24, 2012, along with the
        ORDER DENYING LEAVE dated January 19, 2012. First I would like to thank
        you for your representation in my Direct Appeals' process, at this
        point I am studying about the Federal procedure, and I am requesting a
        copy of the Leave to Appeal to the Court of Appeals that you submitted
        and all documentation pertaining to my case that I may continue with
        the Federal stage at this point.

            Once again I would like to thank you for your representation, and
        I await the documents to start my Federal process. I thank you for your
        time in this matter.

cc: file

                                        Sincerely,

# APPELLATE ADVOCATES

2 RECTOR STREET - 10TH FLOOR, NEW YORK, NEW YORK 10006
PHONE: (212) 693-0085     FAX: (212) 693-0878

*ATTORNEY-IN-CHARGE*
LYNN W. L. FAHEY

*ASSISTANT ATTORNEY-IN-CHARGE*
BARRY S. STENDIG

*SUPERVISING ATTORNEYS*
WINSTON MCINTOSH
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE
LISA NAPOLI

*SENIOR ATTORNEY*
WILLIAM G. KASTIN
STUDENT INTERN COORDINATOR

STEVEN R. BERNHARD
ERIN R. COLLINS
DENISE A. CORSI
A. ALEXANDER DONN
RACHEL A. DUBIN
JONATHAN GARVIN
JOHN GEMMILL
ALLEGRA GLASHAUSSER
LEILA HULL
KENDRA L. HUTCHINSON
JONATHAN M KRATTER
WARREN S. LANDAU
JOSHUA M. LEVINE
KATHERINE A. LEVINE
JESSICA M. MCNAMARA
ANNA PERVUKHIN
DENICE POWELL
KATHLEEN E. WHOOLEY

*OF COUNSEL*
ANDREW E. ABRAHAM
ALEXIS A. ASCHER
JANET CLAIRE LE
ELLEN FRIED
MELISSA S. HORLICK
WILLIAM A. LOEB
REYNA E. MARDER
MICHELLE VALJONE

February 10, 2012

Mr. Abu Kahn
07-A-4685
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Dear Mr. Khan:

In response to your recent letter, I am enclosing with this letter a copy of the leave application I filed in your behalf. I have already sent you the basic documentation pertaining to your appeal and am not sure what other documents you want.

Very truly yours,

Jonathan M. Kratter, Esq.

To:    JONATHAN M. KRATTER, ESQ.
       APPELLATE ADVOCATES
       2 RECTOR STREET - 10TH FLOOR
       NEW YORK, NEW YORK 10006

From:  ABU KHAN # 07A4685
       GREEN HAVEN CORRECTIONAL FACILITY
       P.O. BOX 4000
       STORMVILLE, NEW YORK 12582

Date: February 23rd, 2012

        Dear Mr. Kratter,

             I received your letter dated February 10, 2012, together with the
        leave to appeal, as you stated in your letter, you are not sure of what
        other documents I am asking for.

             Well, I have a copy of the Medical Report, the Trial Transcript
        and the Brief, so I'm good on that part, all that is left is copy[s] of
        any and all investigation that was done in the preparation of the
        Brief.

             Once again I thank you for all that was done in the process of my
        Direct Appeal. I thank you for your time in this matter.

cc: file

                                        Sincerely,

# APPELLATE ADVOCATES

2 RECTOR STREET - 10TH FLOOR, NEW YORK, NEW YORK 10006
PHONE: (212) 693-0085     FAX: (212) 693-0878

*ATTORNEY-IN-CHARGE*
LYNN W. L. FAHEY

*ASSISTANT ATTORNEY-IN-CHARGE*
BARRY S. STENDIG

*SUPERVISING ATTORNEYS*
WINSTON MCINTOSH
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE
LISA NAPOLI

*SENIOR ATTORNEY*
WILLIAM G. KASTIN
STUDENT INTERN COORDINATOR

STEVEN R. BERNHARD
ERIN R. COLLINS
DENISE A. CORSI
A. ALEXANDER DONN
RACHEL A. DUBIN
JONATHAN GARVIN
JOHN GEMMILL
ALLEGRA GLASHAUSSER
LEILA HULL
KENDRA L. HUTCHINSON
JONATHAN M KRATTER
WARREN S. LANDAU
JOSHUA M. LEVINE
KATHERINE A. LEVINE
JESSICA M. MCNAMARA
ANNA PERVUKHIN
DENICE POWELL
KATHLEEN E. WHOOLEY

*OF COUNSEL*
ANDREW C. ABRAHAM
ALEXIS A. ASCHER
JANET CLAIRE LEE
ELLEN FRIED
MELISSA S. HORLICK
WILLIAM A. LOEB
REYNA E. MARDER
MICHELLE VALLONE

February 27, 2012

Mr. Abu Kahn
07-A-4685
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Dear Mr. Khan:

In your recent letter you requested a copy of "any and all investigation that was done in the preparation of the brief." Appellate briefs can be based only on the record of the trial, including the transcript and exhibits. There can be no new factual investigation as part of a direct appeal. Thus, unless I fail to understand what you want, there is no investigation for me to copy and send to you.

Very truly yours,

Jonathan M. Kratter, Esq.

