```
 1                        A PROSPECTIVE JUROR:  No no.

 2                        THE COURT:   13.

 3                        A PROSPECTIVE JUROR:  No.

 4                        THE COURT: 14.

 5                        A PROSPECTIVE JUROR:  Yes, yes, yes.

 6                        THE COURT:   18.

 7                        A PROSPECTIVE JUROR:  No.

 8                        THE COURT:  Mr. Hiralall.

 9                        A PROSPECTIVE JUROR:  Ravendra Hiralall.

10            Ozone Park.  7 years.  19 years.  Single.  High

11            school.  Elevator operator.

12                        THE COURT:   For how long now.

13                        A PROSPECTIVE JUROR:  3 years.

14                        THE COURT:   Have you been working for

15            the same company each of those 3 years.

16                        A PROSPECTIVE JUROR:  Yes.

17                        THE COURT:   Prior to that what did you

18            do.

19                        A PROSPECTIVE JUROR:  I was going to

20            school.

21                        THE COURT:  Number 9.

22                        A PROSPECTIVE JUROR:  No.

23                        THE COURT:   10.

24                        A PROSPECTIVE JUROR:  No.

25                        THE COURT: 11 A.
```

1                    A PROSPECTIVE JUROR:  No.

2                    THE COURT:  B.

3                    A PROSPECTIVE JUROR:  No, no.  No.  No.

4                    THE COURT:  That company that you work

5        with is it here in Queens or in Manhattan.

6                    A PROSPECTIVE JUROR:  Manhattan.

7                    THE COURT:  12 A.

8                    A PROSPECTIVE JUROR: No.  No.  No.

9                    THE COURT:  13.

10                   A PROSPECTIVE JUROR:  No.

11                   THE COURT:  14.

12                   A PROSPECTIVE JUROR:  Yes, yes, yes.

13                   THE COURT:  18.

14                   A PROSPECTIVE JUROR:  No.

15                   THE COURT:  That elevator that you

16       operate it's 4 passengers.

17                   A PROSPECTIVE JUROR:  It's a grate.

18                   THE COURT: And how many floors are there

19       to that building.

20                   A PROSPECTIVE JUROR:  12 floors and a

21       pent house.

22                   THE COURT:  Thank you sir.  Mr. Yuin.

23                   A PROSPECTIVE JUROR:  Peter Yuin.

24       Philippines. Briarwood.  14.  20.  Married.

25       Computer Science with a BS.  Director of IT for the

1       New York City Department of Finance.

2               THE COURT:   You have been working with

3       that agency for how long now.

4               A PROSPECTIVE JUROR:   2 year.

5               THE COURT:   Prior to joining them what

6       did you do.

7               A PROSPECTIVE JUROR:   IT as well.

8               THE COURT:   What kind of business.

9               A PROSPECTIVE JUROR:   GE Financial.

10              THE COURT:   And when you were working

11      with them how long had you worked with them.

12              A PROSPECTIVE JUROR:   3.

13              THE COURT: What kind of work does your

14      wife do.

15              A PROSPECTIVE JUROR:   She is a volunteer

16      right now a parents advocate for the Department of

17      Education.

18              THE COURT: Is there any time that she had

19      worked outside of your home for full time income.

20              A PROSPECTIVE JUROR:   Yes, that was

21      around 10 years ago with Bellevue Hospital. She was

22      a nutrition dietician.

23              THE COURT:   Number 9.

24              A PROSPECTIVE JUROR:   No.

25              THE COURT: 10.

```
1              A PROSPECTIVE JUROR:  Yes.

2              THE COURT:   10 A.

3              A PROSPECTIVE JUROR:  Civil.

4              THE COURT: One or more times.

5              A PROSPECTIVE JUROR:  Once.

6              THE COURT:   10 B.

7              A PROSPECTIVE JUROR:  Yes.

8              THE COURT: C.

9              A PROSPECTIVE JUROR:  4 or 5 years ago.

10             THE COURT: 11 A.

11             A PROSPECTIVE JUROR: Yes.

12             THE COURT:   11 A. Yes. Who and what kind
```
of a crime.
```
14             A PROSPECTIVE JUROR:  Me. Attempted
```
mugging.  And then a couple of muggings.  House
broken into.
```
17             THE COURT: With you and an attempted
```
mugging and then you said a couple of other
muggings.
```
20             A PROSPECTIVE JUROR: Yes, but not in this
```
country.
```
22             THE COURT:   What happened when you were
```
in the attempted mugging.
```
24             A PROSPECTIVE JUROR:  They tried to mug
```
me. I fought them off and a good samaritan helped

1    me.

2              THE COURT:   This was on the street.

3              A PROSPECTIVE JUROR:  Kind of like a

4    street and the entrance of a subway station.

5              THE COURT: How many people attacked you.

6              A PROSPECTIVE JUROR:  3.

7              THE COURT: And did they have  -- did you

8    see any weapons.

9              A PROSPECTIVE JUROR:  No.

10             THE COURT:  Anyone ever caught and

11   charged with that crime.

12             A PROSPECTIVE JUROR:  No.

13             THE COURT:   The person who had helped

14   you out how did they help you out.

15             A PROSPECTIVE JUROR:  They pulled me up

16   from the stairs and kicked one of the guys down the

17   stairs.

18             THE COURT:   Good help.  You said that

19   you were also a victim in a place outside of this

20   country. Anyone ever arrested and charged with those

21   muggings.

22             A PROSPECTIVE JUROR: No.

23             THE COURT:   Any other answers to 11 A.

24   Victim of a crime.

25             A PROSPECTIVE JUROR: No that's it.

 1                    THE COURT: Same answers to 11 B.  Meaning

 2          witness to a crime. Any other answers.

 3                         A PROSPECTIVE JUROR:  No.

 4                         THE COURT:  C.

 5                         A PROSPECTIVE JUROR:  No.

 6                         THE COURT:   D.

 7                         A PROSPECTIVE JUROR:  No.

 8                         THE COURT:  E.

 9                         A PROSPECTIVE JUROR:  No.

10                         THE COURT: F.

11                         A PROSPECTIVE JUROR:  No.

12                         THE COURT:   Is there anything about

13          having been victimized the way that you have over

14          the years that makes you feel that could you not be

15          fair to both sides in this case.

16                         A PROSPECTIVE JUROR: No.

17                         THE COURT:   12 A.

18                         A PROSPECTIVE JUROR:  I am not sure

19          whether the department of finance is law

20          enforcement.  They have the sheriff and taxi

21          enforcement.

22                         THE COURT:   I think that is it.  So

23          other than the work that you do now any other

24          answers to 12 A.

25                         A PROSPECTIVE JUROR:  No.

1                   THE COURT:   B.

2                   A PROSPECTIVE JUROR: Yes.

3                   THE COURT:   Who do you know.

4                   A PROSPECTIVE JUROR:   20 years ago a law

5        firm represented Columbia Presbyterian and Columbia

6        University for delinquent accounts.   Stuff like

7        that.

8                   THE COURT:   How long have you worked

9        with them.

10                  A PROSPECTIVE JUROR:  Almost 3 years.

11                  THE COURT: And any other answers to 12 B.

12                  A PROSPECTIVE JUROR: No.

13                  THE COURT: C.

14                  A PROSPECTIVE JUROR:   No.

15                  THE COURT:   D.

16                  A PROSPECTIVE JUROR:   No.

17                  THE COURT:   13.

18                  A PROSPECTIVE JUROR: No.

19                  THE COURT: 14.

20                  A PROSPECTIVE JUROR: Yes, yes, yes.

21                  THE COURT:   18.

22                  A PROSPECTIVE JUROR:   No.

23                  THE COURT: Thank you sir.  Mr. Sullivan.

24                  A PROSPECTIVE JUROR:   George Sullivan.

25       Brooklyn.  Rockaway, Queens.  4 years.  All my life.

1        Married.  3 years.  I have an associates.

2                THE COURT: That associates is in what

3        subject.

4                A PROSPECTIVE JUROR:  Environmental

5        Science.

6                THE COURT: Number 8.

7                A PROSPECTIVE JUROR:  My wife is a high

8        school science teacher.  So she teaches kids.  9th

9        grade, 10th grade.

10               THE COURT:   What kind of work do you do.

11               A PROSPECTIVE JUROR:  I work for the

12       Department of Environmental Protection.

13               THE COURT:   Doing what.

14               A PROSPECTIVE JUROR:  I am an

15       environmental health and safety engineer.

16               THE COURT:   You have been working with

17       them for how long.

18               A PROSPECTIVE JUROR:  13 and a half

19       years.

20               THE COURT:   What do you do for them as an

21       environmental engineer.

22               A PROSPECTIVE JUROR: Last year what

23       happened it was the bureau that I worked for waste

24       water treatments.  We fell under federal guidelines

25       and we got a federal monitor appointed to us.  What

1     happened is that we have to worry about a lot of

2     environments, regulations, OSCHA kinds of stuff. I

3     am there to help my plant chief to make sure that I

4     implement about 40 or so programs.

5                 THE COURT:   And how many years now has

6     your wife been a teacher.

7                 A PROSPECTIVE JUROR:   10 years.

8                 THE COURT: Number 9.

9                 A PROSPECTIVE JUROR:   No.

10                THE COURT:   10.

11                A PROSPECTIVE JUROR: No.

12                THE COURT: 11 A.

13                A PROSPECTIVE JUROR:   Yes. It was a long

14    time ago.  My grandmother was mugged.  My father was

15    mugged. My grandmother was mugged.  A long time ago.

16                THE COURT:   Anyone ever arrested and

17    charged with those crimes.

18                A PROSPECTIVE JUROR: No.

19                THE COURT:   Anything about the crimes

20    that make you say that you would not be fair to both

21    sides.

22                A PROSPECTIVE JUROR: No.

23                THE COURT: Any other answers to 11 A.

24                A PROSPECTIVE JUROR:   No.

25                THE COURT:   11 B.

```
 1                   A PROSPECTIVE JUROR:  Yes.  I seen a few
 2          things.
 3                   THE COURT:  What kinds of things have you
 4          seen.
 5                   A PROSPECTIVE JUROR:  Well, I saw a
 6          robbery when I was outside of Nathans in Brooklyn a
 7          couple of years ago. A couple of guys robbed
 8          somebody and went on their way and in the early 90's
 9          when I first started going to college I worked
10          midnights doing security.  I saw a few assaults.
11                   THE COURT:  Anything about the kind of
12          things that you witnessed on the street of this city
13          that makes you feel that you could not be fair to
14          both sides in this case.
15                   A PROSPECTIVE JUROR:  No.
16                   THE COURT: C.
17                   A PROSPECTIVE JUROR: No.
18                   THE COURT:   D.
19                   A PROSPECTIVE JUROR:  No.
20                   THE COURT:   E.
21                   A PROSPECTIVE JUROR:  No.
22                   THE COURT:  F.
23                   A PROSPECTIVE JUROR:  No.
24                   THE COURT:  12 A.
25                   A PROSPECTIVE JUROR:  I have a lot of
```

1      friends who are in law enforcement. That's it.

2                      THE COURT: 12 B.

3                      A PROSPECTIVE JUROR:  No.

4                      THE COURT:   C.

5                      A PROSPECTIVE JUROR: No.

6                      THE COURT:   D.

7                      A PROSPECTIVE JUROR:  No.

8                      THE COURT:   13.

9                      A PROSPECTIVE JUROR:  No.

10                     THE COURT:   14.

11                     A PROSPECTIVE JUROR:  Yes, yes, yes, yes.

12                     THE COURT: 18.

13                     A PROSPECTIVE JUROR:  No.

14                     THE COURT:   Thank you sir.  Mr. Clark

15     number 1.

16                     A PROSPECTIVE JUROR:  Francis Clark.

17     Battle Creek, Michigan. Glendale, Queens.  5 months.

18                     THE COURT:   Prior to that where you are

19     living now where had you lived.

20                     A PROSPECTIVE JUROR:  Ridgewood, Queens.

21                     THE COURT: How long had you lived there.

22                     A PROSPECTIVE JUROR:  Approximately 20

23     years.

24                     THE COURT:  5.

25                     A PROSPECTIVE JUROR:  Born here.

| | |
|---|---|
| 1 | Married.  GED.  I am a ramp services clerk at JFK. |
| 2 | THE COURT:   You have been doing that |
| 3 | kind of work for how long now. |
| 4 | A PROSPECTIVE JUROR:  3 years. |
| 5 | THE COURT:   Prior to that what kind of |
| 6 | work did you do. |
| 7 | A PROSPECTIVE JUROR:  Tow truck driver. |
| 8 | THE COURT:  What does your wife do. |
| 9 | A PROSPECTIVE JUROR:  A school aide. |
| 10 | THE COURT:   For how many years. |
| 11 | A PROSPECTIVE JUROR:  Approximately 10. |
| 12 | THE COURT:   Any children of working age. |
| 13 | A PROSPECTIVE JUROR:  Yes, a son and |
| 14 | daughter. |
| 15 | THE COURT: What do they do for A living. |
| 16 | A PROSPECTIVE JUROR:  My son is a |
| 17 | fireman.  And my daughter is a an assistant manager. |
| 18 | THE COURT: In what kind of a company if |
| 19 | you know. |
| 20 | A PROSPECTIVE JUROR:  It's a Dollar |
| 21 | Store. |
| 22 | THE COURT:   Number 9. |
| 23 | A PROSPECTIVE JUROR:  No. |
| 24 | THE COURT: 10. |
| 25 | A PROSPECTIVE JUROR:  Yes. |

1               THE COURT:    10 A.

2               A PROSPECTIVE JUROR:  Criminal.

3               THE COURT:   One or more times.

4               A PROSPECTIVE JUROR:  Twice.

5               THE COURT:   In those 2 cases those 2

6       separate times what were the crimes charged.

7               A PROSPECTIVE JUROR:  One was a murder

8       and one was I think like an assault.

9               THE COURT:   Each of those cases were

10      here in Queens county.

11              A PROSPECTIVE JUROR:  Yes.

12              THE COURT: Relative to both cases 10 B.

13              A PROSPECTIVE JUROR: Yes.

14              THE COURT: And 10 C.

15              A PROSPECTIVE JUROR:  2002 I think.

16              THE COURT: 11 A.

17              A PROSPECTIVE JUROR:  Yes.

18              THE COURT:  What kind and who and what.

19              A PROSPECTIVE JUROR: It was years ago.

20      Somebody helped herself to my wallet.

21              THE COURT:   At the time was the wallet

22      in your pants pocket.          .

23              A PROSPECTIVE JUROR:  Yes pants pocket.

24              THE COURT:   And I imagine they helped

25      themselves to your wallet without you knowing about

```
 1            it.
 2                       A PROSPECTIVE JUROR:  With me knowing.
 3                       THE COURT:   So was there a forcible
 4            taking.
 5                       A PROSPECTIVE JUROR:  Just by the
 6            circumstances.  I was kind of surrounded by
 7            individuals.
 8                       THE COURT:   Anyone ever arrested and
 9            charged with that crime.
10                       A PROSPECTIVE JUROR: No.
11                       THE COURT:   What time of day or night
12            did that happen.
13                       A PROSPECTIVE JUROR:  That was during the
14            day.
15                       THE COURT:   Any other answers to 11 A.
16                       A PROSPECTIVE JUROR:  Well, my wife had
17            her purse removed from her too one time.  My
18            daughter had her nose broken once.
19                       THE COURT:   Under what circumstances.
20                       A PROSPECTIVE JUROR:  As a childhood
21            fight.  And my son had his car broken into a few
22            times.
23                       THE COURT:   Any other answers to 11 A.
24                       A PROSPECTIVE JUROR:  No.
25                       THE COURT: It might be the fact that you
```

```
 1        were born in Battle Creek, Michigan you know to be
 2        surrounded by people and your wallet being taken.
 3        People here would not call that a robbery.  You
 4        would call it well they had helped themselves to my
 5        wallet.  You have a healthy attitude about them,
 6        things that happen in your life apparently.
 7        Anything about any of those crimes that makes you
 8        feel that you could not be fair to both sides in
 9        this case.
10                    A PROSPECTIVE JUROR:  No.
11                    THE COURT:   Some of what you say was in
12        answer to 11 B.  Any other answers to 11 B.
13                    A PROSPECTIVE JUROR: No.
14                    THE COURT: 11 C.
15                    A PROSPECTIVE JUROR: No.
16                    THE COURT:  D.
17                    A PROSPECTIVE JUROR:  Yes.
18                    THE COURT: Who was convicted of what kind
19        of a crime.
20                    A PROSPECTIVE JUROR:  Well, I was
21        convicted in Michigan for driving impaired.  And
22        here in New York about 8 years ago for smoking on a
23        marijuana.
24                    THE COURT:   Anything about that
25        experience those experiences that makes you feel
```

1       that you could not be fair to both sides in this

2       case.

3                       A PROSPECTIVE JUROR:  No.

4                       THE COURT:  Any other answers to 11 D.

5                       A PROSPECTIVE JUROR: No.

6                       THE COURT:  11.

7                       A PROSPECTIVE JUROR:  No.

8                       THE COURT:  11 F.

9                       A PROSPECTIVE JUROR:  No.

10                      THE COURT:  12 A.

11                      A PROSPECTIVE JUROR:  My son was a police

12      officer for a short while.

13                      THE COURT:  Before he joined the fire

14      department.

15                      A PROSPECTIVE JUROR: Yes.

16                      THE COURT:  For a short a while was he a

17      police officer.

18                      A PROSPECTIVE JUROR:  He was actually out

19      of the academy for about 3 months then he

20      transferred over.

21                      THE COURT:  Any other answers to 12 A.

22                      A PROSPECTIVE JUROR:  No.

23                      THE COURT:  12 B.

24                      A PROSPECTIVE JUROR: No.

25                      THE COURT:  C.

1           A PROSPECTIVE JUROR:   No.

2           THE COURT:   D.

3           A PROSPECTIVE JUROR:   No.

4           THE COURT:   13.

5           A PROSPECTIVE JUROR:   No.

6           THE COURT:   14.

7           A PROSPECTIVE JUROR:   Yes.   Yes.   Yes.

8   Yes.

9           THE COURT: 18.

10          A PROSPECTIVE JUROR:   No.

11          THE COURT:   Thank you sir.   Ms. Tito.

12          A PROSPECTIVE JUROR:   Marianna Tito.

13  Ecuador, South American. East Elmhurst.   10 years.

14  25 years.   Married.   Masters in Social Work.   I am

15  actually a rehabilitation counselor for a not for

16  profit agency. I provided service to the mentally

17  disabled people who are dependent on drugs and

18  alcohol.

19          THE COURT:   That's all in connection

20  with the work that you do for that not for profit

21  corporation.

22          A PROSPECTIVE JUROR:   Yes.

23          THE COURT:   You have been doing that for

24  how long now.

25          A PROSPECTIVE JUROR:   10 years.

1          THE COURT:   What kind of work does your

2    husband do.

3          A PROSPECTIVE JUROR:  A air plane

4    mechanic.

5          THE COURT: Is he working at a major

6    company.

7          A PROSPECTIVE JUROR:  He works at JFK.

8          THE COURT:  He has been doing that for

9    how long.

10         A PROSPECTIVE JUROR:  8 years.

11         THE COURT:   9.

12         A PROSPECTIVE JUROR:  Occupation, I am a

13   social worker.

14         THE COURT:   9.

15         A PROSPECTIVE JUROR:  No.

16         THE COURT:  10.

17         A PROSPECTIVE JUROR:  No.

18         THE COURT: 11 A.

19         A PROSPECTIVE JUROR:  No.

20         THE COURT: B.

21         A PROSPECTIVE JUROR:  No.

22         THE COURT: C.

23         A PROSPECTIVE JUROR:  No.

24         THE COURT:   D.

25         A PROSPECTIVE JUROR:  No.

```
 1              THE COURT: E.

 2              A PROSPECTIVE JUROR:  No.

 3              THE WITNESS:  F.

 4              A PROSPECTIVE JUROR:  No.

 5              THE COURT: 12 A.

 6              A PROSPECTIVE JUROR:  Oh I do know a

 7    friend he used to be a very close friend not any

 8    more.  My brother actually has frequent contact with

 9    him. He is a detective.

10              THE COURT:  I am sorry.  You said that

11    you had a friend and then you mentioned your

12    brother.

13              MR. JOHNSTON:  He is actually the one

14    that has frequent contact with this friend.

15              THE COURT:  Any other answers to 12 A.

16              A PROSPECTIVE JUROR: No.

17              THE COURT:  B.

18              A PROSPECTIVE JUROR: No.

19              THE COURT:  D.

20              A PROSPECTIVE JUROR:  No.

21              THE COURT: 13.

22              A PROSPECTIVE JUROR:  No.

23              THE COURT:  14.

24              A PROSPECTIVE JUROR:  Yes, yes, yes.THE

25    COURT:  18.
```

```
1                    A PROSPECTIVE JUROR: No.

2                    THE COURT: And now we are going to go

3          back and speak with Karim and Vohra  And I will ask

4          you men the same questions that I have asked

5          everyone else so far and beginning with the

6          questions that I asked you from here not from the

7          questionnaire and gentlemen you are each over 18

8          years old.

9                    PROSPECTIVE JURORS:  Yes.

10                   THE COURT: Are you a resident of Queens

11         county. Citizens of this country.

12                   PROSPECTIVE JURORS:  Yes.

13                   THE COURT:   Have either of you ever been

14         convicted of a felony.

15                   PROSPECTIVE JURORS:  No.

16                   THE COURT: Are you each able to read,

17         understand and speak English.

18                   PROSPECTIVE JURORS:  Yes.

19                   THE COURT: Do either of you know me, the

20         ADA, the defendant or defense counsel or to your

21         knowledge any of our family or friends.

22                   PROSPECTIVE JURORS:  No.

23                   THE COURT:   You heard me read yesterday

24         from a list of people who may testify in this trial.

25         Do either of you 2 know any one by those names.
```

vld

1       PROSPECTIVE JURORS: No.

2               THE COURT:   Do either of you have any

3       hearing handicap or other type of handicap or

4       disability that would prevent you from sitting as a

5       juror to the latest Friday March 30.

6               PROSPECTIVE JURORS:  No.

7               THE COURT:   Do you have any extreme

8       hardship that would prevent you from giving your

9       full attention to the trial.

10              PROSPECTIVE JURORS: No.

11              THE COURT: Do either of you have any

12      religious, moral or ethical beliefs or reasons that

13      would prevent you from finding a person guilty even

14      in that guilt were proven to you beyond a reasonable

15      doubt.

16              PROSPECTIVE JURORS:  No.

17              THE COURT: You understand that the

18      defendant has a right not to testify.  If you are

19      chosen as a juror if he chooses not to testify would

20      you each be able to follow my instructions and not

21      draw any inference unfavorable to him simply because

22      he chooses not to testify.

23              PROSPECTIVE JURORS:  Yes.

24              THE COURT: If you believe a single

25      witness to a crime beyond a reasonable doubt can you

1   convict.

2                   PROSPECTIVE JURORS:  No.

3                   THE COURT:   And sir what is your

4   position.

5                   PROSPECTIVE JURORS:  I would  -- .

6                   THE COURT:   Counsel approach.

7                   (Whereupon, side-bar conference begins).

8                   THE COURT:   So Mr. Vohra and Mr. Karim

9   what I will do is excuse you from the trial.  It's

10  my sense that there is a communication gap that may

11  exist and I think that it's probably fairest to all

12  sides if you not sit on this case. So thank you

13  gentlemen.

14                  (Whereupon, those 2 jurors exit the

15  courtroom)

16                  COURT CLERK:  Seat number 4 Lucia Avila.

17  Last name A-V-I-L-A.  First name Lucia, L-U-C-I-A.

18  Seat number 6 Courtney Dechalus.  Last name,

19  D-E-C-H-A-L-U-S.  First name Courtney,

20  C-O-U-R-T-N-E-Y.

21                  THE COURT: Good afternoon.  No surprises.

22  I will ask you the same questions that I have asked

23  everyone else beginning first are you each over 18

24  years old and residents of Queens county. Citizens

25  of this country.

1           PROSPECTIVE JURORS:  Yes.

2           THE COURT:   Have you ever been convicted

3      of a felony.

4           PROSPECTIVE JURORS:  No.

5           THE COURT:   Are you able to read and

6      understand English.

7           PROSPECTIVE JURORS: Yes.

8           THE COURT:   Do you have know me, the DA,

9      the defendant or defense counsel or any of our

10     family or friends.

11          PROSPECTIVE JURORS:  No.

12          THE COURT: You heard me read from a list

13     of People who may testify do you know any of those

14     names.

15          PROSPECTIVE JURORS:  No.

16          THE COURT: Any hearing handicap or

17     handicap or any other type of disability that would

18     prevent you from sitting as a juror on this case.

19          PROSPECTIVE JURORS:  No.

20          THE COURT:   Do you have an extreme

21     hardship or other pressing matter that would prevent

22     you from giving your full attention to this trial.

23          PROSPECTIVE JURORS: No.

24          THE COURT:   Do you have any religious,

25     moral or ethical beliefs or reasons that would

1      prevent you from finding a person guilty even if it

2      was proven to you beyond a reasonable doubt.