SUPREME COURT
CRIMINAL TERM-PART K-20 QUEENS COUNTY
125-01 QUEENS BLVD., KEW GARDENS, NY 11415

P R E S E N T:

HON. RONALD D. HOLLIE,

JUSTICE

-------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

Ind. No. 2147/06

Motion: To Vacate Judgment

CPL § 440:10

-against-

ABU KHAN

Defendant.

-------------------------------------------------------------X

The following papers numbered
1 to 3 submitted on this motion.

Abu Khan. Pro Se
For The Motion

Richard A. Brown, D.A.
A.D.A. Edward D. Saslaw
Opposed

Notice of Motion, and Affidavits Annexed.................      ......1 - 2....
Answering and Reply Affidavits...............................      ...... 3 ......

The defendant's motion pursuant *CPL § 440:20* is denied.   See the accompanying
memorandum

Dated: July 10,, 2012

_____

RONALD D. HOLLIE, J.S.C.

MEMORANDUM

SUPREME COURT: QUEENS COUNTY

CRIMINAL TERM: PART K-20

_____

THE PEOPLE OF THE STATE OF NEW YORK :        BY: RONALD D. HOLLIE, J.S.C.

           - against -             :        DATED: July 12, 2012

                                          MOTION: To Vacate Judgment
                                                 C.P.L § 440.10

ABU  KHAN
                                           IND. NO.: 2147/06

                           :

                      Defendant.

_____:

The defendant's pro se motion pursuant to C.P.L § 440.10 to Vacate Judgment is denied.

On March 29, 2007 the  defendant was convicted after jury trial before this Court of Rape in the First Degree, Course of Sexual Conduct Against a Child in the second Degree, Endangering the Welfare of a Child ans Sexual Abuse in the Second Degree. The defendant was sentenced to concurrent determinate terms of incarceration of fourteen years for the conviction of rape, ten years for sexual conduct, five years for endangering the welfare of a child, and one year for sexual abuse with a additional period of post release supervision.

On October 25, 2011, the Appellate Division, Second Department affirmed the defendant's conviction. *People v. Khan, 88 A.D.3d 1014.* The Court of Appeals denied the defendant leave to appeal his conviction on January 19, 2012. See *People v. Khan, 18 N.Y.3d 884.* The defendant by this pro se motion seeks to vacate the judgment. The People filed opposition to the instant motion by affirmation.

The defendant has failed, to set forth sufficient newly discovered evidence of such a nature that if said evidence had been received at trial, the verdict would have been more favorable to the defendant.. Additionally, with respect to issues which defendant failed to raise on appeal and those issues which he raised on appeal and were denied, he is now barred from raising the issues in the instant motion.

Accordingly, the defendant's motion is denied in all respects.

Dated: July 12, 2012

RONALD D. HOLLIE, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT
------------------------------------------
THE PEOPLE OF THE STATE OF NEW YORK,

                   Respondent,

      -against-

ABU KHAN,

               Defendant-Appellant.
------------------------------------------

Queens County
Indict. No. 2147/2006

------------------------------

APPELLANT'S   EXHIBIT   B

TRIAL TRANSCRIPT

------------------------------

Courtesy Copy

Original Filed in ECF
docket number 14-CV-5456

SUPREME COURT OF THE STATE OF NEW YORK
QUEENS COUNTY, NEW YORK
----------------------------------------
THE PEOPLE OF THE STATE OF NEW YORK

                    Plaintiff

        -against-

                                                NOTICE OF MOTION
                                                TO VACATE JUDGMENT

ABU KHAN

                    Defendant
----------------------------------------

PLEASE TAKE NOTICE; that upon the annexed affidavit of ABU KHAN, being
duly sworn on this 21ST day of November, 2012 (and documents attached
thereto) and upon the accusatory instrument, sworn affidavit (and all the
proceedings previously held). The Defendant will move this Court at Criminal
Term Part K-20 thereof, at the Court House located at 125-01 Queens Boulevard,
Kew Gardens, New York 11415.

On the 20TH day of December, 2012, at 10:30 (AM) or as soon thereafter
as this matter may be heard for an order pursuant to Criminal Procedure Law §
440.10(1)(H) for an order of the Court Vacating the Judgment entered in a
previous proceeding against the Defendant on the 24 day of July, 2007, on the
grounds that:

A.   Defense Counsel's failure to consult with or call a Medical Expert or
     to review or challenge the Medical Evidence of Penetration.

B.   Trial Counsel's failure to consult with the Defendant, and investigate
     the facts of the case, did infact prejudice the Defendant.

The Defendant further seeks the order of the Court, Pursuant to the
provisions of Criminal Procedure Law § 440.30(5), ordering the New York State
Department of Corrections to produce the Defendant to any hearing had or to be

- 01 -

conducted in connection to the determination of this motion, and for all other

relief this Court may deem just and proper.


Dated: 21ST day of NOVEMBER, 2012.



Respectfully Submitted,

ABU KHAN 07A4685

c/o: Green Haven Correctional Facility
594 State Route 216
P.O. Box 4000
Stormville, N.Y. 12582


To: Richard A. Brown
    District Attorney
    Queens County, New York




cc: P. Files
    Queens County D.A.
    Supreme Court of N.Y. State