3                      A PROSPECTIVE JUROR:  Yes.

4                      A PROSPECTIVE JUROR:  No.

5                      THE COURT: Approach please.

6                      (Whereupon, a side-bar record begins.)

7                      THE COURT:  Sir you're Courtney Decalus,

8      yes, sir.

9                      A PROSPECTIVE JUROR:  I do not feel that

10     I have the authority to judge someone.  I am a

11     Jehovahs Witness.

12                     THE COURT:  So a personal long held

13     religious based moral belief.

14                     A PROSPECTIVE JUROR:  Yes.

15                     THE COURT: Okay.

16                     MR. JOHNSTON:  Consent.

17                     MS. MALIK:  Consent.

18                     THE COURT:  Thank you for your candor.

19     I will recommend civil cases for you so you do not

20     have to deal with these kinds of issues.

21                     (Whereupon, a side-bar record concludes.)

22                     THE COURT:  He is excused. Civil only.

23                     COURT CLERK:  Seat number 6 George

24     Bonafante.  Last name, B-O-N-A-F-A-N-T-E.  First

25     name George, G-E-O-R-G-E.

1              THE COURT: Good afternoon.  Sir are you

2       over 18 years old. A resident of Queens county.  A

3       citizen of this country.

4                    A PROSPECTIVE JUROR:  Yes.

5                    THE COURT:   Ever convicted of a felony.

6                    A PROSPECTIVE JUROR: No.

7                    THE COURT: Able to read and understand

8       and speak English.

9                    A PROSPECTIVE JUROR: No.

10                   THE COURT: Do you know me, the DA, the

11      defendant or defense counsel or any of our family or

12      friends.

13                   A PROSPECTIVE JUROR:  No.

14                   THE COURT:   You heard me read yesterday

15      from a list of people who may testify do you know

16      any one by those names.

17                   A PROSPECTIVE JUROR: No.

18                   THE COURT:   Any hearing handicap or

19      handicap or any other disability that would prevent

20      you from sitting as a juror to the latest Friday

21      March 30.

22                   A PROSPECTIVE JUROR:  No.

23                   THE COURT:   Do you have any extreme

24      hardship or other pressing matter that would prevent

25      you from giving your full attention to the trial.

1              A PROSPECTIVE JUROR:  No.

2              THE COURT: Any religious, moral or

3         ethical beliefs that would prevent you from finding

4         a person guilty even in it was proven to you beyond

5         a reasonable doubt.

6              A PROSPECTIVE JUROR:  No.

7              THE COURT:   To you and Ms. Avila do you

8         understand that the defendant has a right not to

9         testify.  If you are chosen as a juror and he

10        chooses not to testify can you follow my

11        instructions and not draw any inference unfavorable

12        to the him because he chooses not to testify.

13             PROSPECTIVE JURORS:  Yes.

14             THE COURT: On the question of a single

15        witness if you believe a single witness beyond a

16        reasonable doubt can you convict.

17             PROSPECTIVE JURORS:  Yes.

18             THE COURT:   And is there anything about

19        the nature of the charges in this case including

20        that the defendant is charged with rape that is a

21        sexual offense and the accuser is a young female and

22        obviously he is an adult male is there anything

23        about the nature of the crime charged that makes you

24        feel that you could not give either side in this

25        case a fair trial.

                                                       vld

1            PROSPECTIVE JURORS:  No.

2            THE COURT: To the questionnaire Ms. Avila

3    number 1 please.

4            A PROSPECTIVE JUROR:  Lucia Avila. New

5    York City. Woodhaven.  4 years.  5.  All my life.

6    Divorced.  High school.  Administrative Coordinator.

7            THE COURT:  And what kind of a company.

8            A PROSPECTIVE JUROR:  Law firm.

9            THE COURT:  What do you do.

10           A PROSPECTIVE JUROR:  A law assistant.

11           THE COURT:  How long have you been doing

12   that.

13           A PROSPECTIVE JUROR:  11 years.

14           THE COURT: I think that you said that you

15   are divorced. What kind of work does your ex-husband

16   do.

17           A PROSPECTIVE JUROR:  UPS.

18           THE COURT:  He has been working with

19   them for how long.

20           A PROSPECTIVE JUROR:  8 years.

21           THE COURT:  Number 9.

22           A PROSPECTIVE JUROR:  No.

23           THE COURT:  10.

24           A PROSPECTIVE JUROR:  No.

25           THE COURT: 11 A.

```
 1              A PROSPECTIVE JUROR:  No.

 2              THE COURT:   B.

 3              A PROSPECTIVE JUROR:  No.

 4              THE COURT:   C.

 5              A PROSPECTIVE JUROR:  No.

 6              THE COURT:   D.

 7              A PROSPECTIVE JUROR:  No.

 8              THE COURT: E.

 9              A PROSPECTIVE JUROR:  No.

10              THE COURT:   F.

11              A PROSPECTIVE JUROR:  Yes.

12              THE COURT:  Who sued who for what.

13              A PROSPECTIVE JUROR:  I was in a car

14      accident.

15              THE COURT:   Recently.

16              A PROSPECTIVE JUROR:  3 years ago.

17              THE COURT: Is that case still pending.

18              A PROSPECTIVE JUROR:  No it settled.

19              THE COURT: Handled by the insurance

20      company.

21              A PROSPECTIVE JUROR:  Yes.

22              THE COURT:   Satisfied with the way that

23      the matter was resolved.

24              A PROSPECTIVE JUROR:  Yes.

25              THE COURT: 12 A.
```

1               A PROSPECTIVE JUROR:  Yes, various

2       friends work for NYPD.

3               THE COURT: Doing what.

4               A PROSPECTIVE JUROR:  Detective.  Police

5       officers.

6               THE COURT:   Other than the work that you

7       do any other answers to 12 B.

8               A PROSPECTIVE JUROR:  My sister also

9       works for a law firm.

10              THE COURT: What kind of work does she do.

11              A PROSPECTIVE JUROR:  Right now it's

12      criminal.

13              THE COURT: Meaning working for the firm

14      is criminal.

15              A PROSPECTIVE JUROR:  No she works for a

16      criminal law firm.

17              THE COURT: And any idea as to what kind

18      of work she does.

19              A PROSPECTIVE JUROR:  She is a secretary.

20              THE COURT: 12 C.

21              A PROSPECTIVE JUROR:  No.

22              THE COURT: D.

23              A PROSPECTIVE JUROR:  No.

24              THE COURT: 13.

25              A PROSPECTIVE JUROR:  No.

1              THE COURT:   14.

2              A PROSPECTIVE JUROR:  Yes, yes, yes, yes.

3              THE COURT: 18.

4              A PROSPECTIVE JUROR:  No.

5              THE COURT:   Thank you.  Mr. Bonfante.

6              A PROSPECTIVE JUROR:  George Bonfante.

7     Columbia, South American.  Jackson Heights.  8

8     years.  I have been 30 years.  Married.  GED.  No.

9              THE COURT:   8 asking what kind of work

10    to you do.

11             A PROSPECTIVE JUROR:  I work for a law

12    firm.  I do mail room and filing.

13             THE COURT: You have been working with

14    them for how long now.

15             A PROSPECTIVE JUROR:  Going on 4 years.

16             THE COURT:   What does your wife do.

17             A PROSPECTIVE JUROR:  She does word

18    processing in legal.

19             THE COURT:   In what kind of company.

20             A PROSPECTIVE JUROR:  A law firm.

21             THE COURT:   Is she working in the same

22    firm that you are working.

23             A PROSPECTIVE JUROR:  No.

24             THE COURT:   How long has she been

25    working at that law firm.

```
 1                    A PROSPECTIVE JUROR: She is was working

 2          with them for 5 years.

 3                         THE COURT: Number 9.

 4                         A PROSPECTIVE JUROR:  No.

 5                         THE COURT: 10.

 6                         A PROSPECTIVE JUROR:  No.

 7                         THE COURT:   11 A. Victim of a crime.

 8                         A PROSPECTIVE JUROR:  No.

 9                         THE COURT:   B.

10                         A PROSPECTIVE JUROR:  No.

11                         THE COURT:   C.

12                         A PROSPECTIVE JUROR:  No.

13                         THE COURT: D.

14                         A PROSPECTIVE JUROR:  No.

15                         THE COURT:   E.

16                         A PROSPECTIVE JUROR:  No.

17                         THE COURT:   F.

18                         A PROSPECTIVE JUROR:  No.

19                         THE COURT: 12 A.

20                         A PROSPECTIVE JUROR:  No.

21                         THE COURT: Other than the kind of work

22          that you and your wife do any other answers to 12 B.

23                         A PROSPECTIVE JUROR:  No.

24                         THE COURT: D.

25                         A PROSPECTIVE JUROR:  No.
```

1               THE COURT: 13.

2               A PROSPECTIVE JUROR:  Yes.

3               THE COURT: 13 is yes.

4               A PROSPECTIVE JUROR: Yes.

5               THE COURT: So you have had the kind of

6       pleasant or unpleasant experience with the police

7       that you feel that you could not be a fair and

8       impartial juror.

9               A PROSPECTIVE JUROR:  Yes.

10              THE COURT: Approach.

11              (Whereupon, a side-bar record begins.)

12              A PROSPECTIVE JUROR:  I had an incident

13      where I was accused of  -- I was arrested and then

14      accused of a crime and eventually released.

15              THE COURT: What kind of a crime were you

16      arrested and accused of.

17              A PROSPECTIVE JUROR:  It was a turnstile

18      jumping in which I never did. And had gone you

19      through the turnstile. They have brought me into the

20      precinct.

21              THE COURT:   How long you been in the

22      custody of the police.

23              A PROSPECTIVE JUROR:  I was in there for

24      4 hours until they got it straightened out.

25              THE COURT:   That is a very different

1       kind of  -- that definitely is an unpleasant

2       experience with the police.  So that answer to the

3       first part of the question and do you believe that

4       because of that unpleasant experience that you would

5       not be able to be fair to both sides in this case.

6                  A PROSPECTIVE JUROR:  No.

7                  THE COURT:   It effected you so badly

8       that even though this is a different kind of a

9       charge.

10                 A PROSPECTIVE JUROR:  It would be hard.

11                 THE COURT:   Any questions.

12                 MS. MALIK:  No.

13                 MR. JOHNSTON:  No.

14                 THE COURT:   All right.  And you seem to

15      very strongly believe that you feel that.

16                 A PROSPECTIVE JUROR:  Yes.

17                 THE COURT:   All right.  Sorry about that

18      experience. Of course we had not nothing to do with

19      this.  Still the idea that even 4 hours in the

20      custody of the police under those circumstances has

21      a lasting effect on you.  Thank you for your candor.

22      I will recommend civil cases for you.

23                 A PROSPECTIVE JUROR:  Okay.

24                 THE COURT:   He is excused.  Civil only.

25                 (Whereupon, a side-bar record concludes.)

1          COURT CLERK:  Seat number 6 Chiao Liu.

2     Last name, L-I-U.  First name Chiao, C-H-I-A-O.

3               THE COURT:  Good afternoon MS. Liu.

4               A PROSPECTIVE JUROR: Yes.

5               THE COURT:   Ms. Liu no surprise I will

6     ask you a series of questions. If there is anything

7     that you do not understand just let me know.  Are

8     you over 18 years old. A resident of Queens county.

9     A citizen of this country.

10              A PROSPECTIVE JUROR: Yes.

11              THE COURT:   Ever convicted of a felony.

12              A PROSPECTIVE JUROR:  No.

13              THE COURT:   Are you able to read,

14    understand and speak English.

15              A PROSPECTIVE JUROR:  Yes.

16              THE COURT:   Do you know me the ADA, the

17    defense counsel or the defendant or any of our

18    family or friends.

19              A PROSPECTIVE JUROR:  No.

20              THE COURT:   You heard me read from a

21    list of people who may testify do you know anyone by

22    those names.

23              A PROSPECTIVE JUROR:  No.

24              THE COURT: If you wish I can read those

25    names to you again.

1           A PROSPECTIVE JUROR:  Could you to be

2      sure about it.

3           THE COURT:   All right.  I mentioned it.

4      Ashley Martinez, Leslie Martinez, Ann Martinez,

5      Jaeshawn Benn, Jean Swaby, Dr. Jamie

6      Hoffman-Rosenfeld, Dr. Don Lewittes and Det. Luz

7      Figuoroa. You do not recall anyone, knowing anyone

8      by those names.

9           A PROSPECTIVE JUROR:  No.

10          THE COURT:  Do you have any hearing

11     handicap or any other type of handicap or disability

12     that would prevent you from sitting as a juror on

13     this case.

14          A PROSPECTIVE JUROR:  No.

15          THE COURT: Do you have an extreme hardship

16     or any other type of hardship that would prevent you

17     from sitting as a juror on this case.

18          A PROSPECTIVE JUROR:  No.

19          THE COURT:  Any religious, moral or

20     ethical beliefs that would prevent you from finding

21     the defendant guilty even if it was proven to you

22     beyond a reasonable doubt.

23          A PROSPECTIVE JUROR:  No.

24          THE COURT:   If you are chosen as a juror

25     and if the defendant chooses not to testify would

1       you be able to follow my instructions and not draw

2       any inference unfavorable to him because he chooses

3       not to testify.

4                    A PROSPECTIVE JUROR:  Yes.

5                    THE COURT:  If you believe a single

6       witness to a crime beyond a reasonable doubt can you

7       convict.

8                    A PROSPECTIVE JUROR:  Yes.

9                    THE COURT: And is there anything about

10      the nature of these charges that makes you feel that

11      you cannot be fair to both sides in this case.

12                   A PROSPECTIVE JUROR:  No.

13                   THE COURT: Now to the questionnaire

14      number 1 please.

15                   A PROSPECTIVE JUROR:  Chiao Liu.  I life

16      in Rosedale.  20 years.

17                   THE COURT:  I am wrong.  You had

18      answered Rosedale is number 3. Number 4 how long

19      have you lived at your current address.

20                   A PROSPECTIVE JUROR:  20 years.

21                   THE COURT: Number 5.

22                   A PROSPECTIVE JUROR:  29 years.

23                   THE COURT: 6.

24                   A PROSPECTIVE JUROR:  Married.

25                   THE COURT:   7.

1                    A PROSPECTIVE JUROR:  BS degree in

2        Education.

3                    THE COURT:   8.

4                    A PROSPECTIVE JUROR:  I am a nurse in a

5        hospital.

6                    THE COURT: What kind of nurse are you,

7        RN.

8                    A PROSPECTIVE JUROR:  RN.

9                    THE COURT:  How many years have you been

10       an RN.

11                   A PROSPECTIVE JUROR:  24 years.

12                   THE COURT:   What kind of work does your

13       husband do.

14                   A PROSPECTIVE JUROR:  I work as a nurse

15       labor and delivery.

16                   THE COURT:   So Ma'am you have a nice

17       soft voice.  What that means is that by the time

18       that the sound reaches my ear I may have missed a

19       few things. You have said that you are working as an

20       RN for 24 years.

21                   A PROSPECTIVE JUROR: Yes.

22                   THE COURT:   Are you working in a

23       hospital.

24                   A PROSPECTIVE JUROR:  Yes.

25                   THE COURT: Have you worked for that same

1        hospital each of those 24 years.

2                    A PROSPECTIVE JUROR:  Yes.

3                    THE COURT: What kind of work does your

4        husband do.

5                    A PROSPECTIVE JUROR:  He works as a

6        waiter for 10 years and he opened a Chinese store

7        for 8 years.  Now he just stay home.

8                    THE COURT:  Any children working age.

9                    A PROSPECTIVE JUROR:  I have 2 children.

10                   THE COURT:  What do they do.

11                   A PROSPECTIVE JUROR:  My daughter works

12       for a financial in Connecticut.  My son works for

13       the council mans office's John Liu's office.

14                   THE COURT:  Number 9.

15                   A PROSPECTIVE JUROR:  No.

16                   THE COURT: 10.

17                   A PROSPECTIVE JUROR:  No.

18                   THE COURT: 11 A.

19                   A PROSPECTIVE JUROR:  Yes.

20                   THE COURT: Who and what kind of a crime.

21                   A PROSPECTIVE JUROR:  When my husband was

22       working in a candy store he got robbed and he got a

23       gunshot.

24                   THE COURT:  Anyone ever caught or

25       charged with that crime.

1              A PROSPECTIVE JUROR:  No.

2              THE COURT:  How injured was your husband

3      was he hurt seriously.

4              A PROSPECTIVE JUROR: Yes he got a

5      gunshot.  He survive.  He stay in hospital one week.

6              THE COURT:  He was very lucky.

7              A PROSPECTIVE JUROR: Yes he is.

8              THE COURT:   Any other answers to 11 A.

9              A PROSPECTIVE JUROR: No.

10             THE COURT:   Same answers to 11 B.

11             A PROSPECTIVE JUROR:  B is no.

12             THE COURT:   C.

13             A PROSPECTIVE JUROR:  No.

14             THE COURT:   D.

15             A PROSPECTIVE JUROR:  No.

16             THE COURT:   E.

17             A PROSPECTIVE JUROR:  No.

18             THE COURT:   F.

19             A PROSPECTIVE JUROR:  No.

20             THE COURT: 12 A.

21             A PROSPECTIVE JUROR:  No.

22             THE COURT: B.

23             A PROSPECTIVE JUROR:  No.

24             THE COURT: C.

25             A PROSPECTIVE JUROR:  No.

```
 1                    THE COURT: D.

 2                    A PROSPECTIVE JUROR:  No.

 3                    THE COURT: 13.

 4                    A PROSPECTIVE JUROR:  No.

 5                    THE COURT: 14.

 6                    A PROSPECTIVE JUROR:  Yes, yes, yes, yes.

 7                    THE COURT:   And 18.

 8                    A PROSPECTIVE JUROR:  No.

 9                    THE COURT:   Thank you Ms. Liu.  Thank

10          you all.  Now we will  -- you will be questioned by

11          the attorneys beginning with the ADA.

12  VOIR DIRE

13  BY MS. MALIK:

14                    MS. MALIK:  Good morning again ladies and

15          gentlemen. I would like to follow up on a few of

16          your comments. Ms. Avila you said that you work for

17          a law firm.  What kind.

18                    A PROSPECTIVE JUROR:  I am in Capital

19          Market Corp Security.

20                    THE COURT:   Your sister works in a law

21          firm as well you said.

22                    A PROSPECTIVE JUROR:  Yes.

23                    MS. MALIK:  Is that a criminal defense.

24                    A PROSPECTIVE JUROR:  Yes.

25                    MS. MALIK:  How do you feel about that.
```

1              A PROSPECTIVE JUROR: Fine.  I used to.

2              MS. MALIK:  Which one.

3              A PROSPECTIVE JUROR:  I worked for

4       Sparrow, Singer and Schreiber and Robert DiDio.

5              MS. MALIK:  So here in Queens.

6              A PROSPECTIVE JUROR:  Yes.

7              MS. MALIK:  And Ms. Liu you said that you

8       work in a hospital right.  In labor and delivery.

9              A PROSPECTIVE JUROR:  Yes.

10              MS. MALIK:  By hospital.

11              A PROSPECTIVE JUROR:  Elmhurst.

12              MS. MALIK:  How do you like it there.

13              A PROSPECTIVE JUROR:  All right.

14              MS. MALIK:  Anything about working for

15       Sparrow, Singer and Schreiber and Robert DiDio that

16       would tend to sway you for one side or the other.

17              A PROSPECTIVE JUROR:  No.

18              MS. MALIK:  Not at all. Mr. Singer and

19       Mr. Sparrow are wonderful attorneys.  Mr. Schreiber

20       as well. There is nothing that would kind of tilt

21       the scales of justice for you towards the defense.

22              A PROSPECTIVE JUROR:  No.

23              MS. MALIK:  How many of you here have

24       children. I know that there was some talk about

25       children here.  I want to get a sense of how many

1      people have children just by a show of hands.  All

2      right Ms. Mentar how old are your children.

3                     A PROSPECTIVE JUROR:  One is 20.  She

4      graduated from college.

5                     MS. MALIK:  Ms. Trammell.

6                     A PROSPECTIVE JUROR:  A son 16.

7                     MS. MALIK:  Ms. Avila.

8                     A PROSPECTIVE JUROR:  14 and 20.  Anyone

9      else. Ms. Liu you have a daughter and son.

10                     A PROSPECTIVE JUROR: Yes.

11                     MS. MALIK:  How old are they.

12                     A PROSPECTIVE JUROR:  My daughter is 30.

13     My son is 28.

14                     MS. MALIK:  How about in the back row.

15     Yes.

16                     A PROSPECTIVE JUROR:  Two daughters.  4

17     and 2.

18                     A PROSPECTIVE JUROR:  Ms. Cervantes.

19                     A PROSPECTIVE JUROR:  One daughter.  An

20     adult daughter.  30 years old.

21                     MS. MALIK:  And anybody else.  Mr. Yuin.

22                     A PROSPECTIVE JUROR:  Two daughters.  13

23     and one approaching 11.

24                     MS. MALIK:  Mr. Sullivan.

25                     A PROSPECTIVE JUROR:  No children.

1             MS. MALIK:  Mr. Clark you said that you

2        have a daughter and son.

3             A PROSPECTIVE JUROR:  Yes.  27 and 25.

4             MS. MALIK:  And Ms. Tito.

5             A PROSPECTIVE JUROR:  2 boys. One, 8 the

6        other one is 3 months.

7             MS. MALIK:  Now Mr. Forsyth you worked

8        for a long time as a teacher.  What school did you

9        work in.

10            A PROSPECTIVE JUROR:  Too many.

11            MS. MALIK:  Public schools.

12            A PROSPECTIVE JUROR:  Yes.

13            MS. MALIK:  They are all high schools.

14            MR. JOHNSTON:  Little bit of junior high

15       in the beginning.

16            MS. MALIK:  How did you like working with

17       kids.

18            A PROSPECTIVE JUROR:  It was not my

19       greatest moment.

20            MS. MALIK:  Why is that.

21            A PROSPECTIVE JUROR: It was too

22       difficult.  There is no  -- sometimes it's the

23       supervisors.   It's not all the children. The

24       administrators.

25            MS. MALIK:  But working with children

1    just the children themselves. How do you like

2    teaching them.

3            A PROSPECTIVE JUROR:  Well, I have to

4    really explain this. I have not been in the Board of

5    Education classroom for about 23 years.  Because I

6    changed twice.  I went to the lab for 11 years at

7    the high school level Physical Sciences.

8            Again for the last 10 years from late 92

9    to March 2003 I was an assistant teacher.  So, I am

10   not really a teacher to any great extent any more.

11           MS. MALIK:  Well, you know in this case

12   that it's a sex crime that the defendant has been

13   accused of.  And obviously when you take a sex act

14   and a crime and obviously the person is not going to

15   commit it out in public where there are other

16   witnesses where we come to the one witness issue. I

17   think that you all said that if you believe one

18   witness beyond a reasonable doubt that you would be

19   able to say the word guilty and say guilty is that

20   always true. Does anyone feel differently about

21   that.

22           All right.  I would like to add if that

23   witness turns out to be a child, a young teenager

24   does that change your opinion in any way, Mr.

25   Forsyth.

1          A PROSPECTIVE JUROR:  No.

2          MS. MALIK:  Ms. Trammell.

3          A PROSPECTIVE JUROR:  No.

4          MS. MALIK:  Mr. Spainer, beyond a

5    reasonable doubt.

6          A PROSPECTIVE JUROR:  No.

7          MS. MALIK:  Ms. Liu.

8          A PROSPECTIVE JUROR:  No.

9          MS. MALIK:  Ms. Liu.

10          A PROSPECTIVE JUROR:  No.

11          MS. MALIK:  Anybody in the back row does

12    it change your opinion.

13          A PROSPECTIVE JUROR:  No.

14          MS. MALIK:  I would like to also ask you

15    about scientific evidence because sometimes even

16    though scientific evidence would be great.

17    Sometimes it's just not possible.  You are not going

18    to hear in this case anything about fingerprint

19    evidence.  Blood evidence.  DNA nor positive medical

20    evidence whatsoever.  And even though it's expected

21    sometimes it's just not possible.

22          Is there anyone here who needs scientific

23    evidence to convict.  You know this is a rape case.

24    You know that sexual abuse is involved.  Given those

25    facts or does somebody here need scientific evidence

1      to convict.

2                    THE COURT:    You mean if they believe the

3      witness beyond a reasonable doubt would they need

4      additional --

5                    MS. MALIK:    Would you need the additional

6      evidence to convict.  Assuming that you believe the

7      young lady beyond a reasonable doubt would you need

8      scientific evidence to convict.

9                    A PROSPECTIVE JUROR:    No.

10                   A PROSPECTIVE JUROR:    No.

11                   MS. MALIK:    Ms. Trammell.

12                   A PROSPECTIVE JUROR:    No.

13                   MS. MALIK:    Ms. Avila.

14                   A PROSPECTIVE JUROR:    No.

15                   MS. MALIK:    How about you Ms. Liu would

16     you need scientific evidence.

17                   A PROSPECTIVE JUROR:    Why is it not

18     available.

19                   MS. MALIK:    Sure sometimes there are

20     reasons why it is not available.  Would you be able

21     to convict if there is no scientific or medical

22     evidence based on the testimony of that one witness

23     assuming that you believed her beyond a reasonable

24     doubt would you be able to do that.

25                   A PROSPECTIVE JUROR:    I think so.

1          MS. MALIK:  You think that you might have

2     a little trouble with that.  It's okay if you don't

3     maybe this is not the case for you to sit on.  I

4     appreciate your honest answer.

5          A PROSPECTIVE JUROR:  It's hard with no

6     evidence.

7          MS. MALIK:  Okay.  Does anybody else feel

8     the same way.

9          THE COURT: 2 minutes.

10          MS. MALIK:  Ms. Medins.

11          A PROSPECTIVE JUROR: No.

12          MS. MALIK:  Anybody in the back row.

13          A PROSPECTIVE JUROR:  No.

14          MS. MALIK:  How about you.

15          A PROSPECTIVE JUROR:  No.

16          MS. MALIK:  Mr. Yuin.

17          A PROSPECTIVE JUROR: No.

18          MS. MALIK:  All right.  Yesterday the

19     defense counsel brought up to you the fact that

20     there is a delay in outcry. You have not heard any

21     evidence yet as to how long the outcry was. How long

22     it took the victim to come forward and say what

23     happened to her.  Can you think of any reason why

24     the child would delay in telling another adult about

25     them being sexually abused.

1              MR. JOHNSTON:   I am going to object to

2         that.

3              THE COURT:   Sustained.

4              MS. MALIK:   Can you promise me that you

5         will keep in mind when you listen to her testimony

6         as to why she delayed in telling anybody.

7              A PROSPECTIVE JUROR:   Yes.

8              MS. MALIK:   Ms. Avila do you think that

9         if a parent was abusing their child do you think

10        that it could be safe for that child to go to tell

11        that other parent if the parent was abusing the

12        child and says do not tell anybody else because I am

13        going to get you.

14             MR. JOHNSTON:   I will object to that.

15             THE COURT:   Sustained.

16             MS. MALIK:   Can you promise me that you

17        will keep that in mind. I would ask you ladies and

18        gentlemen please to just be fair and impartial to

19        both sides here.  Okay.

20             And is there anyone sitting here now that

21        they think that you cannot be fair and impartial to

22        both sides. You have all had a chance to sit here

23        for about an hour.  Can you all promise to do that.

24        Can you promise me that when you listen to this

25        young lady's testimony that you use your common

1     sense. And listen to what she has to say.  And

2     figure out if there is any benefit for her to be

3     lying about this. Can you promise me that you will

4     do that for her.

5                    A PROSPECTIVE JUROR:  Yes.

6                    MS. MALIK:  Thank you very much.

7                    THE COURT:  All right.  Counsel, Mr.

8     Johnston.

9  VOIR DIRE

10 BY MR. JOHNSTON:

11                   MR. JOHNSTON:  Thank you your Honor.

12    Good afternoon folks.

13                   A PROSPECTIVE JUROR: Good afternoon.

14                   MR. JOHNSTON:  I will be pretty quick.

15    It's getting close to the lunch hour.  I want to

16    discuss this one thing about this one witness rule

17    that the judge mentioned about how if you believe

18    one witnesses testimony beyond a reasonable doubt

19    would you be able to return a verdict of guilty and

20    the law is yes you do not need 2 witnesses. You do

21    not need 4 witnesses.

22                   However, it's a little more complicated

23    than that.  That one witness must convince you

24    beyond a reasonable doubt of each and every element

25    of the crime that you are going to be considering

1    when you deliberate.  So a witness might convince

2    you about certain things but not convince you about

3    other things.  And if what she does not convince you

4    of beyond a reasonable doubt is one of the material

5    elements of the crime then the defendant is entitled

6    to a verdict of not guilty because it's the Peoples

7    obligation to prove each and every element of the

8    crime beyond a reasonable doubt.

9            In addition to that the judge is going to

10   tell you this that is reasonable doubt can arise out

11   of a lack of evidence. So when you are deliberating

12   the law says that if you feel that you do not have

13   enough evidence you can consider that as being a

14   reasonable doubt.  The judge will give you the

15   instructions.

16           Is there anyone here that would have a

17   problem assuming that what I just told you is

18   correct and I think that the judge will so tell you.

19   Anyone here would have any problem following those

20   instructions.

21           A PROSPECTIVE JUROR:  No.

22           MR. JOHNSTON:  Now just a few things

23   those of you who have either young children or at

24   some time have had young children have there been

25   occasions when your own children really did not tell

```
 1          you the complete truth. Anyone who has had an
 2          experience like that on matters involving their kids
 3          where the kids just didn't tell the truth to them.
 4          Even though they were their parents.  Anybody had
 5          that experience.  Nobody.
 6                    A PROSPECTIVE JUROR: Yes.
 7                    MR. JOHNSTON:  Well, the judges voir dire
 8          was very, very complete.  We have covered a lot of
 9          matters.  The only final thing that I would like to
10          say to you folks is that based on what you have told
11          me and you told the accused and you told the DA that
12          you all feel that you could be fair and impartial,
13          listen to the evidence, use your common sense in
14          evaluating the evidence and then after all the
15          evidence is in and the judge has instructed you on
16          the law you would be able to render a verdict that
17          is a fair and impartial verdict. All of you feel
18          that way.
19                    A PROSPECTIVE JUROR:  Yes.
20                    MR. JOHNSTON:  Thank you.  I have no
21          further questions.
22                    THE COURT:  Thank you Mr. Johnston.  As
23          you saw us all yesterday this is the point that I
24          have to discuss some legal matters with counsel and
25          the defendant outside of your presence. If you wish
```

1    you can it can leave your coats in those seats.

2    Follow the instructions of the officers.  We will

3    have you wait outside of the courtroom. We will

4    bring you back in here in about 5 or so minutes.

5                 (Whereupon, jurors exit the courtroom)

6                 THE COURT: When you are ready let me

7    know.

8                 (Whereupon, there is a pause in the

9    proceedings.)

10                THE COURT: So we have 5 jurors.  We need

11   7 looking at number 1 through 7 People cause.

12                MS. MALIK:   Number 6 Ms. Liu your Honor.

13   She indicated that she would need scientific

14   evidence in addition to the one witness in order to

15   convict.

16                THE COURT: Counsel consent.

17                MR. JOHNSTON:  No, not really judge.  I

18   really do not think that she understood the concept.

19   I think that the question could have been phrased

20   differently. I would object to a for cause

21   objection.

22                THE COURT: Well, I only have the answer

23   that she gave to the question but for the record she

24   really physically it was a long delay between the

25   question being asked and and answers given. It seems

1    to me that she struggled either to understand the

2    question or to make a judgment as to whether or not

3    she could accept that principle.

4            In any event the combination of the delay

5    and her equivocation on the issue over the

6    objections of the defense the cause challenge by the

7    People is granted as to number 6.  People any other

8    further cause 1 through 7.

9            MS. MALIK:  No your Honor.

10           THE COURT:  Defense cause.

11           MR. JOHNSTON:  No.

12           THE COURT: People peremptory 1 through 7.

13           MS. MALIK:  Number 1, Mr. Forsyth.

14   Number 2, Andrea Mentar.  Number 3, Yolafda

15   Trammell.  That's it your Honor.

16           THE COURT:   Defense peremptory.

17           MR. JOHNSTON:  For the first 7 judge.

18           THE COURT:  Yes.

19           MR. JOHNSTON:  Just number 7.

20           THE COURT:  Ms. Wieland.

21           MR. JOHNSTON:  Yes.

22           THE COURT: Juror number 6 then is Ms.

23   Avila and 7 is Mr. Spainer.  We have 7.  Need 5.

24           COURT CLERK: Juror number 4 is 6.  Juror

25   number 5 is 7.

```
 1                    THE COURT: Correct.  We have 7.  We need
 2         5.  Looking at now 8 through 12. People cause.
 3                    MS. MALIK:  No your Honor.
 4                    THE COURT:  Defense cause.
 5                    MR. JOHNSTON:  None for cause.
 6                    THE COURT: People peremptory. 8 through
 7         12.
 8                    MS. MALIK:  Number 10 Hiralall.  Number
 9         13 Clark.
10                    THE COURT:  No it's 8 through 12.
11                    MS. MALIK:  I am sorry your Honor.  One
12         moment.
13                    MS. MALIK:  That's it your Honor.
14                    THE COURT:  Defense peremptory.
15                    MR. JOHNSTON:  Just number 9 your Honor
16         Martha Cervantes.
17                    THE COURT:  Juror number 8 then is Ms.
18         Medins and 9 is Mr. Yuin and 10 is Mr. Sullivan.
19                    Looking now at 13 and 14. People cause.
20                    MS. MALIK:  None for cause your Honor.
21                    THE COURT:  Defense cause.
22                    MR. JOHNSTON:  None your Honor.
23                    THE COURT: People Peremptory.
24                    MS. MALIK:  Number 13 Francis Clark.  And
25         number 14.  Ms. Tito.
```

1              THE COURT:  We have 10 jurors.  Can we

2     have any accomodation on any of those struck to you

3     know give us 12.

4              (Whereupon, there is a pause in the

5     proceedings.)

6              THE COURT:  Do we have an agreement.

7              COURT CLERK:  7 and 2.

8              MS. MALIK:  That's fine your Honor.

9              MR. JOHNSTON:  Agreed.

10             THE COURT:   So, with the supplemental we

11    will just be looking for the alternates.

12             MR. JOHNSTON:  Yes.

13             THE COURT:   Okay.  Bring in the panel.

14    2 is Mentar.  And 7 is Wieland.

15             COURT CLERK: Okay.  They are going to be

16    11 and 12. 2 is going to be 11.

17             THE COURT:   Yes. Ready.

18             COURT OFFICER:  Panel entering.

19             COURT CLERK:  Jurors if you hear your

20    name please remain seated.  Andrea Mentar, Lucia

21    Avila, Robert Spainer, Jennifer Wieland, Angelita

22    Medins, Peter Yuin and George Sullivan.

23             Those names that I have called please

24    remain seated. The other names that were not called

25    please take your belongs and following the

1         instructions of the officers.

2                   COURT CLERK: Are the remaining jurors

3         acceptable to the People.

4                   MS. MALIK:  Yes.

5                   COURT CLERK:  To the defense.

6                   MR. JOHNSTON:  Yes.

7                   COURT CLERK:  All right.  Jurors would

8         you please rise and raise your right hand.  Do each

9         of you solemnly swear or affirm that you will try

10        this action in a just and impartial manner to the

11        best of your judgment and render a verdict according

12        to the law and the evidence so help you God.

13                  (Whereupon, yes is answered by all)

14                  THE COURT: You may be seated.

15                  THE COURT:  Thank you.  Yesterday you saw

16        that we had picked the first 5 jurors.  You are the

17        next 7 so with you we have the 12 jurors. The 12

18        main jurors.  There is nothing more for us to do

19        now. The first 5 were told to come in at 2 o'clock

20        this afternoon. Leave and have lunch now come back

21        and join with them after lunch for you it may be

22        2:15.  And we still have more work to do. We have to

23        choose the alternates in this case.

24                  So when you come back from lunch there

25        will be a point this afternoon where I will excuse

1    you all for the balance of the day and ask you to

2    come in probably at 10 tomorrow morning.  At this

3    point welcome to this jury. Have a great lunch and

4    see you this afternoon at 2:15.

5              (Whereupon, jurors exit the courtroom)

6              THE COURT:  There being nothing further

7    see you this afternoon.

8              (Whereupon, a luncheon recess was taken).

9              COURT CLERK:  Case on trial.  2147 of 05.

10    Abu Khan.

11             MR. JOHNSTON:  Judge there is one thing

12    before we go with the jurors.  For scheduling I

13    spoke to Mr. Khan a few minutes ago.  He indicated

14    to me that he is not getting back out to Rikers

15    Island until 8 o'clock. They wake him up at 4

16    o'clock. He is very tired. He would like to do a

17    compromise on Friday. Rather than hold him to the

18    commitment that he made to you earlier that I would

19    work on Fridays he would prefer at least this Friday

20    to be allowed to exercise his religious services and

21    not be brought to court on Friday.

22             THE COURT:  People any objection.  I

23    have extended this case to as late as next Friday.

24    So there is certainly time within the dates that I

25    have discussed with the jurors to handle that.  I

1        guess we can work around that day off for any

2        witnesses that you would otherwise call.

3                  MS. MALIK:  My only concern is your Honor

4        the witnesses, civilian witnesses, that I have they

5        obviously live out of state.  They live in Florida.

6        That is my only concern is their return flight to

7        Florida which I can double check on once I get back

8        to the office.

9                  THE COURT:   What is your sense when they

10        will actually be called, tomorrow.

11                  MS. MALIK:  Yes.  Probably.  Yes.

12                  THE COURT:   So then.

13                  MR. JOHNSTON:  We should be done with

14        them tomorrow.  I do not ask a lot of questions.

15                  THE COURT:   Okay.  All right.  Also it's

16        my intention just to put maybe 8 jurors in the box

17        and not the full 14. Just deal with that number for

18        the alternates.  It should go faster.

19                  MS. MALIK:  That's fine your Honor.

20                  MR. JOHNSTON:  Fine your Honor.

21                  THE COURT:   All right.  Good.  So as of

22        this point it's still Wednesday.  I don't see any

23        reason why we cannot have a day off on Friday.  And

24        what we will try to do is to work around it if there

25        is any problem then we will be made aware of that

                                                        vld

1   tomorrow.

2            MR. JOHNSTON:  Very good judge.

3            COURT OFFICER:  Jury panel entering.

4            COURT CLERK:  Jurors please rise and

5   raise your right hand.  Do you solemnly swear or

6   affirm that you will give true answers to questions

7   put to you regarding your qualifications to serve as

8   a juror in the trial of this indictment.

9            PROSPECTIVE JURORS:  Yes.

10           COURT CLERK:  Thank you you may be

11  seated.

12           THE COURT: Good afternoon and welcome to

13  Part K-20 I am Ronald Hollie.  I am the justice of

14  the Supreme Court who has been assigned to preside

15  over the trial of this case. You have been assembled

16  to participate in the process of a criminal case.

17           The name of the case is the People of the

18  State of New York against Abu Khan. We select a jury

19  by asking jurors question. The purpose of the

20  questions is to select from among you a juror which

21  will be fair and impartial to the defendant and the

22  People of the State of New York.

23           The purpose of the questions is not to

24  embarrass you or to pry into any private areas of

25  your lives.

1                    The jury selection process is often

2          called voir dire.  That is a french term that means

3          to speak the truth.  You must give a truthful answer

4          both to myself and questions asked of you by the

5          attorneys. If you are uncomfortable giving truthful

6          answers in open court you may signal me by asking

7          for what is a side-bar.  At that point I will invite

8          you to approach me to share your answers with me and

9          the attorneys out of the hearing of the prospective

10         jurors.

11                   I mentioned that the title of the case is

12         People of the State of New York against Abu Khan.

13         The People in this case are represented by Ms. Mina

14         Malik an ADA  of Queens county.  Ms. Malik.

15                   MS. MALIK:  Thank you your Honor. Good

16         afternoon ladies and gentlemen.

17                   THE COURT:   The defendant is Abu Khan

18         and he is represented by his attorneys Mr. Robert

19         Johnston and Mr. Samuel Viruet.

20                   MR. JOHNSTON:  Good afternoon.

21                   MR. VIRUET:  Good afternoon.

22                   COURT: Now we are here because the

23         defendant has been indicted by a Queens Grand Jury

24         which means that he has been charged with several

25         crimes. In fact he has been charged with 4 crimes.

1        Each of the crimes that he has been charged with is

2        listed as a separate count of the indictment so

3        there are 4 counts of the indictment and what I will

4        do is read those counts to you now.

5                    The first count the Grand Jury of the

6        county of Queens by this indictment accuse the

7        defendant of the crime of rape in the first degree

8        committed as follows.

9                    That the defendant Abu Khan on or about

10       November 30 in the year 2004 in the county of Queens

11       being 18 years old or more engaged in sexual

12       intercourse with Ashley Martinez a person less than

13       13 years old.

14                   In the second count the Grand Jury of the

15       county of Queens by this indictment accuse the

16       defendant of the crime of course of sexual conduct

17       against a child in the second degree committed as

18       follows.

19                   That the defendant Abu Khan on or about

20       and with between January first in the year 1997 and

21       December 31 of 2000 in the county of Queens over a

22       period of time not less than 3 months in duration

23       knowingly and continually engaged in 2 or more acts

24       of sexual conduct to wit; the defendant placed his

25       hands on the breasts and placed his penis in the

vld

1    hands of Ashley Martinez a child less than 11 years

2    old.

3            In the third count the Grand Jury of the

4    county of Queens by this indictment accuse the

5    defendant of the crime of endangering the welfare of

6    a child committed as follows.

7            That the defendant on or about November

8    30 in the year of 2004 in the county of Queens

9    knowingly acted in a manner likely to be injurious

10   to the physical, mental or moral welfare of Ashley

11   Martinez a child less than 17 years old.

12           In the fourth count the Grand Jury of the

13   county of Queens by this indictment accuse the

14   defendant of the crime of sexual abuse in the second

15   degree committed as follows.

16           That the defendant on or about November

17   30, 2004 in the county of Queens subjected Ashley

18   Martinez a person less than 14 years old to sexual

19   contact by touching the breasts of Ashley Martinez

20   with the hands of the defendant.

21           What will happen at this point is that

22   the part clerk will randomly draw the names of 8

23   prospective jurors.  They will each be seated in the

24   jury box to my right.  Questions will be asked of

25   the jurors in the jury box.  The questions will be

1    loud enough for you to hear.  To those of you not

2    initially called listen and pay attention because

3    before jury selection is over you may find yourself

4    in the jury box.

5              I want to thank you in advance for your

6    willingness to serve as jurors in this criminal

7    case. I know that many of you have other obligations

8    and it's a sacrifice to be here.  I want you to know

9    that you honor our constitutional form of government

10   when you allow yourself to be included in a process

11   that a person accused of a crime can exercise his

12   right to have a trial before his peers.

13             COURT CLERK:  Seat number one, Susan

14   Sherr.   Last name S-H-E-R-R.   Seat number 2, Linda

15   Dobrin.  Last name, D-O-B-R-I-N.  Seat number 3,

16   Anna Santos.  Last name, S-A-N-T-O-S.  Seat number

17   4, Nilda Alanis.  Last name, A-L-A-N-I-S.

18             Seat number 5 Gregory Huck.  Last name,

19   H-U-C-K. Seat number 6, Wai Vng.   First name,

20   W-A-I.  Last name, V-N-G. Seat number 7, first name

21   is Khairool, K-H-A-I-R-O-O-L.   Last name is Khan,

22   K-H-A-N.  Seat number 8 Voleh Mitringa.  Last name,

23   M-I-T-R-I-N-G-A.  First name, V-O-L-E-H.

24             THE COURT: Good afternoon again.  The

25   first series of questions that I have of you have

1       nothing to do with the questionnaire that you have

2       in your hands. They are questions that I will ask

3       you from here. So I will need you to pay attention

4       to the questions that I verbalize to you and I need

5       yes, no answers to the questions.

6               So if you can give me either a verbal

7       yes, no answer or if you wish you can nod your heads

8       up and down for yes and sideways ways for no.  Is it

9       fair to say that you are each over 18 years old.

10              PROSPECTIVE JURORS:  Yes.

11              THE COURT: Are you each residents of

12      Queens county and citizens of this country.

13              PROSPECTIVE JUROR:  Yes.

14              THE COURT:   Now Ms. Vng have you

15      understood everything that I have said so far, Ms.

16      Vng.

17              A PROSPECTIVE JUROR:  Yes.

18              THE COURT: Have either of you ever been

19      convicted of a felony.

20              A PROSPECTIVE JUROR:  No.

21              THE COURT:  Are you each able to read,

22      understand and speak English.

23              A PROSPECTIVE JUROR: No.

24              THE COURT: Do either of you know me, the

25      ADA, the defense counsel or any of our family or

1    friends.

2              A PROSPECTIVE JUROR:  No.

3              THE COURT: There are several people who

4    may testify in this trial.  I will read those names

5    to you now.  Ashley Martinez.  Leslie Martinez.  Ann

6    Martinez.  Jaeshawn Benn, B-E-N-N.  Jean Swaby.  Dr.

7    Jamie Hoffman-Rosenfeld.  Dr. Don Lewittes.

8    L-E-W-I-T-T-E-S. Detective Luz Figueroa.  Do either

9    of you know anyone by those names.

10             A PROSPECTIVE JUROR:  No.

11             THE COURT: This case we fully expect to

12   be over at the latest by the end of next week

13   meaning by Friday March 30th.  So it will be a

14   relatively short trial.  I say that to you to now

15   ask you these questions. Do either of you have any

16   hearing handicap or any other type of disability

17   that would prevent you from sitting as a juror to

18   the latest Friday March 30th.

19             A PROSPECTIVE JUROR:  No.

20             THE COURT: Do you have an extreme

21   hardship or other pressing matter that would prevent

22   you from giving your full attention to this trial.

23             A PROSPECTIVE JUROR:  No.

24             THE COURT: Do either of you have any

25   religious or moral or ethical beliefs or reasons

1          that would prevent from you finding a person guilty

2          even if that guilt were proven to you beyond a

3          reasonable doubt.

4                    A PROSPECTIVE JUROR:  No.

5                    THE COURT: You may know if not you will

6          now learn that any person who is arrested and

7          charged with a crime in this country has a right not

8          to testify at trial.  As I sit here now I have no

9          way of knowing if Mr. Khan will testify in his

10         trial.  Nor should I know at this point in the

11         trial.  But I am letting you know that at he has a

12         right not to and if you are chosen as a juror and if

13         he chooses not to testify you would be instructed by

14         me that you may not draw any inference that is

15         unfavorable to him simply because he chooses not to

16         testify.  Would you each be able to follow that

17         instruction.

18                    PROSPECTIVE JURORS:  Yes.

19                    THE COURT: Also there are times when

20         crimes are committed when it's only a single person

21         present.  Meaning the person who is the victim of

22         that crime.

23                    So the law is that if a jury believes a

24         single witness to a crime beyond a reasonable doubt

25         that is enough to convict.  There are some people

1       who feel that well even if I do believe a single

2       witness, the victim, beyond a reasonable doubt and

3       what they say amounts to a crime they can't convict

4       because they would want another person present or

5       something else to corroborate what it is that the

6       victim has said.

7                    Saying that to you now since I have said

8       that if you believe a witness beyond a reasonable

9       doubt that is enough to convict is there anyone of

10      you who feels that even if you do believe a single

11      witness beyond a reasonable doubt you cannot convict

12      restating it in a way that makes more sense.  If you

13      believe a victim witness to a crime beyond a

14      reasonable doubt can you convict.

15                    A PROSPECTIVE JUROR:  Yes.

16                    THE COURT: Also you have heard me read

17      the indictment and the charges so you know that the

18      nature of this crime charged is rape.  That it's a

19      sexual offense obviously.  And that the accuser is a

20      young female and obviously the defendant, the

21      accused, is an adult male.  Is there anyone of you

22      who because of the nature of the crime charged feels

23      that you cannot give both sides a fair trial okay.

24      So Ms. Santos, what I will do is ask you to

25      approach.

1              (Whereupon, a side-bar record begins.)

2              THE COURT: If you can explain to me.

3              A PROSPECTIVE JUROR:  I'm just a single

4      mother of 2 girls.  It would be very hard more me to

5      hear about somebody molesting my daughter.  I have a

6      problem with that.

7              THE COURT:   Most of us would have a

8      problem with the crime charged.  Are you saying that

9      because you have the 2 young daughters that your

10     problem, your feelings are so strong.

11             A PROSPECTIVE JUROR:  My view of the

12     judgment yes.  I have to admit I would not mind

13     sitting on a jury.  It would be judgment.

14             THE COURT:  Understood.  Consent.

15             MR. JOHNSTON:  Yes.

16             MS. MALIK:  Yes.

17             THE COURT:   What I will do is that is

18     one of the reasons that I asked the question is that

19     the reaction that you have is a quite normal one,

20     but we have to know what your answers are so I thank

21     you for being candid. I will excuse you from this

22     trial. Thank you for your candor.  She is excused

23     and Ms. Sherr please approach. You raised your hand.

24     Is it something about the nature of the crime.

25             A PROSPECTIVE JUROR: Yes, a close friend

```
 1        of mine basically had the same thing happened to
 2        her.   She has not recovered yet.
 3                  THE COURT: When she was a child.
 4                  A PROSPECTIVE JUROR:  Yes.  And we are 37
 5        now.   I cannot be a part of this I am sorry.
 6                  THE COURT:   Thank you for your honesty.
 7        It's important to the process.  And that we all know
 8        and the answers that you gave make absolute sense.
 9        Thank you for your candor.  I am excusing you from
10        this case.
11                  THE COURT: Yes Ms. Vng.
12                  A PROSPECTIVE JUROR:  I have a physical
13        problem.   This side of the ear.
14                  THE COURT: A hearing problem.
15                  A PROSPECTIVE JUROR:  Yes.
16                  THE COURT: Is there anything that as I
17        was talking is there any time that you did not hear.
18                  A PROSPECTIVE JUROR: Yes not clear.  And
19        I have the language problem too.
20                  THE COURT:   All right.  Consent.
21                  MR. JOHNSTON:  Yes.
22                  MS. MALIK:  Yes.
23                  THE COURT:  All right.  She is excused.
24                  (Whereupon, a side-bar record concludes.)
25                  COURT CLERK:  Seat number one, Edward
```

1    Morrissey.  Last name, M-O-R-R-I-S-S-E-Y.  Seat

2    number 3, first name is Elzbieta, E-L-Z-B-I-E-T-A.

3    Last name Nowak, N-O-W-A-K.  Seat number 6 Katrina

4    Elliot.  Last name, E-L-L-I-O-T.

5              THE COURT: To Mr. Morrissey and Ms. Nowak

6    and Elliot you heard me ask the questions that I

7    have so far asked everyone else in the panel.  I

8    will ask the same questions of you but before I do

9    is there any single issue or a single question that

10   I have asked that you have a problem with.

11             A PROSPECTIVE JUROR:  No.

12             THE COURT: Okay.  Mr. Morrissey from the

13   beginning sir I am sorry. To you 3 these questions

14   are, are you each over 18 years old, residents of

15   Queens county and citizens of this country.

16             A PROSPECTIVE JUROR: Yes.

17             THE COURT:   Have either of you been

18   convicted of a felony.

19             PROSPECTIVE JURORS:  No.

20             THE COURT:   Are you each able to read,

21   understand and speak English.

22             PROSPECTIVE JURORS:  Yes.

23             THE COURT:   Do you know me, the ADA or

24   defense counsel or to your knowledge any of our

25   family and friends.

vld

```
 1                    PROSPECTIVE JURORS:  No.

 2                    THE COURT: Do you know the names listed

 3         of potential witnesses in this case.

 4                    PROSPECTIVE JURORS:  No.

 5                    THE COURT: Any hearing handicap or any

 6         other type of disability to prevent you from sitting

 7         on this case.

 8                    PROSPECTIVE JURORS:  No.

 9                    THE COURT: Do you have a hardship that

10         would prevent from you giving your full attention to

11         the end of this trial.

12                    PROSPECTIVE JURORS: No.

13                    THE COURT:  Do you have any religious,

14         moral or ethical beliefs or reasons that would

15         prevent you from finding a person guilty even if it

16         was proven to you beyond a reasonable doubt.

17                    PROSPECTIVE JURORS:  No.

18                    THE COURT: Should you be chosen as a

19         juror and if the defendant chooses not to testify

20         would  you be able to follow my instructions and not

21         draw any inference unfavorable to him simply because

22         he chooses not to testify.

23                    PROSPECTIVE JURORS:  Yes.

24                    THE COURT: On the issue of single witness

25         if you believe a single witness to a crime beyond a
```

1          reasonable doubt can you convict.

2                    PROSPECTIVE JURORS:  Yes.

3                    THE COURT: And is there anything about

4          the nature of the crime charged meaning that

5          includes the fact that it's a sexual offense,

6          accuser is a young female. The defendant is an adult

7          male. Is there anything about that that would make

8          you think that you could not give both sides in this

9          case a fair trial.

10                   PROSPECTIVE JURORS:  No.

11                   THE COURT: All right.  So now to the

12         questionnaire and beginning with Mr. Morrissey I

13         will read through each question with him and get his

14         answers.  And beginning with Ms. Dobrin I will read

15         the question number.

16                   Mr. Morrissey, your name.

17                   A PROSPECTIVE JUROR:  Edward Morrissey.

18         Queens, New York.

19                   THE COURT: Area of residence.

20                   A PROSPECTIVE JUROR:  Middle Village.

21                   THE COURT: How long.

22                   A PROSPECTIVE JUROR:  8 years.

23                   THE COURT:   How long have you lived in

24         this country.

25                   A PROSPECTIVE JUROR:  58 years.

```
1                      THE COURT:   What is your marital status.
2                      A PROSPECTIVE JUROR:  Single.
3                      THE COURT:   Years of education.
4                      A PROSPECTIVE JUROR:  Masters degree.
5                      THE COURT: What subject.
6                      A PROSPECTIVE JUROR:  English.
7                      THE COURT:   Number 8 what is your
8       occupation.
9                      A PROSPECTIVE JUROR:  I am a court clerk
10      for the Supreme Court New York County.  Sorry just
11      promoted.  I am a management analyst.  First of the
12      year.
13                     THE COURT: And still working in Manhattan
14      Supreme Court.
15                     A PROSPECTIVE JUROR:  Yes.
16                     THE COURT:  And you have been working
17      with the court system for how long now.
18                     A PROSPECTIVE JUROR: 23 years.
19                     THE COURT:  Your last role as a court
20      clerk were you working in the courtroom .
21                     A PROSPECTIVE JUROR:  In administration.
22                     THE COURT: And I imagine happy with the
23      new promotion.
24                     A PROSPECTIVE JUROR:  Yes.
25                     THE COURT: Any children of working age.
```

vld

1          A PROSPECTIVE JUROR: No.

2          THE COURT: Number 9 served on a state or

3     federal Grand Jury.

4          A PROSPECTIVE JUROR:  Grand Jury, no.

5          THE COURT: Served on a state or federal

6     trial jury.

7          A PROSPECTIVE JUROR:  State twice.

8          THE COURT: So it's yes and 10A is yes.

9     Civil or criminal.

10         A PROSPECTIVE JUROR: One civil.  One

11    criminal.

12         THE COURT:  What was the charge in the

13    criminal case.

14         A PROSPECTIVE JUROR:  It was a drug deal

15    and they copped a plea before we got the case.

16         THE COURT:  And that civil case had that

17    gone to verdict.

18         A PROSPECTIVE JUROR:  They also settled

19    before the jury rendered a verdict.

20         THE COURT:  10C.

21         A PROSPECTIVE JUROR:  40 years ago.

22         THE COURT:  11A, have you or any

23    relative, close friend been the victim of a crime.

24         A PROSPECTIVE JUROR:   Not that I

25    recall.

 1                    THE COURT:   11B, any relative or close

 2          friend been the witness of a crime.

 3                    A PROSPECTIVE JUROR:   I was a witness to

 4          a crime.

 5                    THE COURT: What kind of a crime.

 6                    A PROSPECTIVE JUROR:   I had a part time

 7          job in Macys.   I was held up at gun point here in

 8          Queens.

 9                    THE COURT:   Working night time.

10                    A PROSPECTIVE JUROR:   I worked in the

11          vault in Macys.  I was held up at gun point.

12                    THE COURT:   Anyone arrested and charged.

13                    A PROSPECTIVE JUROR: Yes.

14                    THE COURT:   Do you know how they were

15          arrested.

16                    A PROSPECTIVE JUROR: They were arrested

17          on the scene.  Alarms went off and the police showed

18          up. My involvement in court there was my statement.

19          I did not go to court.

20                    THE COURT:   Are you satisfied with the

21          way that matter was handled by the police department

22          and the court system.

23                    A PROSPECTIVE JUROR: Yes.

24                    THE COURT: Was anyone hurt in the course

25          of that robbery.

1           A PROSPECTIVE JUROR:  The assailant he

2      shot himself.  Ricochet.

3           THE COURT: So he fired his gun but the

4      bullet actually --

5           A PROSPECTIVE JUROR:  He hit the frame of

6      the bullet proof glass that ricocheted into his

7      hands.

8           THE COURT:   So that explains why he was

9      still at the scene when the police arrived.

10           A PROSPECTIVE JUROR:  Yes.

11           THE COURT:   And I guess he could be

12      easily identified in a crowds of people.

13           A PROSPECTIVE JUROR:  There were 7

14      witnesses.

15           THE COURT: Any other answers to 11B.

16           A PROSPECTIVE JUROR:  No just that.

17           THE COURT: 11C. Accused of a crime.

18           A PROSPECTIVE JUROR:  No.

19           THE COURT:   11D.  Convicted of a crime.

20           A PROSPECTIVE JUROR: No.

21           THE COURT: 11E, testified in a criminal

22      proceeding.

23           A PROSPECTIVE JUROR:  No, other than

24      myself through a statement.

25           THE COURT: 11F, been a party to a civil

1     lawsuit.

2                    A PROSPECTIVE JUROR:  No.

3                    THE COURT: Other than the work that you

4     do have you or any relative or close friend been

5     employed by a law enforcement agency.

6                    A PROSPECTIVE JUROR:  I come from a

7     family of police officers.

8                    THE COURT:  11B, have you or any

9     relative or close friend been employed by a law

10    firm.

11                   A PROSPECTIVE JUROR:  After retirement,

12    yes.  Several friends after retirement work for law

13    firms.

14                   THE COURT: Other than in connection with

15    the work that you have been doing over the years in

16    the court system have you or any relative or close

17    friend had any legal training.

18                   A PROSPECTIVE JUROR:  There are a few

19    attorneys in the family.

20                   THE COURT:  12D, you or any relative or

21    close friend worked in behalf the defendant.

22                   A PROSPECTIVE JUROR:  I presume that the

23    attorney did in their line of work.

24                   THE COURT:  Number 13.  With the police

25    that you feel that could you not be a fair and

1    impartial juror.

2                A PROSPECTIVE JUROR:  I don't think so.

3    I don't think that it would be a problem.

4                THE COURT:  You know that there will not

5    be a problem.

6                A PROSPECTIVE JUROR:  I don't think that

7    there will be a problem.

8                THE COURT:  Can you make any more of a

9    firm statement meaning that you will be able to be

10   fair to both sides in this case.

11               A PROSPECTIVE JUROR:  I would think so.

12   I was thrown by the pleasant experience with the

13   police department.

14               THE COURT: But whether or not it was

15   pleasant or unpleasant you will be able to give both

16   sides in this case a fair trial.

17               A PROSPECTIVE JUROR:  I believe so yes.

18               THE COURT:  The answer is yes.

19               A PROSPECTIVE JUROR:  Yes.

20               THE COURT:  14. The law says that an

21   indictment is only an accusation of a crime.  You

22   can not infer that a defendant is guilty and because

23   he was been arrested and indicted by a Grand Jury.

24   Can you accept that concept and can you follow the

25   law that I will later present to you.

1        A PROSPECTIVE JUROR: Yes.

2            THE COURT:  15, the law says that the

3    defendant is presumed innocent until he has been

4    guilty beyond a reasonable doubt. Can you follow the

5    law.

6        A PROSPECTIVE JUROR:  Yes.

7            THE COURT: 16, because you have heard no

8    evidence up to this point and if you were asked to

9    vote right now you would have to vote that the

10   defendant is not guilty.

11       A PROSPECTIVE JUROR:  Yes.

12           THE COURT:   17, the law says that the

13   prosecution has the burden of proving the defendant

14   guilty beyond a reasonable doubt.  Can you accept

15   that and will you follow the law that I will later

16   present to you.

17       A PROSPECTIVE JUROR:  Yes.

18           THE COURT:   18, do you know any reason

19   why you could not sit as a fair and impartial juror

20   in this case.

21       A PROSPECTIVE JUROR:  No.

22           THE COURT:   Ms. Dobrin.

23       A PROSPECTIVE JUROR:  Linda Dobrin.

24   Flushing, New York.  21 years.  59 years. Married.

25   Masters degree.  Post Masters in Administration.

1    THE COURT:    Number 8.

2    A PROSPECTIVE JUROR:  I am an assistant

3    principal. My husband is the executive vice

4    chancellor for CUNY.

5    THE COURT:   You're much faster than I

6    can process.

7    A PROSPECTIVE JUROR:  I am an assistant

8    principal.

9    THE COURT: What level school.

10   A PROSPECTIVE JUROR:  Elementary.

11   THE COURT:  How many years have you been

12   teaching.

13   A PROSPECTIVE JUROR:  20.

14   THE COURT:   How many of those years have

15   you been an assistant principal.

16   A PROSPECTIVE JUROR:  Close to 10.

17   THE COURT:   How many years have you been

18   working out of that particular school building.

19   A PROSPECTIVE JUROR:  Well, I have worked

20   in several schools. I worked for the New York City

21   public schools. I work with special children so that

22   I had to move from school to school from time to

23   time. It's kind of an awkward question. It's 20

24   years with the New York City public schools in a

25   variety of the schools. Most in an administrative

1      capacity.

2              THE COURT:   You said that your husband

3      is a vice --

4              A PROSPECTIVE JUROR:  Executive vice

5      chancellor for the City University of New York.

6              THE COURT: He's been working for them for

7      how long now.

8              A PROSPECTIVE JUROR:  5 years.

9              THE COURT:   Prior to that what kind of

10     work was he doing.

11             A PROSPECTIVE JUROR:  He worked for

12     Guiliani and his administration. He worked for the

13     Koch administration. He worked for the Dinkins

14     administration in a variety of capacities.

15             THE COURT:   You have children.

16             A PROSPECTIVE JUROR:  2 in college. One

17     is in Binghamton and one is in Albany.

18             THE COURT:   Number 9.

19             A PROSPECTIVE JUROR: No.  Never served.

20             THE COURT:   10.

21             A PROSPECTIVE JUROR:  I served in a civil

22     case once.  Maybe about 20 years ago.  They settled

23     out of court.  That was probably the last time that

24     I served.

25             THE COURT:   11 A.

1                   A PROSPECTIVE JUROR:  No.

2                   THE COURT:   B.

3                   A PROSPECTIVE JUROR:  No.

4                   THE COURT:   D.

5                   A PROSPECTIVE JUROR:  I have a nephew who

6          was convicted of a crime.

7                   THE COURT: What kind of a crime.

8                   A PROSPECTIVE JUROR:  A robbery.

9                   THE COURT:   Under what circumstances.

10                  A PROSPECTIVE JUROR:  I don't really

11         know.

12                  THE COURT: Was it here in the city.

13                  A PROSPECTIVE JUROR: Yes.

14                  THE COURT:   How long ago was it.

15                  A PROSPECTIVE JUROR:  5, 8 years ago.  I

16         don't know.  I did not attend any of the

17         proceedings.

18                  THE COURT:   He is a nephew on your side

19         of the family.

20                  A PROSPECTIVE JUROR: Yes.

21                  THE COURT:   Your sister, brother.

22                  A PROSPECTIVE JUROR: My brothers son.

23                  THE COURT: Is there anything that you

24         have learned that either the crime that he was

25         charged with or how he was handled by either the

1      police department or the court system and eventually

2      the sentence that he received anything that makes

3      you feel that he was unfairly treated.

4              A PROSPECTIVE JUROR:  I knew very little

5      about the proceedings or anything that happened. I

6      just know that he was arrested and that he did some

7      time in jail.  I know very little beyond that.  I do

8      not know the circumstances that he was arrested

9      under or anything like that.

10             THE COURT:   So it is not a discussion

11     that you and your brother have had.

12             A PROSPECTIVE JUROR:  No.

13             THE COURT: Any other answers to 11 B.

14             A PROSPECTIVE JUROR:  Yes, my brother was

15     also convicted of robbery.

16             THE COURT:   His.

17             A PROSPECTIVE JUROR: He is  -- I was very

18     young.  I do not remember any of the details of what

19     happened.

20             THE COURT:   So your brother being the

21     father of your nephew.

22             A PROSPECTIVE JUROR:  Yes.

23             THE COURT: And anything about the kinds

24     of trouble that they had been in that makes you feel

25     that you could not be fair to both sides in this

1        case.

2                        A PROSPECTIVE JUROR: No.

3                        THE COURT: 11 E.

4                        A PROSPECTIVE JUROR:  No.

5                        THE COURT: F.

6                        A PROSPECTIVE JUROR: Well, my husband is

7        constantly being sued as part of the university.  He

8        must have about 300 or so.

9                        THE COURT:   Understood.  If you go put

10       Dobrin, his name in the court system suddenly bing,

11       bing, bing.

12                       A PROSPECTIVE JUROR: A lot.

13                       THE COURT:   12 A.

14                       A PROSPECTIVE JUROR: My husband is also a

15       peace officer.

16                       THE COURT:   Any other answers to 12 A.

17                       A PROSPECTIVE JUROR:  Well, I was

18       employed by Davis, Poke and Rodwell as well maybe

19       about 20 years ago I worked for them in a

20       secretarial capacity.

21                       THE COURT:   For how long.

22                       A PROSPECTIVE JUROR:  On and off about 5

23       or 6 years.

24                       THE COURT:   So that's an answer to 12 A

25       and B.  Any other answers to 12 B.

```
 1                      A PROSPECTIVE JUROR:  No.

 2                      THE COURT:   12 C.

 3                      A PROSPECTIVE JUROR:  My husband

 4           obviously had legal training as part of his piece

 5           officer status.

 6                      THE COURT:   12 D.

 7                      A PROSPECTIVE JUROR:  No.

 8                      THE COURT: 13.

 9                      A PROSPECTIVE JUROR:  No.

10                      THE COURT: 14 S.

11                      A PROSPECTIVE JUROR:  Yes, yes, yes, yes.

12                      THE COURT:   18.

13                      A PROSPECTIVE JUROR:  No.

14                      THE COURT:   Thank you. Ms. Nowak, number

15           one.

16                      A PROSPECTIVE JUROR:  Elzbieta Nowak.

17           Poland.  Middle Village, Queens.  6 years.  19

18           years.  Married.  Bachelors in Accounting.

19                      THE COURT:   Number 8.

20                      A PROSPECTIVE JUROR:  Assistant

21           Retirement Examiner.

22                      THE COURT:   For a company or.

23                      A PROSPECTIVE JUROR:  New York City

24           Retirement System.

25                      THE COURT:   You have been doing that
```

1              kind of work for them for how long.

2                          A PROSPECTIVE JUROR:   Just 6 months.

3                          THE COURT:   Prior to that.

4                          A PROSPECTIVE JUROR:   I stayed home.

5                          THE COURT:   So you had worked in the

6         home.

7                          A PROSPECTIVE JUROR: Yes.

8                          THE COURT: What kind of work does your

9         husband do.

10                         A PROSPECTIVE JUROR:   A jewelry and model

11        maker.

12                         THE COURT:   Model.

13                         A PROSPECTIVE JUROR:   Model maker.

14                         THE COURT:   And the model that he is

15        making.

16                         A PROSPECTIVE JUROR:   For watches.

17                         THE COURT:   Any children of working age.

18                         A PROSPECTIVE JUROR: No my son is 14.

19                         THE COURT:   Number 9.

20                         A PROSPECTIVE JUROR:   No.

21                         THE COURT: 10.

22                         A PROSPECTIVE JUROR:   No.

23                         THE COURT: 11 A.

24                         A PROSPECTIVE JUROR:   No.

25                         THE COURT:   B.

1        A PROSPECTIVE JUROR:  No.

2        THE COURT:   C.

3        A PROSPECTIVE JUROR:  No.

4        THE COURT:   D.

5        A PROSPECTIVE JUROR:  No.

6        THE COURT:  E, no.

7        THE COURT:   F.

8        A PROSPECTIVE JUROR:  No.

9        THE COURT: 12 A.

10       A PROSPECTIVE JUROR:  No.

11       THE COURT:   B.

12       A PROSPECTIVE JUROR:  No.

13       THE COURT:   C.

14       A PROSPECTIVE JUROR:  My cousin in

15  Poland.  I know that they are attorneys not like

16  immediate family.

17       THE COURT:  Maybe the same answers to 12

18  D.

19       A PROSPECTIVE JUROR:  No.

20       THE COURT: Number 13.

21       A PROSPECTIVE JUROR: No.

22       THE COURT:   14 S.

23       A PROSPECTIVE JUROR: Yes.

24       THE COURT:   15.

25       A PROSPECTIVE JUROR:  Yes.  Yes. Yes.

1            THE COURT:    And 18.

2            A PROSPECTIVE JUROR: No.

3            THE COURT:  Ms. Alanis.

4            A PROSPECTIVE JUROR:  Nilda Alanis.

5    Argentina.  Sunnyside.  27 years.  37 years.

6    Divorced.  High school.

7            THE COURT:    Number 8.

8            A PROSPECTIVE JUROR:  I am not at the

9    present.

10           THE COURT: When you were working full

11   time what were you doing.

12           A PROSPECTIVE JUROR:  I was a

13   housekeeper.

14           THE COURT: And how long have you been on

15   disability.

16           A PROSPECTIVE JUROR:  4 years.

17           THE COURT: Is this an injury that

18   occurred in the performance of your duties.

19           A PROSPECTIVE JUROR:  No.  It's

20   depression. My last employer was a Ms. Leona

21   Helmsley.

22           THE COURT:    Approach please.

23           (Whereupon, a side-bar record begins.)

24           THE COURT:  So I imagine that the things

25   that we read are absolutely untrue.  Mrs. Helmsley

1    is an absolute peach to work with.

2                    A PROSPECTIVE JUROR:  No, I am sorry but

3    it's worse than what people think it is.

4                    THE COURT: Have you had any  -- are you

5    able to support yourself on disability.  You said

6    that you were divorced now.

7                    A PROSPECTIVE JUROR:  Yes.

8                    THE COURT:  So you said that you

9    suffered with bouts of depression is that being

10   medicated now.

11                   A PROSPECTIVE JUROR:  I am almost out of

12   the medication anti depressant. I have to renew very

13   soon.

14                   THE COURT:  So are there -- any with

15   that depression how is it manifested.  Do you just

16   have a bad mood. Listless.  Losing focus.  What

17   manifestations.

18                   A PROSPECTIVE JUROR:  Well, I was very

19   depressed because I work very, very hard for many

20   years and then I start a business and comes 9/11. I

21   have to go in bankruptcy because I lost everything

22   that I have work so much for all of these years.

23   That's why I was very depressed. Very down. You know

24   if I can work for also Leona Helmsley I know how to

25   control myself and to think about  -- I am  --

1            THE COURT:  So the depression was based

2       on your  -- when you were working with Ms. Helmsley

3       was it before or after the business.

4            A PROSPECTIVE JUROR:  Before.

5            THE COURT:  So your depression it's onset

6       was because more by the losses that you suffered

7       because of that 9/11 and the business that you had

8       created.

9            A PROSPECTIVE JUROR: Because I work very

10      hard.  I was for maybe 20 years.  I do things by

11      myself. The older one that is my youngest one is a

12      police officer. He is in the 30th Precinct in the

13      Domestic Violence Unit.

14           THE COURT: So given  -- how are you

15      functioning now as far as the depression is

16      concerned.

17           A PROSPECTIVE JUROR:  I am okay.

18           THE COURT:  So if you're chosen as a

19      juror in a criminal case which someone is charged

20      with rape that is something that would cause you --

21           A PROSPECTIVE JUROR: No.  That would not

22      interfere in my judgement.

23           THE COURT: Any questions.

24           MS. MALIK:  No.

25           MR. JOHNSTON:  Did you say that he worked

vld

1      for domestic violence.

2                    A PROSPECTIVE JUROR:  My youngest son.

3                    MR. JOHNSTON:  He is a detective.

4                    A PROSPECTIVE JUROR:  No, he is a police

5      officer in Manhattan.

6                    MR. JOHNSTON:  How often do you see him.

7                    A PROSPECTIVE JUROR:  Once a month.

8                    MR. JOHNSTON:  When you do meet him do

9      you discuss what he has been working on.

10                   A PROSPECTIVE JUROR:  No,  he does not

11     like to talk about his job.  I know nothing about

12     it.

13                   MS. MALIK:  How to you feel about him

14     being a police officer.

15                   A PROSPECTIVE JUROR: My heart beats every

16     time that I hear the news. I check the news.  But

17     you know.

18                   MS. MALIK:  How long have you been

19     divorced.

20                   A PROSPECTIVE JUROR:  30 years.  Long

21     time.

22                   THE COURT:  Let me ask you the rest of

23     the questions here I think that I was on number 8

24     what about number 9.

25                   A PROSPECTIVE JUROR: No.

```
 1                    THE COURT: 10.

 2                    A PROSPECTIVE JUROR:  No.

 3                    THE COURT:   11 A.

 4                    A PROSPECTIVE JUROR: No.  No.  No.  No.

 5       No.  No.

 6                    THE COURT: Other than your son any other

 7       answers to 12 A.

 8                    A PROSPECTIVE JUROR:  Well, my son and

 9       yes I have many friend lawyers.

10                    THE COURT: So your son is a police

11       officer so he is with 12 A. 12 B you have a number

12       of friends who are attorneys.

13                    A PROSPECTIVE JUROR: Yes.

14                    THE COURT:  That's the answer to 12 C.

15       Any other answers.

16                    A PROSPECTIVE JUROR:  No.

17                    THE COURT:  D.

18                    A PROSPECTIVE JUROR:  Well, my friends a

19       lawyer.

20                    THE COURT: Number 13.

21                    A PROSPECTIVE JUROR:  No.

22                    THE COURT:  14.

23                    A PROSPECTIVE JUROR: No.  No:  No.

24                    THE COURT: 18.

25                    A PROSPECTIVE JUROR:  Yes, no.
```

1          THE COURT:   All right.  Have a seat.

2          (Whereupon, a side-bar record concludes.)

3          THE COURT: Mr. Huck.

4          A PROSPECTIVE JUROR:  Gregory Huck.

5     Queens, New York.  Glendale.  11 years.  31 years.

6     Married.  4 years high school education.  I work in

7     a plastic factory.

8          THE COURT:  You have been working with

9     them for how long now.

10          A PROSPECTIVE JUROR:  11 years.

11          THE COURT:   What does your wife do.

12          A PROSPECTIVE JUROR: Lease accountant in

13     Manhattan.

14          THE COURT:   What kind of company is she

15     working for.

16          A PROSPECTIVE JUROR:  It's called

17     accounts receivable.  Transition department.

18          THE COURT: Number 9.

19          A PROSPECTIVE JUROR:  No.

20          THE COURT: 10.

21          A PROSPECTIVE JUROR: No.

22          THE COURT: 11 A.

23          A PROSPECTIVE JUROR:  No.

24          THE COURT:   B.

25          A PROSPECTIVE JUROR: No.  No.  No.  No.

1            THE COURT:  F.

2            A PROSPECTIVE JUROR:  No.

3            THE COURT:   12 A.

4            A PROSPECTIVE JUROR:  No.

5            THE COURT:   B.

6            A PROSPECTIVE JUROR: No.  No.

7            THE COURT: 13.

8            A PROSPECTIVE JUROR: No.

9            THE COURT: 14 S.

10           A PROSPECTIVE JUROR: Yes.  Yes.  Yes.

11    Yes.

12           THE COURT:   18.

13           A PROSPECTIVE JUROR: No.

14           THE COURT:   Thank you.  Ms. Elliot,

15    number one.

16           A PROSPECTIVE JUROR:  Katrina Elliot.

17    Brooklyn. Jamaica.  9 years.  US citizen all of my

18    life.  Divorced.  Halfway towards my Associates.

19           THE COURT:   8.

20           A PROSPECTIVE JUROR:  Supervisor with the

21    United States Post Office.

22           THE COURT:   Working with them for how

23    long.

24           A PROSPECTIVE JUROR:  7 and a half years.

25           THE COURT:   How long have you been a

1    supervisor.

2                    A PROSPECTIVE JUROR:  2.

3                    THE COURT:   And as a supervisor at any

4    given time how many people do you supervise.

5                    A PROSPECTIVE JUROR:  Any where from 10

6    to 30, 35.

7                    THE COURT: I know that you said that you

8    are divorced. What kind of work did your ex-husband

9    do.

10                   A PROSPECTIVE JUROR: He is a brick layer.

11   He builds houses.

12                   THE COURT: Any children of working age.

13                   A PROSPECTIVE JUROR:  Yes.

14                   THE COURT:   What kind of work do they

15   do.

16                   A PROSPECTIVE JUROR:  My son is s 26 he

17   is a security guard, school security.

18                   THE COURT:   Number 9.

19                   A PROSPECTIVE JUROR:  No.

20                   THE COURT:   10.

21                   A PROSPECTIVE JUROR:  No.

22                   THE COURT:   11 A.

23                   A PROSPECTIVE JUROR: Yes.

24                   THE COURT:   Who and what kind of a

25   crime.

1           A PROSPECTIVE JUROR: Me and my mother

2     were Christmas shopping. We were pickpocketed.

3     Wallet taken.

4           THE COURT:   Anyone ever caught or

5     charged.

6           A PROSPECTIVE JUROR: No.

7           THE COURT:   Any other answers to 11 A.

8           A PROSPECTIVE JUROR:  I know friends that

9     were victims but I cannot remember what the details

10    were. It was not anything of violence.

11          THE COURT:   So in the course of that

12    shopping trip during Christmas you and your mother

13    had each separately.

14          A PROSPECTIVE JUROR:  Yes.

15          THE COURT: During the same trip.

16          A PROSPECTIVE JUROR: No separate trips.

17          THE COURT:   So, it was not each of you

18    were walking side by side.

19          A PROSPECTIVE JUROR:  No.

20          THE COURT:   And you each had your bag --

21    pocketbook.

22          A PROSPECTIVE JUROR:  Her sister put my

23    purse in her bag. And looking through the close

24    racks they got me.

25          THE COURT:   11 B.

1 A PROSPECTIVE JUROR: No.

2 THE COURT: C.

3 A PROSPECTIVE JUROR: Yes.

4 THE COURT: Who was accused of what.

5 A PROSPECTIVE JUROR: 17 year old nephew

6 for fighting and stealing.

7 THE COURT: Was he arrested and charged

8 and brought into court.

9 A PROSPECTIVE JUROR: Yes.

10 THE COURT: Nephew and he's whose son.

11 A PROSPECTIVE JUROR: My sister.

12 THE COURT: Is there anything about what

13 happened to him that makes you feel that he was

14 unfairly treated.

15 A PROSPECTIVE JUROR: No, I think that he

16 was very stupid though.

17 THE COURT: Any other answers to 11 C.

18 A PROSPECTIVE JUROR: No.

19 THE COURT: 11 D. Same answers.

20 A PROSPECTIVE JUROR: Yes, because he was

21 convicted and put on 5 years of probation. It was

22 reduced to some type of a misdemeanor.

23 THE COURT: 11 E.

24 A PROSPECTIVE JUROR: No.

25 THE COURT: F.

vld

```
 1                    A PROSPECTIVE JUROR: No.

 2                    THE COURT:  12 A.

 3                    A PROSPECTIVE JUROR: No.

 4                    THE COURT:   B.

 5                    A PROSPECTIVE JUROR:  No.

 6                    THE COURT: C.

 7                    A PROSPECTIVE JUROR:  Yes.

 8                    THE COURT: D..

 9                    A PROSPECTIVE JUROR:  No.

10                    THE COURT:   13.

11                    A PROSPECTIVE JUROR: No.

12                    THE COURT:   13.

13                    A PROSPECTIVE JUROR:  Yes.  Yes.  Yes.

14          Yes.

15                    THE COURT: 18.

16                    A PROSPECTIVE JUROR:  Yes.

17                    THE COURT:   Ms. Khan.

18                    A PROSPECTIVE JUROR:  Kharool Khan.

19          Guyana.  Jamaica.  7 years.  12 years. Married.

20          High school.  9.

21                    THE COURT: Number -- maybe I missed my

22          numbers.

23                    A PROSPECTIVE JUROR:  8.

24                    THE COURT:   7 was 9 great.

25                    A PROSPECTIVE JUROR:  Yes.
```

1                    THE COURT: Number 8.

2                    A PROSPECTIVE JUROR: Professional nanny.

3                    THE COURT:   Oh, at first I thought that

4          you said 9.  And then I thought that you said nun.

5          Meaning a habit.  You are saying that you are not

6          employed.

7                    A PROSPECTIVE JUROR:  I am a professional

8          nanny.

9                    THE COURT:   Okay. Are you working with

10         just a single family.

11                   A PROSPECTIVE JUROR: Yes.

12                   THE COURT: How long have you been working

13         with that family.

14                   A PROSPECTIVE JUROR:  4 years.

15                   THE COURT: How many of their children are

16         you working with.

17                   A PROSPECTIVE JUROR:  2.

18                   THE COURT:  Ages.

19                   A PROSPECTIVE JUROR:  3 and a half and 1

20         and a half.

21                   THE COURT: Did you say that you were

22         married.

23                   A PROSPECTIVE JUROR: Yes.

24                   THE COURT:   What does your husband do.

25                   A PROSPECTIVE JUROR:  A carpenter.

1           THE COURT:  Any children of working age.

2           A PROSPECTIVE JUROR:  No.  2

3    preschoolers.

4           THE COURT:   9.

5           A PROSPECTIVE JUROR:  No.

6           THE COURT: 10 S.

7           A PROSPECTIVE JUROR:  No.  No.  No.  No.

8    No.

9           THE COURT: 12 A.

10          A PROSPECTIVE JUROR:  Yes.

11          THE COURT:   Who works for what agency.

12          A PROSPECTIVE JUROR:  Both of my bosses

13   are prosecutors.

14          THE COURT:   Husband and wife.

15          A PROSPECTIVE JUROR: Yes.

16          THE COURT: Are they working in the same

17   office.

18          A PROSPECTIVE JUROR: No.

19          THE COURT:   Would you know whether they

20   are working for a state prosecutord office or

21   federal.

22          A PROSPECTIVE JUROR:  He is working for

23   Brooklyn.  And the lady she St.  Andrews Place.

24          THE COURT: So one state and one federal.

25          A PROSPECTIVE JUROR: Yes.

1          THE COURT: Same answers to 12 B.

2          A PROSPECTIVE JUROR:  No.

3          THE COURT:   12 C.

4          A PROSPECTIVE JUROR: No.

5          THE COURT: 12 D.

6          A PROSPECTIVE JUROR: No.

7          THE COURT:   13.

8          A PROSPECTIVE JUROR:  No.

9          THE COURT:   14.

10         A PROSPECTIVE JUROR: Yes.  Yes.  Yes.

11   Yes.

12         THE COURT:   18.

13         A PROSPECTIVE JUROR:  No.

14         THE COURT:   Thank you Ms. Khan. Finally

15   we are at Mr. Mitringa.

16         A PROSPECTIVE JUROR:  Voleh Mitringa.

17   Ukraine.  Jackson Heights.  40.  57.  Married.  3

18   years college. MTA bus operator.

19         THE COURT:  For how long now.

20         A PROSPECTIVE JUROR:  3.

21         THE COURT:   Prior to that.

22         A PROSPECTIVE JUROR:  3 years Greyhound.

23         THE COURT:  So you were working long

24   distance before now it's more local.

25         A PROSPECTIVE JUROR:  Yes.

1          THE COURT: What does your wife do.

2          A PROSPECTIVE JUROR:  She is at home.

3          THE COURT: And any children of working

4    age.

5          A PROSPECTIVE JUROR: Yes, I have 2 sons

6    and a daughter.

7          THE COURT:   What do they do.

8          A PROSPECTIVE JUROR:  One son is a car

9    sales man.  The other one is a pharmacist and my

10   daughter is a lighting specialist.

11         THE COURT:   9.

12         A PROSPECTIVE JUROR: No.

13         THE COURT: 10.

14         A PROSPECTIVE JUROR:  Yes.

15         THE COURT:   A.

16         A PROSPECTIVE JUROR:  Civil.

17         THE COURT:   One or more times.

18         A PROSPECTIVE JUROR:  Yes.  We reached a

19   verdict about 4 years ago.  It was an insurance

20   claim settlement.

21         THE COURT:   So you had sat as a juror in

22   only that one civil case.

23         A PROSPECTIVE JUROR: Yes.

24         THE COURT:   11 A.

25         A PROSPECTIVE JUROR: Yes.

1      THE COURT:    Who.

2      A PROSPECTIVE JUROR: My daughter and my

3  wife were mugged. They were not injured.  They were

4  scared.

5      THE COURT:    Mugged how.

6      A PROSPECTIVE JUROR:  At knife point.

7  The person demanded money. Fortunately they have

8  enough to satisfy his need.

9      THE COURT:    Anything about that crime

10  involving your wife and daughter that makes you feel

11  that you could not be fair to both sides in this

12  case.

13      A PROSPECTIVE JUROR:  No.

14      THE COURT: Any other answers to 11 A.

15      A PROSPECTIVE JUROR:  No.

16      THE COURT:    That is the same answer to

17  11 B.  They were witnesses to that crime, to the

18  crime against them. But other than that you are

19  saying that 11 B, C., D and F is all no.

20      A PROSPECTIVE JUROR:  No.

21      THE COURT: 12 A.

22      A PROSPECTIVE JUROR: No.

23      THE COURT:    Who.

24      A PROSPECTIVE JUROR: My dads friend best

25  friend was a police officer.

```
 1                  THE COURT: Any other answers to 12 A.
 2                  A PROSPECTIVE JUROR:  The rest are no.
 3                  THE COURT: So 12 B, C, and D are no.
 4                  A PROSPECTIVE JUROR:  Yes.
 5                  THE COURT: 13.
 6                  A PROSPECTIVE JUROR:  No.
 7                  THE COURT:  14.
 8                  A PROSPECTIVE JUROR: Yes, yes, yes, yes.
 9                  THE COURT: 18.
10                  A PROSPECTIVE JUROR:  No.
11                  THE COURT:  Thank you all.
12                  Now you have a chance to hear from the
13          attorneys with Ms. Malik.
14   VOIR DIRE
15   BY MS. MALIK:
16                  MS.  MALIK:  Good afternoon ladies and
17          gentlemen.  I am ADA Mina Malik.  I work in the
18          Special Victims Bureau here at the Queens county
19          prosecutors office, the district attorneys office
20          here.  And it's my responsibility at this time to
21          present this case to you.
22                  I appreciate the candid answers that you
23          have given so far and as jurors there are no right
24          or wrong answers.  All we are looking for is an
25          honest answer and to pick people who can be fair to
```

1      both the People of the State of New York as well as

2      to the defendant in this case.

3              Okay.  So, I would like to ask you a few

4      questions.  I would like to follow up on some

5      things. Mr. Morrissey you said that you were a court

6      clerk for New York County.  Congratulations on the

7      promotion by the way.

8              A PROSPECTIVE JUROR:  Thank you.

9              MS. MALIK:  Was that civil or criminal.

10             A PROSPECTIVE JUROR:  Civil.

11             MS. MALIK:  How long did you work there.

12             A PROSPECTIVE JUROR:  23 years.

13             MS. MALIK:  Do you have any children at

14     all.

15             A PROSPECTIVE JUROR: No.

16             MS. MALIK:  Mr. Huck do you have any

17     children.

18             A PROSPECTIVE JUROR:  No.

19             MS. MALIK:  Ms. Khan you have said that

20     you have 2 kids that are in high school.

21             A PROSPECTIVE JUROR: Yes.  They are 18

22     and 15.  18 is a girl.  15 is the boy.

23             MS. MALIK:  How long have you been a

24     nanny.

25             A PROSPECTIVE JUROR:  4 years.

1              MS. MALIK:  What did you do before that.

2              A PROSPECTIVE JUROR:  I was in a private

3      home cleaner.

4              MS. MALIK:  I would like to ask Ms.

5      Dobrin you have been working in the school system

6      for a very, very long time. How do you like working

7      with children.

8              A PROSPECTIVE JUROR:  I work with very

9      emotionally disturbed children.  I work in PN.  That

10     is in Whitestone. That's where I am currently

11     located. Same school but we have many, many sites.

12             MS. MALIK:  I simply would like to ask

13     you do you agree or disagree with the law that makes

14     it a crime for an adult to have sexual contact with

15     a child under a certain age.

16             A PROSPECTIVE JUROR: Yes I do. I have

17     children in school.  That have been victims of

18     sexual contact with adults.

19             MS. MALIK:  How about Mr. Morrissey. How

20     do you  feel about those laws.

21             A PROSPECTIVE JUROR:  I agree with them.

22     I used to teach high school for 12 and a half years.

23             MS. MALIK:  All right.  Anybody else. How

24     are you feeling on it. Ms. Nowak.

25             A PROSPECTIVE JUROR:  I was a teacher in

1     Poland so I know.

2                 MS. MALIK:  And Ms. Alanis.

3                 A PROSPECTIVE JUROR: No.

4                 MS. MALIK:  Do you agree with them also.

5                 A PROSPECTIVE JUROR:  Yes.

6                 MS. MALIK:  Mr. Huck.

7                 A PROSPECTIVE JUROR:  Definitely.

8                 MS. MALIK:  Ms. Elliot.

9                 A PROSPECTIVE JUROR: Yes.

10                MS. MALIK:  Ms. Khan.

11                A PROSPECTIVE JUROR: Yes.

12                MS. MALIK:  Now you know it's sexual

13    abuse and it involves a course of conduct for a

14    period of time with a young girl.  I would like to

15    ask you what does a pedophile or a child molester

16    look like.

17                MR. JOHNSTON:  I am going to object to

18    that.

19                THE COURT: Sustained.

20                MS. MALIK:  Take a look at the defendant.

21                MR. JOHNSTON:  Objection.

22                THE COURT:  Overruled.

23                MS. MALIK:  Take a look at the defendant.

24    Is there anything about him that makes you feel

25    sympathetic towards him.  Or to say that you know

1        what he really does not look like the type of person

2        that would commit the crime that he's accused of in

3        this case.

4                    Mr. Morrissey anything about his

5        appearance that makes you feel sorry for him.

6                    A PROSPECTIVE JUROR:  I for him, no.

7                    MS. MALIK:  Ms. Dobrin.

8                    A PROSPECTIVE JUROR:  I do not judge

9        anybody by the way that they look.

10                   MS. MALIK:  Do you all agree that you can

11       not judge a book by it's cover. That no matter how

12       charming or the social status, employment or

13       educational level that you just can't judge them by

14       that.  You don't know what goes on behind closed

15       doors would you all agree with me.

16                   A PROSPECTIVE JUROR:  Yes.

17                   MS. MALIK:  Could you promise that you

18       will keep that in mind during this case.

19                   A PROSPECTIVE JUROR: Yes.

20                   MS. MALIK:  Now the judge is going to ask

21       -- he asked you about the testimony of one witness

22       and you all agreed that you would be able to convict

23       the defendant if you believed the one witness beyond

24       a reasonable doubt.

25                   I am going to tell you that the one

1    witness that you are going to hear from in this case

2    is Ashley Martinez regarding the sexual acts and the

3    crime. Obviously when you have a sexual act and a

4    crime was committed people are not going to do that

5    out in public. Would you agree with that.

6                    A PROSPECTIVE JUROR:  Yes.

7                    MS. MALIK:  In fact sex is a very private

8    thing normally. When it's committed with a criminal

9    act you know originally there are hardly any

10   witnesses to that.  If that one witness who you are

11   going to hear from is a young teenager would that

12   effect your opinion in any way as to whether you

13   could convict the defendant if you believed her

14   beyond a reasonable doubt. The fact that she is a

15   teenager.  Would that effect your opinion Mr.

16   Morrissey.

17                   A PROSPECTIVE JUROR:  I would have to see

18   what her age would have to do with it.

19                   MS. MALIK:  Ms. Nowak.

20                   A PROSPECTIVE JUROR:  Yes.

21                   MS. MALIK:  Ms. Khan would that effect

22   your opinion.

23                   A PROSPECTIVE JUROR:  No.

24                   THE COURT:  Ms. Elliot.

25                   A PROSPECTIVE JUROR:  No.

                                              vld

1          MS. MALIK:  How about you Mr. Mitringa.

2          A PROSPECTIVE JUROR:  No.

3          MS. MALIK:  I am going to tell you ladies

4     and gentlemen that you are not going to hear about

5     fingerprint evidence in this case or blood evidence.

6     You are not going to have you know DNA evidence in

7     this case. A lot of times people hear the word rape

8     and the charge of rape they think that you are going

9     to have all of this kind of evidence. DNA.  Blood

10    evidence.  Evidence of fingerprints.  Positive

11    medical evidence.

12         I am going to tell you that you are not

13    going to have any of that.  Sometimes scientific

14    evidence is just not possible. Even if it's expected

15    it's just not possible for whatever explanation that

16    it is for whatever reason that is given that you are

17    going to hear the witness, one witness a teenage

18    girl and there is no scientific evidence would you

19    still be able to convict the defendant if you

20    believed the girl beyond a reasonable doubt.

21         A PROSPECTIVE JUROR:  Yes.

22         MS. MALIK:  In other words do you need

23    more than just her testimony. Do I need scientific

24    evidence to convict the defendant Mr. Morrissey.

25         A PROSPECTIVE JUROR: I don't think so,

1       no.

2                   MS. MALIK:  Ms. Nowak.

3                   A PROSPECTIVE JUROR:  No.

4                   MS. MALIK:  Ms. Alanis.

5                   A PROSPECTIVE JUROR: No.

6                   MS. MALIK:  Mr. Huck.

7                   A PROSPECTIVE JUROR: No.

8                   MS. MALIK:  Ms. Elliot.

9                   A PROSPECTIVE JUROR:  No.

10                  MS. MALIK:  Khan.

11                  A PROSPECTIVE JUROR:  No.

12                  MS. MALIK:  Mr. Mitringa.

13                  A PROSPECTIVE JUROR:  No.

14                  MS. MALIK:  I would like to talk to you

15      ladies and gentlemen of the jury about children who

16      have been abused.  Ms. Dobrin you said that you know

17      children who have been abused in the past.  Did you

18      wait some time to report it.

19                  A PROSPECTIVE JUROR:  A lot of time you

20      do not know.  We just know the evidence of what has

21      happened. We do not know the details of the cases.

22                  MS. MALIK: Okay.  Does anybody else here

23      know anybody who has been abused.  Obviously you do

24      not have to mention any names. Do you think that it

25      would be unusual for a child to wait some time

1    before reporting some sort of a sexual abuse. Ms.
2    Dobrin.
3              A PROSPECTIVE JUROR:  Yes.
4              MS. MALIK:  What do you think.
5              A PROSPECTIVE JUROR:  Usually to report
6    it without waiting. No.  Many years could go by
7    before they report it, yes.
8              MS. MALIK:  And would you be able to sit
9    there and listen to the reason as to why a child
10   waited for some time and take that into
11   consideration in evaluating the case.
12             PROSPECTIVE JUROR:  Absolutely.
13             MS. MALIK:  How about you Mr. Morrissey.
14             A PROSPECTIVE JUROR: Yes.
15             MS. MALIK:  We teach our children if
16   something bad happens to you, if something wrong
17   goes on, if somebody hurts you tell somebody.  Tell
18   an adult. Tell somebody that you trust. Tell a
19   police officer.  A lot of times that does not
20   happen.
21             Can you promise me that you are going to
22   sit there and keep an open mind and listen to the
23   young ladys reasons as to why she did not tell
24   anybody right away as these things were happening
25   with her.  Can you promise me that.

1          A PROSPECTIVE JUROR: Yes.

2          MS. MALIK:  Ms. Dobrin.

3          A PROSPECTIVE JUROR:  Yes.

4          MS. MALIK:  Can you all promise me that.

5          A PROSPECTIVE JUROR:  Yes.

6          MS. MALIK:  I appreciate your time.  All

7     I am going to ask that you do is to please keep an

8     open mind. There are no jury schools.  When you walk

9     through the door you do not leave your common sense

10    at the door.  You come in here and you apply all of

11    the years of knowledge and wisdom that you have

12    combined and I am just going to ask that you keep

13    that in mind and listen to what happened to the

14    young lady and please keep an open mind. Thank you

15    much very much.

16          THE COURT:  Thank you counsel.  Mr.

17    Johnston.

18 VOIR DIRE

19 BY MR. JOHNSTON:

20          MR. JOHNSTON:  Good afternoon.  As the

21    judge indicated I am Robert Johnston.  I am assisted

22    by co-counsel Samuel Viruet. We represent the

23    accused in this case.

24          Mr. Morrissey you have been in the court

25    system for 23 years.

1              A PROSPECTIVE JUROR: Yes.

2              MR. JOHNSTON:  Did you ever work on the

3         criminal side.

4              A PROSPECTIVE JUROR: No.

5              MR. JOHNSTON:  Did you start off as a

6         court officer.

7              A PROSPECTIVE JUROR:  I came in as an

8         administrative service clerk in payroll.

9              MR. JOHNSTON:  You have always been on

10        the civil side.

11             A PROSPECTIVE JUROR: Yes in

12        administration.

13             MR. JOHNSTON:  So you never had an

14        opportunity to be under the official or work in a

15        criminal court part.

16             A PROSPECTIVE JUROR:  No.

17             MR. JOHNSTON:  You also told us that you

18        were a teacher is that right.

19             A PROSPECTIVE JUROR: Yes.

20             MR. JOHNSTON:  During the course of that

21        experience you said that you taught high school.

22             A PROSPECTIVE JUROR:  I taught 9th and

23        11th grade.

24             MR. JOHNSTON:  In your experience in high

25        school did you ever have students that out and out

1      lied to you to your face without any questions.

2                    A PROSPECTIVE JUROR:  Certainly.

3                    MR. JOHNSTON:  Many times.

4                    A PROSPECTIVE JUROR: Yes.

5                    MR. JOHNSTON:  Well one of the things

6      that the jury has to do in a case like this is to

7      try to judge the credibility of a witness.  By that

8      we mean the believability.  There is no doubt going

9      to be a young girl who is going to swear to tell the

10     truth and she is going to say some things that are

11     very, very negative towards Mr. Abu Khan.

12                    It would be your job as a juror to listen

13     to what she has to say. Use your common sense in

14     evaluate some things that she has to say. Listen to

15     all the evidence in the case before you came to any

16     conclusion.  And then at the end make a decision

17     about whether or not the totality of the evidence

18     convinces you beyond a reasonable doubt that Mr. Abu

19     Khan is guilty of this.

20                    Because just because a witness swears to

21     tell the truth and tells you a story that is very

22     connected with him that does not mean that you have

23     to believe it.  You might say you know I would like

24     something more than just a word.  How about

25     something extra.  You do not need 2 witnesses but

1    the judge is going to tell you at the end of the

2    case that a reasonable doubt can arise out of a lack

3    of evidence.

4              MS. MALIK:  Objection your Honor.

5              THE COURT: Overruled.

6              MR. JOHNSTON:  Now, another thing that

7    was mentioned we the defendant, the defense, are not

8    looking for any sympathy and we are certainly not in

9    favor of any law that would allow an adult to take

10   sexual advantage of a young child.

11             I think that everybody is in agreement

12   that such a situation would be intolerable.  What we

13   are interested in is getting Mr. Abu Khan a fair

14   trial.  So I just say to you now is there any one of

15   you here for whatever reason feels like you could

16   not use your common sense in evaluating the

17   testimony, waiting until all the evidence is in,

18   waiting until after the judge instructs you on the

19   law before you make any final decision as to what

20   should be the verdict in this case.

21             Will everybody keep an open mind because

22   if you make your mind up right after Ashley Martinez

23   testifies you would not be a fair juror, you would

24   not be listening to both sides and considering all

25   the evidence. So will everybody keep an open mind

1          until the end of the case.

2                    A PROSPECTIVE JUROR:  Yes.

3                    MR. JOHNSTON:  And Mr. Matringa the

4          situation about your wife and your daughter when

5          they were mugged would that have any bearing on your

6          ability to be fair and impartial in this case.

7                    A PROSPECTIVE JUROR: No.

8                    MR. JOHNSTON:  Was anyone ever arrested.

9                    A PROSPECTIVE JUROR:  Yes.

10                   MR. JOHNSTON:  Did the police interview

11         your wife and your daughter.

12                   A PROSPECTIVE JUROR: Yes.

13                   MR. JOHNSTON:  They took a report.  Did

14         they have to look at any photographs or anything

15         like that.

16                   A PROSPECTIVE JUROR: Yes.

17                   MR. JOHNSTON:  Mr. Huck I just making

18         some notes did you say that you work for the plastic

19         company.

20                   A PROSPECTIVE JUROR: Yes.

21                   MR. JOHNSTON:  What is that.

22                   A PROSPECTIVE JUROR:   I make plastic

23         rods and sheets.

24                   MR. JOHNSTON:  How long have you been

25         doing that.

1               A PROSPECTIVE JUROR:  11 years.  I am a

2      manager.

3               MR. JOHNSTON:  I have no further

4      questions your Honor.

5               THE COURT: Thank you counsel.  What we

6      will do is if you wish you can leave your coats in

7      those seats.  At this point in the trial where I

8      have to handle some legal matters with counsel and

9      the defendant out of the jurors presence.  So if you

10     would just if you wish leave your coats in those

11     seat.

12               Follow the instructions of the officers.

13     We will bring you back within about 5 or so minutes.

14               (Whereupon, jurors exit the courtroom. )

15               THE COURT:  Counsel when you are ready

16     let me know.

17               MR. JOHNSTON:  We are ready judge.

18               THE COURT: Okay.  First of all as to

19     challenges for cause as to the entire panel of 8,

20     People cause.

21               MS. MALIK:  None your Honor.

22               THE COURT:  Defense cause.

23               MR. JOHNSTON:  The only thing was I

24     believe that it was Nilda Alanis that she came up to

25     the bench.  I believe that when you asked her about

1    the questions regarding the presumption of innocence

2    and proof beyond a reasonable doubt she answered no

3    rather than yes I believe that's what I heard.  Am I

4    correct in that.

5           THE COURT:   Well, my memory is that she

6    answered those question the way that everyone else

7    has.

8           MR. JOHNSTON:  I thought that she said

9    you know what the answer should be yes I believe

10    that she said no.  I don't think that she understood

11    the question but in any event I have no challenges

12    for cause.

13           THE COURT:  All right.  So now looking

14    for the first alternate and Mr. Morrissey People

15    peremptory.

16           MS. MALIK:  No your Honor.

17           THE COURT:   Defense peremptory.

18           MR. JOHNSTON:  No.

19           THE COURT: All right.  So the first

20    alternate is Mr. Morrissey.  Looking for the second

21    alternate.  Ms. Dobrin.  People peremptory.

22           MS. MALIK:  No your Honor.

23           THE COURT:   Defense.

24           MR. JOHNSTON:  Yes.

25           THE COURT: All right.  Looking for a

1    second alternate now looking at Ms. Nowak. People

2    peremptory.

3           MS. MALIK:  Yes your Honor.

4           THE COURT: Looking for a second alternate

5    now looking at Ms. Alanis. People peremptory.

6           MS. MALIK:  No.

7           THE COURT:  Defense.

8           MR. JOHNSTON:  Yes.

9           THE COURT:  All right.  Looking for a

10    second alternate looking at Mr. Huck.  People

11    peremptory.  People you have used 1 already.

12           MS. MALIK:  Yes.

13           THE COURT:  Defense you have used 2

14    already for the second peremptory.

15           MR. JOHNSTON:  No, we have used one for

16    the second.

17           MS. MALIK:  I have used one.

18           MR. JOHNSTON:  She used one and we have

19    used 2.

20           THE COURT:  I think that's for the

21    second.

22           MR. JOHNSTON:  We used one for seat

23    number 2 and the People have used one for seat

24    number 2.  Now we have used one for seat number 2 we

25    have used 2 judge.  And the People have only used

1        one.

2                    THE COURT:  I thought that one of you

3        used 2.

4                    MR. JOHNSTON:  We did judge.

5                    THE COURT: All right.  So People as to

6        Mr. Huck.

7                    MS. MALIK:  No peremptory your Honor.

8                    THE COURT: So then the second alternate

9        is Mr. Huck.

10                   MR. JOHNSTON:  Yes.

11                   THE COURT:  So we have our jury.  First

12       alternate being Mr. Morrissey.  The second being Mr.

13       Huck.

14                   COURT OFFICER:  Panel entering.

15                   COURT CLERK:  Jurors if you hear your

16       name please remain seated.  Edward Morrissey and

17       Gregory Huck. The names that were not called please

18       follow the direction of the officer.

19                   Are the remaining jurors acceptable to

20       the People.

21                   MS. MALIK:  Yes.

22                   COURT CLERK:  Acceptable to the defense.

23                   MR. JOHNSTON:  Yes.

24                   COURT CLERK: Could you please rise.

25       Raise your right hand.  Do you solemnly swear or

1    affirm that you will try this action in a just and

2    impartial manner to the best of your judgment and

3    render a verdict according to the law and the

4    evidence.

5              (Whereupon, yes is answered by all).

6              THE COURT:   As you may know now or will

7    now learn we have been in the process of trying to

8    select a jury in this case for the last day or two.

9    We already have 12 jurors.  We were looking for the

10   2 alternates.  You are the 2 alternates.

11             The first 12 were told to come in at 10

12   AM tomorrow morning.  You have to join them at 10 AM

13   tomorrow morning when you as a group you will hear

14   preliminary instructions from me. You will hear

15   opening statements from both counsel.  And we will

16   start hearing evidence tomorrow morning.

17             Welcome to the jury and we'll see you

18   tomorrow morning at 10 AM.

19             (Whereupon, jurors exit the courtroom)

20             THE COURT: So Ms. Malik in the morning

21   tomorrow the first thing in the morning we will

22   learn whether or not you have made adjustments as

23   far as not having to work on Friday, this Friday.

24             MS. MALIK:  Yes.

25             THE COURT:   And also you would have gone

1    through all of the material that you have from

2    Florida and give us an up to date  -- an update as

3    to where you are as far as giving information to the

4    defense and how that information would be used at

5    trial.

6            MS. MALIK:  Yes your Honor.

7            THE COURT:  Anything else.

8            MR. JOHNSTON:  Judge now that the jury is

9    sworn I believe counsel is obligated to give us the

10   Grand Jury minutes.  I do not have the Grand Jury

11   minutes yet of the witnesses.

12           MS. MALIK:  I believe that under CPL

13   240.45 it's right before opening statements is when

14   I am supposed to turn them over.  I will try not to

15   wait until then.

16           THE COURT: My I expect too that the first

17   thing in the morning tomorrow you will have

18   certainly that and anything else that may yet not

19   have been provided.

20           MR.  JOHNSTON:  It's my impression that

21   it's after a jury was sworn but not before opening

22   statement. All right.  Whatever.  I might need a

23   little time to read it over.

24           THE COURT:  If there is any problem as

25   far as you know a few minutes here or there you will

1      have it.

2                      MR. JOHNSTON:   Okay.

3                      THE COURT:    See you at 10 o'clock

4      tomorrow.

5                      (Whereupon the court stands in recess

6      until tomorrow morning March 22, 2007 at 10 AM)

7                      *********************************

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF QUEENS:   CRIMINAL TERM:  Part K-20

 3   ----------------------------------------x    Indictment No.
     THE PEOPLE OF THE STATE OF NEW YORK    :     2147/2006
 4

 5           -against-                       :

 6                                           :

 7   ABU KHAN                                :

 8                      Defendant    :

 9   ----------------------------------------x

10                             March 22, 2007

11                             125-01 Queens Boulevard
                               Kew Gardens, New York 11415
12

13   B E F O R E:  THE HONORABLE  RONALD HOLLIE,
                                              Justice
14

15   A P P E A R A N C E S:

16               Honorable Richard A. Brown
                 For the People:
17               District Attorney - Queens County
                 125-01 Queens Boulevard
18               Kew Gardens, New York 11415
                 BY:  MINA MALIK, ESQ.
19                    Assistant District Attorney

20
                 For the Defendant:
21               ROBERT JOHNSTON, ESQ.
                 Defense Counsel
22

23

24                             Viola L. Dunnom, SCR

25
```

vld

1              COURT CLERK:  Calendar 1 indictment 2147

2        of 2006.  Abu Khan.

3              MS. MALIK:  Mina Malik for the People.

4              MR. JOHNSTON:  Robert Johnston for Mr.

5        Khan.

6              MR. VIRUET:  Samuel Viruet. Co-counsel

7        for Mr. Khan.

8              THE COURT:  This morning has everything

9        been turned over to counsel.

10             MS. MALIK:  Yes I have a list of the

11       Rosario material and discovery material would the

12       court like me to read it up or hand it up.

13             THE COURT:  Handing up the list is fine.

14             MS. MALIK:  Thank you your Honor it's

15       been signed by both defense counsel.

16             THE COURT:  And as to Friday is it

17       possible to work around that.

18             MS. MALIK:  It is possible.

19             COURT CLERK:  The defendant who is

20       incarcerated is present and produced before the

21       court.

22             MR. JOHNSTON:  Judge, I have one issue

23       that I have to bring to the courts attention.  I

24       have been reading the Grand Jury minutes for the

25       first time a few minutes ago regarding the testimony

1    of Ashley Martinez.  One of the problems that the

2    defense has had in this particular case is trying to

3    pin down exactly at what time on November 30 of 2004

4    Ashley Martinez is alleging that the defendant had

5    sexual relations with her.

6              Now the criminal court complaint that was

7    filed said that the incident of sexual conduct of

8    rape actually had occurred about 11 PM on November

9    30 of 2004.  Prior counsel had filed a notice of a

10   Bill of Particulars and the response to the notice

11   of the Bill of Particulars said that on November 30,

12   2004 at approximately 1 PM in the afternoon.

13             So we are sort of at a loss and sort of

14   surprised that the Bill of Particulars would say

15   that the incident happened at 1 o'clock in the

16   afternoon where we have an alibi for and the Grand

17   Jury testimony and the criminal court complaint it

18   says that this happened at 11 o'clock in the evening

19   when we really do not have an alibi for -- I do not

20   mean an alibi.

21             I mean that we have evidence that it

22   could not have happened at the location at 1 o'clock

23   in the afternoon.  So, I feel that the defendant has

24   been deprived of due process of the law.  I would

25   just ask the court to dismiss the case.

```
 1                    THE COURT:  I think that certainly
 2        motions made by the defense for an inspection of the
 3        Grand Jury issue that issue has been reviewed by a
 4        judge prior to the matter being sent to this part.
 5        It sounds like whether or not it's 11 PM or 1 PM it
 6        seems to be the possibility of a typo where it's
 7        just one of the ones was either repeated or deleted.
 8        It seems to be one date involved.  One address
 9        involved.  And frankly as I mentioned the matter has
10        been if not directly certainly indirectly addressed
11        earlier in these proceedings.  So your motion to
12        dismiss is respectfully denied.  Anything else.
13                    MR. JOHNSTON:  Nothing your Honor.
14                    THE COURT:  All right.  Are we ready.
15                    MS. MALIK:  Yes your Honor.
16                    THE COURT:  Are there any witnesses for
17        either side in the audience.
18                    MS. MALIK:  No your Honor.
19                    MR. JOHNSTON:  No we are not going to
20        call any of the people in the courtroom.
21                    (Whereupon, there is a pause in the
22        proceedings.)
23                    COURT OFFICER:  Jury entering.
24                    COURT CLERK:  Both sides stipulate to the
25        presence and proper seating of the jury.
```

1          MR. JOHNSTON:  Yes.

2          MS. MALIK:  Yes.

3          THE COURT: Good morning members of the

4     jury.  At this time I am required by law to instruct

5     you generally concerning your basic functions,

6     duties and conduct and to acquaint you in a general

7     way to trial procedures and certain rules that will

8     apply to every juror so that you will be better able

9     to assess and weigh the evidence as presented and

10    reach a proper verdict.

11          The trial has commenced with you the

12    selection of the jury.  The next step in the trial

13    is an opening statement by the People during which

14    she will tell you what she intends to prove by way

15    of evidence to support the charges set forth against

16    the defendant.

17          Subsequent to that defense counsel if he

18    desires may also make an opening statement.  What

19    counsel for either party says in an opening

20    statement is not evidence.  You may consider the

21    opening statement as a preview of what each side

22    intends to prove by way of evidence in a case.

23          After the opening statement or statements

24    the DA will present a witness or witnesses who will

25    be questioned by her.  This is called direct

                                                    vld

1    examination.  After the DA completes her questions

2    defense counsel will be given an opportunity to

3    question that same witness and this is called cross

4    examination.  After the People have concluded the

5    calling of their witnesses and the introduction of

6    any exhibits which are admissible into evidence the

7    defendant may offer evidence in his defense.

8              After the defendant rests and the People

9    rest the defendant may make a closing argument

10   following which the People may make a closing

11   argument.  Then I will charge you on the law and you

12   will retire to deliberate for the purpose of

13   reaching a verdict.  That is a general outline of a

14   trial procedure.

15             For the most part evidence consists of

16   the testimony of witnesses under oath and exhibits

17   which are admitted or are introduced into evidence.

18   Questions in and of themselves are not evidence.

19             Therefore, you cannot infer any fact from

20   the mere asking of a question.  It is the answer

21   coupled with the question that constitutes evidence.

22   For example if a witness were asked a question do

23   you own a car and a witness answered no you may not

24   infer from the mere asking of that question that the

25   witness owns a car.

                                                 vld

1      During the course of the trial either

2  attorney may object to a question or an answer on

3  the grounds that it's illegal, improper or

4  inadmissible.  If I sustain the objection I believe

5  that the question or answer was in some manner

6  improper and not admissible.  If I sustain the

7  objection the question may not be answered.  If an

8  answer has already been given I will say strike it

9  from the record and therefore the answer is no

10  longer evidence in the case.

11      If I overrule the objection that means

12  that the question is proper and I will permit it to

13  be answered or if already answered I will permit the

14  answer to stand as evidence in the case.  Please do

15  not resent the fact that either attorney makes

16  objections.  This is their duty.  Do not hold it

17  against either attorney if I rule against them or

18  infer from my ruling that I hold any view for or

19  against either party.

20      As I will explain to you in detail in the

21  final charge as jurors in the case you are the sole

22  judge of the facts and I am the sole judge of the

23  law.  You must accept the law as I give it to you

24  without hesitation or reservation even if you

25  privately disagree with me.  You must keep an open

1    mind about the facts of this case throughout the

2    entire trial.

3    Also you know nothing about this case

4    because you haven't heard any evidence.  Please do

5    not talk to anyone about this case until after you

6    have reached a verdict.  Do not talk to your

7    friends, spouse, significant others or anyone else

8    concerning what you have heard or the questions that

9    the court or the parties have asked you or anyone

10   else.

11   It's sufficient to tell your friends,

12   spouse or significant other that you have been

13   chosen to be a jury or an alternate juror and that

14   you expect to hear evidence soon.  You must not

15   express any opinion as to your determination even

16   among yourselves until I finally give the case to

17   you.  You must not visit or view the place where the

18   incident occurred or any other premises or place

19   involved in the case.  You must promptly report to

20   the court any incident within your knowledge

21   involving any attempt by any person to improperly

22   influence any member of the jury.

23   If you do not hear the testimony at any

24   point in the trial please raise your hand and to

25   notify me.  I must further instruct you that I have

1      told the attorneys that outside of this room that

2      they are not to talk to any one of you even to say

3      hello, good morning, et cetera.

4                    They are not to say anything at all to

5      you.  In the same manner I am instructing you not to

6      say anything to them.  Also, outside of this room

7      while I will know who you are and you may know who I

8      am I will not speak with you.  Please do not

9      consider this rude it is only through that way that

10     we can insure that there is no miscommunication or

11     the appearance of such between any of the attorneys

12     with the jurors, the parties or the court.

13                   If there is any communication observed

14     please report it to the court officer and the court

15     officer will inform me.  Please do not tell any of

16     your fellow jurors about this communication.

17                   Under the law only 12 jurors will

18     deliberate on this case when this is submitted for

19     consideration.  Alternates jurors are called on to

20     serve because a regular juror may be prevented from

21     continuing to serve by some dire emergency or

22     serious illness.

23                   The alternates are required to pay the

24     same careful attention to the trial as regular

25     jurors so if needed they will be fully familiar with

1   the case.  The fact that there are alternate jurors

2   does not mean that any regular juror is free to

3   excuse him or herself from the trial.  As a duly

4   chosen juror it's your obligation to be available to

5   deliberate when this case is concluded.

6               Only the lawyers and in the court may

7   take notes.  I am sorry.  Only the lawyers and the

8   court may ask questions.  The jurors may not ask

9   questions.  You may not take notes during the trial.

10  There are some sound reasons for this rule.

11              One, it's often difficult to take notes

12  and at the same time to look at a witness and fully

13  comprehend and appreciate what the witness is saying

14  and how a witness is saying it.

15              Since you are the finders of the facts

16  who are responsible for evaluating the believability

17  and accuracy of a witnesses testimony it is

18  important that you be able to both fully comprehend

19  what a witness is saying and how the witness is

20  saying it without the distraction of takings notes.

21              Also there is no real need to take notes

22  since every word of each witness is recorded by the

23  court reporter and during deliberations upon your

24  request that testimony can be read back to you.  The

25  lawyers and the court may take notes.  The

vld

```
1        difference is this.  The lawyers and the court are

2        not the finders of the facts.  The lawyers and the

3        court are not responsible for evaluating the

4        witnesses in order to come to a verdict of guilty or

5        not guilty.  The lawyers and the court have other

6        functions for which some note taking may be useful.

7               You are not to attach any importance to

8        the lawyers or the court taking or not taking notes.

9        You must decide the case on the evidence and on the

10       law.  And finally this has not been an issue but

11       please be on time as I am sure that you already know

12       if one of you is missing we cannot commence or

13       continue the case.

14               If the attorneys are ready we will now

15       proceed with opening statements first to be

16       delivered by the People Ms. Malik.

17               MS. MALIK:  Thank you your Honor.

18  OPENING STATEMENT

19  BY MS. MALIK:

20               MS. MALIK:  Good morning ladies and

21       gentlemen of the jury.  We are here today ladies and

22       gentlemen of the jury for one reason and one reason

23       alone.  Because of this man sitting right here

24       before you Abu Khan.  And the reason why we are here

25       ladies and gentlemen is because he was the
```

1    stepfather of a young lady, a little girl named

2    Ashley Martinez and he was supposed to be her

3    protector.  He was supposed to be her provider.  He

4    was supposed to be there for her for all intents and

5    purposes but he wasn't.

6              What he did was introduce her to the dark

7    and evil world of child sexual abuse.  And before I

8    get into how he did that ladies and gentlemen of the

9    jury I would like to just bring you back for a

10    moment to almost a year ago it was Easter Sunday,

11    April 16, 2006.

12             Ashley Martinez was living in Florida at

13    the time with her mother Leslie.  Her little brother

14    Jaeshawn and her 2 other siblings who are the

15    defendants children Andrew and Ariel.  And they had

16    just had an Easter dinner.  The defendant was not

17    there because at that point in time he had not been

18    a part of the Martinez family life for about a year

19    and a half.

20             He was out of the picture on April 16,

21    2006 And Ashley was having issues.  She was having

22    some behavior issues and her mother and her got into

23    an argument on Easter Sunday.  They got into an

24    argument.  It escalated from there to the point that

25    the mother said what is the matter with you.  What

1    is wrong with you.  Why are you acting like this.

2              And Ashley after this lovely Easter

3    dinner said you don't even know me.  You don't know

4    who I am.  You do not know what I have been going

5    through.  And her mother said what could you at 13

6    possibly be going through.  What could you as a 13

7    year old girl possibly be going through.  How bad is

8    your life.  Did you kill somebody.  Did you hurt

9    somebody.  Did something happen to you.  Did

10   somebody hurt you.  Did somebody rape you.  And she

11   was asking these questions in a passive manner not

12   expecting the response that she got.

13             And Ashley's answer was yes.  Yes.

14   Somebody hurt me.  And somebody raped me.  You just

15   don't know about it.  And the answers that she came

16   up with was June which is the defendants nickname.

17   That is his nickname.  Jimmy hurt me.  You don't

18   know.  Night after night.  Day after day what he did

19   to me was her response.

20             And that's what Leslie Martinez had to

21   listen to on Easter Sunday.  That her daughter had

22   been sexually abused by the man that she used to

23   love and loved for years on end.  And that's how

24   this whole thing came to light ladies and gentlemen.

25             Ironically enough the defendants first

1    name is Abu A-B-U which in Arabic means father.  But

2    a father he was not.  A provider he was not.

3              MR. JOHNSTON:  Judge this is not a

4    summation.  I would be object.

5              THE COURT:  Sustained.

6              MS. MALIK:  The evidence will show that

7    he was not a father to her ladies and gentlemen.

8    That he wasn't a provider to her.  That he wasn't a

9    protector to her.  Later on in the years that he was

10   living in the Martinez household what the evidence

11   will show ladies and gentlemen is that between 1997

12   and 2004 is when this entire abuse of a sexual

13   nature began with Ashley Martinez.

14             You are going to learn that Ashley

15   Martinez around that time was about 5 or 6 years

16   old.  They were living here at that time in New

17   York.  They lived in College Point, Queens and in

18   Ozone Park, Queens.  You are going to learn ladies

19   and gentlemen that during that 3 year period this

20   defendant sitting right here violated and took the

21   innocence of a little girl.

22             And what he did was that he started

23   touching her.  He started touching her body.  He

24   started touching her breasts.  He started touching

25   other areas of her body.  He made her touch his

penis.  And this happened on 2 or more occasions ladies and gentlemen spread out over the course of those 3 years.

And she is going to come in and tell you as much as she can remember about those instances. You have to keep in mind that she was young when this was happening to her.  This was something that she did not want to happen to her.  She is not going to remember every single detail.  And every single date and every single time.  But she is going to tell you what this man did to her and what he put her through.

And between 1997 and 2000 you are going to learn that she was under the age of 11 years old. And that the defendant he was an adult at that point in time.  And he was living here in Queens.  And that's how this whole thing unraveled and unfolded ladies and gentlemen.  But it escalated from there. Because when Ashley's mother Leslie started to live with the defendant and the relationship started in 1996 and they lived in College Point she had 2 children then.  She had Ashley and she had Jaeshawn.

Those 2 children are not the defendants children.  In 1998 is when she had her little girl Ariel with the defendant.  And that's when the abuse

1    started getting worse. After the third child comes

2    into being.  And she is living here in Queens.  They

3    are living together as a family.  Ms. Martinez's

4    mother is unaware of what is going on.

5          You will learn from Ashley that one of

6    the evenings that she did not tell is that the

7    defendant would threaten her that he would say don't

8    tell your mother she is not going to believe you

9    anyway.  Because he knew that the mother was in love

10   with him.  That Leslie Martinez was in love with

11   him.  He knew that he could take this little girl.

12   This 5, 6, 7 year old little girl and mold her into

13   whatever he wanted her to be.

14         THE COURT:  Sustained.

15         MS. MALIK:  You are going to learn ladies

16   and gentlemen of the jury that when they moved down

17   to Florida in about 2001 that they all moved down

18   and they lived together in Florida.  And that's

19   where things got even worse.  Because the defendant

20   decided that he was going to have Ashley Martinez

21   graduate from the touching and the feeling up and

22   all of that kind of violation to actual sexual

23   intercourse.

24         And it was down in Florida ladies and

25   gentlemen when these acts escalated.  And he started

1   having sex with her.  He put his penis into her

2   vagina.  Going late at night into her room.  When

3   everybody else was asleep in the house.  Touching

4   her where she shouldn't have been touched.  Doing

5   what he wanted to do for his own sexual

6   gratification.  Putting his penis into her vagina

7   over and over and over again.  And still she didn't

8   tell.  She didn't tell because she knew what he was

9   capable of.

10          You are going to hear about the physical

11  abuse that she witnessed this man committing.  You

12  are going to hear about the verbal abuse that she

13  heard this man commit towards her own mother.  You

14  are going to hear about how she felt she couldn't

15  tell her own mother what was going on because here

16  was the man abusing her mother and here was a man

17  who is telling you that your mother is not going to

18  believe you anyway.

19          And here was a little girl saying what am

20  I going to do.  That's what you are going to hear

21  ladies and gentlemen.  And then you are going to

22  learn ladies and gentlemen that Ashley because of

23  all of this was acting out and had discipline

24  problems.  Talking back to her mother.  You have to

25  understand all of the anger that she was feeling

1    inside and that she was keeping that all bottled up.

2    What she did she decided at one point that it was

3    best if she would go live with her grandmother.

4            Ann Martinez back to New York in the

5    College Point address.  But the defendant was living

6    up here.  Ashley knew that she was going -- that he

7    was going back down to Florida.  And she said I am

8    going to go live with my grandmother.  She got in

9    trouble in school.

10           The mother said, Leslie Martinez said,

11   okay you know what you are going back to New York.

12   You are going to live with your grandmother for a

13   while.  She came up here.  And she knew that the

14   defendant was going back down there to Florida.

15           At that point she said that I am not

16   saying anything about this I am not going to take

17   this any more.  She came up on November 30, 2004.

18   And the defendant picked her up at the airport.  And

19   he took her home to Ann Martinez's house, Ashley's

20   grandmother.  And he waited. He waited.  They had

21   some conversation.  They ate some food.  Ashley had

22   endured this for so many years.  She is there again.

23   Alone with him.  And he waited until later on that

24   night as he always did.  Coming to her in the middle

25   of the night to violate her.

1      And that's exactly what he did ladies and

2    gentlemen of the jury.  Because later on that night

3    he decided that he was going to go downstairs to the

4    living room which was where Ashley was and he

5    decided that he was going to touch her again as he

6    always had in the past.  He touched her breasts.

7    And she as always just gave in. She gave in. Even

8    though she didn't want to she gave in.  This is what

9    she was used to for her entire life almost.

10      THE COURT:  Sustained.

11      MS. MALIK:  Since she was 5 years old.

12    So, he took off her clothes and he put his penis

13    into her vagina again.  She is 12 years old at the

14    time.  And he was about 37 years old.  That's why

15    you are here today ladies and gentlemen.  And that's

16    the last time that this ever happened to her.

17    Because the very next day the defendant left New

18    York and came back down he went back down to

19    Florida.  And at that point his relationship with

20    Leslie Martinez was for all intents and purposes all

21    over.

22      And he was out of the picture.  Out of

23    their lives.  And then that's how we get to Easter

24    Sunday of last year ladies and gentlemen. When she

25    finally, finally out cries.  When her mother hit the

1   nail on the head and she asked her those very

2   pointed questions.  Did somebody hurt you.  Did

3   somebody rape you.  Not expecting the answer that

4   she is going to give.  You will learn that Leslie

5   Martinez reported it to Florida authorities.

6   Everything that happened, that Ashley was

7   interviewed.  Jaeshawn was interviewed.  Ariel and

8   Andrew were both interviewed.

9            And you will learn ladies and gentlemen

10  that Ashley went through several medical examines.

11  She went through one down in Florida.  She went

12  through one up here in New York because the New York

13  police report have to file in this jurisdiction.

14  She was examined.  And uncomfortable exam as anyone

15  who ever had a gynecology exam knows.  Inserting a

16  speculum.  Examining the vagina and that's what she

17  had to endure.

18           You will learn that her medical exam was

19  normal.  That there was no indication of any kind

20  of a trauma and you will learn that there is an

21  explanation for that.  As a teenager you have a

22  hymen.  And it's elastic and it can stretch and it

23  will allow for objects to enter.  You will hear all

24  of that.  You will hear from an expert as to why

25  there was a delay in out cry.

1        That is what the evidence is going to

2    show ladies and gentlemen of the jury.  The

3    evidence is going to show that she is being

4    truthful with you.  That there was no reason for

5    her to make this up.  And she has not made this up.

6    And she is going to have the courage one last time

7    to face this man.

8        MR. JOHNSTON:  Objection.

9        THE COURT:  Sustained.

10       MS. MALIK:  And the evidence will show

11   ladies and gentlemen that when she comes in to this

12   courtroom she is going to tell you everything that

13   he did to her since she was 5 or 6 years old.  She

14   is going to tell you how he touched her on her

15   breasts and on her vagina and took her innocence

16   away as a little girl.  She is going to tell you how

17   he put his penis into her vagina when she was 12,

18   when she was 11, when she was 10.

19       MR. JOHNSTON:  Objection judge.

20       THE COURT:  Overruled.

21       MS. MALIK:  That's what she is going to

22   sit here and tell you ladies and gentlemen.  That's

23   what the evidence is going to show in this case.

24   That he was no father to her despite his first name

25   and I am going to ask you ladies and gentlemen that

1            at the end of this case to come back with the only

2            verdict that you can after you listen to the words

3            from Ashley Martinez.

4                        Listen to her closely.  She is 14 years

5            old now.  She is not the little girl any more.  The

6            5 or 6 year old little girl when this all started.

7            She is not the little girl without a voice.  She is

8            a young lady who can come in here and tell you what

9            happened.

10                       MR. JOHNSTON:  Objection.

11                       THE COURT:  Sustained.

12                       MS. MALIK:  So please ladies and

13           gentlemen at the end of this case return the only

14           just and only right and the only correct verdict

15           that you can and that is a verdict of guilty.  Thank

16           you.

17                       THE COURT:  All right.  Mr. Johnston.

18   OPENING STATEMENT

19   BY MR. JOHNSTON:

20                       MR. JOHNSTON:  Good morning folks.  At

21           this posture the law gives me the opportunity but

22           not the obligation to make what is called an opening

23           statement.  And my opening statement is some what

24           different from the ADA's opening statement.  And the

25           difference is as you have already learned that

1    because the People have the burden of proving this

2    particular defendant guilty beyond a reasonable

3    doubt.  She has the burden of saying what she

4    intends to prove.

5          Since the defendant is presumed to be

6    innocent and it's the Peoples burden to prove his

7    guilt beyond a reasonable doubt and I don't have to

8    prove that he is innocent.  I am going to tell you

9    what I believe the evidence is going to show.

10         First of all the fairy tale that Ashley

11   Martinez is going to tell you is not going to make

12   any sense and it's not going to be backed up by any

13   other evidence except her own words.

14         You see count 2 of the indictment says

15   that the defendant Abu Khan on or about and between

16   January first of 1997 and December 31 of 2000 in

17   the county of Queens supposedly engaged in some

18   improper sexual conduct with Ms. Ashley Martinez.

19         Well, Mr. Abu Khan did not even know

20   Ashley Martinez in January of 1997.  He didn't know

21   her mother in January of 1997.  He didn't meet

22   Lesley Martinez until October of 1997.  Up until

23   that point in time Ashley Martinez and Lesley

24   Martinez lived with a fellow by the name of Michael

25   Benn who is the natural father of Lesley Martinez.

1    And that was a dysfunctional relationship.

2              MS. MALIK:  Objection.

3              THE COURT:  Overruled.

4              MR. JOHNSTON:  I am going to indicate in

5         cross examination judge --

6              THE COURT:  Overruled.

7              MR. JOHNSTON:  It was the reason why that

8         relationship was so dysfunctional that Lesley

9         Martinez decided to move in and live with Mr. Abu

10        Khan in about November or December of the year of

11        1997.

12             Now, they lived together here in Queens

13        from November of 1997 till about January of 2001.

14        During that period of time Ashley Martinez did not

15        say anything to anyone about any sexual abuse

16        whatsoever.  She went to school.  Didn't tell the

17        teacher.  I don't know if she attended church but

18        there is no evidence that she said or reported

19        anything like this to anybody if she did attend

20        church.  Didn't say anything to her mother.  Didn't

21        say anything to any friends.

22             And then that family unit moved down to

23        Florida.  They were down in Fort Lauderdale,

24        Florida from January of 2001 and they lived

25        together as a group until around September first of

vld

1     2004.  Again nothing said to anyone about any

2     sexual abuse.  Any misconduct.  Any sexual

3     intercourse.  Nothing at all.

4              As it so happened Abu Khan when he was

5     living in Queens was involved in the refrigeration

6     business.  And an old employer of hers -- of his

7     rather Phoenix Refrigeration called him up and said

8     that we have a job.  It will be a 3 month contract

9     can you come up we are short a man. Can you come up

10    from Florida and stay in Queens and work on this

11    job for us.  And after some discussion agreed to

12    come up to Queens.

13             So from the early part of September of

14    2004 he was up in Queens till December first of

15    2004.  Ashley Martinez is in Florida.  He is up in

16    New York city.  He is not around the family.  She

17    says absolutely nothing at all to anyone about any

18    sexual abuse or sexual misconduct or sexual

19    intercourse.

20             Apparently Ashley at the time is a

21    handful for her mother.  So her mother calls up and

22    says that she cannot handle Ashley that she wants

23    to send Ashley up to stay with the grandmother here

24    in Queens and would Abu pick her up at the airport.

25    He says sure why not.  No problem.  She flies up on

1    November 30.  He picks her up at the airport. He

2    takes her back to the house. They unpack her bag.

3    She is wearing Florida clothing they decided that

4    she needed different clothing to wear because it's

5    a lot colder up here than down in Florida.

6         He and her go out to a pharmacy they have

7    to get products that females need. They go for

8    lunch and they go shopping for winterized clothing

9    and they go back to the house.  About 5 or 5:30

10   grandma comes home, the man she lives with comes

11   home, grandma's live in boyfriend.  And they have

12   dinner together but Abu has been away from -- well

13   he decided that he wants to go out and see some of

14   his friends so he leaves the house and he goes out.

15        I don't recall if they played pool or

16   tried to play pool. He came back later on that

17   night and goes to sleep.  His contract is up. He is

18   going back to Florida the next morning.  So

19   December first he leaves Queens. Rents a car and

20   drives back to Florida.  Ashley is with grandma up

21   in Queens. He was not in Queens. He was back down

22   in Florida.

23        He gets back down about December 2nd.

24   December 2nd he tries to get back in to the house

25   with Lesley Martinez, Ashley's mom, and Lesley

1    tells him listen I don't think that our

2    relationship is working out that good. I need my

3    space so I do not want you living with me any more.

4    He says okay.  He leaves and he moves in with his

5    sister who also lives in Fort Lauderdale.

6            The next day he is going to the house to

7    pick up his personal effects. Goes back to his

8    sisters house. He is with his sister until January

9    2 of 2005.  So he is not with mom anymore. He was

10   not up in Queens where Ashley is and he goes back

11   into New York to get back in the refrigeration

12   business and he stays in the Bronx. He stays there

13   for a while.  Moves back to Queens. All the while

14   until September of 2005 Ashley is up in New York

15   with grandma.  Lesley is down in Florida.  He was

16   not involved in their life at all.

17           She says nothing at all about any rape to

18   anybody or any sexual abuse. Nothing like that at

19   all.  Finally in March of 2006 by sheer

20   happenstance there is -- they all meet together at

21   some sort of a fair.  And Lesley is there, Ashley

22   is there.  The 2 boys are there. The defendant is

23   there. His sister is there.  And another friend of

24   his a fellow by the name of Tom Adopolis (ph).  And

25   while they are there there is some bad blood

1    between Lesley and Abu.  And says to him I am going

2    to get you.  You are never going to see your kids

3    again.

4            Apparently she was mad because she felt

5    that he should be sending her more money for

6    supporting not only the 2 natural children but the

7    2 stepchildren. And she is angry about that.  He

8    does not think anything of it.  There is no big

9    problem there.

10            In March of 2006 low and behold in April

11    of 2006 at Easter sometime apparently Ashley all of

12    a sudden decides that for the last almost 10 years

13    she has been physically abused by the defendant.

14    And Ashley and mom go trotting off to the police in

15    Florida and make this claim that he has been

16    abusing her for 10 years.

17            The police in Florida contact the New

18    York City police.  New York City police do a little

19    investigation, very little.  And the defendant is

20    arrested.  He said what are you talking about.  I

21    didn't do anything.  You are under arrest.  So

22    either the DA's office and the police department

23    decide lets have a physical examination of Ashley.

24    Lets see if there is some other evidence besides

25    her words that this physical abuse happened.

1              Well, she is examined by Dr. Rosenfeld.

2       Dr. Rosenfeld apparently is a flag bearer for child

3       abuse.

4              MS. MALIK:  Objection your Honor.

5              THE COURT: Sustained.

6              MR. JOHNSTON:  Well, she only testifies

7       for the prosecution.

8              MS. MALIK:  Objection.

9              THE COURT: Sustained.

10             MR. JOHNSTON:  In any event Dr. Rosenfeld

11      does this physical examination and examines the

12      child.  No evidence of sexual abuse.  No evidence of

13      a broken hymen. No evidence of any scarring from

14      maybe old injury.  No nothing.  Gee, that does not

15      fit in with the theory of this here.

16             MS. MALIK:  Objection your Honor.

17             THE COURT:  Sustained.

18             MR. JOHNSTON:  That does not go along

19      with Ashley's  testimony.

20             MS. MALIK:  Objection.

21             THE COURT: Sustained.

22             MR. JOHNSTON:  So Dr. Rosenfeld, the DA

23      thought this up.  Dr. Rosenfeld says, well you know,

24      you know the hymen is elastic.  It can expand and

25      contract.  And therefore that's the reason why

1       that's the reason why there might be no evidence of

2       sexual penetration.  That might be the reason why

3       the hymen is still in tact.

4                   Now, Dr. Rosenfeld is going to testify as

5       an expert. The judge is going to give you

6       instructions on how you should consider expert

7       testimony. The bottom line is that just because an

8       expert says something is true does not mean that

9       you have to believe that expert.  You can use your

10      own common sense and make your own decision as to

11      whether or not you believe the so called expert.

12                  Now so what do we have here, we have a

13      girl who claims that she is raped repeatedly with

14      an intact hymen. No scarring.  No evidence of any

15      injury.  No nothing.

16                  Now, what about Abu Khan.  Well, he was

17      born -- he is going to tell you, he is going to

18      testify.  He was born in Trinidad and he came to

19      the US in 1986.  Had some menial jobs.

20                  THE COURT: Sustained.

21                  MR. JOHNSTON:  He is going to testify.

22                  THE COURT: I know.  But that's not

23      relevant.  Approach please.

24                  (Whereupon, a side-bar record begins.)

25      Strike that.

1          (Whereupon, an off the record discussion

2     was held at the bench.).

3          MR. JOHNSTON:  I am going to sort of wrap

4     it up right now. Basically what I believe the

5     evidence is going to show is that the only one and

6     the only evidence against Mr. Abu Khan is the

7     testimony of Ashley Martinez.  The doctors are not

8     going to support her story.  Her mother was not a

9     witness to this.  She didn't report any of this for

10    10 years.

11          Even though he was out of her life for a

12    period of time over the course of those 10 years

13    she never said anything to anyone.  And the

14    defendant is going to tell you that he didn't do

15    it.

16          So I just ask you to keep an open mind.

17    Sympathy plays no part in your deliberations here.

18    Don't make your mind up until all the evidence is

19    in. Okay. Thank you very much.

20          THE COURT: Thank you counsel both.  And

21    just to caution and remind you all that after

22    hearing the opening statements of both counsel that

23    what each counsel said in their opening statement is

24    not the evidence.  Each one has said what they told

25    you what they believe the evidence will show, but

Leslie Martinez/Direct/Ms. Malik                    352

1              the evidence will come from the witness stand.  You

2              can be certainly guided by what it is they said.

3              Again what they said is not evidence in this case.

4                        With that People call your first witness.

5                        MS. MALIK:  The People call Lesley

6              Martinez.

7                        THE COURT: Counsel please approach.

8                        (Whereupon, an off the record discussion

9              was held at the bench.)

10                       COURT OFFICER:  Witness entering.

11  L E S L I E  M A R T I N E Z, having been duly sworn, was

12             examined and testified as follows:.

13                       COURT OFFICER:  People call Leslie

14             Martinez.  As their witness.  M-A-R-T-I-N-E-Z.  She

15             is a resident of the state of Florida.

16                       THE COURT:  Counsel you may inquire.

17

18  DIRECT EXAMINATION

19  BY:  MS. MALIK:

20       Q.   Good morning.

21       A.   Good morning.

22       Q.   Can you tell us how old you are?

23       A.   I am 31.

24                       THE COURT:   Ma'am your voice is very

25             soft.  We have to hear everything that you say.  If

                                                              vld

1           you do not mind would you scoot you up and speak

2           into the microphone so that your voice can be

3           heard.

4    Q.     What state do you live in?

5    A.     Florida.

6    Q.     How long have you been living in Florida?

7    A.     6 years.

8    Q.     Who do you live with there?

9    A.     My boyfriend and my 4 children.

10   Q.     What is your boyfriends name?

11   A.     Nigel.

12   Q.     What is your educational background?

13   A.     My highest level is some college.

14   Q.     Do you work?

15   A.     Yes.

16   Q.     What do you do?

17   A.     I am an office manager for a construction company.

18   Q.     What is the name of the construction company?

19   A.     Supreme Construction Corp.

20   Q.     Where is that?

21   A.     Deerfield Beach, Florida.

22   Q.     How long have you been a construction company

23   manager?

24   A.     For this company I have been there for a year.

25   Q.     What were you doing before then?

1    A.   Same, construction field.  I did billing and
2    administrative work for another company.
3    Q.   And what kind of billing and administrative work
4    did you do for the other company?
5    A.   We worked for the Department of Transportation for
6    the state of Florida and the maintenance of traffic on the
7    roads.  We billed according to bids and contracts.
8    Q.   What are your duties now where you work?
9    A.   Right now I do direct insurance billing.  I handle
10   insurance.  Homeowners insurance claims.
11   Q.   How many days a week do you work Ms. Martinez?
12   A.   I work 5 days a week in the office.  And the phone
13   lines for the emergency services line are forwarded to my
14   cell phone so I take that home in the evening and on the
15   weekends.
16   Q.   So how many hours approximately would you say that
17   you work?
18              THE COURT:  Working now.
19              MS. MALIK:  Yes.
20   A.   Well, 40 hours during the week and whatever comes
21   in on the emergency lines.
22   Q.   When did you come to New York this time around?
23   A.   2 weeks ago.
24   Q.   So have you been missing work?
25   A.   Yes I have been working from home through a laptop

1  the best that I can.

2        Q.   Now you said that you have some children?

3        A.   Yes.

4        Q.   How many children?

5        A.   I have 4 kids.

6        Q.   And what are their names?

7        A.   Ashley is the oldest.  My second is Jaeshawn.  And

8  I have 2 little ones.  Ariel and Andrew.

9        Q.   Ashley is Ashley Martinez?

10       A.   Yes.

11       Q.   And how old is she?

12       A.   She is 14.  She is going to be 15 next month.

13       Q.   What school did she go to?

14       A.   Boyd Anderson High School.

15       Q.   What grade is she in?

16       A.   In the 9th grade.

17       Q.   What about Jaeshawn?

18       A.   Jaeshawn's last name is Benn.  And he is 13.  And

19  he goes to Lauderdale Langer Middle School.

20       Q.   What grade is in he?

21       A.   He is in the 7th.

22       Q.   And what about Ariel how old is she?

23       A.   Ariel is 8.  She goes to Broadview Elementary.  She

24  is in second grade.

25       Q.   And Andrew?

1     A.   Andrew is 6.  He is in first grade and he also goes
2  to Broadview Elementary.
3     Q.   Do you know someone by the name of Abu Khan?
4     A.   Yes I do.
5     Q.   Do you know him by any other name?
6     A.   Yes.
7     Q.   What is that?
8     A.   By Jimmy.
9     Q.   Do you see him in the courtroom today?
10    A.   Uh huh.  Yes.
11    Q.   Can you point him out and identify him by an
12 article of clothing?
13    A.   He is sitting right there with the grayish coal
14 black shirt button down.
15              THE COURT:  Indicating the defendant.
16    Q.   Now how long had you known the defendant?
17    A.   I have known him since I was about 13.
18    Q.   How did you know him?
19    A.   His family and my family are friends from before
20 they all became citizens.  They went back some of them to
21 Trinidad back in their own country.
22    Q.   What year were you born in?
23    A.   I was born in 75.
24    Q.   So you have known the defendant since about 1988?
25    A.   Yes.  Yes.  Uh huh.

1      Q.  You didn't meet him in 1997 did you?

2      A.  No I knew him before -- him before.

3      Q.  You knew him for a while before that?

4      A.  Yes.

5      Q.  Can you tell us what your relationship was like

6  with the defendant.  How did it start?

7      A.  It actually started in the ending of 96 you know we

8  used to see each other at family parties.

9      Q.  When you used to see each other at family parties?

10               THE COURT:  Wait, wait you are both

11          talking at the same time.  Ask your question and

12          don't begin answering until she finishes asking.

13      Q.  When you used to see the defendant at family

14  parties what was your relationship then?

15      A.  Flirting.  We flirted. I was married.

16      Q.  Okay.  And how many years older than you was the

17  defendant?

18      A.  He was 8, 9 years older than me.  9 years I think.

19      Q.  So when you used to flirt with him how old were you

20  then?

21      A.  I was probably about 21.

22      Q.  Did there come a time when you started a romantic

23  relationship with him?

24      A.  Uh huh.

25      Q.  When did you start that?

1      A.   We started seeing each other like in October of 96

2   around that time but it was the ending of 96.

3      Q.   And did there come a time that you started living

4   together?

5      A.   Yes.

6      Q.   When was that?

7      A.   It was almost immediately it was in the beginning

8   of 97.   We went to live with my mom.

9      Q.   And where does your mother live?

10     A.   She lives in College Point, Queens.

11     Q.   Where was it that you lived with the defendant and

12  your mom?

13     A.   3-04 121st Street in College Point.

14     Q.   Is that in the county of Queens?

15     A.   Yes.

16     Q.   So when you started this romantic relationship with

17  the defendant and you moved in your mothers house who moved

18  in with you?

19     A.   My 2 children.   Myself.   And then Jimmy as well.

20     Q.   And what 2 children did you have at the time?

21     A.   Ashley and Jaeshawn.

22     Q.   For how long did you live with the defendant at

23  your mothers house in College Point, Queens?

24     A.   We lived there for -- we got a place in South Ozone

25  Park in 99 I think that it was the ending of 99 -- no 98, 98

1    yes we moved out.

2         Q.    So from 1997 until about 1998?

3         A.    No 99 I am sorry.  99 ending of 99.

4         Q.    So from 1997 until 99 you were living with the

5    defendant in your mothers house with your 2 children?

6         A.    Yes.

7         Q.    Is that the same house where your mother lives now?

8         A.    Yes.

9         Q.    What is your mothers name?

10        A.    Ann Martinez.

11        Q.    Do you remember the layout of the house?

12        A.    Yes.

13        Q.    Can you describe it for us?

14        A.    You walk up concrete steps.  It's a bunch of condos

15    and they are all adjoined together.  You walk up the concrete

16    steps and you go into her unit and then you walk up a

17    different set up steps up through the foyer and you have the

18    main floor which is the living room and you can make it a

19    dining room.

20             She extended into a living room and a full kitchen

21    and bathroom.  And you walk up the steps and there are 3

22    bedrooms and 2 bathrooms upstairs.

23        Q.    Is there any other level other than that?

24        A.    There is an additional level up in the second

25    floor.  There is a loft in one of the bedrooms.  A private

1   loft.

2       Q.   How do you get up to that?

3       A.   There are spiral steps in the center of the room.

4       Q.   So can you describe for us the relationship with

5   the defendant in the beginning how was it?

6       A.   It was good.  He was very kind and sweet and he

7   took care of me.  He took care of my kids.  I was working you

8   know I wasn't doing what I am doing now so you know he was

9   there for me through everything that we needed.  He is a good

10  provider.  He took care of us.

11      Q.   What kind of things would you do together?

12      A.   We did everything together.  We did everything he

13  is very family oriented.  We did a lot of family stuff.  We

14  did not start travelling until later on in the relationship.

15  We did a lot of things together.

16      Q.   Did you have any children with the defendant?

17      A.   Yes, I have 2.

18      Q.   And who is the first child that you had with the

19  defendant?

20      A.   Ariel.

21      Q.   Can you tell us when Ariel was born?

22      A.   Ariel was born in December of 98.

23      Q.   What is her birthday?

24      A.   December 25, 1998.

25      Q.   Can you tell us Ms. Martinez after Ariel was born

vld

1    in December of 1998 was there anything that changed in your

2    relationship with the defendant after she was born?

3        A.   Our relationship just took a turn.  It wasn't the

4    same anymore.

5        Q.   At that point you have a new born baby and how old

6    was Ashley and Jaeshawn at that point?

7        A.   Ashley must have been about 7 or 8.  Jaeshawn was

8    about 5.

9        Q.   Did you have another child with the defendant?

10       A.   Yes I did.

11       Q.   When was that?

12       A.   In 2000 June of 2000.

13       Q.   June what?

14       A.   June 26, 2000.

15       Q.   Who is that other child?

16       A.   That is Andrew.

17       Q.   Now, how was the defendant in your relationship

18   after Andrew was born?

19       A.   We you know the relationship we kept it together.

20   It was rocky, but we kept it together.

21       Q.   So they are about 2 years apart.  Andrew and Ariel?

22       A.   Yes.

23       Q.   So you had Andrew and Ashley was about 2 years old

24   when you had -- I am sorry, Ariel was about 2 years old?

25       A.   Yes.

1        Q.    How old was Ashley and Jaeshawn when you had
2    Andrew?
3        A.    Ashley was about 8 or 9 I do not have the age down
4    pat.  8 or 9.
5                    THE COURT:  If you can Ms. Martinez would
6                you know the month and year of each one of your
7                other children's birth.  Ashley.
8                    THE WITNESS:  Ashley's birthday is April
9                of 1992.
10                    THE COURT:  And Jaeshawn.
11                    THE WITNESS:  Jaeshawn's is February of
12                1994.  Ariel is December of 1998.  And Andrew is
13                June of 2000.
14        Q.    And what is Ashley's exact birthday?
15        A.    April 26 of 1992.
16        Q.    What about Jaeshawn?
17        A.    February 9, 1994.
18        Q.    So you have Andrew.  And you have Ariel and
19    Jaeshawn and Ashley and at that point in time where were you
20    living?
21        A.    With Ariel -- once we had Ariel we moved a couple
22    of months after she is born.  We moved to South Ozone Park.
23        Q.    Do you remember what address was there?
24        A.    130- 18 117th Street I am not sure if I have the
25    numbers right.  It's around that.

1       Q.    Is that location was that in the county of Queens?

2       A.    Yes.

3       Q.    So after Andrew was born how was your relationship

4  with the defendant then?

5       A.    It was the same.  It was the same but you know.  I

6  have my children.  I had 2 children who call him daddy. And I

7  had you know 2 little ones with him.  And you know you just

8  like any other relationship that you have, you do the best

9  that you can to keep it together.  That's what I did.  So

10 despite you know the way that the relationship was I did what

11 I had to do to take care of my children and keep a family

12 together and we were a family.

13      Q.    I would like to bring your attention to about 1999

14 and 2000.  Did you notice anything about Ashley's behavior at

15 that point?

16      A.    Yes.

17      Q.    Can you tell us what you noticed?

18      A.    Ashley she had she got like -- being mouthy. It was

19 a preadolescent in such a young age.  She would argue and

20 constantly bicker.  She would not listen.  She wasn't taking

21 care of herself with her hygiene.  I would have to get her to

22 brush her hair.  Just things that little kids do not normally

23 do she is a little more defiant.

24      Q.    And in 1999 -- 2000 can you tell us how old Ashley

25 was at that point in time approximately?

vld

1    A.    Ashley in 2000 was about 9 years old.  9, 10 years
2    old.

3    Q.    She was born in 92?

4    A.    Yes my math is bad right now sorry.

5              THE COURT:  If she is born in 1992 from
6              1999 to 2000 she is about 7 or 8 years old is that
7              fair to say.

8              THE WITNESS:  Yes.

9    Q.    Did there come a time that you moved from New York
10   City?

11   A.    Yes.

12   Q.    Where did you move?

13   A.    We moved to Florida.

14   Q.    What was the reason?

15   A.    I wanted to leave New York.  I was tired of the
16   cold.  We would travel to Florida his family lives in
17   Florida.

18   Q.    Whose family?

19   A.    Jimmy's family.  We would go down to visit for the
20   Miami Carnival.  There is a West Indian Festival.  I never
21   wanted leave.  The weather was perfect.  You felt like that
22   it was on a constant vacation.  I just wanted to get away
23   from New York.  It was just time.

24   Q.    When did you move down approximately to Florida?

25   A.    We moved down in May of 2000.

1     Q.   2000?

2     A.   Uh huh.

3     Q.   Where in Florida did you move?

4     A.   We moved to a city of Lauder Hill.

5     Q.   Who did you move there with?

6     A.   Me.  It was me, Jimmy and the 4 children.

7     Q.   Where did your children go to school when you moved

8 down there?

9     A.   Well, Ariel and Andrew were babies.  But Ashley and

10 Jaeshawn went to school called Banyon (ph) Elementary.

11    Q.   Can you tell us what kind of a housing that you

12 lived in Florida?

13    A.   It was an apartment.  An apartment complex that we

14 lived in.

15    Q.   Now, did there come a time after you moved to

16 Florida that you again noticed a change in Ashley's behavior?

17    A.   Yes, she was -- the teachers were calling.

18 Teachers were complaining.  She was failing school.  She

19 would not stop talking in class.  She would not listen to the

20 teachers.  She was failing in her grades.

21    Q.   Did you notice anything about her weight?

22    A.   Uh huh.

23    Q.   What did you notice about her weight?

24    A.   She put on a lot of weight.

25    Q.   Can you describe for us from what she went to?

1     A.   She probably went from maybe about 65 pounds to

2   almost 100 by the time she reached about the age of 11 she is

3   140 pounds.

4     Q.   140?

5     A.   140 pounds at the age of 11.

6     Q.   So would you say that was over weight at that point

7   in time?

8     A.   Uh huh.

9                THE COURT:  Ma'am are you saying that as

10               of the date that you had moved from New York to

11               Florida she was 65 pounds or 100.

12               THE WITNESS:  She was 65 pounds when she

13               left.  She was a range weight maybe about 10, 15

14               pounds over.  She is a little bit chunkier than the

15               normal.  She was not to the excess that it was when

16               we moved to Florida.

17               THE COURT:  How long after you have moved

18               to Florida did you see that she had established a

19               weight of 140 pounds.  What year was that.

20               THE WITNESS:  The year by the time -- by

21               the year of 2002 to 2003 she had reached 140 she is

22               bigger now much bigger now.

23               THE COURT:  You had moved into Florida in

24               the year of 2000.

25               THE WITNESS:  Yes, so it progressed.  It

1          went you know.  It was sort of like a cross between

2          I don't know how to say if she was adolescent or

3          maybe hormonal glands.  She just sprouted.  She

4          just went in all directions.

5                    THE COURT:  I understand.

6     Q.   So from 2001 to 2004 where did you live Ms.

7  Martinez?

8     A.   From 2000 to 2004 my uncle brought us a house.  He

9  was interested in buying property.  He bought property for us

10  in Lauderdale which is another city in Broward.  And we moved

11  into that house and we were paying the mortgage on the

12  property so it was sort like to help us get established.

13     Q.   When you said we were paying the mortgage who are

14  you talking to?

15     A.   Me and Jimmy.

16     Q.   And did there come a time that in August of 2004

17  that the defendant moved some where?

18     A.   Yes, he would come back and forth to New York.  He

19  would work with the company that he worked with in New York.

20  And he would come back for a couple of months at a time.  And

21  go back to Florida.  And then try to look for another job.

22  And couldn't find another job or keep a job.

23            And then he would go back to New York work again.

24  Come back down to Florida.  Look and try to keep a job.  And

25  it just never ever happened.

1      Q.    Do you remember the name of the company that he
2   worked for in New York?

3      A.    Phoenix Refrigeration.  It was the company that he
4   was with prior to us moving.

5      Q.    So from the time that you went down to Florida
6   until August of 2004 how many times approximately would you
7   say that the defendant moved?

8      A.    I would say maybe about 3 times.  About 3 times.

9      Q.    And for each of those 3 times how long would he be
10  gone for?

11     A.    Sometimes 2 months.  Sometimes 4 months.
12  Depending.  The last time that he went was about 4 months.

13     Q.    So you and your 4 children would be living alone in
14  Florida while he came up here to work?

15     A.    Uh huh.

16     Q.    And in August of 2004 Ms. Martinez can you tell us
17  what happened in your relationship then?

18     A.    I just I reached a point where I just felt as if
19  for everything that he was doing I was taking care of my
20  children by myself.  You know he wasn't there.  He was in New
21  York.  And you know a phone call is a phone call.  But I was
22  there.  And I was on my own.  I already was not happy in the
23  relationship.  And I wanted to move on.

24          I felt like you know what it was the opportunity
25  that I had to move on.  I was doing it by myself anyway.  I

1    was taking on the responsibility of my children and the

2    finances and I just felt like that is what I needed to do.

3        Q.   When the defendant was up here in New York those 37

4    times during the course of 2000 to 2004 did he go back down

5    and visit his children at all?

6        A.   Yes, when he left the times in between.

7        Q.   Right?

8        A.   That August.

9        Q.   No, no when he would come up here and work in New

10   York.

11       A.   Would he come and visit.

12       Q.   Right.

13       A.   He did come after that August.  He did come back

14   down in October he did come.

15       Q.   Now towards the end of the summer into the Fall of

16   2004 what happened with you and the defendant?

17       A.   In August once when he decided that he was going to

18   go backup again I told him before he left that you know try

19   to make it work here.  And you know but I didn't want -- if

20   he went up the next time I am not, you know, I am not going

21   to stay with him and I told him before he left but I don't

22   think that he took me seriously.

23            So he went up anyway.  He went up to work and you

24   know it's not a bad thing.  You know that he is taking care

25   of his family but at the same time we were stationed in

1    another state.  We needed to be together.  If we are going to

2    make anything work.

3         Q.    So, did the defendant come backup to New York City?

4         A.    Yes.

5         Q.    And when he came up to New York where did he live

6    do you know?

7         A.    He was staying with my mom.

8         Q.    How is it that he came to stay with your mother?

9         A.    My mom offered him.  Let him stay there.  She let

10   him stay there because he is working.  And she said that go

11   ahead.  Save your money.  And you know at least then you know

12   that you are putting it away.  You are not paying rent.  You

13   are not paying food.  You are not paying for stuff.  You are

14   banking that money so that when you go back to Florida you

15   guys can take care of the kids.

16        Q.    Where was your mother living at the time?

17        A.    Same place in College Point, Queens.

18        Q.    3-04 121st Street?

19        A.    Yes.

20        Q.    Did there come a time that you found out that the

21   defendant was coming back to Florida?

22        A.    Well, he came back in October.  He came back for

23   the Carnival, the Miami Carnival.  I knew that he was coming

24   back for the holidays because his family you know he has a

25   large family.  They always have something.  I knew that he

1    was coming back for the holidays.  Plus the kids were there.

2    He wants to spend time with the kids on the holiday.

3         Q.    When you say the holidays which holidays are you

4    talking about?

5         A.    Christmas.

6         Q.    You said that the family expected him back.  Which

7    family, where were they living?

8         A.    They lived in Miami.  His sister in Broward and

9    some of his family they are scattered.

10        Q.    How do you find out that the defendant was coming

11   back to Florida after October?

12        A.    Well, I knew.  He would not leave you know and go

13   and not come see the kids on the holiday.  Family is there.

14   I knew that he was going to come.  Plus he said that he was

15   going to come.  It was not like it was a conversation that he

16   was coming.  I knew when he was coming.

17        Q.    Did you know exactly when he was returning to

18   Florida?

19        A.    No.

20        Q.    Did you tell Ashley that he was coming back?

21        A.    He told Ashley that he was coming.  He told the

22   kids you know I am coming.  I am going to buy you gifts but

23   we didn't know exactly what date he was going to come.

24        Q.    So, I would like to bring you to November of 2004

25   Ms. Martinez.  Where were you then where were you living?

1    A.    I was still living in North Lauderdale.

2    Q.    Were you living with your 4 children at the time?

3    A.    Yes.

4    Q.    How was Ashley's behavior in November of 2004?

5    A.    Ashley's behavior you know the same thing she was

6    to herself.  She could not keep a friend.  She you know her

7    eating habits were horrible.  When she ate you could not help

8    but watch her eat.  She ate.

9    Q.    What do you mean by that, that the eating habits

10   were horrible?

11   A.    You know that normal people would eat with a spoon

12   or fork.  She kind of devoured her food.  If you said

13   something to her about her weight she would argue with you

14   about it.  If you said anything to her she would fight with

15   you about it.

16         She could not get along with anyone so she tended

17   to just kind of stay to herself.  There was no really you

18   know mom and daughter and family and sitting down watching

19   TV.  It was not like that.  She tends to stay to herself

20   because she would just argue and just go to her room.

21   Sending her to her room she was -- she was constantly on

22   punishment.

23   Q.    How was her grades in school?

24   A.    She was not getting grades at all.  She was a

25   straight F student.

1        Q.    Did something happened in 2004?

2        A.    She cursed out her teacher.  And I got a phone call

3    from the school in November when she cursed out the teacher

4    and they suspended her from school.

5        Q.    When Ashley got suspended from school was there a

6    decision made as to do something with Ashley?

7        A.    She said that she did not want to live with me any

8    more.

9        Q.    Did she tell you why?

10       A.    She did not tell me why but and I did know my mom

11   is very close to her and I felt like as if I am not making

12   moves to make this child do anything better my mom can do it

13   then I did not want to say no. Go ahead.  If you want to give

14   it a try.  That's my daughter.  That is my daughter for life.

15            I am not afraid that I am going to lose my

16   relationship with her.  I did not want to stop her from

17   trying to do good.  If she thought that she could do better

18   by my mom I felt like go ahead.

19       Q.    What was the decision that was made regarding

20   Ashley's living arrangement?

21       A.    She said that she wanted to go live with my mom.

22   My mom said okay.  My mom made arrangements for her to come

23   to New York and start the school here in New York.

24       Q.    Who was she going to live with in New York?

25       A.    My mom.

1      Q.   How did you go about arranging her travel plans to

2   go to New York?

3      A.   My mom did it.  My mom arranged everything.  She

4   arranged the ticket information.  She took over from there.

5      Q.   Do you remember when Ashley left Florida to go to

6   New York?

7      A.   Yes, it was the end of November?

8      Q.   Do you remember the exact date?

9      A.   November 30.

10      Q.   Of 2004?

11      A.   Yes.

12      Q.   And where was the defendant living at that time?

13      A.   He was still at my mom's house.

14      Q.   He was coming back to Florida?

15      A.   Yes.

16      Q.   Did you know exactly when he was coming back?

17      A.   No.

18      Q.   Did you speak with the defendant about actually

19   going to live -- Ashley going to live in New York?

20      A.   Yes.

21      Q.   What did you say to him?

22      A.   He knew that she was doing bad in school.  He knew

23   that she got suspended.  That is their father.  She called

24   him dad.  So just like any parent would tell another parent

25   what is going on in the home I kept that communication open.

1          Let him know what was happening.  Let him know that
2    she got suspended and that she wanted to stay with my mom.
3    And it was just basically trying to be good parents together.
4    I was not going to -- he was a part of her life since she was
5    a little baby.  I was not going to sit down and say you can't
6    have nothing to do with her.

7        Q.   Now I would like to bring you now to the early
8    morning of November 30 of 2004 what did you do with Ashley
9    that morning?

10       A.   I dropped her to the airport.

11       Q.   And when you got -- when you dropped her off at the
12   airport did you hear from her later that day?

13       A.   Yes.

14       Q.   Did you learn that she had reached New York safely?

15       A.   Yes.

16       Q.   Do you remember what time you had spoken to her?

17       A.   I really do not remember.

18       Q.   And how long was Ashley going to live with your mom
19   up here in New York?

20       A.   Ashley was going to stay that she was going to stay
21   with my mom until high school.  Until college.  It just
22   depended you know.  If she was doing good let her stay you
23   know.  If she was going to do good in school you know, you
24   know, because she did not tell me.  It was not like she said
25   that I am going to go for a year.  It was okay.  I will go

1   maybe I will come back after high school.  Maybe I will just

2   come back after college.

3        Q.   So you believed that she wasn't coming back for a

4   few years?

5        A.   Yes, I did but at the same time I did think that

6   she could not live without me.  I am her mom.  I didn't think

7   that she could stay away from me that long.  I said maybe I

8   will let her cool off.  She needed to breeze out for a

9   minute.  She was very miserable.  Her brothers, her sisters,

10  her friends you know.  You know maybe she might not like the

11  cold you know.

12       Q.   She expressed to you that she did not want to come

13  back to live in Florida?

14       A.   Yes.

15       Q.   How long did Ashley live in New York for?

16       A.   She lived in New York until the end of the summer

17  of 2005 she came back in time to go to school in Florida.

18       Q.   When Ashley came back Ms. Martinez how was her

19  behavior then?

20       A.   It was better.  It was better.  It was as if the

21  time apart was much needed.

22       Q.   And during that time period from about December

23  first of 2004 to when she came back to live with you in

24  Florida in August of 2005 of the defendant living in your

25  mothers house at that time?

1      A.    From November to December of -- say that again.

2      Q.    From December first of 2004 to August of 2005 when

3   Ashley returned to you in Florida was the defendant living at

4   your mothers house where Ashley was living?

5      A.    No.

6      Q.    Do you know where she was living during that time

7   period?

8      A.    In the Bronx.

9      Q.    And what was your relationship like with the

10  defendant at that time?

11     A.    We were no longer talking.

12     Q.    Did he come to see his children Andrew and Ariel?

13     A.    No, he came to see them in July they came in the

14  summer time.  They saw him in July.  He went to my

15  grandmother's house.  He picked them up.  They went out to

16  eat.  That was it.

17     Q.    So that was July of 2005?

18     A.    Yes, he saw them for the Christmas of 2004.  The

19  kids stayed with him.  Jaeshawn, Ariel and Andrew stayed with

20  him through the Christmas break.

21     Q.    How about July of 2005 up to the present.  How many

22  times has he seen Andrew and Ariel?

23     A.    Since 2005 to now he has not seen them.

24     Q.    Have you ever asked the defendant for any kind of

25  financial support?

1    A.    No, I mean typically if I engage in a conversation
2    with him I am like you know are you going to send something
3    but it wasn't sent you know.

4    Q.    Have you ever filed any court proceedings seeking
5    any kind of emergency support?

6    A.    I wanted to.  Unfortunately I did not have a place
7    of residence so there were no papers -- in order to file in
8    the State of Florida you have to have a place to serve and we
9    had no address.  No information.

10   Q.    What do you mean by that that, you have to have a
11   place of residence?

12   A.    Papers have to be served.  And if we don't know
13   where he is you cannot notify him that there is a request to
14   come to trial.  He has to know that you know.

15   Q.    Okay.  So -- but you never filed any kind of
16   proceeding seeking any financial support from him?

17   A.    No.  No.

18   Q.    Now, Ms. Martinez I want to bring you back to April
19   16 of 2006 do you remember that day?

20   A.    Yes.

21   Q.    Was it a special occasion?

22   A.    It was Easter.

23   Q.    And where were you on Easter day of 2006?

24   A.    We were home in our house.  We moved at that point
25   from North Lauderdale.  I moved to an apartment in Lauder

1    Hill.   I moved back to Lauder Hill and we stayed there.

2         Q.    Who was living with you at the time?

3         A.    At the time it was my boyfriend and my 4 kids.

4         Q.    And is this your current boyfriend?

5         A.    Yes.

6         Q.    What is his name?

7         A.    Nigel.

8         Q.    What did you do that day?

9         A.    Well, Nigel was in Georgia with his family.  And it

10   was just me and the children.  And when I tried to keep it as

11   traditional as I could, my family does it big.  His family

12   did it big. I wanted to just cook dinner just like we

13   originally did.  We sat down and watched TV and ate a nice

14   big dinner.

15        Q.    Who would you normally spend Easter with?

16        A.    In the past it was with Jimmy's family when we are

17   in Florida and when we were in New York it was with my

18   family.

19        Q.    So was this the first Easter that you were spending

20   alone with your 4 children?

21        A.    Yes.

22        Q.    So what did you do did you have a meal that day?

23        A.    Yes.  We had a nice dinner with the chicken.  You

24   know.  The Thanksgiving spread so that's what we did.

25        Q.    Who was with you?

1      A.    It was Ashley, Jaeshawn, Ariel and Andrew.

2      Q.    Now during that time did there come a time that

3  dinner was over.  And you your 4 children were kind of

4  sitting around?

5      A.    The children would play outside with the other kids

6  in the neighborhood.  They were outside playing.

7      Q.    When you say the children who are you talking

8  about?

9      A.    Ariel and Andrew.  And Jaeshawn and Ashley and me

10  we were sitting together.  Ashley started to wash dishes.

11  She is cleaning up it was pretty late in the evening at that

12  point it was a quite day.

13      Q.    Did something happen with Ashley at that point in

14  time and with you at that point in time?

15      A.    Yes, Ashley had told my current boyfriends brother

16  and cousin that he was using me. Just things that a 13 year

17  old would never say is what she was doing.  She was playing

18  these games.  Malicious games to sabotage the relationship

19  that I was in.

20          Oh, he is using her.  And he does not love her.

21  Things like that.  I decided to confront her and say you know

22  that is kind of big people talk for a little girl.  Why would

23  you say something like that.  And I confronted her on the

24  issue and of course she gets defensive and she can't explain

25  her reasoning. The only reasoning that she has is that she --

1   to be mean.

2           And we went back and forth arguing back and forth.

3   You know, at this point I am just fed up. I am tired.   I am

4   tired of the mouth. I am tired of the arguing. I am tired of,

5   you know, her.   I am taking care of these kids. Giving her

6   everything that I can possibly give her.   Every time I look

7   at her I say if the sky is blue she will say no it's black.

8   It was constant battling.

9           I broke it down.   I said what is it.   What is your

10  problem. Why do you hate me so much. What have I ever done to

11  you to make you hate me so much.  Not expect, you know the

12  turn of the events that happened you know I asked her you

13  know, why, why are you the way that you are.  Why do you hate

14  your brother.   Why do you hate your sister.   Why do you

15  constantly bicker. Why are you constantly fighting. Why don't

16  you get good grades.

17          Why don't you listen to your teachers. Just

18  everything. You know she said that you don't know me. I said

19  what could a mother not possibly know about a 13 year old

20  like I was never 13 years old.   What is it .  You know.  And

21  I went on to ask her a series of questions you know what is

22  the problem and you know I asked her is somebody hurting you.

23  And she said --

24                  MR. JOHNSTON:   Judge, I am going to

25              object to this as we discussed at the bench.

1              THE COURT:    Noted.   Overruled.

2       Q.    Did she give you an answer?

3       A.    Yes, she did.   She said you -- she said yes and at

4   that point I got like really silent because I was not

5   expecting that at all.   That's not something that you would

6   think would happen you know to your child.   And I said well

7   who and when and you know everything that you can possibly

8   think and she told me who it was.   And that was it.

9       Q.    What was her demeanor like when she told you?

10      A.    It was sort of like a person who had so much -- it

11  was a surreal moment because her back was turned to me.   And

12  I am standing there and I am doing the typical mother thing.

13  Yelling, yelling, yelling and we are loud.   And she has her

14  back to me. She refused to look at me.   I can see that she is

15  sobbing. Sobbing, crying.

16          And you know when she finally did release it she

17  turned -- she looked at me and her shoulder went slump like

18  this. We kind of fell on the floor.   And you know we sat

19  there I could not imagine that my life was so busy that I did

20  not may attention to any of the signs.   That I did not listen

21  when she was angry.   And I didn't hear her cry.   And I didn't

22  see her pain because the pain was there, but I did not pay

23  attention.   You know we just -- it was no reason for her to

24  give me any explanations.

25          There was no reason for her to tell me anything

vld

1    more than what she said.  At that moment there it just made

2    so much sense. Just everything made sense.  And you know I

3    neglected my daughter you know.

4         Q.   What do you mean that it made so much sense?

5         A.   I should have paid so much -- I looked at the

6    situation and the way that she and the anger and the weight

7    gain.  And I looked at the attitude and the way that she

8    treated her brothers and sisters and the fact that any time

9    that a teacher told her to sit down and she would say no. Any

10   time somebody said something to the kids you know she just

11   could not deal with authority and you know it was just sad

12   and to know that I passed it off as she is looking for

13   attention.  I passed it off and said that I was a mother at

14   the age of 16.

15        Maybe I didn't know how to be a good mom.  Maybe I

16   had too many kids.

17                  MR. JOHNSTON:   I am going to object to

18            that it's irrelevant.

19                  THE COURT: Next question.

20        Q.   Did Ashley tell you who had harmed her?

21        A.   Yes.

22        Q.   Did you ask her if she was raped?

23        A.   Yes.

24        Q.   Did she give you an answer?

25        A.   Yes.