```
 1        Q.   What was her answer?

 2                  MR. JOHNSTON:  Objection.

 3                  THE COURT: Sustained.

 4        Q.   What did you do when she gave you the answer, do

 5   not tell us what the answer was, what did you do?

 6        A.   I just cried.

 7        Q.   What did you do with Ashley?

 8        A.   I just held her.

 9        Q.   How were you -- you were in the kitchen at that

10   point in time?

11        A.   Yes.

12        Q.   How were you in the kitchen?

13        A.   The kitchen is small.  It was a small apartment.

14   And I was just holding her.  She was bigger than me. I was

15   just holding her.

16        Q.   What was she doing while you were holding her?

17        A.   She was crying.

18        Q.   Was she saying anything?

19        A.   She said that I would not have believed her. She

20   said that I thought that you wouldn't believe me.

21        Q.   What did you do after you learned that Ms.

22   Martinez?

23        A.   We stayed the same the whole night. It was pretty

24   dramatic.  We went on. I continued to tell her that I loved

25   her and that she should have come to me. I did not want her
```

1    to feel as if you know I asked her if she is wanted to go

2    ahead and press charges that the decision was hers and I

3    would stand by her 100 percent with whatever she chose. She

4    said yes.

5        Q.    So what did you do in terms of pressing charges?

6        A.    The next morning I went to our local police station

7    and I filed charges.  I did the procedure that they

8    instructed us to do.

9        Q.    Did you go to Ashley's school?

10       A.    We didn't disclose, no, to the school.

11       Q.    Did you file a police report in Queens county?

12       A.    It was filed after the Florida was filed.

13       Q.    Can you tell us how you went about filing a report

14   in Queens county?

15                        MR. JOHNSTON:  Objection.

16                        THE COURT: Overruled.

17       Q.    What did you do?

18       A.    I didn't have to do it.  Florida sent the

19   transcript over from there and then a case was opened at the

20   time Ashley was here for the summer and she was staying with

21   my mom again and that's when the detective contacted me and

22   my mom.

23       Q.    Ms. Martinez did ever have any idea that the

24   defendant was doing anything to Ashley?

25       A.    No --

1    Q.    In all the years that you were together.

2    A.    No.

3    Q.    Did she tell you why she hated you so much?

4                MR. JOHNSTON:  Objection.

5                THE COURT:  Overruled. Just a yes or no.

6    A.    No, no.

7    Q.    Can you tell us how your relationship with Ashley

8  is now?

9    A.    She will not leave my side now.  We talk more.

10 Listen more.  She is still feisty at times you know. She was

11 14.  She is going to be 15 now. She was getting therapy.  And

12 you know we are moving forward so you know we are doing much

13 better.  Much better.  A lot more laughter.

14               MS. MALIK:  No further questions your

15          Honor.

16               THE COURT: Mr. Johnston.

17               MR. JOHNSTON:  Judge can we take about 5

18          minutes.

19               THE COURT: Sure.

20               (Whereupon, a brief recess was taken.).

21               THE COURT: Ms. Martinez if you just wait

22          outside.

23               THE COURT: Approach counsel please

24          briefly.

25               (Whereupon, an off the record discussion

1          was held at the bench.)

2                    COURT OFFICER:  Witness entering.  Panel

3          entering.

4                    COURT CLERK:  Both sides stipulate to the

5          presence and proper seating of the jury.

6                    MR. JOHNSTON:  Yes.

7                    MS. MALIK:  Yes.

8                    COURT CLERK: I remind the witness that

9          you are still under oath.

10                   THE COURT:  Mr. Johnston.

11                   MR. JOHNSTON:  Thank you your Honor.

12    CROSS EXAMINATION

13    BY MR. JOHNSTON:

14         Q.   Ms. Martinez are you 31 years of age?

15         A.   Yes.

16         Q.   You are going to have to speak up so the last

17    gentleman in the box can hear you.  And I believe that you

18    told the jury that sometime probably in October or November

19    of 1997 you moved in with Abu?

20         A.   No.

21         Q.   No.  When was it that you moved in with Abu Khan to

22    live together?

23         A.   We started living together early in January of 97.

24    We got together in 96 the end of 1996.

25         Q.   So where were you living together in January of

Leslie Martinez/Cross/Mr. Johnston                388

1   1997?

2       A.   We were with my mom.

3       Q.   The 2 of you were living together in January of

4   1997 at your moms house?

5       A.   Yes.

6       Q.   Now Ashley's father is Michael Benn right?

7       A.   No.

8       Q.   What is his name?

9       A.   Her fathers name is Eddie Varega (ph).

10      Q.   Eddie Varega.  That is Ashley's father?

11      A.   Yes.

12      Q.   Well before you moved in or began a relationship

13  with Abu Khan were you living with a fellow by the name of

14  Michael Benn?

15      A.   Yes, he was my husband.

16      Q.   Were you legally married?

17      A.   Yes.

18      Q.   And was one of the reasons why that relationship

19  dissolved so to speak was because of the fact that he was

20  abusive both verbally and physically towards you.

21              MS. MALIK:  Objection.

22              THE COURT:  Overruled.

23      A.   No.

24      Q.   You just decided that you had enough with Mr. Benn

25  and you preferred to live with Abu Khan?

vld

1               MS. MALIK:  Objection your Honor.

2               THE COURT:  Overruled.

3       A.   That's not the case. My relationship with Mike. We

4  were young.  You know, I had nothing in common with him.  I

5  wasn't happy in the relationship.  I wasn't happy with the

6  way that the relationship was going.  I just wasn't in love

7  with him the way that a wife should be in love with her

8  husband.

9       Q.   Did you bother getting a divorce before you moved

10  in with Abu Khan?

11      A.   No.

12              MS. MALIK:  Objection.

13              THE COURT: Overruled.

14      Q.   So you still are married to Mike and you moved in

15  with Abu is that correct?

16      A.   Yes.

17      Q.   And you are living at your mom's house?

18      A.   Yes.

19      Q.   And you are living there for a period of time and

20  then you moved out of your mom's house and you move to an

21  apartment in Ozone Park?

22      A.   Yes.

23      Q.   Now when to the best of your recollection did you

24  move down to Florida?

25      A.   In 2001, May of 2001.

Leslie Martinez/Cross/Mr. Johnston          390

1      Q.    Okay. Not May 2000, May 2001?

2      A.    May 2001.

3      Q.    And you were living at Ozone Park up to that point

4   in time?

5      A.    Yes.

6      Q.    And when you moved down to Fort Lauderdale you were

7   staying -- did you move down to Fort Lauderdale first or did

8   you go right to North Lauderdale?

9      A.    We lived in Lauder Hill first.

10      Q.    How long were you at the address in Lauder Hill

11   before you moved to the house that your uncle purchased?

12      A.    We lived in -- we did not finish the lease. We

13   broke our lease. We moved before the lease ended.

14      Q.    During that period of time was Ashley going to

15   school?

16      A.    Yes.

17      Q.    Which school was she going to?

18      A.    Banyon Elementary.

19      Q.    What grade was she in?

20      A.    She was at the time there third grade.

21      Q.    Now?

22      A.    Third, fourth grades.

23      Q.    Did you ever take the children to church on

24   Sundays?

25                     MS. MALIK:   Objection.

vld

```
 1                    THE COURT:  Overruled.

 2         A.   No.

 3         Q.   So did Ashley go to school regularly?

 4         A.   Yes.

 5         Q.   And during at least up to that point in time Ashley

 6    had made no complaint or made any accusation against Jimmy as

 7    you call him regarding any sort of sexual abuse or sexual

 8    misconduct?

 9         A.   No.

10         Q.   And you did not witness any?

11         A.   No.

12         Q.   So then you were living together pretty much in

13    harmony with Jimmy all the way in Florida until 2004 and

14    about September when he had a contract or a job opportunity

15    up in Queens is that correct?

16         A.   I'd not say harmony.  We did the best that we could

17    to stay together.  I have 2 small children. I was not about

18    to break up my home just on the fact that I was not happy. I

19    was not going to be selfish like that.

20         Q.   So he is trying to earn some money to help support

21    the family so if there is a job opportunity up in Queens for

22    3 months you didn't have a problem with that is that right?

23                    MS. MALIK:  Objection.

24                    THE COURT:  Overruled.

25         A.   I did not like it.
```

1        Q.    You didn't like it?

2        A.    I didn't like it.  I didn't like the fact that he

3    would be going back and forth to Florida.  I didn't like the

4    fact that he could not keep a job in Florida. I had a job.  I

5    stayed on a job. There were agencies that could help you keep

6    a job.  Why couldn't he take advantage of the opportunity

7    that he had.

8        Q.    But the wages in Florida are not --

9                   MS. MALIK:  Objection, your Honor.  Who

10             is testifying.

11       Q.    The wages in Florida are not the wages in New York

12   City?

13       A.    You know he was not a low level employee.  He had

14   major experience.  He had the experience to make the money.

15   Unfortunately, there were certain situations maybe he just

16   was not happy in Florida. But the money is there to be made.

17   I am supporting 4 children on one salary.

18       Q.    In any event he went up to New York City in

19   September of 2004 and he was up and he was staying at

20   grandma's, your mothers place his mother-in-law I guess you

21   would say.  And he was working up here and you telephoned him

22   on November 28 or 29 and told him that you were sending

23   Ashley up to her grandma's house where he was staying is that

24   correct?

25       A.    Yes.

1    Q.   And you told him that she was uncontrollable. She

2    would not listen to anyone.  She is rebellious.  By the way

3    at that period of time did she have a boyfriend.

4                   MS. MALIK:  Objection.

5                   THE COURT:  Overruled.

6    A.   No.

7    Q.   She had no boyfriends?

8    A.   No.

9    Q.   Or no boyfriends that you knew about?

10   A.   No, she had no boyfriends.

11   Q.   Now so you sent her up and she arrived on November

12   30 of 2004 back up here in New York because you spoke to

13   either you spoke to her and she told you that she had arrived

14   safely is that correct?

15   A.   Yes, she called me at some point in the day. I

16   don't remember what time of the day it was and let me know

17   that she arrived.  My mom called me as well.

18   Q.   Did you ever divorce Michael Benn?

19   A.   No.

20                   MS. MALIK:  Objection your Honor.

21                   THE COURT:   Overruled.

22   A.   I did make attempts to divorce him though.

23   Q.   Did you make the same attempts to divorce him that

24   you made to locate him so that you could file a petition for

25   child support?

1                   MS. MALIK:  Objection.

2                   THE COURT: Sustained.  Sustained you do

3     not have to answer that.

4     Q.   Now, he returned back to Florida about December 2

5 of 2004 is that correct?

6     A.   He drove back and he left in the night time so it's

7 about a 24 hour drive so that would be around that time the

8 2nd and the 3rd.

9     Q.   And when he arrived back in Florida and came to

10 where you were living did you tell him that you needed some

11 space and you didn't want him to be living with you any

12 longer?

13    A.   I told him before he left when he left in August

14 that if he went back to New York for this last time that I

15 did not want to be with him any more.  I told him repeatedly

16 by phone when we had phone conversations.  I did not want to

17 be with him any more.

18    Q.   But the question is when he finally got back to

19 Florida you could have changed your mind. Did you tell him I

20 didn't change my mind I need my space?

21    A.   Yes.

22    Q.   So he did not move back with you on December 2 of

23 2004.  He began living his sister is that correct?

24    A.   No, he stayed with me for a couple of days in the

25 house.

Leslie Martinez/Cross/Mr. Johnston                395

```
1     Q.   Then he took his personal effects and left?

2     A.   Yes.

3     Q.   And then he moved in with his sister?

4     A.   Yes.

5     Q.   And you're by yourself?

6               THE COURT:  Meaning.

7     Q.   You are living there by yourself?

8     A.   Yes, me and my 4 kids. I had 3 kids. Ashley was in

9  New York.

10    Q.   Now on December 10 of that year did Jimmy as you

11 call him arrive at your place unexpectedly at about 5 in the

12 morning.

13              MS. MALIK:  Objection your Honor.

14              THE COURT:   Overruled.

15    A.   It wasn't before Christmas it was after Christmas.

16 It was before he made his trip back to New York.

17    Q.   And is that when you had a little incident because

18 Nigel was living with you?

19    A.   He was not living with me, but yes Nigel was not

20 living with me.

21    Q.   Well, Nigel was in bed with you when he arrived?

22              MS. MALIK:  Objection your Honor.

23              THE COURT: First you said that I am not

24         sure what.

25              MR. JOHNSTON:  I will withdraw that.
```

                                                        vld

1              THE COURT:  What year are we talking

2         about.

3              MR. JOHNSTON:  I will withdraw the

4         question.

5    Q.   When Jimmy as you call him arrived you say that it

6    was after Christmas?

7              THE COURT: After Christmas what year.

8    Q.   Of 2004. When he arrived he discovered you in bed

9    with Nigel is that correct?

10             MS. MALIK:  Objection. Relevance.

11             THE COURT:  Overruled.

12   A.   Yes.

13   Q.   And there was some sort of a verbal confrontation?

14             THE COURT:  Between.

15   Q.   Between you and Jimmy?

16   A.   Yes he came in with a gun.

17   Q.   A gun?

18   A.   He had a gun in his pocket.  He pulled the gun out.

19   He put it in Nigel's face. He knocked me down. He threw me to

20   the floor.  My 3 children were sitting there watching it. I

21   tried to call 911 at the time.  That's when he knocked me

22   down again.  And when I did finally call 911 he hid his gun.

23   He hid his keys and he stayed at the property for about 2

24   hours after.

25   Q.   The police came?

1    A.    Yes.

2    Q.    And he was there?

3    A.    Yes.

4    Q.    And no one was arrested?

5    A.    Nobody was arrested.   They told him that he needed

6  to leave the property.   That I told him that I did not want

7  to be with him. He was not staying at the property.   He had

8  no reason to come in at 5 o'clock in the morning drunk into

9  the house.   And specifically was told that we are no longer

10 together.   And that he needed to leave the property that

11 there was no more a relationship.

12    Q.    He left and that was it with your relationship

13 between you and he is that right it was over with?

14    A.    Yes.

15    Q.    Now at that time Ashley is still with grandma up in

16 New York right?

17    A.    Yes.

18    Q.    And she stayed up in New York with grandma until

19 what, the school year of 2005?

20    A.    Yes.

21    Q.    About what month?

22    A.    August.   School starts in August.

23    Q.    So she stayed all of way up in Florida until 2005?

24    A.    She stayed in New York.

25    Q.    New York I meant.   And then she returned back to

1  Florida?

2      A.   Yes.

3      Q.   And Jimmy is out of your life at that point. He

4  left right after December of 2004?

5      A.   Yes.

6      Q.   Right after Christmas of 2004?

7      A.   Yes.

8      Q.   Now did there come a time in March of 2006 that

9  there was a fair down in Florida when you had occasion to

10  meet Jimmy and a friend of his Tom Popadopolis and his --

11  Jimmy's sister and some other people did you meet them at

12  this fair?

13     A.   Yes, it's a local fair in the city.  And I brought

14  the children there and his sister and his family was there.

15  And everybody was talking.  They saw the kids.

16     Q.   All right.  You answered my question?

17              THE COURT:   Counsel is this an

18         appropriate time maybe to break for lunch.

19              MR. JOHNSTON:  Yes, fine judge.

20              THE COURT: All right.  Great.  Prior to

21         your being brought in and I had a conversation with

22         all counsel and we have agreed to in the course of

23         the examination of this witness to pick a point

24         where it would end at a logical point to begin

25         after lunch.

Leslie Martinez/Cross/Mr. Johnston                    399

1              I think that we have reached that point

2        now. Please follow the instructions of the officer.

3        Have a great lunch.  See you this afternoon at 215.

4                   (Whereupon, the jurors exit the

5        courtroom).

6                   THE COURT: Thank you Ms. Martinez. See

7        you this afternoon at 2:15.

8                   THE WITNESS: Thank you.

9                   THE COURT:   Anything further.

10                  MS. MALIK:  No your Honor.

11                  (Whereupon, court takes a luncheon

12       recess).

13                  COURT CLERK:  Case on trial continued.

14       All parties are present.  No jury is present at

15       this time.

16                  COURT OFFICER:  Witness entering.  Jury

17       entering.

18                  COURT CLERK:  Both sides stipulate to the

19       presence and proper seating of the jurors.

20                  MR. JOHNSTON:  Yes.

21                  MS. MALIK:  Yes.

22                  COURT CLERK: I do remind the witness that

23       you are still under oath.

24                  THE COURT: All right.  Mr. Johnston.

25                  MR. JOHNSTON:  Thank you your Honor.

1        Q.    Ms. Martinez I believe that we left off when we

2   were discussing an incident that happened in Florida when

3   there was a confrontation between yourself and the defendant

4   regarding the fact that you were in bed with this fellow

5   Nigel do you remember that?

6        A.    Right.

7        Q.    I believe that you told the jury that it was after

8   Christmas on December of 2004?

9        A.    Yes, it was right after Christmas before he left to

10   go back to New York.

11        Q.    Would you change your answer as to the date if the

12   Florida police report said that it was on December 10 of

13   2004?

14        A.    It was after Christmas.

15        Q.    You still sure of that?

16        A.    Yes.

17        Q.    Now you also after the defendant left the household

18   and you had the 4 kids to raise so to speak and he was no

19   longer living with you did you apply for any public

20   assistance from Florida state?

21                    MS. MALIK:   Objection your Honor.

22                    MR. JOHNSTON:   Judge, I will tie it up in

23            a minute.

24                    MS. MALIK:   Objection.

25                    MR. JOHNSTON:   There was testimony

1            that --

2                      THE COURT: Approach.

3                      (Off the Record Discussion).

4       Q.   Ms. Martinez after the defendant and you stopped

5    living together did he for a period of time send you checks

6    and this is after you have split up after this Christmas of

7    2004 did he send you checks of $175.00 a week to help the

8    support of the children?

9       A.   No.

10                     MR. JOHNSTON:  Could I have this marked

11               as defense A for identification.

12                     THE COURT: Okay.  Counsel if there is any

13               further exhibit that you wish to have marked would

14               you also show that.

15                     MR. JOHNSTON:  I have a number of

16               photostatic copies of checks.

17                     THE COURT:  Would you show each of those

18               to counsel at this point.

19                     MS. MALIK:  Your Honor can we approach on

20               this please.

21                     THE COURT: Yes.

22                     (Off the Record Discussion).

23                     COURT OFFICER:  Defense A so marked.

24       Q.   Now would you look at defense A please.  Does that

25    document refresh your recollection regarding the answer that

                                                            vld

1    you just give regarding whether or not at any time you

2    received $175.00 in a money orders from Mr. Abu Khan?

3         A.   No.

4         Q.   It does not refresh your recollection?

5         A.   No.

6         Q.   Your name is on there?

7                   MS. MALIK:   Objection.

8         A.   Yes.

9                   THE COURT:   Sustained.  Answer is

10             stricken.

11        Q.   Did you live at 54 North West Florida, Fort

12   Lauderdale, Florida?

13        A.   No.

14        Q.   You did not?

15        A.   No.

16        Q.   Was that his sisters address?

17        A.   I am not sure it was her exact address.

18        Q.   Did you receive any payments from him through his

19   sister?

20        A.   No.

21        Q.   For child support?

22        A.   No. I never received this.

23                  THE COURT:   I am sorry.

24        Q.   Now, there came a time on March 19 of 2006 that you

25   attended a fair called Joy Rolly's Shop (ph) is that correct?

vld

```
 1        A.    It's not called Joy Rolly's Shop. That is a
 2   restaurant in the parking lot where --
 3        Q.    That's where the fair is being held?
 4        A.    Yes.
 5        Q.    Did you attend there on that date at that place?
 6        A.    Yes.
 7        Q.    And were you there with Ashley and the children?
 8        A.    Yes.
 9        Q.    And did you meet Abu and a fellow by the name of
10   Tom who is a friend of Abu's?
11        A.    I was with his sister.  His 2 sisters.
12                   THE COURT:   I am sorry.  You were with
13              whose 2 sisters.
14                   THE WITNESS:   When I got there I saw his
15              2 sisters.
16                   THE COURT:   Whose.
17                   THE WITNESS:   Jimmy, his 2 sisters and we
18              were all standing together. They were with the
19              children talking and then --
20                   THE COURT:   I am sorry.  So you used he
21              and we.  When you said that you saw the defendants
22              2 sisters.
23                   THE WITNESS:   Yes.
24                   THE COURT:   You said we were with the
25              sisters who are the we that was with the sisters.
```

vld

1          THE WITNESS: It was the children and

2     myself and a girlfriend of mine. We were all there.

3          THE COURT: All there with who as far as

4     the sisters are concerned.

5          THE WITNESS: His nieces and nephews were

6     there. They came as a family as a group. It's a

7     fair. It was rides and stuff. All of us were

8     there.

9          THE COURT: When you said that you were

10    with the defendants sisters at the time that you

11    said that you were with the defendants sisters was

12    the defendant present.

13    A.   No.

14         THE COURT: All right.

15    Q.   Did there come a time that the defendant did join

16    the group that was there?

17    A.   He started to approach from a distance and the

18    minute that I saw his face I left.

19         THE COURT: Counsel, that was not your

20    phone.

21         MR. JOHNSTON: No, it was not judge. I

22    am innocent.

23    Q.   Okay. So, you say that as soon as you saw Abu you

24    turned around and took the children and went off?

25    A.   Went home.

1      Q.   Now, this was before your daughter told you that

2   she had been sexually abused is that correct?

3      A.   Yes.

4      Q.   And the reason why you took the kids and marched

5   off is because you felt that he wasn't contributing enough to

6   their support?

7      A.   I just felt like you came into opportunity from New

8   York you didn't even come look for your kids. You did not say

9   I am here. You made no attempts to visit.

10     Q.   The answer to my question.

11               MS. MALIK:   Objection could she finish

12               the answer.

13               THE COURT:   Counsel you asked her what

14               was the reason that she left.

15     Q.   No, I said the reason why you felt that he wasn't

16  giving you enough support. It's either a yes or no answer?

17     A.   He wasn't supporting the kids.

18     Q.   Was the reason why you took the kids is because you

19  felt that he wasn't giving enough support?

20               THE COURT:   You can answer that question

21               yes or no or you can't answer the question. It's as

22               phrased.

23     A.   He wasn't supporting them. He was wasn't there for

24  them at all.

25     Q.   Now, in addition to walking off with the kids did

```
 1   you also say to him I will get your ass and you will never
 2   see them again?
 3        A.   I never said that.
 4        Q.   You didn't say that.
 5        Q.   Now, how long after Jimmy moved out from where you
 6   were living in Florida in 2005 did Nigel move in?
 7        A.   Maybe we ended up living together maybe about 2
 8   months, 3 months after the relationship.
 9        Q.   In other words after your --
10        A.   He left.
11        Q.   Broke off with Richie you began living --
12                  THE COURT:   Richie?
13        Q.   I am sorry. Jimmy.  Jimmy I meant?
14        A.   I lived in Miami.
15                  THE COURT:   Who lived there.
16        A.   Nigel.  He lived in Pembroke Pines. We were
17   together often.  He did not move in, move in with me until
18   maybe 3, 4 months. I would not say that he was living with
19   me.
20        Q.   He kept his own place?
21        A.   He lived with his mother in Pembroke Pines and me
22   and him I lived up in Monmonth (ph).  We stayed together.
23        Q.   You still together?
24        A.   Yes.
25        Q.   Was it your testimony on direct examination that
```

1    before Ashley left Florida on November 30 to come back to New

2    York City to stay with your grandmother that Ashley said that

3    she wanted to come back to live knowing, live there knowing

4    that Richie was also there?

5                       THE COURT:    Jimmy.

6                       MR. JOHNSTON:   Jimmy.   Too many men in

7              your life.

8                       THE COURT:   Counsel.

9                       MR. JOHNSTON:   Excuse me judge.

10                      MS. MALIK:   Judge.   I am going to object

11             to these characterizations.

12                      THE COURT:   Understood. Inappropriate

13             comment.

14                      MR. JOHNSTON:   I apologize.

15       Q.    Getting back to what we were talking about.   Did

16   your daughter Ashley indicate to you before she came back to

17   New York on November 30 that she wanted to come back to New

18   York to stay with grandma and at that time she knew that Abu

19   was also living with grandma?

20       A.    She knew he was there but she wanted to stay with

21   my grandmother.

22                      THE COURT:   Ma'am that's your

23             grandmother.

24                      THE WITNESS:   My mom. It's my mom.

25                      THE COURT:   Your mom. Her grandmother.

```
 1              And she knew that he was coming back to Florida.
 2              Who knew.
 3                   THE WITNESS:  Ashley knew. Ashley knew
 4              that he was coming back.
 5   Q.    Now you are 31 years of age right?
 6   A.    Yes.
 7   Q.    Did you post a biography on My Space?
 8                   MS. MALIK:  Objection your Honor.
 9                   THE COURT:   Approach counsel.
10                   (Whereupon, an off the record discussion
11              was held at the bench.)
12                   MR. JOHNSTON:  I have no further
13              questions judge.
14                   THE COURT: And just to be clear Ms.
15              Martinez it was a number of questions asked about
16              when you and the defendant broke up and it was date
17              given. There was an August date. There was I
18              believe an October or November date.  And a final
19              parting in December.
20                   When you were answering the question as
21              to when Nigel started living with you was that 4
22              months after the August date.  4 months after the
23              October date, the December date.
24   A.    After the December date.  We were actually friends.
25   And you know our relationship blossomed.  But you know we
```

1    were friends ultimately first.

2                    THE COURT: Any further questions.

3                    MS. MALIK:  Just a few your Honor.

4    REDIRECT EXAMINATION

5    BY MS. MALIK:

6        Q.   How long have you been with Nigel?

7        A.   It's going to be 3 years this year.

8        Q.   And how long all together were you with the

9    defendant?

10       A.   About 8 years.

11       Q.   8 years?

12       A.   Yes.

13       Q.   Exclusively with the defendant?

14       A.   Yes.

15       Q.   And for the majority of that time how did you feel

16   about him?

17       A.   I loved him.  I loved him despite everything you

18   know that's the father of my children.  He was there for

19   Ashley.  He was there for Jaeshawn. They called him daddy.

20   And I have 2 children with him I loved him for that you know.

21       Q.   You said that they called him daddy. Who called the

22   defendant daddy?

23       A.   Ashley and Jaeshawn.

24       Q.   Does Ashley know her biological father?

25       A.   No.

                                                         vld

```
 1        Q.    Has she ever had any contact with him?

 2        A.    When she was a baby and when she was maybe about 5

 3   years old but he never showed any interest.

 4        Q.    So even though the defendant was not actually

 5   Ashley and Jaeshawn's biological father they still called him

 6   daddy?

 7        A.    Yes.

 8        Q.    And they thought of him as their father?

 9        A.    Yes.

10        Q.    And the father was the only father that Ashley ever

11   knew?

12        A.    Yes, aside from my ex, my husband, but other than

13   that yes he was there.  He was there from when they are

14   small.

15        Q.    When you say your ex are you taking about Michael

16   Benn?

17        A.    Yes.

18        Q.    Was he here this morning?

19        A.    Yes.

20              THE COURT:    Who he.

21        Q.    Michael Benn is he supportive of you?

22        A.    Yes, his mother is here as well.

23        Q.    And sitting in the audience now?

24        A.    Yes.

25              MR. JOHNSTON:    Judge, I do not see the
```

1              relevance of this line of questioning.

2                   THE COURT: Overruled.

3        Q.    The defense attorney asked you about this fair on

4    March 17 of 2006.  I would like to bring you back to that.

5    You have said that you saw the defendant and you took the

6    kids and you went home.  Why did you take the kids to go

7    home?

8        A.    Because it -- just here we are taking the kids out

9    and he comes strolling with this smile on his face but he did

10   not contact our kids.  How --

11       Q.    What do you mean that he did not contact the kids?

12       A.    Leslie, I am here.  I am in Florida.  Can I see the

13   kids.  I am going to a fair.  Can I take the kids with me you

14   know.  Can I see the kids.  You know, it shouldn't be my

15   bumping into you, you know, in a fair.  You never contacted

16   your kids.  Never. It's not to say that our family didn't

17   know each other where we live.  Where you couldn't lose

18   connection with me you know.  We had family bond before then.

19            So, you know it was easy to contact me you know. It

20   was easy.  Look for your kids.  You don't just up and

21   disappear.  Look for them and then you want to come and smile

22   in front of these children and for what. To play with them

23   for a second.

24                   THE COURT:  Next question.

25       Q.    So if the defendant ever made an attempt to contact

1  you regarding seeing the children around being there for them
2  and taking them and spending time with them would you have
3  stood in the way of that at all?

4      A.   No, no.  All I ask, look for your children.  What
5  happened between me and him I tried to be as amicable as
6  possible. I did not contact him. I did not harass him.  I did
7  not look for him, you know.

8          Yes, you know, I am raising 4 children on my own. 2
9  of them are his. I mean I didn't back out from my
10 responsibility, you know.  I stayed there.  I did what I had
11 to do to take care of my kids.  And it's an insult to me to
12 know that you know what you were a part of their lives you
13 were a good part of their lives you were daddy.  You did the
14 shows.  You did the parent/teacher conference.

15         The moment that the relationship just did not go
16 the way that you wanted it to go you just up and left.
17 Regardless of what happened between me and him that was
18 between me and him.

19              THE COURT:   Next question.

20     Q.   So you never involved your children
21 Ashley or Jaeshawn or Ariel or Andrew in the problems that
22 you had with the defendant?

23     A.   No.

24     Q.   Never talked to them about your problems with the
25 defendant?

1    A.    No, just what they witnessed and what they saw for
2  themselves but as far as it goes as bad mouthing and no there
3  was no reason for me to do that.  It was obvious all on it's
4  own.

5    Q.    You also talked about this incident after Christmas
6  with Nigel and the defendant it was actually brought out on
7  cross examination.  You were talking about the defendant
8  talking out a gun had you seen that gun before?

9    A.    Yes.

10   Q.    Where had you seen that gun before?

11   A.    There were a few incidents where that gun came out.

12               MR. JOHNSTON:  I am going to object to

13          that.

14               THE COURT: Sustained.

15   Q.    Did that gun belong to the defendant?

16   A.    Yes.

17   Q.    Counsel also asked you Ms. Martinez he said to you,
18 you never witnessed any sex abuse by the defendant against
19 Ashley do you remember that question?

20   A.    Yes.

21   Q.    Did you sleep with Ashley in her room every night?

22   A.    No.

23   Q.    Did you ever sleep in the same room as Ashley?

24   A.    No.

25   Q.    Did the defendant have access at night to Ashley's

1  bedroom?

2       A.   Yes.

3                  MS. MALIK:   I have no further questions

4            your Honor.

5                  MR. JOHNSTON:   Just briefly judge.

6  RECROSS EXAMINATION

7  BY MR. JOHNSTON:

8       Q.   Ms. Martinez for a period of time after Abu moved

9  out in 2004 you were living at 2057 Clamion (ph) Way, North

10 Lauder Hill, Florida is that correct?

11      A.   Yes.

12      Q.   And you moved out of that address at the end of

13 2005 right?

14      A.   Yes.

15                 MS. MALIK:   Objection your Honor. Beyond

16           the scope.

17                 THE COURT:   Well, sustained counsel.

18                 MR. JOHNSTON:   Judge they made a point

19           that he never visited the kids.  If he didn't know

20           where she was living how could he visit the kids.

21                 MS. MALIK:   How did that come out of this

22           witness.

23                 MR. JOHNSTON:   I am going to ask her

24           this.

25                 THE COURT:   All right.  Overruled.

1    Q.    You moved out at the end of 2005 did you tell Abu

2   where you moved to?

3    A.    Yes.

4    Q.    How did you do that?

5    A.    We did it by phone.

6    Q.    You knew where he was living in the Bronx?

7    A.    No, he has the same Nextel number.  I talked to him

8   on the phone.  We had the discussions of why you are not

9   there.  Why you are not calling the kids. I gave him my

10  address.  If you are willing to do something do it.  You are

11  going to send something. If you are going to send child

12  support send it. If you are going to visit your kids when you

13  are in town this is where we stay.

14   Q.    Now you just said something else and I lost my

15  train of thought.  Now regarding the claim that you made to

16  the police that the defendant had a gun when you had that

17  incident with him the police came right?

18   A.    Yes.

19   Q.    The defendant stayed there right?

20   A.    Yes.

21   Q.    And they looked all around and cannot find a gun?

22   A.    Right.

23              MS. MALIK:  Objection.

24              THE COURT: Overruled.

25   Q.    And the defendant was not arrested is that correct?

1    A.   In.

2    Q.   He was just allowed to walk away?

3    A.   Yes, I did not press charges.

4    Q.   Apparently they did not believe you.

5             MS. MALIK:  Objection.

6             THE COURT: Sustained.

7             MR. JOHNSTON:  I have no further

8    questions judge.

9             THE COURT:  Anything further.

10           MS. MALIK:  No your Honor.

11           THE COURT: All right.  Thank you Ms.

12    Martinez.

13           THE WITNESS: Thank you.

14           THE COURT: There are times that you

15    planned thinking that certain witnesses would be

16    longer and so that I need to bring in or to start a

17    second witness and just when you think that it

18    would go longer it goes shorter and what I am

19    saying is that there are no further witnesses

20    today.

21           Also by agreement with all counsel and

22    the defendant we will not be in session tomorrow.

23    So you will be excused for the balance of this day.

24    You do not have to come in tomorrow.  And this

25    trial will resume at 10 AM Monday morning.

1            Have a great weekend. See you Monday
2       morning at 10AM.
3            (Whereupon, jurors exit the courtroom).
4            THE COURT:  Anything further.
5            MR. JOHNSTON:  Nothing judge.
6            MS. MALIK:  Actually yes, your Honor, I
7       would like to address the comments that Mr.
8       Johnston keeps making in the presence of the jury.
9       Whispering, you know, saying things inappropriate
10      about the witness on the stand or whatever else may
11      be the case. I think it's highly inappropriate. I
12      know Mr. Johnston normally practices in the Bronx
13      and not here in Queens county.
14           I would ask the court to direct him not
15      to make those side comments because I think that
16      it's inappropriate in this case. And what he did
17      here was attack her character through his
18      questioning.  And through what he was saying some
19      of the jurors heard what he was saying I think that
20      it's highly inappropriate.
21           THE COURT: Well --
22           MR. JOHNSTON:  Judge, it's part of my job
23      to attack her character and credible.
24           MS. MALIK:  Not the way that you were.
25           THE COURT:  Within bounds.

1          MR. JOHNSTON:  I do not mean to.

2          THE COURT:  Certainly that comment when

3     it is yourself that was mixing up the nickname of

4     your client from you know from Jimmy to Richie.

5     There was no indication that any of the

6     relationships that Ms. Martinez has had there was

7     no one that to my knowledge that she stated whose

8     name was Richie.

9          So that comment, the reason for your

10     misstating the defendants name and attributing it

11     to her the number of boyfriends that she had was

12     beyond bounds and was inappropriate.  If I had

13     mentioned it to you at the time and we have

14     finished with her as a witness for the moment.  But

15     I certainly would not expect those kinds of

16     comments towards any other witness that is called.

17          MR. JOHNSTON:  I apologize.

18          THE COURT:  That said.  Anything else.

19          MS. MALIK:  No.  Thank you your Honor.

20          THE COURT:  See you Monday morning.

21          (Whereupon, matter is adjourned to Monday

22     March 26, 2007 at 10 AM).

23          **********************

24

25

vld

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF QUEENS:   CRIMINAL TERM:  Part K-20

 3   -----------------------------------------x   Indictment No.
     THE PEOPLE OF THE STATE OF NEW YORK    :    2147/2006
 4

 5              -against-                      :

 6                                            :

 7   ABU KHAN                                 :

 8                        Defendant   :

 9   -----------------------------------------x

10                          March 26, 2007

11                          125-01 Queens Boulevard
                            Kew Gardens, New York 11415
12

13   B E F O R E:   THE HONORABLE  RONALD HOLLIE,
                                          Justice
14

15   A P P E A R A N C E S:

16              Honorable Richard A. Brown
                For the People:
17              District Attorney - Queens County
                125-01 Queens Boulevard
18              Kew Gardens, New York 11415
                BY:  MINA MALIK, ESQ.
19                   Assistant District Attorney

20
                For the Defendant:
21              ROBERT JOHNSTON, ESQ.
                Defense Counsel
22

23

24                          Viola L. Dunnom, SCR

25
```

```
 1              COURT CLERK: Case on trial. 2147 of 06.
 2    Abu Khan.
 3              MS. MALIK:  Mina Malik for the People.
 4              MR. JOHNSTON: Robert Johnston.
 5              MR. VIRUET:  Samuel Viruet.
 6              COURT CLERK:  Defendant incarcerated.
 7    Produced.  Before the court.
 8              THE COURT: Good morning.  Mr. Khan is
 9    also now present. Good morning Mr. Khan.
10              THE DEFENDANT:  Good morning sir.
11              THE COURT: There were some matters that
12    we should place on the record prior to the jury
13    being brought in.
14              MS. MALIK:  Yes, in meeting with the
15    detective assigned to this case.  Luz Figueroa I
16    received 6 pages of Rosario material which have not
17    been turned over to the defense before.  I am
18    turning them over now. They consist of the hand
19    written notes of Ann Martinez.  And handwritten
20    notes by the detective of Ashley Martinez which are
21    basically what is in the DD5.
22              They are verbatim copies of the DD5 but
23    typed.  There is also a page regarding the
24    defendants pedigree information and work
25    information.  As well as items that were picked up
```

1     by a friend of the defendant, his belongings, these

2     items were released to Alejandro Gonzales.  Finally

3     a 2 page unusual occurrence report.

4              THE COURT:   You are saying that

5     detectives handwritten notes the substance of which

6     was already included in the type written copies

7     given to counsel earlier.

8              MS. MALIK:   That's correct with respect

9     to Ann Martinez and Ashley Martinez.

10             THE COURT:   Is there anything further.

11             MS. MALIK:   Yes, your Honor, I would like

12    to introduce photographs of the complaining witness

13    when she testifies later on today.

14             I have two photos in front of me your

15    Honor. One is of her when she is about 5 or 6 years

16    old. The other one is a picture of her with she was

17    been 6 or 7 years old. I think that it's relevant

18    to this case because the acts that are alleged in

19    the indictment occurred and starts in 1997 through

20    the year 2000 encompassing those years when she is

21    basically 5 years to 7 years old.

22             I do have to prove according to the

23    indictment that the victim was under the age of 11.

24    And also I think that it's probative and relevant

25    to the time that she looked like at the time that

1       the crime started. For those reasons your Honor I

2       would ask that I be allowed to introduce those

3       photographs.

4               THE COURT:  Any objection.

5               MR. JOHNSTON:  Yes, judge as I indicated

6       to the court at the bench a few minutes ago off the

7       record these are 2 pictures of this young girl at a

8       young age. She is a lot thinner I will give you

9       that but I believe this is not relevant to any

10      material issue that will involved here.

11              Ashley Martinez's age has not been

12      disputed.  And I believe that they are only going

13      to be offered to try to get some sympathy from the

14      jury so we would object to the admission of those

15      photographs and in addition judge the DA at the

16      bench conference indicated that she intended to

17      call the arresting officer.

18              Well, it's my understanding that the

19      arresting officer was notified by Florida and

20      conducted an investigation in Queens and then based

21      on that investigation arrested Mr. Khan.  He made

22      no statements when he was arrested.  And so

23      therefore I feel that the detective can really not

24      contribute any evidence that would be relevant to

25      an issue on trial. We all know Mr. Khan has been

1      arrested.  We know the girl has said something

2      about him.

3           However, I feel that the detectives

4      testimony would only be bolstering the testimony of

5      Ashley Martinez and what other witnesses the People

6      decide to call so I don't think that it should

7      be -- the detective should be allowed to testify in

8      this particular matter.

9           THE COURT:  So you have an objection to

10     both of these 2 photographs being accepted into

11     evidence and also any testimony from an

12     investigating officer.  People you intend to go

13     over the testimony of an investigating officer.

14          MS. MALIK:  Yes, Detective Luz Figueroa.

15     She is not going to testify as to what Ashley

16     Martinez or any other witness told her regarding

17     this these incidents. She is merely going to

18     testify regarding that she received a report and

19     she received a request to investigate this case and

20     of the steps that she took in terms of

21     investigating this case and what she did as a

22     detective with the Special Victim Bureau and the

23     Child Abuse Squad and what she did in relation to

24     the case.

25          I also have to bring out that the

Proceedings                424

1   defendant was over a certain age. The detective

2   took pedigree information from the defendant. I

3   have to establish that his date of birth is

4   December 12 of 1966 and how old he was at the time

5   that this alleged event occurred.  That is part the

6   indictment.

7            MR. JOHNSTON:  Judge we are willing to

8   stipulate to that to avoid any problem.

9            THE COURT:   Over the objection of the

10   defense that application to introduce those 2

11   photographs into evidence as probative of what the

12   victim looked like at the age that she is alleged

13   to have been a victim over the objection of the

14   defense those photographs will be admitted as

15   People's 1 and 2.

16            And I see no reason why the detective

17   should not be able to testify you know concerning

18   her investigation of this case including the steps

19   made to apprehend the defendant and any pedigree

20   information that she received from the defendant.

21   So the objection of the defense is respectfully --

22   the objections of the defense is respectfully

23   denied.

24            MS. MALIK:  Thank you your Honor.

25            THE COURT: Anything else.

1              MS. MALIK:  Just with respect to the

2    testimony of Ashley Martinez your Honor.  I know

3    that we discussed the other day her testimony

4    regarding the reasons why she didn't out cry about

5    these instances earlier.  And one of the things

6    that came to light was not only that she witnessed

7    physical and verbal abuse towards her mother that

8    made her afraid of out crying.  But also she

9    witnessed the defendant inflict wounds upon himself

10   and be violent towards himself and that is another

11   reason why she did not out cry.

12             She was afraid and thought if he could do

13   that kind of thing to himself imagine what he could

14   do it other people.

15             THE COURT:  You believe that the

16   information that she has relative to this

17   observation of a broken bottle and self inflicting

18   wound it's your belief that that is a reason that

19   she said that she did not come forward.

20             MS. MALIK:  Correct.  One of the reasons.

21             THE COURT:  One of the reasons.

22             MS. MALIK:  Correct.

23             THE COURT:  Defense.

24             MS. MALIK:  There is also another

25   incident where I believe that the defendant tried

vld

1        to throw himself from a car as the car was moving.

2        That is another incident that she brought to my

3        attention.

4                THE COURT: Now as something that she

5        observed or a reason for her choosing not to come

6        forward.

7                MS. MALIK:  Something that she observed

8        and which turned into a reason. One of the reasons

9        why she didn't come forward and report what was

10       happening to her.

11               THE COURT: Defense.  Any objection.

12               MR. JOHNSTON:  I have no objection judge.

13               THE COURT:  Anything further People.

14               MS. MALIK:  No your Honor.

15               THE COURT: Ready to go forward with the

16       next witness.

17               MS. MALIK:  Yes.

18               THE COURT: And that will be who.

19               MS. MALIK:  Ann Martinez.

20               THE COURT:  Is that the sister.

21               MS. MALIK:  The victim's grandmother.

22               THE COURT: And you will have those

23       exhibits marked now.

24               MS. MALIK:  Yes.

25               COURT OFFICER:  Jury entering.

vld

```
 1                    COURT CLERK:  Both sides stipulate to the
 2            presence and proper seating the jurors.
 3                    MR. JOHNSTON:  Yes.
 4                    MS. MALIK:  Yes.
 5                    THE COURT: Good morning.  We have been
 6            here working and on those matter that I mentioned
 7            earlier those matters I worked on outside of your
 8            presence.
 9                    We are now ready to continue the trial
10            with you members of the jury.  So, People call your
11            next witness please.
12                    MS. MALIK:  The People call Ann Martinez.
13                    COURT OFFICER:  Witness entering.
14   A N N   M A R T I N E Z, having been duly sworn, was examined
15            and testified as follows:
16                    COURT OFFICER:  People call witness Ann
17            Martinez.  M-A-R-T-I-N-E-Z.  Resident of Queens
18            county.
19                    THE COURT: Please inquire.
20   DIRECT EXAMINATION
21   BY MS. MALIK:
22        Q.   Good morning.
23        A.   Good morning.
24        Q.   Can you tell us how old you are?
25        A.   53.
```

| 1 | Q. | Where do you live? |

2   A.   3-04 121st Street.  College Point, Queens.  Second

3   floor.

4   Q.   How long have you been living there?

5   A.   15 years.

6   Q.   Who do you  live with?

7   A.   My common law spouse Hubert Chan, my son, his

8   girlfriend Sandy and my 2 granddaughters.

9   Q.   Is your common law spouse in the courtroom today?

10   A.   Yes.

11   Q.   Is he behind us in the light blue shirt and the

12   blue tie?

13   A.   Yes.

14   Q.   What does your common law spouse do for a living?

15   A.   He is a school bus driver.

16   Q.   Do you have any children?

17   A.   I have 2 kids.

18   Q.   And what are their names?

19   A.   Leslie Ann Martinez.  Philip Martinez.

20   Q.   How old are they?

21   A.   31 is my daughter.  26 is my son.

22   Q.   Can you tell us what your educational background

23   is?

24   A.   I just have a high school diploma.

25   Q.   Do you work?

1      A.    Yes.

2      Q.    Where do you work?

3      A.    I work for Kramer Levin in New York City.

4      Q.    What kind of an agency is that?

5      A.    It's corporate and litigation law.

6      Q.    What do you do for Kramer Levin?

7      A.    I do securities exchange commissions. It's

8  electronics filings with the SCC.

9      Q.    How long have you been working there?

10     A.    June will be 8 years.

11     Q.    What did you do before you worked there.

12     A.    I worked for Scatnoff (ph) for 15 years.  I worked

13 in word processing and billing and collections reports.

14     Q.    Is that mean?

15     A.    Yes.

16     Q.    What kind of an agency is that?

17     A.    Personal injury and acquisition law.

18     Q.    Is that a law firm as well?

19     A.    Yes.

20     Q.    How many days a week do you work approximately?

21     A.    5 days a work.

22     Q.    Approximately how many hours do you work?

23     A.    Mostly 35.  I do overtime.  Could be you know more

24 than 35, 40, 45 hours a week.

25     Q.    Do you know someone by the name of Abu Khan?

```
 1          A.    Yes.

 2          Q.    Do you know him by any other name?

 3          A.    Yes.

 4          Q.    What is that?

 5          A.    It's Jimmy.

 6          Q.    Do you see him in the courtroom today?

 7          A.    Yes.

 8          Q.    Could you point him out and identify him by an

 9    article of clothing?

10          A.    The brown shirt with the tie.

11                     THE COURT:  Indicating the defendant.

12          Q.    How long have you known the defendant

13    approximately?

14          A.    In a relationship with my daughter close to 10

15    years; 9, 10 years. I knew of him before I met him a couple

16    of times. His family was good friends with my family so I

17    knew him as a younger boy, young man.

18          Q.    Now, can you tell us over the course of the years

19    what was your -- the nature of your relationship with the

20    defendant?

21          A.    It was good.

22          Q.    Can you describe to us how it was?

23          A.    Pleasant.  I -- we got along well.  Never really

24    argued. He felt comfortable with me.  Close to me.  He told

25    me many times that he trusted me and he treated me like I was
```

Ann Martinez/Direct/Ms. Malik                    431

1   his mom. He called me mommy.

2        Q.   How did you treat him?

3        A.   With respect.  I respected that.  And I liked that.

4        Q.   Did you think of him as a son-in-law?

5        A.   Yes I did.

6        Q.   How is your relationship with your daughter Leslie.

7        A.   Fine.  Wonderful.

8        Q.   Do you know someone by the name of Ashley Martinez?

9        A.   Yes.

10       Q.   Who is she in relation to you?

11       A.   My granddaughter.  My first born.

12       Q.   How is your relationship with her?

13       A.   Wonderful.  Great.

14       Q.   Now from 1997 to the present did the defendant ever

15  live with you?

16       A.   No.

17       Q.   Do you remember when he started living with you?

18       A.   He came in 2004.

19       Q.   Now when did he started living with you?

20       A.   Oh in 1997.

21       Q.   And where did he start living with you?

22       A.   He.

23       Q.   In 1997?

24       A.   In 1997 and lived in my home with my daughter and

25  my 2 grand kids.

1      Q.   Is that at 3-04 121st Street in College Point?

2      A.   Correct.

3      Q.   Who did the defendant move in your house with?

4      A.   With my daughter Leslie Martinez.

5      Q.   Anybody else?

6      A.   With Ashley Martinez.  And Jaeshawn Benn, my two

7   grand kids.

8      Q.   Who is Jaeshawn Benn?

9      A.   My grandson.

10     Q.   Is that Leslie's other son?

11     A.   Yes.

12     Q.   Can you describe the layout of your house at 3-04

13   121st Street?

14     A.   It's a duplex 2 family condominium.  I am on the

15   first floor when you walk up.  The first floor is the kitchen

16   living room and half bath.  And a deck on the outside. And up

17   the steps on the second floor I have 3 bedrooms and 2 full

18   baths.

19          In one of the middle bedrooms is a double bedroom

20   because there are spiral steps going up to a room called the

21   loft. So there are 2 rooms in one. That loft room is on one

22   level. The other 3 bedrooms are on the second floor.

23     Q.   Now did there come a time that the defendant,

24   Leslie, Jaeshawn and Ashley moved out of your house?

25     A.   Yes.

```
1        Q.   Do you remember what year was that?

2        A.   At the moved out 1999.

3        Q.   Do you remember where they moved?

4        A.   To Florida.

5        Q.   Before they moved to Florida?

6        A.   Oh, they moved in Queens.  Rockaway I am not sure.

7   It was in Queens.

8        Q.   Do you remember them moving to Ozone Park, Queens?

9        A.   Yes.

10                  MR. JOHNSTON:  Judge, I think that we

11             have had enough leading.

12                  THE COURT: Sustained.

13       Q.   How is your relationship with the defendant after

14   he moved out with his family?

15       A.   Fine.

16       Q.   And did there come a time that you had 2

17   grandchildren through the defendant and through your daughter

18   Leslie?

19       A.   Yes.

20       Q.   Who are those grand children?

21       A.   Ariel Khan and Andrew Khan.

22       Q.   Did there come a time that the defendant moved to

23   Florida with Leslie and your 4 grand children?

24       A.   To Florida yes.

25       Q.   When.  Do you remember when that was approximately?
```

Ann Martinez/Direct/Ms. Malik                434

1       A.    2000 I am not 100 percent sure.

2       Q.    After the defendant moved to Florida with his

3  family did he ever come live with you for months at a time?

4       A.    Yes.

5       Q.    Do you remember approximately how many times he

6  came to live with you?

7       A.    Approximately 3 to 4 times.

8       Q.    And can you tell us the purpose for the defendant

9  coming to stay with you for those months at a time?

10      A.    To work.

11      Q.    I would like to direct your attention to August

12  2004 Ms. Martinez, were you living at 3-04 121st Street?

13      A.    Yes.

14      Q.    Did there come a time during that month that the

15  defendant came to live with you?

16      A.    Yes.

17      Q.    What was the purpose for him coming to live you

18  with you during August of 2004?

19      A.    To work.

20      Q.    Do you remember how long he stayed with you?

21      A.    2 and a half to 3 months.

22      Q.    Do you remember when he left?

23      A.    Yes.

24      Q.    When did he leave?

25      A.    December first.

1        Q.   Of 2004?

2        A.   Yes.

3        Q.   Now directing your attention to late November of

4   2004 did there come a time during that period when a decision

5   was made that Ashley would come and live with you?

6        A.   Yes.

7        Q.   Can you tell us the purpose of her coming to live

8   with you at that time?

9        A.   She was having trouble in school in Florida and a

10  little bit of trouble also getting along with her mom.

11       Q.   Were arrangements made for Ashley to come to New

12  York City?

13       A.   Yes.

14       Q.   Did she in fact come to New York City?

15       A.   Yes.

16       Q.   How did she get here?

17       A.   She flew we get her a ticket.

18       Q.   Do you remember when she came?

19       A.   November 30.  I believe that she had a 9 o'clock or

20  morning flight.

21       Q.   Is that November 30 of 2004?

22       A.   Yes.

23                 THE COURT: Also you said we who is the we

24            that got her the ticket.

25                 THE WITNESS:  One of us I am not sure it

vld

1    might be my daughter.  I am not sure who purchased
2    the ticket.
3             THE COURT:   As you sit here now you do
4    not know whether or not that ticket was purchased
5    by you or your daughter.
6             THE WITNESS:  Correct.
7             THE COURT: So when you say we you are
8    referring to either you or your daughter.
9             THE WITNESS:  Correct.
10            THE COURT:   Ms., you mentioned that home
11   that there are 3 bedrooms on one level.
12            THE WITNESS: Yes.
13            THE COURT: Were you living in one of --
14   was one of those bedrooms your bedroom.
15            THE WITNESS: Yes.
16            THE COURT: Was that the one in the middle
17   or the one on --
18            THE WITNESS:  The far left.
19            THE COURT:   Was Leslie and Mr. Khan
20   staying in one of those bedrooms.
21            THE WITNESS: Yes.
22            THE COURT:   Which of them.
23            THE WITNESS:  In the middle the loft.
24   They were at the bottom bedroom that  was in 1997.
25            THE COURT:  Yes and when Mr. Khan came

1       back to live you with those 3 or 4 times which of

2       the 3 bedrooms was he staying in then.

3              THE WITNESS:  I assume the right bedroom

4       to my granddaughter.  He would stay in the middle

5       with the one in the loft or sometimes he would be

6       on the sofa downstairs.

7              THE COURT: Counsel.

8       Q.   His Honor asked you a question about where Leslie

9   and the defendant would stay.  And you said that he stayed at

10  the -- in the bedroom with the loft?

11      A.   Yes, on the bottom bedroom.

12      Q.   Who would stay upstairs in the loft?

13      A.   Jaeshawn my grandson and Ashley.

14      Q.   Now, directing your attention to November 30 of

15  2004 were you working on that day?

16      A.   Yes.

17      Q.   What about your husband?

18      A.   Yes he was working.

19      Q.   And what about the defendant was he working on that

20  day?

21      A.   I don't think so.

22      Q.   Was there a decision made regarding who was going

23  to pickup Ashley from the airport when she got to New York

24  City?

25      A.   Yes.

1        Q.    Can you tell us how that decision was made?

2        A.    I believe that it was made the day before because

3   we discussed it that since Jimmy had a more flexible --

4                    THE COURT:   Again you said we discussed.

5              Who is the we.

6        A.    Hubert Chan and myself and that it would be best

7   that he get her from the airport.

8        Q.    What time does your husband normally leave for work

9   in the morning?

10       A.    He believe like 4:30 AM.

11       Q.    What about you?

12       A.    I believe like 7:30 quarter to 8 AM.

13       Q.    So did you go to work at Kramer Levin that day on

14  November 30 of 2004?

15       A.    Yes.

16       Q.    Did your husband go to pickup the school children

17  as a bus driver on that day?

18       A.    Yes he did.

19       Q.    Do you remember when you got home that day?

20       A.    Yes.

21       Q.    Can you tell us when that was?

22       A.    It was close to 7 o'clock.

23       Q.    Did you see Ashley?

24       A.    Yes.

25       Q.    What happened when you saw Ashley?

1    A.    It was very good to see her you know we greeted
2  each over.
3    Q.    And did you see the defendant at that time?
4    A.    Yes.
5    Q.    Did your husband come home that evening?
6    A.    Yes.
7    Q.    And do you remember approximately what time you
8  went to sleep?
9    A.    I went to bed between 9 and 10 that night my
10 husband had to go and Ashley went with Jimmy to take his work
11 truck to Long Island to take it in.  So my husband took him.
12   Q.    Whose work truck?
13   A.    Jimmy's.
14   Q.    So your husband and Ashley went to bring the
15 defendants work truck to Long Island?
16   A.    Yes and I stayed home.
17   Q.    Where did you and your husband sleep that night?
18   A.    The master bedroom upstairs on the second floor.
19   Q.    And do you remember what time your husband went to
20 sleep that night?
21   A.    10 o'clock.
22   Q.    Did you hear anything during the night?
23   A.    No.
24   Q.    Did you wake up the next morning?
25   A.    Yes.

```
 1        Q.    What happened the next day.
 2        A.    The next day I got up. I had a day off because I
 3   was supposed to go register Ashley in school and the 3 of us
 4   were going to go do this. Jimmy, Ashley and myself and that's
 5   what we did.
 6        Q.    What did you do the next day?
 7        A.    We got up.  Had coffee. Got ready to go to the
 8   school.
 9        Q.    What did you do.  Did you -- did you register in
10   school?
11        A.    Yes.
12        Q.    What did you do after?
13        A.    He took us to Brooklyn shopping.
14        Q.    What did the defendant do that night the night of
15   December first of 2004?
16        A.    That is the night that he left to drive back to
17   Florida.
18        Q.    Do you know how he got down there?
19        A.    He drove I believe that we rented a car.  He rented
20   a car.
21        Q.    How long did Ashley stay with you?
22        A.    Ashley stayed until the next summer.  So it's like
23   8 months or --
24        Q.    Did she move back down to Florida at some point?
25        A.    Yes.
```

1       Q.    Is that the following summer, 2005?

2       A.    Correct.

3       Q.    How was your relationship with the defendant after

4   he left on December first of 2004?

5                   THE COURT:    Through to when.

6       Q.    Just after he left?

7                   THE COURT:    Through to now.

8       Q.    Yes.

9       A.    I spoke to him after he left on the first. Maybe

10  twice.  He called me but not after that.

11      Q.    Now between December first of 2004 and last year

12  was there any kind of animosity or anything between you and

13  the defendant?

14      A.    No.

15                  MS. MALIK:    I have no further questions

16          your Honor.

17  CROSS EXAMINATION

18  BY MR. JOHNSTON:

19      Q.    Ms. Martinez just a few questions.  On the day that

20  Ashley arrived from Florida to stay with you because she was

21  being difficult to handle so to speak for your daughter in

22  Florida you told the jury that you came home about 7 PM is

23  that correct?

24      A.    Yes.

25      Q.    And was Hubert there when you returned home or?

1        A.    Yes.

2        Q.    He was.  He was home already?

3        A.    Yes.

4        Q.    Do you know when he arrived home?

5        A.    No I don't know the exact time.

6        Q.    In any event did you have dinner together?

7        A.    I am not sure if we ate dinner because he went with

8   Jimmy to Long Island. I am not sure if he sat down and ate

9   dinner that night.

10       Q.    Did you have dinner?

11       A.    Yes probably ate something, yes.

12       Q.    And you said that Hubert and Jimmy went out to Long

13  Island to what pickup a truck?

14       A.    To drop his work truck because he was leaving to go

15  to Florida. He could not leave his truck in my driveway.  He

16  had to take it back to his job.

17       Q.    So he had been working for Phoenix Refrigeration?

18       A.    Yes.

19       Q.    And they had to return the truck to the boss

20  because he was leaving for Florida the next day?

21       A.    Correct.

22       Q.    Do you recall what time Mr. Chan and Jimmy left for

23  Long Island?

24       A.    After 7.  Has to be when I came home.

25       Q.    And do you know how long they were gone before they

1    returned?

2         A.    At least a couple of hours by 9.

3         Q.    By 9?

4         A.    Yes.

5         Q.    And you were still up at the time?

6         A.    I was up in my room I am not sure if I was sleep or

7    if I was watching TV I was up.

8         Q.    Where was Ashley?

9         A.    Ashley came in with them.  And was --

10        Q.    Ashley went with them?

11        A.    Yes.

12        Q.    So the 3 of them went out to Long Island?

13        A.    Yes.

14        Q.    What happened when Ashley got back and Hubert got

15   back and the defendant got back?

16        A.    I knew that they were back. I did not leave my

17   room. I don't think that I left my room.  Hubert went to bed

18   because we usually go to bed at 10.

19        Q.    Would you describe yourself as a light sleeper or a

20   heavy sleeper?

21        A.    It depends.

22        Q.    Depends?

23        A.    Yes.

24        Q.    And during the course of the evening you didn't

25   hear anything that caused you to be alarmed in any way is

```
 1 ┃ that correct?
 2 ┃     A.   No I did not.
 3 ┃     Q.   In fact when the defendant was living with you for
 4 ┃ all of that period of time you never heard anything that
 5 ┃ caused you to be alarmed in any way?
 6 ┃     A.   No.
 7 ┃                 MS. MALIK:   Objection your Honor.
 8 ┃                 THE COURT:   Overruled.
 9 ┃                 MR. JOHNSTON:   I have no further
10 ┃            questions judge.
11 ┃                 THE COURT:   Anything further.
12 ┃ REDIRECT EXAMINATION
13 ┃ BY MS. MALIK:
14 ┃     Q.   When Ashley was sleeping in the loft room in your
15 ┃ house Ms. Martinez were there times that she was sleeping
16 ┃ there and you weren't around?
17 ┃     A.   Yes.
18 ┃     Q.   Do you know everything that happened in the loft
19 ┃ room when Ashley Martinez was sleeping there?
20 ┃     A.   No.
21 ┃     Q.   Was the defendant living there in the house at the
22 ┃ same time Ashley was sleeping in the loft room during 1997
23 ┃ through 2000?
24 ┃     A.   Yes.
25 ┃     Q.   The defendant was there the night of November 30,
```

1   2004?

2       A.   Yes.

3       Q.   And after you went to sleep on November 30, 2004 do

4   you know what happened with Ashley Martinez and the

5   defendant?

6       A.   No.

7       Q.   Just because you were not aware of anything

8   happening.

9       A.   Yes.

10                  MR. JOHNSTON:  Objection.

11                  THE COURT: Ma'am just so that I am clear

12            did you say that on the date that Ashley came back

13            to stay with you did she have a room assigned.

14                  THE WITNESS: Yes.

15                  THE COURT:  And which room was that.

16                  THE WITNESS:  The one on the very right

17            side with the -- on your right side. Not the one

18            with the loft.

19                  THE COURT:   And at that point was -- did

20            the defendant have assigned sleeping quarters on

21            the couch or the lower level meaning on the first

22            entry level or in --

23                  THE WITNESS:  Right.  In the middle

24            downstairs or downstairs. He knew that room was

25            assigned to my granddaughter.

1              THE COURT:    Which of the rooms was
2    assigned to granddaughter.
3              THE WITNESS:    The one on the right side
4    with the window.
5              THE COURT:    During the time when Mr.
6    Khan was staying with you in your house and your
7    daughter and other grand children were down in
8    Florida where was his assigned sleeping.
9              THE WITNESS:    In 1997.
10             THE COURT: No, this is now in those times
11   that he would come up when the family was living in
12   Florida.
13             THE WITNESS:    Okay.  He would sleep in
14   the room where Ashley was assigned. No one else was
15   in the room in the house.
16             THE COURT:    So at that point was there
17   anyone assigned to the middle bedroom.
18             THE WITNESS:    No, at that time it was
19   just Jimmy in the house so he could sleep in.  We
20   never really specified that this is your room.
21   This was a TV room.  It had cable and had a sofa
22   bed and the room on your right side also had a full
23   size bed, but he would mostly use the one with the
24   full size bed.
25             THE COURT:    Anything counsel?

                                                    vld

1              MR. JOHNSTON:  I do judge.

2    RECROSS EXAMINATION

3    BY MR. JOHNSTON:

4        Q.   When Jimmy was visiting from Florida where would he

5    be assigned to sleep?

6        A.   When he was working and living at my house.

7        Q.   Yes, when he was living at your house up here?

8        A.   And Ashley was not around.

9        Q.   Yes and Ashley was in Florida?

10       A.   I never assigned a room to him. So he just used

11   where ever to sleep which ever room he was comfortable in.

12   If he fell asleep watching TV there was a sofa bed there and

13   there was a couch.

14       Q.   If Ashley was up like November 30 of 2004 where was

15   Jimmy supposed to sleep?

16       A.   Jimmy could sleep in the loft room. There were beds

17   in there or downstairs there was a couch.

18       Q.   Not any of the bedrooms next to Ashley?

19       A.   Well, the loft room the one in the middle is next

20   to Ashley room.

21       Q.   But it's upstairs?

22       A.   Yes.

23       Q.   You have to go up that spiral staircase?

24       A.   Right.

25       Q.   So he could sleep in the loft up above?

1  A.  Yes, there was a mattress.

2  Q.  Or if he fell asleep downstairs?

3  A.  Yes there was a couch.

4          MR. JOHNSTON:  Thank you.

5          THE COURT:  Okay.  I just want to make

6  sure that we are clear as to how this middle

7  bedroom is set up.  Can you describe for us once

8  you walk into that middle bedroom what are you

9  looking at.

10         THE WITNESS:  You walk straight in. There

11  is a big TV on your left side there is a couch.

12  And it's a pull out couch. You walk straight up the

13  spiral steps. There was another little room, the

14  same side.  I have a mattress just put on the floor

15  and just like storage stuff. Blankets and stuff

16  that I have in storage.

17         There is a mattress. Sleeping bag.

18  Blankets in the loft room if the kids came or

19  anybody else can be comfortable up there and sleep.

20         THE COURT: So as you are entering that

21  middle bedroom is there an area on that first level

22  that you are on not walking up the stairs to the

23  loft is there an area in that place in that initial

24  area when you walk in is there a place to sleep.

25         THE WITNESS:  Yes on the couch.

```
 1                     THE COURT:  So on that first in that
 2              first room that first area when you walk into the
 3              middle bedroom there is a couch.
 4                     THE WITNESS:  Yes.
 5                     THE COURT:   That is a sleeper couch.
 6                     THE WITNESS:  Correct.
 7         Q.    But the only bed that exists in that middle room
 8    would be mattresses in the loft area?
 9         A.    Yes just the mattress.
10                     THE COURT:   Anything further.
11    RE/REDIRECT EXAMINATION
12    BY MS. MALIK:
13         Q.    Can you tell us what time period that you are
14    talking about when you had the sleeper couch in the middle
15    bedroom on the lower level and the mattress in the loft area
16    what time period are you talking?
17         A.    The same time 2004 November 30.
18         Q.    And on November 30, 2004 can you tell us where you
19    had TV's in the house?
20         A.    I had a TV in that same bedroom. One in the master
21    bedroom and one on the first floor. 3 TV's.
22         Q.    Was that the TV that was in the middle bedroom is
23    that in the loft area?
24         A.    No.
25                     MS. MALIK:  I have no further questions
```

1          your Honor.

2                    THE COURT:   Anything further.

3                    MR. JOHNSTON:   Nothing further.

4                    THE COURT: Thank you Ma'am.   People call

5          your next witness please.

6                    MS. MALIK:   The People call Det. Luz

7          Figueroa.

8                    COURT OFFICER:   Witness entering.

9   L U Z   F I G U E R O A, having been duly sworn, was examined

10         and testified as follows:

11                   COURT OFFICER:   People call Detective Luz

12         Figueroa.   F-I-G-U-E-R-O-A.   Queens Child Abuse

13         Squad.   Shield number 5467.

14   DIRECT EXAMINATION

15   BY MS. MALIK:

16      Q.   Good morning?

17      A.   Good morning.

18      Q.   What agency do you work for?

19      A.   The New York City Police Department.

20      Q.   In what capacity?

21      A.   Detective.

22      Q.   How long have you been with  the NYPD?

23      A.   I am going on my 16th year.

24                   THE COURT: Detective if you would your

25         voice is kind of low. If you could scoot up and

Det. Figueroa/Direct/Ms. Malik                   451

1              speak louder.  Thanks.
2       Q.    How long have you been a detective?
3       A.    I am going on my 11th year.
4       Q.    Can you tell us when you first started with the
5  NYPD?
6       A.    I started in 1991.
7       Q.    Where were you first assigned?
8       A.    The 70 Precinct in Brooklyn.
9       Q.    And in starting with the NYPD in what capacity were
10  you working with the NYPD?
11      A.    I was a police officer at the time.
12      Q.    How did you become a detective?
13      A.    I went to the narcotics division.
14      Q.    What did you do there?
15      A.    I was an undercover.
16      Q.    What do you mean by you were an undercover?
17      A.    I was purchasing drugs as an undercover officer.
18      Q.    Where are you currently assigned?
19      A.    Queens Child Abuse Squad.
20      Q.    Where is your office located?
21      A.    112-25 Queens Boulevard.
22      Q.    And you also worked with the Special Victim Squad
23  of the NYPD?
24      A.    Yes.
25      Q.    How long have you been were you with the Special

1    Victim Squad?

2         A.   I will be hitting my 6th year.

3         Q.   How long have you been with the Child Abuse Squad?

4         A.   2 years.

5         Q.   Is the Child Abuse Squad a derivative of the Queens

6    Special Victim Squad?

7         A.   Yes it is.

8         Q.   Approximately how many detectives are in the

9    Special Victims Squad and the Child Abuse Squad?

10        A.   In my office it's maybe right now maybe 14, 15 I am

11   not quite sure.

12        Q.   What are your duties with the Child Abuse Squad?

13        A.   We investigate physically and sexually abused

14   children.

15        Q.   Do you work with other agencies in connection with

16   the investigations and allegations of child physical and

17   sexual abuse?

18        A.   Yes.

19        Q.   Can you tell us what those other agencies are?

20        A.   ACS and the Queens DA's Office.

21        Q.   How many cases of child abuse both sexual and

22   physical have you personally investigated approximately?

23        A.   About 200.

24        Q.   And how many cases of child physical and sexual

25   abuse have you assisted in investigating approximately?

1     A.    Probably a little over 200.

2     Q.    Now I would like to direct your attention to

3     Tuesday June 13, 2006 detective were you working on that date

4     as a detective with the Child Abuse Squad?

5     A.    Yes, I was.

6     Q.    Did there come a time that you were assigned to

7     investigate a case involving a subject named Abu Khan?

8     A.    Yes.

9     Q.    Do you see him in the courtroom today?

10    A.    Yes I do.

11    Q.    Would you please point him out and identify him by

12    an article of clothing that he is wearing?

13    A.    Sitting there with a brown shirt.

14              THE COURT: Indicating the defendant.

15    Q.    Who is the victim in that case?

16    A.    Ashley Martinez.

17    Q.    Did there come a time on June 13 of 2006 that you

18    met with Ashley Martinez?

19    A.    Yes I did.

20    Q.    Did you interview her?

21    A.    Yes I did.

22    Q.    Did you remember who was with Ashley at that time?

23    A.    Her grandmother.

24    Q.    Do you remember Ashley's mothers name?

25    A.    Leslie Martinez.

1      Q.    Do you remember where Ashley's mother Leslie

2    Martinez was on that date?

3      A.    She was in Florida at the time.

4      Q.    On June 15 of 2006 detective were you working on

5    this case then?

6      A.    Yes I was.

7      Q.    Can you tell us when you -- what you did in

8    connection with this case on June 15 of 2006?

9      A.    I responded to Long Island to Mr. Khan's place of

10   employment.

11     Q.    Where was that?

12     A.    I believe it was Mineola.

13     Q.    What kind of a place of employment was it do you

14   remember the name?

15     A.    Phoenix Refrigeration.

16     Q.    Who did you go to Phoenix Refrigeration with?

17     A.    I went with Detective Fox and Detective Reyes.

18     Q.    Do you remember approximately what time you went

19   there on June 15 of 2006?

20     A.    I would have to check.

21                  THE COURT: Please.

22     A.    It was at 1300 hours.  1 PM, I am sorry.

23     Q.    When you went to Phoenix Refrigeration detective

24   who if anyone did you speak with there?

25     A.    I spoke to the manager of the refrigeration

1   company.

2        Q.   And after speaking with the manager did your

3   investigation focus on another location?

4        A.   Yes.

5        Q.   Where was that location?

6        A.   May I.

7                        THE COURT: Yes.

8        A.   The other location was 2149 Ralph Avenue.

9        Q.   Where is that located?

10       A.   Brooklyn.

11       Q.   What is that location?

12       A.   It's a Waldbaum's Supermarket.

13       Q.   What did you do next after you focused in on that

14   location?

15       A.   I called my office and I spoke to one of my

16   coworkers Detective Mark Percina (ph) and told him that they

17   needed to respond to that location.

18       Q.   Now I would like to direct your attention to about

19   4 PM on June 15 of 2006 do you remember where you were at

20   that time detective?

21       A.   At 4 PM. May I.

22       Q.   Yes.

23       A.   I was at my office.

24       Q.   At the Queens Child Abuse Squad?

25       A.   Yes.

vld

1          Q.    Who was brought to your office at about 4 PM on

2     June 15 of 2006?

3          A.    The defendant Mr. Khan.

4          Q.    And what police action was taken with respect to

5     the defendant?

6          A.    I informed the defendant --

7          Q.    What did you actually do?

8          A.    I introduced myself to the gentleman and I told him

9     who I was.  And the reason why he was at my office.

10         Q.    Did you place him under arrest?

11         A.    Yes.

12         Q.    Are you familiar with the term pedigree information

13    detective?

14         A.    Yes I am.

15         Q.    Can you tell us what that is?

16         A.    Pedigree information would be his personal

17    information.  His name, date of birth, height and weight,

18    place of residence.

19         Q.    And can you tell us did you take pedigree

20    information from the defendant?

21         A.    Yes.

22         Q.    Can you tell us what the defendant told you his

23    date of birth was?

24         A.    He said that his date of birth was December 12,

25    1966.

```
 1        Q.   And given his date of birth detective on November
 2   30 of 2404 how old was the defendant at that time?
 3        A.   39.
 4        Q.   Can you tell us what he told that you his height
 5   was?
 6        A.   5' 11".
 7        Q.   Can you tell us what he told you that his weight
 8   was?
 9        A.   179.
10        Q.   179 pounds?
11        A.   Yes.
12        Q.   Now detective are you familiar with the Queens DA's
13   hotline?
14        A.   Yes.
15        Q.   Can you tell us what that is?
16                  MR. JOHNSTON:   I am going to be object to
17             anything further on the issue of relevance judge.
18                  MS. MALIK:   Can we approach.
19                  THE COURT:   Please.
20                  (Off the Record Discussion).
21                  MR. JOHNSTON:   Judge, for the record the
22             following questions I am objecting to on the
23             grounds of relevance.
24                  THE COURT: Objection noted.   Overruled.
25        Q.   Detective are you familiar with the Queens DA's
```

1   hotline?

2        A.    Yes I am.

3        Q.    Can you tell us what that is?

4        A.    That's an ADA that is on call 24 hours.

5        Q.    Well the hotline itself when you call the Queens DA

6   office hotline?

7        A.    There is a detective there that will take the

8   information that you give him.

9        Q.    And how often is that hotline in service?

10       A.    It's 24 hours.

11       Q.    Now are you familiar with the Queens DA Special

12  Victim Writing Program?

13       A.    Yes.

14       Q.    Can you tell us what that is?

15       A.    That's an ADA that is on call to help to assist

16  when you have an arrest either to interview your victim.

17       Q.    Did you contact the Queens DA hotline in connection

18  with this case?

19       A.    Yes I did.

20       Q.    And who did you ultimately speak with regarding

21  this case from the Queens DA office?

22       A.    To Brian Lee.

23       Q.    And is he an ADA?

24       A.    He is a supervisor for the district attorney.

25       Q.    What was the purpose of you contacting him on that

```
 1   date?
 2                    MR. JOHNSTON:  Objection.
 3                    THE COURT: Overruled.
 4        A.   I informed him that I have an arrest and what the
 5   arrest was about and he came down and he interviewed the
 6   victim.
 7        Q.   Ashley Martinez?
 8        A.   Yes.
 9                    MS. MALIK:  I have no further questions
10            your Honor.
11                    THE COURT:  Mr. Johnston.
12                    MR. JOHNSTON:  Just a second your Honor.
13                    THE COURT: Sure.
14                    MR. JOHNSTON:  I have no questions judge.
15                    THE COURT: Thank you detective.  People
16            call your next witness please.
17                    MS. MALIK:  The People call Ashley
18            Martinez.
19                    COURT OFFICER:  Witness entering.
20   A S H L E Y  M A R T I N E Z, having been duly sworn, was
21            examined and testified as follows:
22                    COURT OFFICER:  People call Ashley
23            Martinez.  M-A-R-T-I-N-E-Z.  Resident Of Florida.
24                    THE COURT:  Please inquire.
25   DIRECT EXAMINATION
```

```
 1   BY MS. MALIK:

 2       Q.   Good morning Ashley.

 3       A.   Good morning.

 4       Q.   I am going to ask you to keep your voice up so that

 5   everybody in the courtroom can hear you?

 6       A.   Okay.

 7       Q.   If do you not understand any of my questions ask me

 8   to rephrase it?

 9       A.   Okay.

10       Q.   How old are you?

11       A.   I am 14 years old.

12       Q.   When is your birthday?

13       A.   April 26, 1992.

14       Q.   What state do you live in?

15       A.   I live in Florida.

16       Q.   Do you go to school?

17       A.   Yes I do.

18       Q.   What school?

19       A.   I go to Boyd Anderson High School.

20       Q.   What grade are you in?

21       A.   I am in the 9th grade.

22       Q.   What kind of extra curricular do you do?

23       A.   Currently in dance. Him hop and jazz and I am in

24   the band, the school band.

25       Q.   Can you tell us when you came to New York this time
```

```
 1   around?
 2        A.   I have been here for the past 2 weeks.
 3        Q.   Did you miss school last week?
 4        A.   Yes I have.
 5        Q.   Did you miss school the week before?
 6        A.   Yes.
 7        Q.   What was the purpose for you coming to New York?
 8        A.   To be here right now.
 9        Q.   Did you ever live if New York before?
10        A.   Yes I lived -- I was born in New York.  And I moved
11   from there in 2000. Then I came back in 2004.
12        Q.   When you moved in 2000 where did you move?
13        A.   To Florida.
14        Q.   Do you know someone by the name of Abu Khan?
15        A.   Yes.
16        Q.   Do you know him by any other name?
17        A.   Jimmy.
18        Q.   Do you see him in the courtroom today?
19        A.   Yes, he is sitting right there.
20        Q.   Could you point him out?
21        A.   He is in the brown shirt.
22                  THE COURT: Indicating the defendant.
23        Q.   Ashley you said that you knew the defendant you
24   knew him as Jimmy what did you call him?
25        A.   I called him daddy.
```

1    Q.   Did there come a time that he came to live with
2    you?
3    A.   Yes he did.  Around the time when I was 6 years old
4    when he became -- when he was with my mother.
5    Q.   What kind of a relationship did he have with your
6    mother?
7    A.   They were romantically involved.
8    Q.   Do you remember how old you were when he came to
9    live with you?
10    A.   I was around 5 years old.
11    Q.   Where did he come to live with you?
12    A.   In my grandmother's house in College Point.
13    Q.   What is the address there?
14    A.   3-04 121st Street. College Point, New York.
15    Q.   Who did you he live with?
16    A.   It was my mother and my little brother Jaeshawn and
17    my grandmother.
18    Q.   Did there come a time that you had a baby sister
19    through the defendant and your mother?
20    A.   Yes I did in 1998 my sister Ariel was born.
21    Q.   Did there come a time that you had a baby brother
22    through the defendant and your mother?
23    A.   Yes, Andrew was born in 2000.
24    Q.   How was your relationship with the defendant when
25    he first came to live with you?

```
 1        A.    It was very good. He treated me very nicely. He
 2   treated me like I was his daughter.
 3        Q.    What kinds of things did he do with you?
 4        A.    He would sit down.  We would talk. We would go out
 5   together.  It was like a father and daughter relationship.
 6        Q.    Now Ashley do you know your biological father?
 7        A.    No I don't.
 8        Q.    Do you have any kind of relationship with your
 9   biological father?
10        A.    I met him once I did not know that he was my father
11   at the time.
12        Q.    So who was Jimmy to you?
13        A.    I looked at him as a father figure in my life
14   because he was all I knew.
15        Q.    Were you and Jimmy close?
16        A.    Yes very.  We were very close.
17        Q.    Out of your siblings Jaeshawn, Ariel and Andrew and
18   yourself who was the defendant closest to?
19        A.    He was close to me.
20        Q.    Did there come a time Ashley that your relationship
21   with the defendant changed?
22        A.    Yes there did.
23        Q.    Can you tell us how it changed?
24        A.    He started touching me in way that I did not like
25   it.
```

1    Q.    I want to bring you back in 1997 okay.  Almost 10
2  years ago where were you living then?
3    A.    I was living in my grandmother's house in Queens.
4    Q.    Is that the house in College Point.
5    A.    Yes it is.
6    Q.    Did there come a time that you moved from College
7  Point to Ozone park?
8    A.    Yes there did.
9    Q.    And in 1997 who was living with you at your
10  grandmothers house?
11    A.    It was Jimmy and my mother and me and my
12  grandmother.
13    Q.    What about Jaeshawn?
14    A.    Jaeshawn was there too.
15    Q.    Now, were you living at your grandmother's house
16  from 1997 through about 1999?
17    A.    Yes.
18    Q.    With the defendant and your mother and Jaeshawn?
19    A.    Yes.
20    Q.    I want to talk to you about those years 1997 to
21  2000?
22    A.    Okay.
23    Q.    Did anything ever happen with you and the defendant
24  in those 3 years?
25    A.    Yes.

1      Q.    Do you remember in detail what happened to you
2   during those 3 years with the defendant?

3      A.    Yes I do.

4      Q.    Can you tell us what would happen?

5      A.    It was one evening I couldn't sleep and I went
6   downstairs and he was with my mother downstairs and I went
7   downstairs because I couldn't sleep. He was watching
8   wrestling on TV.  He came upstairs to tell me a story, excuse
9   me, and he came upstairs to tell me a story and he made me
10  touch his private parts.

11     Q.    Ashley was that the very first time that anything
12  happened?

13     A.    Yes.

14     Q.    Do you remember why you couldn't sleep that night?

15     A.    Previously I had watched a movie Candyman.  I had
16  bad nightmares. It was hard for me to sleep.

17     Q.    That night can you tell us where you were sleeping,
18  what were the sleeping arrangements regarding your mother,
19  the defendant?

20     A.    Yes I can. We were sleeping in a room it's a loft
21  of bedrooms.  There are spiral stairs.  Him and my mother
22  slept in the downstairs part of the bedroom.  Me and my
23  brother Jaeshawn slept in the upstairs part of the bedroom.

24     Q.    That loft bedroom how do you get up there?

25     A.    There is a down for the downstairs part and the

1    stairs lead upstairs to another bedroom.

2         Q.   Is there a bedroom below the last bedroom?

3         A.   Below the spiral steps. You can overlook the stairs

4    to the other bedroom.

5         Q.   When you overlook from the stairs what would you

6    see?

7         A.   I would see the bed where my mother and Jimmy

8    slept.

9         Q.   So you said that you couldn't sleep because you had

10   seen a scary movie Candyman?

11        A.   Yes.

12        Q.   What did you do?

13        A.   I was just laying up in my bed I would go

14   downstairs so that somebody could -- so I can sit down with

15   somebody.  Maybe somebody could come upstairs and help me to

16   fall asleep.

17        Q.   Were you looking for anybody in particular?

18        A.   No.

19        Q.   When you got downstairs did you get downstairs to

20   where your mother and Jimmy slept?

21        A.   Yes.

22        Q.   What did you see?

23        A.   He was up watching TV.  My mother was asleep.

24        Q.   What did you do when you saw the defendant?

25        A.   Well, I asked if somebody can come upstairs and

1  stay with me to help me fall asleep.

2      Q.  What did the defendant do?

3      A.  He came upstairs with me.

4      Q.  When he came upstairs with you what happened when

5  you got upstairs?

6      A.  We both laid down on my bed. He began telling me a

7  story.

8      Q.  Do you remember the story?

9      A.  Yes, it was about a girl who could not put a star

10 on a Christmas tree.

11     Q.  What happened while he was telling you that story?

12     A.  He made me touch his penis.

13     Q.  Can you tell us how he did that?

14     A.  He took my hand and put it over his boxers.

15     Q.  Do you remember what he was wearing?

16     A.  His boxers and a T-shirt.

17     Q.  When he took your hand and he put it over his

18 boxers what did you feel?

19     A.  His penis.

20     Q.  And what did he do with your hand?

21     A.  He put it on top of it and made me rub it.

22     Q.  What did you think at that point in time?

23     A.  I didn't know what to think. I trusted him so much.

24 I loved him so much.  I didn't know what to do.

25     Q.  Did you say anything to him about it?

1       A.   No.

2       Q.   Did he say anything to you?

3       A.   No, he continued the story.

4       Q.   How did that time end?

5       A.   Can you repeat the question please.

6       Q.   How did that time end?

7       A.   I don't remember.

8       Q.   Can you tell us during the time period of 1997 to

9  2000 what kinds of things he would do to you?

10      A.   It was -- he would touch me in places that I did

11  not want to be touched.

12      Q.   Can you tell us where he would touch you?

13      A.   On my breasts and around my body.  Places nobody

14  should touch me.

15      Q.   And how often during 1997 and 2000 would that

16  happen during that time?

17      A.   It was a little over 5 times under 10 times.

18      Q.   Was it spread -- all of those incidents was it

19  spread out over that entire time period?

20      A.   Yes it was.

21      Q.   At the time when he was telling the story Ashley

22  and he made you touch his penis did that happen again?

23      A.   With the story?

24      Q.   No that he made you touch his penis during 1997 and

25  2000?

vld

1       A.   Yes it did.

2       Q.   Do you remember the last time that it happened

3   before you moved to Florida?

4       A.   No I can't recall.

5       Q.   When you moved to Florida who did you move with?

6       A.   I moved with Jimmy, Ariel, Andrew my mother and

7   Jaeshawn.

8       Q.   While you were living in Florida can you tell us

9   what your relationship was like with the detective?

10      A.   I tried to block out everything that happened to

11  me.

12      Q.   Why did you try to block it out?

13      A.   I wanted acceptance so bad.  I just tried to

14  imagine nothing was happening.

15      Q.   Can you tell us Ashley what kinds of things

16  happened with you and the defendant in Florida?

17      A.   He started having sex with me.

18      Q.   Do you remember the first time that he had sex with

19  you?

20      A.   I don't remember.

21      Q.   Do you remember about how old you were?

22      A.   I was around the age of 9 and 10.

23      Q.   And where would he have sex with you in Florida?

24      A.   In my bedroom.

25      Q.   The first time that he had sex with you was in

1  Florida?

2      A.   Yes.

3      Q.   What would you do when he had sex with you in

4  Florida?

5      A.   I didn't do anything. I was scared.

6      Q.   What -- why were you scared?

7      A.   I was just scared.  I didn't know what to do.  I

8  couldn't do anything. I didn't know what to think.  I didn't

9  know if it was right.  If it was wrong.  I didn't know

10  anything.

11      Q.   Were you scared for other reasons?

12      A.   Yes because I seen him yell at people.  I didn't

13  want to tell anybody or nothing like that.

14      Q.   Could you tell us what you had seen the defendant

15  do or say that made you scared and made you not tell anybody

16  about what was happening?

17      A.   He said that he was trying to make me a woman and

18  if his daughter was there he would have done it to her.  If

19  you tell that nobody is going to believe me. And all kinds of

20  stuff.

21      Q.   Did you ever see the defendant do anything that

22  made you scared to tell?

23      A.   Yes, I seen him argue with my mother and push my

24  mother.

25      Q.   Did you ever hear him do anything that made you

1  afraid to tell?

2        A.    Argue, yes.

3        Q.    What about?

4                    THE COURT:    Do not lead counsel.

5        Q.    When you saw your mother, when you saw the

6  defendant argue with your mother what would you hear?

7        A.    I would hear him tell her shut up. He was a jealous

8  person.  Most of the time that they would argue he was mad.

9  That she could not wear certain items of clothing. She could

10  not go certain places that is mostly what they would argue

11  about.

12        Q.    Do you remember if he called her anything?

13        A.    He called her fat and said that nobody is ever

14  going to be with her.

15        Q.    What about you did he call you anything?

16        A.    He used to call me fat ass.

17        Q.    What?

18        A.    A fat ass.

19        Q.    What did you understand that to mean?

20        A.    That I was fat.

21        Q.    What about your brother Jaeshawn?

22        A.    He used to call my brother a little faggot.

23        Q.    Do you know approximately how many times the

24  defendant had sex with you in Florida?

25        A.    It was very frequent.

1    Q.    And during those times Ashley did you ever tell
2    your mother?

3    A.    No I didn't.

4    Q.    Why didn't you tell your mother?

5    A.    Because my mother I thought my mother loved him so
6    much. She used to let him beat on her and talk to her the way
7    that he wanted to.  I didn't think that she would believe me
8    because she loved him so much.

9    Q.    And during the time period that you were in Florida
10   what was your relationship like with your mother?

11   A.    We didn't have a very strong relationship.

12   Q.    Why was that?

13   A.    Because I just couldn't connect with my mother on
14   the level that I wanted to. We used to butt heads a lot and
15   argue a lot.

16   Q.    Did it have anything to do with what was going on
17   with the defendant?

18   A.    Yes, I wanted my mom to know what was going on.
19   It's her house. She should know what is going on in it.

20   Q.    You never told a guidance counselor at school?

21   A.    No I could not confide in anybody.  I didn't trust
22   anybody.

23   Q.    Ashley I would like to talk to you about November
24   30 of 2004 do you remember that day?

25                    THE COURT:    Approach counsel.

1                    (Off the Record Discussion).

2        Q.   Ashley let me bring you back to what was going on

3   in Florida for a moment.  You said that the defendant started

4   to have sex with you?

5        A.   Yes.

6        Q.   Can you tell us what you mean when you said that?

7        A.   I don't understand -- like his penis would enter my

8   vagina.

9        Q.   Now, I would like to bring you to November 30 of

10  2004 do you remember that day?

11       A.   Yes I do.

12       Q.   Did you come to New York City on that day?

13       A.   Yes I did.

14       Q.   What was the purpose for you coming to New York

15  City?

16       A.   Because I was trying to -- he is coming back to

17  Florida.  I didn't find a need to stay if he was going to

18  come back.

19       Q.   Did you get suspended from school in November of

20  2004?

21       A.   Yes I did.

22       Q.   Who were you going do live with?

23       A.   My grandmother.

24       Q.   Is that Ann Martinez?

25       A.   Yes that is.

```
 1        Q.   Where were you going to live with your grandmother?

 2        A.   In her house in 3- 04.

 3        Q.   121st Street?

 4        A.   Yes.

 5        Q.   How old were you on November 30?

 6        A.   I was 12 years old.

 7        Q.   Now where was the defendant living at that time

 8   Ashley?

 9        A.   With my grandmother.

10        Q.   Did you know that at the time that you came to New

11   York?

12        A.   Yes I did.

13        Q.   Did you know whether the defendant was going to

14   leave New York?

15        A.   Yes.

16        Q.   What did you know?

17        A.   I knew that he was coming back to Florida. It was

18   around Christmas and he wanted to be with my family.

19        Q.   Did you know where -- did you think that he was

20   going to be staying when he went back to Florida?

21        A.   With my mother.

22        Q.   In your house in Florida?

23        A.   Yes.

24        Q.   Do you remember when your flight was from Florida

25   that day on November?
```

vld

1       A.    It was from Fort Lauderdale International Airport

2   at around 5 o'clock in the morning.

3       Q.    When did you arrive in New York, sometime in the

4   morning?

5       A.    Yes.

6       Q.    Who met you at the airport?

7       A.    Jimmy.

8       Q.    Where did he take you?

9       A.    To my grandmother's house to drop my things off.

10      Q.    When you got there what did you do?

11      A.    I dropped my things off I changed into some

12  comfortable clothes and something warm and we went out to get

13  something to eat.

14      Q.    And when you went out to get something to eat what

15  did you do after that?

16      A.    Came to the house.

17      Q.    Can you describe your grandmothers house for us?

18      A.    When I came in through the front door there were

19  steps that lead upstairs to a living area.  There was a couch

20  and a television.  There is a small hallway. There is 2 sides

21  to the hallway.  There is a kitchen.  There is a bathroom.

22  You go up another flight of stairs that leads to a bathroom

23  and 3 other bedrooms.

24      Q.    And in one of those bedrooms is there something

25  else?

1    A.    There is a bedroom with a full size bedroom and
2   windows.   There is another bedroom with a couch and
3   television and my grandmother's bedroom on the other side of
4   the hallway.
5    Q.    And the bedroom with the couch on the television
6   does that have another stair case in it?
7    A.    That's the loft room with the spiral stair case.
8    Q.    So when you were at the house that day tell us what
9   you did?
10    A.    Well, we went -- we got something to eat at the
11   Chinese Restaurant. We came back. I was watching television.
12    Q.    Now, I want to talk to you about later on that
13   night.  At about 11 o'clock that night.  Do you remember
14   where you were at about that time?
15    A.    Yes, I was upstairs watching television inside of
16   the loft bedroom.
17    Q.    And who came into the bedroom?
18    A.    Jimmy.
19    Q.    Now, at that time was there a TV in the loft
20   bedroom or was the TV in the lower part downstairs from the
21   loft?
22    A.    It was in the lower part of the loft bedroom.
23    Q.    So you were not actually in the loft room itself?
24    A.    No.
25    Q.    Now what happened did somebody come in when you

vld

 1  were watching TV?

 2       A.    Yes.

 3       Q.    Who came in?

 4       A.    Jimmy.

 5       Q.    What happened when the defendant came in?

 6       A.    Well, he started harassing me and touching me and I

 7  asked him to leave me alone. I went downstairs.

 8       Q.    When you say that he started harassing you and

 9  touching you what do you mean by that?

10       A.    Touching my body.  I didn't want to be near him so

11  I went downstairs.

12       Q.    Where did he touch you?

13       A.    On my breasts and my arm.  I was like could you

14  please leave me alone.

15       Q.    You said that you went downstairs where did you go?

16       A.    To the living room.

17       Q.    What did do you when you got downstairs?

18       A.    I sat on the couch and turned the television on.

19       Q.    What did the defendant do?

20       A.    He came downstairs.

21       Q.    Now when he got downstairs what is the very first

22  thing that he did?

23       A.    He sat on the couch with me.

24       Q.    I am sorry?

25       A.    He sat on the couch with me.

```
 1        Q.    And what did he do next?
 2        A.    He started touching me.
 3        Q.    Where did he touch you?
 4        A.    On my breasts and my arms.
 5        Q.    What did he touch you with?
 6        A.    His hands.
 7        Q.    What were you doing when he was doing that to you?
 8        A.    I was sitting there trying to tune him out. I
 9   continued watching television.
10        Q.    What do you mean that you were trying to tune him
11   out?
12        A.    I was trying to act as if nothing was happening.
13        Q.    Why were you trying to act as if nothing was
14   happening?
15        A.    I was scared I wanted to blank everything out of my
16   head.
17        Q.    You have done that before?
18        A.    Yes I have.
19        Q.    Explain to us what you would do?
20        A.    I would just act like I was sleeping or just lay
21   there not able to do anything.
22        Q.    What would go through your mind when the defendant
23   was touching you?
24        A.    I would feel nasty and degraded. Not like myself.
25        Q.    You said that you would imagine that you were
```

1  sleeping is there anything else?

2      A.   I would imagine that I was at grandmothers safe and

3  away from harm.

4      Q.   When you talk about your grandmothers house which

5  grandmother?

6      A.   Ann Martinez.

7      Q.   What about on November 30, 2004 to you remember

8  what you were thinking about what the defendant started

9  touching with you his hands?

10     A.   I wanted somebody to come downstairs badly and save

11 me.

12     Q.   Did you scream out?

13     A.   No I didn't.

14     Q.   Why didn't you scream out?

15     A.   Because I was scared to scream out.  I didn't know

16 any better.

17     Q.   Why were you scared at that point in time?

18     A.   Because I have been through so much. I been through

19 it so many times.  I just was scared of reaction.

20     Q.   What did you think the defendant would do if you

21 said something to anybody?

22     A.   That I would get hurt.  My family would get hurt.

23 I didn't know what to think.

24     Q.   Why did you think that you and your family would

25 get hurt?

1      A.    Because if I said something or screamed out and

2   somebody react in a wrong way it would have been a big fight

3   and argument and I did not feel like going through any of

4   that.

5      Q.    Did you ever see the defendant do anything to

6   himself?

7      A.    Yes I did.

8      Q.    Can you tell us about that?

9      A.    We had a Halloween party and he got very drunk and

10  he cut himself up with a bottle in his head and his chest.

11     Q.    Do you remember when that was?

12     A.    Yes, I was -- it was -- I can't remember what year

13  it was.

14     Q.    Do you remember if it was in Florida or New York?

15     A.    In New York.

16     Q.    And how did that impact you on not being able to

17  tell anybody about what was happening with you?

18     A.    I seen what the person is capable of doing to

19  themselves and what they can do to somebody else can be 10

20  times worse.

21     Q.    So Ashley lets talk about being on the couch down

22  stairs in your grandmothers house when the defendant started

23  touching your breasts and you just sat there.  What happened

24  after he started touching your breasts?

25     A.    He took my clothes off and he took his clothes off

1  and he had sex with me.

2       Q.    Do you remember what you were wearing?

3       A.    Yes, shorts and a T-shirt.

4       Q.    Did you have a bra on?

5       A.    Yes I did -- no I didn't.

6       Q.    Do you remember what the defendant was wearing?

7       A.    Yes, boxers and a T-shirt.

8       Q.    You said that he took his clothes off and then he

9  took your clothes off?

10      A.    Yes.

11      Q.    And what did he do after he took your clothes off?

12      A.    He had sex with me.

13      Q.    What do you mean about that?

14      A.    He put his penis inside my body.

15      Q.    And where did he put his penis in your body?

16      A.    In my vagina.

17      Q.    How did it feel when he did that?

18      A.    It felt nasty.  Emotionally it hurt.  Mentally it

19  hurt. Physically it hurt.

20      Q.    What did he do when he put his penis inside your

21  vagina.  What do you mean by that when he put it inside your

22  vagina what did he do did he stay still. Did he move around.

23      A.    He moved around.

24      Q.    Can you tell us how he moved around?

25      A.    He moved back and forth.

Ashley Martinez/Direct/Ms. Malik                482

1    Q.   Where were you when this was going on?

2    A.   I was on the couch.

3    Q.   How were you positioned and how was he positioned?

4    A.   It's a recliner.  I had the recliner open and he

5  was on top of me.

6    Q.   Were you -- was his front to your front?

7    A.   Yes.

8    Q.   Who was on top and who was on the bottom?

9    A.   He was on top of me.

10   Q.   Now when he came out when he took his penis out of

11 your vagina what did he do right after that?

12   A.   He ejaculated into a napkin.

13   Q.   How do you know what he did?

14   A.   That I seen it.

15   Q.   What did you see?

16   A.   I seen white stuff coming out of him.

17   Q.   Where did you see it come out of?

18   A.   Out of his penis.

19   Q.   Did he say anything to you?

20   A.   No he never talked.

21   Q.   How did you feel at that point?

22   A.   I didn't know how to feel.  Just felt nasty.

23   Q.   What did you do -- what did he do after he

24 ejaculated into the napkin?

25   A.   He went and washed it off and went backup stairs.

```
 1        Q.    What did you do?

 2        A.    I put my clothes on and sat there and acted like

 3   nothing ever happened.

 4        Q.    Was that the last time anything ever happened with

 5   the defendant?

 6        A.    Yes.

 7        Q.    Was that the last time that he ever touched you in

 8   ways that you should not have been touched Ashley?

 9        A.    Yes it was.

10        Q.    Did you ever tell anybody after that?

11        A.    Yes I told my mother.

12        Q.    Lets talk about that.  I want to talk you to about

13   Easter Sunday.  April 16, 2006 do you remember that day?

14        A.    Yes I do.

15        Q.    Can you tell us about that day?

16        A.    Well, I had said some things about my mothers

17   boyfriend and she brought it to my attention. I did not

18   really like him at the time.  So I said some things that I

19   should not have said about him. She was upset.

20        Q.    Who was your mothers boyfriend?

21        A.    Nigel.

22        Q.    Is that her boyfriend now?

23        A.    Yes.

24        Q.    They have been together this whole time?

25        A.    Yes.
```

1      Q.    And you said that your mother got upset about you

2   saying something about Nigel?

3      A.    Yes.

4      Q.    What happened?

5      A.    She brought it to my attention. She told me all we

6   have is each other. We need to stick together through

7   everything. She had a discussion with me and Jaeshawn.  I was

8   doing the dishes while we are all speaking and me and her

9   started arguing. We are on the defense. I really argued a lot

10  with everybody.

11          Me and my mother started arguing and my brother

12  left the house and went in the front to play with my little

13  brother and sister.  Me and my mom were arguing.  She said

14  what is wrong with you did you kill somebody. Did you hurt

15  somebody.  Did anybody hurt you.  I had said yes somebody

16  hurt me. I did not look at her.  I kept washing the dishes.

17  I kept my face turned.  I could not look her in the face and

18  tell her anything.

19          She asked me were you raped. I said yes mommy. She

20  said by who. I said by Jimmy and she came and held me in her

21  arms and I just cried. She just cried.

22      Q.    Did you file a report Ashley?

23      A.    My mother asked me if I wanted to or I didn't want

24  to. I told her that I did.  The next day she took me to the

25  precinct, the police station.

1      Q.    Do you remember what police station?

2      A.    The Lauder Hill police station. It wasn't in that

3  place that this happened so they referred me to the North

4  Lauderdale Sheriffs Department and I went there.

5      Q.    You went from the Lauder Hill to the North

6  Lauderdale Sheriffs Department?

7      A.    Yes.

8      Q.    That was the very next day?

9      A.    Yes.

10     Q.    Why didn't you go that night?

11     A.    I was in shock that I said something.  I finally

12  spoke out and my mom was in shock and we needed time together

13  to cool off.

14     Q.    Did you think that your mother was going to believe

15  you?

16     A.    No I didn't.

17     Q.    Why didn't you think that your mother was going to

18  believe you?

19     A.    Because I never up to that point had a relationship

20  with my mom like that. She was just I thought that she was

21  going to say you are lying.  You're just lying.  So I just

22  thought that's what she was going to tell me.

23     Q.    Why did you think that she was going to accuse of

24  lying?

25     A.    Because me and my mom never sat down and talked. We

vld

1  never really were like that with each other.  I knew that she
2  still loved him.  He was the father of her kids. If I said
3  something she would have thought that I was lying and making
4  it up.
5      Q.   Did the defendant ever tell you anything about if
6  you told your mother.
7              MR. JOHNSTON:  Objection.
8              THE COURT:   Don't lead.
9      Q.   What did the defendant tell you?
10     A.   He tell me that my mom would not believe me and
11 that she is going to believe him over me.
12     Q.   Do you remember when he started telling you that?
13     A.   It was probably around the time that I came to
14 Florida.  Never -- I really said nothing about it in New
15 York. At the time that I realized that it was wrong and I
16 realized what was going on and when I would bring it to his
17 attention he would get really mad at me.
18     Q.   What do you mean that?
19     A.   I would tell him that it's not right. I want to
20 wait until I am married.  That this is wrong what is going
21 on. I did not like it. He would get really mad.  He would get
22 mad about it. I didn't want to see anybody mad.
23     Q.   Now, did there come a time Ashley that you went to
24 the Broward County Sexual Assault Treatment Center in
25 Florida?

1      A.    Yes.

2      Q.    Were you examined there by a sexual assault

3   examiner?

4      A.    Yes it was a lady.  Two ladies were in the room and

5   my mother was with me.

6      Q.    Do you remember when you went?

7      A.    I don't remember exactly when.

8      Q.    Can you tell us what they did there when they

9   examined you?

10                     MR. JOHNSTON:  Objection judge.

11                     THE COURT:    What they did.

12     Q.    What they did to her?

13                     THE COURT:    This examining her.

14           Overruled.

15     Q.    Can you tell us what they did to you Ashley when

16  they examined you at Broward County?

17     A.    They put me on the table. They propped my legs up

18  and the lady had this metal tool and she put it inside of me

19  and opened me up and was taking pictures of me on the camera

20  on this little camera thing and it was on the laptop and then

21  she used a Q-tip swab.

22     Q.    You said that she used a metal tool do you know

23  what that is called?

24     A.    No.

25     Q.    You said that she put it inside of you where?

Ashley Martinez/Direct/Ms. Malik          488

1    A.    In my vagina.

2    Q.    How did that feel when she put --

3    A.    It hurt a lot.

4              MR. JOHNSTON:  Objection judge.

5              THE COURT: Sustained.

6              MS. MALIK:  Judge can we approach.

7              THE COURT:  Okay.

8              (Off the Record Discussion).

9              THE COURT:  Objection sustained.

10   Q.    Ashley I would like to direct your attention to

11   June 13, 2006.  Do you remember meeting with Det. Figueroa?

12   A.    Yes I do.

13   Q.    Where did you meet her?

14   A.    On Queens Boulevard in this building in the

15   downstairs part in the precinct.

16   Q.    Did you talk to Det. Figueroa on this date?

17   A.    Yes I did.

18   Q.    About the acts that happened to you?

19             MR. JOHNSTON:  Judge I am going to object

20             to this.

21             THE COURT: Overruled.

22   A.    Yes.

23   Q.    Now, do you remember June 16 of 2006 a few days

24   later do you remember talking to an ADA.

25   A.    Yes, Brian Lee.

1    Q.   Do you remember having a conversation with ADA Lee?

2    A.   Yes I do.

3    Q.   Do you remember where that was?

4    A.   In the same building in a conference room.

5    Q.   And I would like to direct your attention to June

6    21 of 2006 do you remember meeting Dr. Jamie Hoffman

7    Rosenfeld?

8    A.   Yes.

9    Q.   Where did you meet her?

10   A.   The same building on I believe it was the third

11   floor.  They have a doctors office.

12   Q.   Can you tell us what she did to you there?

13   A.   She gave me another physical like the one in

14   Florida.

15   Q.   Was that on June 21st of 06?

16   A.   No I went for that reason. I did not end up doing

17   it she did not have the supplies so they did blood work.

18   Q.   And what else did she do for you that day?

19   A.   Well, I had to pee in a cup and she had taken blood

20   work from me.

21   Q.   Did you make an appointment to go back to see Dr.

22   Jamie?

23   A.   Yes I did.

24   Q.   And do you remember going back there on June 21st

25   of 2006 I am sorry. July 5 of 2006?

1      A.    I am not sure what the date was but I believe that
2   was it.

3      Q.    When you went back too see Dr. Jamie Rosenfeld the
4   second time can you tell us did she examine you then?

5      A.    Yes, she did.

6      Q.    Can you tell us what that examination was like.
7   What did she do?

8      A.    This time they used this plastic thing it hurt
9   really bad.  They put it inside of me.  It snaps open so that
10  they can get a better view of it.

11     Q.    Who was with you?

12     A.    My grandmother, but I wanted to go in by myself.

13     Q.    When you say that Dr. Jamie Hoffman Rosenfeld used
14  a plastic thing where did she put that plastic thing?

15     A.    In my vagina.

16     Q.    What else did she do that day if you remember?

17     A.    She took pictures and did a cotton swab.

18     Q.    What did she do with that?

19     A.    She stuck it in my butt and in my vagina to take
20  samples.

21     Q.    When you say that she stuck it in your butt are you
22  talking about your anus?

23     A.    Yes.

24     Q.    Now I would like to direct your attention to August
25  4 of 2006 were you still in New York at that time?

vld

1      A.    Yes I was.

2      Q.    Do you remember meeting with ADA Erica Rosengarden?

3      A.    Yes.

4      Q.    Where did you go on this day?

5      A.    We went to the Grand Jury another building up the

6   block from here.

7      Q.    And finally I want to direct your attention to

8   March 12 of 2007 do you remember that date Ashley?

9      A.    Yes I do.

10     Q.    It's about 2 weeks ago?

11     A.    Yes.

12     Q.    Do you remember coming to New York on that date?

13     A.    Yes.

14     Q.    And a few days before?

15                MR. JOHNSTON:   I am going to be objecting

16            to this.   What relevance does this have.

17                THE COURT:   Overruled. That's a yes or

18            no.

19     Q.    Do you remember coming to New York a few days

20   before?

21     A.    Yes.

22     Q.    And on March 12 of 2007 did you see Dr. Jamie

23   Rosenfeld again?

24     A.    Yes.

25     Q.    And where did you see her at that time?

1      A.    The same place. This time it was another doctor
2  that she had with her.
3      Q.    And what -- did she examine you again at that time?
4      A.    Yes she did.
5      Q.    Can you tell us what that examination was like?
6      A.    It was basically the same process but it hurt a
7  little more because she wanted to make sure.
8      Q.    Let me ask you this what hurt?
9      A.    When she was doing my examination and my vagina.
10     Q.    How did she go about doing that examination?
11     A.    She used the same plastic thing but at first she is
12  just spreading the lips open to check insides.  She was
13  taking pictures.
14     Q.    When you say that what are you talking about?
15     A.    The lips on my vagina.
16     Q.    What did she do with the plastic thing?
17     A.    Put it inside of me and opened it up so she can get
18  a better view.
19     Q.    Where did she put it inside of you?
20     A.    Inside of my vagina.
21     Q.    I would like to show you People's exhibit number 1
22  for identification Ashley do you recognize that?
23     A.    Yes I do.
24     Q.    What is that?
25     A.    That's a picture of me.

1    Q.    What is that a picture of you from?

2    A.    When I was 6 years old.

3    Q.    And is that a fair and accurate representation of

4    how you looked when you were about 6 years old?

5    A.    Yes.

6              MS. MALIK:   It's -- I would ask that it

7         be moved into evidence as People's exhibit number

8         1.

9              MR. JOHNSTON:   Continued objection judge.

10             THE COURT: Noted.  Over the objection of

11        defense what has been previously marked as Peoples

12        1 for identification is now in evidence as People's

13        1.

14             COURT OFFICER:   People's exhibit 1 is

15        moved into evidence.

16   Q.    At this time I would ask you Ashley to take a look

17   at what has been marked as People's exhibit number 2 for

18   identification.  What is that Ashley?

19   A.    That is a picture of me when I was around the age

20   of 7.

21   Q.    And is that a fair and accurate representation of

22   how you appeared when you were 7 years old?

23   A.    Yes.

24             MS. MALIK:   I would ask that exhibit 2 be

25        moved into evidence.

1                    THE COURT: Over the objection --

2                    MR. JOHNSTON:  Same objection.

3                    THE COURT: Over the objection of defense

4          counsel what has been previously marked as exhibit

5          2 is now in evidence as Peoples 2.

6                    COURT OFFICER:  People's exhibit 2 is now

7          moved into evidence.

8                    THE COURT:  Ashley as you are looking at

9          those 2 photographs how many years separate your

10         age from photograph 1 to photograph 2.

11    A.   A year.

12    Q.   Can you tell us how to you feel about the defendant

13  now?

14                   MR. JOHNSTON:  Objection.

15                   THE COURT:  Overruled.

16                   MR. JOHNSTON:  Irrelevant.

17                   THE COURT:  Overruled.

18    A.   I do not like him.

19    Q.   Why don't you like him?

20    A.   Because he is lying.  He's lying.  He knows the

21  truth.  And I want him to get help very bad.

22                   MR. JOHNSTON:  Judge, I am going to

23         object to all of this.  I would ask that it be

24         stricken.

25                   THE COURT: Sustained.

1           MS. MALIK:  I have no further questions

2      your Honor. I would ask that People's exhibit 1 and

3      2 be published to the jury at this time.

4           THE COURT:   Okay.  Approach counsel.

5           (Whereupon, photographs are published to

6      the jury).

7           (Whereupon, an off the record discussion

8      was held at the bench.)

9           THE COURT:  Mr. Johnston, cross

10     examination.

11          MR. JOHNSTON:   Thank you your Honor.

12   CROSS EXAMINATION

13   BY MR. JOHNSTON:

14      Q.   Good afternoon Ashley?

15      A.   Hello.

16      Q.   If I ask you a question and you do not understand

17   the words that I use please let me know and I will try to say

18   it in different words okay?

19      A.   No problem.

20      Q.   Now, I believe that you told the jury Ashley that

21   you first met Jimmy in about 1996 or 1997?

22      A.   Yes.

23      Q.   At that time who were you living with?

24      A.   I was living with Mike, my brother Jaeshawn's

25   father,my mom's husband at the time.

```
 1        Q.    Is Mike, Michael Benn?

 2        A.    Yes.

 3        Q.    And he is Jaeshawn's father?

 4        A.    Jaeshawn.

 5        Q.    Jaeshawn's father.  And what was the relationship

 6   between your mom and Mike?

 7        A.    They were married.

 8        Q.    They were married.  Did they fight much?

 9                     MS. MALIK:   Objection.

10                     THE COURT:   Overruled.

11        A.    No.

12        Q.    Everything was harmonious in the household?

13        A.    Yes.

14        Q.    Did there come a time that Jimmy moved in or did

15   you move in with Jimmy?

16        A.    No he moved with us after my mother and Mike

17   separated.

18        Q.    So your mother and Mike separated and Jimmy moved

19   into where you were living is that correct?

20        A.    Yes.

21        Q.    And how long had he been living there before you

22   say that he started doing something inappropriate?

23        A.    Maybe a year, not a year. A couple of months.

24        Q.    A couple of months?

25        A.    Yes.
```

1    Q.   Now, you told the jury that you didn't say anything

2    to anyone at all until Easter Sunday of 2006 is that correct?

3        A.   Correct.

4        Q.   And even though for at least 9 months or so you

5    were staying in Queens with your grand mom and Jimmy was

6    living down in Florida you didn't say anything to grandma at

7    all is that right?

8        A.   At the time when I live in New York when I moved in

9    is 2004.

10       Q.   Yes, when you came up to stay with grandma in New

11   York and Jimmy went back down to Florida the next day you

12   stayed in New York for about 9 months or the summer of 2005?

13       A.   Yes.

14       Q.   And you never told grandma about anything happening

15   during that period of time when Jimmy was down in Florida?

16       A.   No I didn't.

17       Q.   And when you were going to school down in Florida

18   you didn't say anything to any of your teachers or anything

19   like that?

20       A.   No I didn't.

21       Q.   Is that correct?

22       A.   Yes that's correct.

23       Q.   Now, do you presently have a boyfriend?

24       A.   No, I don't.

25                    MS. MALIK:   Objection.

```
1                           THE COURT:  Overruled.
2          Q.   You don't?
3          A.   No I don't.
4          Q.   Have you ever had a boyfriend?
5                           MS. MALIK:  Objection.
6          A.   No I haven't.
7                           THE COURT:    Overruled.
8          A.   No I haven't.
9          Q.   Now, you put a little biography out on My Space is
10   that correct?
11                          MS. MALIK: Objection.
12         A.   Yes I have a My Space.
13                          THE COURT:  Overruled.  Approach please.
14                          MR. JOHNSTON:  I will just be brief.  I
15              do not -- I am not going to go into any great
16              detail about it.
17                          THE COURT: All right.
18                          MR. JOHNSTON:  It's nothing serious.
19                          THE COURT:   All right.  I will wait to
20              hear the next question.
21                          MS. MALIK:  Objection can we approach.
22                          THE COURT:   Not yet.
23         Q.   Now, I believe that you told the jury that while
24   you were in Florida over a period of time you were having
25   frequent sexual relations with Jimmy is that correct?
```

1       A.    Yes.

2       Q.    And about how often were they?

3       A.    It was very often.

4       Q.    Very often meaning what?

5       A.    I could not telling you the exact amount of times

6  it happened.

7       Q.    Was it frequently like every week or more than

8  that?

9       A.    Yes.  Yes.

10      Q.    Every week?

11      A.    Yes.

12      Q.    For how long a period of time?

13      A.    It was going on for a long amount of time.

14      Q.    More than a year or two?

15      A.    Yes.

16      Q.    Now, that day on Easter Sunday when you told the

17  jury that you eventually told your mother did your mother

18  actually ask you the question as to whether or not you had

19  been raped or not?

20      A.    Yes she did.

21      Q.    She said have been raped and you said yes?

22      A.    She said did somebody hurt you.  I said yes and she

23  said were you raped and I said yes.

24      Q.    That's how it came out?

25      A.    It was an argument before and then it led into

1    that.

2        Q.    Now while your mother and you and Jimmy were living

3    down in Florida -- actually withdrawn?

4             There came a time when your mother and Jimmy didn't

5    get along while they were living down in Florida is that

6    correct?

7        A.    Yes.

8        Q.    And you were up with grandma up in Queens right?

9        A.    Yes.

10       Q.    And when you came back down to Florida in 2005 he

11   was no longer in the household is that right?

12       A.    That's correct.

13       Q.    And during that period of time after he left while

14   you were there after you came back from Queens to Florida and

15   he was no longer in the household did your mother ever

16   complain about him not giving her enough money to support any

17   of the kids?

18                     MS. MALIK:    Objection your Honor.

19                     THE COURT:    Overruled.

20       A.    No, she didn't.  She never pressured him. She never

21   called him. None of that.

22       Q.    Do you know if she ever received any checks from

23   him?

24       A.    No she didn't.

25       Q.    She didn't?

1       A.   No.

2       Q.   You sure of that?

3       A.   I am positive.

4       Q.   Now, when was it that Nigel moved in?

5       A.   My mother and Nigel have been together about 3

6    years.  I could not tell you exactly when he moved in.  It

7    was over the period of time when I was in New York.

8       Q.   He moved in when you are in New York when you came

9    back down?

10      A.   He is with us.

11      Q.   What is your relationship with him?

12      A.   He treats us very good. He respects my privacy and

13   he respects my space.

14      Q.   Now, the day that you flew up from Florida to stay

15   with grandma, November 30 of 2004, that's what we are going

16   to be talking now?

17      A.   Okay.

18      Q.   Now you flew up to either La Guardia or Kennedy and

19   Jimmy met you at the airport?

20      A.   Yes.

21      Q.   And then you drove from the airport to grandma's

22   house and unpacked your clothing?

23      A.   I did not unpack. I just put my stuff down.

24      Q.   Now did you then go out shopping for clothing

25   because you did not really have warm enough clothing?

1    A.    No we went and got something to eat.

2    Q.    You did that first?

3    A.    Yes.

4    Q.    What about stopping at a pharmacy to get some

5  products that woman need and men don't?

6    A.    I don't recall that.

7    Q.    Well, your flight gets in at what time?

8    A.    I don't know what time it was. Sometime in the

9  morning.

10   Q.    And how long do you figure that it took to travel

11  from the airport to get to grandma's house?

12   A.    Maybe 2 and a half years -- oh, from the airport to

13  grandma's house. About a half an hour. 20 minutes.

14   Q.    And you just dropped your luggage off?

15   A.    Yes I changed into something warmer because I was

16  not dressed for the weather.

17   Q.    And then you went out for Chinese food?

18   A.    Yes.

19   Q.    Was this for take out?

20   A.    We took it back to the house.

21   Q.    So what time would you think that you arrived back

22  at the house after purchasing the Chinese food?

23   A.    I don't know what time I came back.

24   Q.    Now, your grandma and Mr. Chan is it?

25   A.    Mr. H.

1    Q.    Mr. H.

2    A.    Mr. H., yes.

3    Q.    They would stay in one bedroom right?

4    A.    Correct.

5    Q.    And you had the middle bedroom that had the spiral

6    staircase is that right?

7    A.    I was sleeping in the room because Jimmy was

8    sleeping in the other room.

9    Q.    Jimmy was in the bedroom to the right?

10   A.    With the windows yes.

11   Q.    That is on November 30 of 2004?

12   A.    Yes.

13   Q.    Now I believe that you told the jury that you were

14   in the middle bedroom the one with the spiral staircase and

15   you were watching TV and that Jimmy entered your room is that

16   correct?

17   A.    Yes.

18   Q.    And he supposedly touched you and you left that

19   room and went downstairs to the living room where the TV is

20   in the living room is that correct?

21   A.    Yes.

22   Q.    Now on that particular day nobody was sleeping

23   downstairs is that right?

24   A.    No, my grandmother always sleeps in her bedroom.

25   Q.    And when you arrived downstairs to watch TV was the

1    couch bed open?

2         A.    It's not a couch bed it's a recliner.  I sat down

3    and I opened it myself.

4    .    Q.    Pardon me?

5         A.    I sat down and I opened it myself.

6         Q.    And then I believe that you said that he came

7    downstairs and you had a conversation is that right?

8         A.    We didn't have a conversation.

9         Q.    You talked?

10        A.    Well I didn't really say anything to him, no.

11        Q.    Pardon me?

12        A.    We didn't speak.

13        Q.    You didn't speak.  And you said that you were

14   watching a movie?

15        A.    I was watching television correct.

16        Q.    What were you watching?

17        A.    I don't remember what I was watching.

18        Q.    At what time is this?

19        A.    Around 11 o'clock at night.

20        Q.    Now, you had gone out to Long Island with Jimmy and

21   grandma's boyfriend is that right?

22        A.    Correct.

23        Q.    And do you remember what time it was that you went

24   out to Long Island?

25        A.    I don't remember what time it was no.

1      Q.    Do you remember what time you got back?

2      A.    Got back from Long Island.

3      Q.    Yes?

4      A.    It was before 10 o'clock.

5      Q.    Do you recall where it was that you went on Long

6   Island?

7      A.    We went to his job to drop off his work truck.

8      Q.    Does the name Mineola mean anything to you?

9      A.    No I didn't know exactly where it was. I was not

10  familiar with New York.

11     Q.    He had to drop off his truck because he is going

12  back down to Florida the next day right?

13     A.    Correct.

14     Q.    And you went with him along with grandma's

15  boyfriend?

16     A.    Yes.

17     Q.    Now by the way you told the jury that you never

18  said anything to anyone because you were afraid okay?

19     A.    Uh huh.

20     Q.    That's what you just told the jury a few minutes

21  ago.  You also told the jury that you knew that when you left

22  Florida on November 30 that Jimmy was still in grandma's

23  house in Queens where you were going to have to stay is that

24  right?

25     A.    Correct.

1    Q.   Why didn't you tell your mother lets wait a day or
2    two before I fly up to New York because that will give Jimmy
3    a chance to come back down to Florida?

4    A.   Because Jimmy had booked my ticket previously for
5    me to come and drive with him from New York to Florida and I
6    didn't want to do that.  I had a ticket already booked to
7    come down there.

8    Q.   It was either your grandma or somebody else that
9    made those reservations?

10   A.   Yes, grandma booked the ticket.  Jimmy told my
11   grandmother that I can drive down from New York to Florida so
12   that he can could have company.

13   Q.   No I am talking about you are down in Florida you
14   are supposed to fly to New York to stay with grandma because
15   you are having a problem in Florida.  You knew Jimmy was up
16   in Queens. You found out that you were going to be flying up
17   a day before Jimmy was supposed to leave from New York and go
18   back to Florida.

19       Why didn't you tell your mother that you wanted to
20   go on a later date so that you would not have to have any
21   problem or you would not be afraid of him at all?

22   A.   Because I had my ticket booked. And because I
23   figured I did not want to stay if I knew that he was coming
24   back.  I wanted to leave.

25   Q.   You knew that he was coming back the following day?

1      A.    Yes I didn't know when it was going to be exactly.

2    When I went to New York I found out that it was the next day.

3      Q.    You did not think to tell your mom or to tell

4    grandma listen lets postpone it for a day or two and you

5    could have made up a reason why?

6      A.    I didn't think to do that at that time.

7      Q.    Now, you were back in New York in the summer of

8    2006 is that correct?

9      A.    Yes that is.

10     Q.    And do you  recall attending some sort an outing?

11     A.    Yes, somehow or another Jimmy found out that my

12   brother and sister were in New York. My grandmother and

13   mother asked me to go to make sure that nothing happens while

14   he see's the kids.

15     Q.    This is summer of 2006?

16     A.    Yes.

17     Q.    At that particular outing did you wander away from

18   the group?

19                    MS. MALIK:  Objection your Honor.

20                    THE COURT:   This is an outing here in

21            New York.

22                    MR. JOHNSTON:  Yes judge.

23                    THE COURT:   Overruled.

24     A.    I don't recall that.

25     Q.    Well, did the family find you with a strange 30

vld

 1  year old man?

 2                      MS. MALIK:  Objection your Honor.

 3                      THE COURT:   Overruled.

 4      A.   What do you mean by a strange 30 year old man.

 5      Q.   Some stranger they found you kissing him or

 6  something?

 7                      MS. MALIK:  Objection your Honor.

 8      Q.   At that outing?

 9      A.   No.

10                      THE COURT: Overruled.

11                      MR. JOHNSTON:  Can I have a second judge.

12                      THE COURT: Sure.

13                      (Whereupon, there is a pause in the

14          proceedings.)

15      Q.   Ashley before you came to court today probably on

16  Friday did  you have a conversation with the DA and did you

17  tell her -- did you discuss the case together?

18      A.   We met a couple of times prior to the case yes we

19  did.

20      Q.   Did you discuss what you were going to testify

21  about here?

22      A.   Not word by word no.

23                      MS. MALIK:  Objection.

24                      THE COURT:  Overruled.

25      Q.   You didn't discuss what you were going to testify

1   about?
2       A.   I discussed why I was here and we discussed -- yes
3   we did.
4       Q.   Okay?
5                THE COURT: Yes, we did what have a
6            discussion word by word.  What do you mean by you
7            had a discussion with the ADA.
8       A.   We met and spoke about why I was here and we got to
9   know each other and we spoke about the trial and what was
10  going on.
11      Q.   And you claim that Jimmy at one time at least one
12  time I think that you claim that he put his penis in your
13  hand is that correct?
14      A.   Yes.
15      Q.   Was it of normal size?
16               MS. MALIK:  Objection.
17               THE COURT: Sustained.
18      Q.   About how big was it?
19      A.   I don't remember.
20      Q.   And you told the jury that you had frequent sex
21  with him down in Florida?
22      A.   Yes.
23               MR. JOHNSTON:  I have no further
24           questions.
25               THE COURT:   Anything more Ms. Malik.

vld

1              MS. MALIK:   Can we approach a moment your

2         Honor.

3              THE COURT:   Yes.

4              (Off the Record Discussion).

5              THE COURT:   With apologizes I thought

6         that it would be a much shorter time than to send

7         you out and bring you back in.   So that once we

8         finish with this witness then there will be no

9         further witnesses today.   So your patience will be

10        rewarded in a manner of speaking.

11             Any redirect examination.

12   REDIRECT EXAMINATION

13   BY MR. MALIK:

14        Q.   Ashley the defense attorney asked you about an

15   outing in the summer of 2006 do you remember when it was?

16        A.   I don't remember the date.

17        Q.   Was it some sort of a feast?

18        A.   He wanted to see my little brother and sister.  We

19   took them all to the park.

20        Q.   Was your mother with you?

21        A.   No, my great grandmother was.

22             THE COURT:   Your great grandmother being

23        your grandmother's mother.

24        A.   Yes.

25        Q.   Now defense counsel asked you about having a

```
 1    boyfriend do you remember that question?
 2         A.   Yes.
 3         Q.   Did you have a boyfriend at the time?
 4         A.   No.
 5                        THE COURT:   At what time.
 6         Q.   Have you ever had a boyfriend?
 7         A.   No.
 8         Q.   I would like to show you this.  Remember when you
 9    were talking to Dr. Jamie Hoffman Rosenfeld?
10         A.   Yes.
11         Q.   Take a look that the?
12                        MR. JOHNSTON:   Judge, this is improper
13              redirect.  I did not go into any of this on cross.
14                        MS. MALIK:   Yes he did.
15                        THE COURT:   Overruled for the moment.
16              Next question.
17         Q.   Do you remember talking to Dr. Jamie Hoffman
18    Rosenfeld?
19         A.   Yes.
20         Q.   Did you tell her that you had a boyfriend at some
21    point in time?
22         A.   Yes.
23         Q.   Do you remember that now after you looked at that
24    piece of paper I gave you?
25         A.   Yes.
```

1     Q.   Now defense counsel asked you about this time

2  period after November 30 of 2004 until the summer of 2005

3  when you were living with your grandmother Ann Martinez in

4  College Point. Why didn't you tell your grandmother during

5  that time what the defendant had done to you?

6     A.   Like I said before now that he was out of the

7  picture I know that I could tell but I just didn't know how

8  to approach people.  I didn't know what I come out and said.

9  I was waiting for it to come to me and I was waiting for the

10  right time to say something.

11     Q.   How did it make you feel what the defendant was

12  doing to you for all of those years how did it make you feel?

13     A.   It made we feel nasty.  I didn't know what to think

14  about it. Degraded.  My self esteem level dropped. I started

15  doing bad in school.  I gained a lot of weight.  It depressed

16  my life a lot. It's not that I can forget about it because I

17  can't.

18     Q.   Defense counsel asked you if you talked to me about

19  this case. Do you remember when it was the first time that I

20  met you?

21     A.   It was I believe it was Monday that happened after

22  I came in on Saturday.

23     Q.   That being March 12 of 2007?

24     A.   Yes.

25     Q.   And did anyone tell what to say here today?

1      A.    No.

2      Q.    Did anyone give you a script as to what to say here

3  today in court?

4      A.    No.

5      Q.    Ashley your allegations against the defendant are

6  you making these up because the defendant did not pay child

7  support to your mother?

8      A.    No that has nothing to do with me.

9      Q.    Did you make this up because the defendant did not

10 give any money to your family for his own 2 children Ariel

11 and Andrew?

12     A.    No that has nothing to do with me.

13     Q.    Is this some sort of a conspiracy between your

14 mother and you because the defendant has not paid any child

15 support?

16     A.    No.

17                  MS. MALIK:   I have no further questions

18            your Honor.

19                  THE COURT:   Mr. Johnston.

20                  MR. JOHNSTON:  Nothing further judge.

21                  THE COURT:   Thank you Ms. Martinez.  As

22            you have seen we have run a little past lunch time.

23            We have done that because I have been advised that

24            we will have no further witnesses today. So there

25            is no reason to call you back after lunch.

1          So we went running along this morning. So

2     there will be no further witnesses today.  Next

3     witness will be available the first thing in the

4     morning tomorrow. So nothing more to do with you

5     now. Have a great night.

6          Follow the instructions of the officer.

7     We will see you tomorrow morning at 10AM.

8               (Whereupon, the jurors exit the

9     courtroom).

10               THE COURT:  Anything further counsel.

11               MS. MALIK:  No your Honor.

12               MR. JOHNSTON:  Nothing more judge.

13               THE COURT:  See you tomorrow morning 10

14     AM.

15               (Whereupon, court is adjourned until

16     tomorrow March 27, 2007 at 10 AM).

17

18

19

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF QUEENS:   CRIMINAL TERM:  Part K-20

 3   ----------------------------------------x   Indictment No.
     THE PEOPLE OF THE STATE OF NEW YORK   :   2147/2006
 4

 5              -against-                        :

 6                                               :

 7   ABU KHAN                                    :

 8                          Defendant            :

 9   ----------------------------------------x

10                          March 27, 2007

11                          125-01 Queens Boulevard
                            Kew Gardens, New York 11415
12

13   B E F O R E:   THE HONORABLE  RONALD HOLLIE,
                                          Justice
14

15   A P P E A R A N C E S:

16              Honorable Richard A. Brown
                For the People:
17              District Attorney - Queens County
                125-01 Queens Boulevard
18              Kew Gardens, New York 11415
                BY:  MINA MALIK, ESQ.
19                   Assistant District Attorney

20
                For the Defendant:
21              ROBERT JOHNSTON, ESQ.
                Defense Counsel
22

23

24                               Viola L. Dunnom, SCR

25
```

vld

Proceedings

1          COURT CLERK:  Case on trial. Calendar 1.

2     Indictment 2147 of 2006.  People versus Abu Khan.

3     From the pens.

4               MS. MALIK:  Mina Malik.

5               MR. JOHNSTON:  Robert H. Johnston.

6               MR. VIRUET:  Samuel Viruet. Co-counsel

7     for the defendant.

8               THE COURT: Good morning counsel, all.

9     The defendant is now present. Good morning Mr.

10    Khan.  Are we ready to go forward.

11              MS. MALIK:  Yes, your Honor, just a few

12    things that I would like to address.  Do you mind

13    if we approach.

14              THE COURT:  Sure.

15              (Whereupon, an off the record discussion

16    was held at the bench.

17              THE COURT:  You have an application.

18              MS. MALIK:  Yes, your Honor, I am asking

19    at this time to recall Ashley Martinez to the

20    stand.  There is a part of her testimony that needs

21    to be corrected.

22              Yesterday when defense counsel was asking

23    her questions about an outing in the summer of 2006

24    Ashley thought that he was referring to the summer

25    of 2005 with which is when the outing took place.

1    The record needs to be corrected.  Clearly it could

2    not have been the summer of 2006.  The defendant

3    was arrested on June 15 of 2006.  He has been

4    incarcerated since then.

5              I would ask the court that Ashley

6    Martinez be recalled for that limited purpose as

7    well to clarify that there was another outing that

8    defense counsel brought up on March 17 of 2006 and

9    to make sure that those are 2 distinct outings so

10   there is no dispute with respect to the jury.

11             THE COURT:  You represent that Ashley was

12   present at each of those outings.

13             MS. MALIK:  Yes your Honor.

14             THE COURT:  So there is no objection

15   counsel.

16             MR. JOHNSTON:  No objection.

17             THE COURT:  For the limited purpose of

18   correcting the date of the summer outing from 2006

19   to 2005 and also just to explain where the 2

20   outings were.  I think that one was in Florida.

21   The other one here in New York.

22             Then Ashley can be recalled for that

23   limited purpose.  Other than that are we ready.  Is

24   she outside.

25             MS. MALIK:  Yes, your Honor, I would just

1    like to check on that.  She was going through the

2    line earlier before I came here.  She is there your

3    Honor.

4              With respect to the next witness I am

5    planning on calling Dr. Jamie Hoffman Rosenfeld.  I

6    would like to know if you want the exhibits

7    premarked now.

8              THE COURT:  Yes.

9              COURT OFFICER:  Jury entering.

10             COURT CLERK:  Both sides stipulate that

11   all sworn jurors are present and properly seated.

12             MR. JOHNSTON:  Yes.

13             MS. MALIK:  Yes.

14             THE COURT: Good morning.  People call

15   your next witness please.

16             MS. MALIK:  The People recall Ashley

17   Martinez to the stand.

18             COURT CLERK:  The witness was previously

19   sworn.

20             THE WITNESS:  Yes I do.

21             COURT OFFICER:  The People recall witness

22   Ashley Martinez.  M-A-R-T-I-N-E-Z.

23   REDIRECT EXAMINATION

24   BY MS. MALIK:

25      Q.   Good morning.

vld

1      A.   Good morning.

2      Q.   I would like to talk to you about your testimony

3  yesterday.   The defense attorney asked you about an outing

4  the summer of 2006 do you remember those questions?

5      A.   Yes I do.

6      Q.   Could you tell us where that outing was?

7      A.   It actually took place in the summer of 2005.   I

8  got mixed up with the dates.   It took place in a park on

9  Junction Boulevard.

10      Q.   And who was present at that outing?

11      A.   Jimmy, my great grandmother, my brother and sister

12  and myself.

13      Q.   That outing is before you ever told anyone about

14  what the defendant had told to you?

15      A.   Yes.

16      Q.   Now, this outing -- do you know about an outing on

17  March 17 of 2006?

18      A.   I am not sure can you refresh my memory.

19      Q.   Do you remember where you were in March of 2006?

20              THE COURT:   You mean what state.

21              MS. MALIK:   Yes.

22              THE WITNESS:   I was in Florida.

23      Q.   Do you remember there being a festival or a fair?

24      A.   Yes.

25      Q.   Can you tell us about that?

1      A.   Well, my mother took us to a festival.  Just by

2  chance Jimmy and his family were there.  My mother didn't

3  know that Jimmy was there.  He seen his family.  She was

4  letting them see the kids.  There was no problem with this.

5  She didn't know Jimmy was there so she just left.  She didn't

6  say anything.  She just left.

7      Q.   And the summer of 2005 the outing at the park on

8  Junction Boulevard is that in Queens county?

9      A.   Yes.

10     Q.   Where was your mother at that time?

11     A.   She was in Florida.

12              MS. MALIK:  I have no further questions

13          your Honor.

14              THE COURT:  Any questions counsel.

15              MR. JOHNSTON:  No your Honor.

16              THE COURT:  All right.  Thank you Ms.

17          Martinez.

18              THE WITNESS:  Thank you.

19              THE COURT: People call your next witness.

20              MS. MALIK:  The People call Dr. Jamie

21          Hoffman-Rosenfeld.

22  D O C T O R   H O F F M A N-R O S E N F E L D, having been

23          duly sworn, was examined and testified as follows:

24              MS. ROSENFELD:  I affirm.

25              COURT OFFICER:  People call witness Dr.

1          Jamie Hoffman-Rosenfeld.

2    H-O-F-F-M-A-N  R-O-S-E-N-F-E-L-D  Medical Director of Queens

3          Child Advocacy Center.

4    DIRECT EXAMINATION

5    BY MALIK:

6      Q.   Good afternoon.

7      A.   Good afternoon.

8                THE COURT:   It's still morning.

9      Q.   What is your occupation?

10     A.   I am a pediatrician and the medical director of the

11   Queens Child Advocacy Center and I am a child abuse

12   pediatrician.

13     Q.   Can you tell us what is the Queens Child Advocacy

14   Center?

15     A.   The Queens Child Advocacy Center is a multi

16   disciplinary program that's housed in a building several

17   blocks from here where children and teenagers are brought for

18   evaluation if there is a concern that they have been abused

19   in anyway including physical abuse and sexual abuse. At that

20   program I participate in the evaluation it is primarily doing

21   the medical evaluation of the children and teenagers.

22     Q.   How long have you been working at the Child

23   Advocacy Center?

24     A.   Well, I am the first doctor and we opened the Child

25   Advocacy Center as a new program a little over 2 years ago.

1      Q.    How long have you been a doctor?

2      A.    I have been a doctor since I graduated from medical

3   school in 1981 so that is almost 26 years.

4      Q.    Can you tell us your educational background?

5      A.    I graduated from the Thomas Jefferson Medical

6   College in 1979.  No, I am sorry, 1981. I started my

7   internship residency and chief residency in pediatrics at the

8   Albert Einstein College of Medicine and Jacobi Medical

9   Center.  And my graduate degree was in a combined program

10   with  -- I earned my Bachelors and MD in 5 years.  It was a

11   combined program between Penn State University and the Thomas

12   Jefferson University Medical College.

13      Q.    What year did you graduate from medical school?

14      A.    1981.

15      Q.    And can you tell us what an internship is?

16      A.    Internship is the first year of a residency and

17   primarily doctors graduate from medical school and enter the

18   internship in the field that they have chosen to pursue for

19   their career.

20          There are some that are of a general rotating

21   internship that physicians do to prepare them to enter highly

22   specialized fields. Such as ophthalmology. In pediatrics the

23   intern is in the first year of a 3 year pediatric residency.

24   I did an additional year as a chief resident at Jacobi

25   Medical Center.

1       Q.   So when did your residency end?

2       A.   I finished the chief residency which was the extra

3   year.  I was chosen to stay on to supervise the residents in

4   1985.

5       Q.   What is your speciality?

6       A.   Pediatrics.

7       Q.   Can you tell us what pediatrics is?

8       A.   Pediatrics is the health field that is dedicated to

9   the care of children, infant children and adolescents.

10      Q.   You're licensed to practice medicine in the State

11  of New York?

12      A.   Yes, I am.

13      Q.   Can you tell us when you received that license?

14      A.   1983.

15      Q.   Are you licensed in any other states?

16      A.   Not currently.

17      Q.   How long have you been practicing in New York state

18  then?

19      A.   Since I completed my residency in 1985.

20                    THE COURT:   Dr., is there an age above

21              which a child or a teen will no longer be a

22              pediatric  patient?

23                    THE WITNESS:   There is some discretion

24              for individuals providing whether they are no longer

25              teenagers or age out of their program, but generally

vld

1          the age of 18 is when the pediatric field ends.  I

2          know that there are social programs that have

3          adolescent programs providing care to teenagers that

4          go up to 21 for example, but I believe it's 18.

5    Q.    In the course of your professional career have you

6          ever had calls of chief complaints who were sexually

7          abused and or raped?

8    A.    Yes.

9    Q.    Can you tell us approximately how many patients you

10   personally examined?

11   A.    Well, I started doing child abuse work in 1987 when

12   I started the Child Abuse Program at Jacobi so that was about

13   20 years ago. In the past 20 years I have examined several

14   hundred children per year so over 20 years we are talking

15   about thousands of children and adolescents.

16   Q.    Have you ever observed or supervised an

17   examination?

18   A.    Yes.

19   Q.    And approximately how many examinations have you

20   observed or supervised?

21   A.    Well, my employment has all been at medical

22   institutions that were teaching institutions that are

23   connected to medical schools.  At Jacobi and later at

24   Montefiore and Long Island Jewish Hospital. There are intern

25   residents that are practicing and learning under the

1   supervision of more senior doctors.

2           Over the years I have had the opportunity to work

3   side by side with those doctors in training to supervise

4   their examinations as well.  Hundreds.

5       Q.   Do you currently do it now in Long Island Jewish

6   Medical Center?

7       A.   Yes, I am the chief of the section of Child

8   Advocacy and Protection at the Schneider Children Hospital

9   which is the children hospitals within the Long Island Jewish

10  North Shore Health System.

11      Q.   Can you tell us your duties there?

12      A.   In addition to my role as the medical director of

13  the Child Advocacy Center I am also in charge of the program

14  for evaluating children if they come in to either North Shore

15  Hospital or Schneider Childrens Hospital with concerns,

16  complaints of abuse of any kind; including sexual abuse and

17  sexual assault.  I get calls to consult on those patients. I

18  direct the evaluations on those patients.

19      Q.   And you said that you were the chief over there.

20  Do you supervise other pediatricians, the other doctors

21  there?

22      A.   Sure, I mean I am consulted so I direct the care

23  when there is a case to evaluate for possible child abuse of

24  any child and I would supervise other people involved in the

25  care of those other children and adolescents.

1          I teach regularly on pediatrics in the medical
2    center in the health field at the medical school.  Medical
3    school being Albert Einstein College of Medicine.

4          Q.   Have you conducted any research in the area of
5    pediatric medicine?

6          A.   Yes.

7          Q.   Can you tell us about that?

8          A.   I am part of a New York State funded program which
9    is called the Examination of Child Abuse Medical Provider
10    which is a program that was developed with funding with the
11    New York State Department of Health and the New York State
12    Family Service to teach providers outside of New York State
13    that might be providing in areas where there aren't medical
14    experts in this field near by.

15          To improve their skills so that they can at least
16    teach a child that has a complaint or some believe that might
17    be sexually abused so that they will know what to do in the
18    immediate circumstances while deciding if they have need to
19    transport that child to a place like the Advocacy Center
20    where I work for more expert evaluation.  And we did a
21    research project evaluating the outcome of that program and
22    published those findings in pediatric journals.

23          Q.   Are you published in any other way?

24          A.   Yes.

25          Q.   Can you tell us about that?

1          A.    I co-authored a chapter on child sexual abuse for
2     pediatrics called Primary Care Pediatrics which was publish
3     by Lipon Cott Press (ph).

4                I am working on a publication of another chapter of
5     a text book specifically for physicians working in emergency
6     rooms.  The chapter is all  -- the whole topic of child abuse
7     including child sexual abuse that is going to be published by
8     Cambridge University Press.

9          Q.    You said earlier that you teach. Do you teach and
10     lecture in the area of child sexual abuse?

11          A.    Yes.

12          Q.    Can you tell us where and the topics?

13          A.    I teach locally not only to people within the
14     medical field. I give regular lectures at Albert Einstein.
15     I teach regularly to various medical groups in training.
16     Just this week I gave a lecture to the pediatric residents at
17     Schneider Childrens Hospital.

18                But I teach also people outside of the medical
19     field.  This morning immediately before coming here I was
20     giving a lecture to a group of captains to the NYPD as part
21     of their professional development.  I taught them this topic.
22     I have taught in local conferences, regional and national
23     conferences on this topic.

24          Q.    Are you involved in training other professions in
25     the sexual abuse examination.

1        A.    Yes.

2        Q.    Who do you train?

3        A.    The resident, the residents and fellows in

4   pediatrics that work in my institution.  I also for example

5   give a talk to  -- it was a training to all heads of the

6   emergency department in Brooklyn, Queens, Nassau and Suffolk

7   County. Did not get every single head of the emergency

8   department to talk, but professionals in the field of

9   emergency medicine for trauma.

10       Q.    Dr., do you keep current in your field?

11       A.    Yes.

12       Q.    Can you tell us how you do that?

13       A.    Well, I get several professional journals. The

14  Child Abuse and Neglect Journal.  The Child Maltreatment

15  Journal. Plus there are often articles on these topics

16  published in the regular Pediatric Journal. Just as the

17  Journal of Pediatrics and a number of the other journals.

18            I am a member of other professional organizations

19  including the American Professional Society of the Abuse of

20  Children.  In fact I am the New York State examiner president

21  of that organization and a member of the International

22  Society for the Prevention of Child Abuse and Neglect.

23            A member of the American Academy of Pediatric

24  Society on Child Abuse and Neglect.  Go to conferences

25  regularly. Both as a participant, but also sometimes as part

1    of the teaching facility of conferences at one annual

2    conference on child abuse.

3        Q.   Have you ever testified before in the courts of New

4    York State doctor?

5        A.   Yes many times.

6        Q.   Can you approximate how many times?

7        A.   It's just a guess over the past 20 years somewhere

8    between 50 and 100 is a guess.

9        Q.   Can you tell us in what courts you testified in?

10       A.   I have testified in both Criminal Court and Family

11   Court and Grand Jury's in Queens County, New York County.

12   Both the Bronx and Westchester and Brooklyn.

13       Q.   Have you testified in the Supreme Court of the

14   State of New York as well?

15       A.   Yes.

16       Q.   And has your testimony been accepted as that of an

17   expert in the field of Pediatric Medicine and Child Sexual

18   Abuse by the courts of this state?

19       A.   Yes.

20       Q.   Have you ever been consulted by a defense attorney

21   or the defense bar in cases involving child sexual assault?

22       A.   I don't recollect a time when I was consulted

23   specifically on a case of child sexual assault.

24       Q.   Have you ever been consulted by a defense attorney

25   or the defense bar?

1        A.    Yes.

2        Q.    In what cases?

3        A.    A shaken baby case, physical abuse, or it was the

4    Central Park jogger case where I was consulted to give an

5    opinion on some physical findings on the skin.  Some marks on

6    the skin.

7                    MS. MALIK:  At this time, your Honor, I

8              would ask that  -- offer Dr. Rosenfeld as an expert

9              in the field of Pediatric Medicine and Child Sexual

10             Abuse.

11                   THE COURT:   Any objection counsel.

12                   MR. JOHNSTON:  No.

13                   THE COURT: And Dr., if you would just you

14             were asked a number of questions as to the number of

15             patients that you have treated and consulted, the

16             hundreds, that you have personally examined the many

17             more hundreds that you had supervised.

18                   Are those children and now breaking them

19             down to female and male. What percentage would you

20             think you have been involved with as far as female,

21             male.

22                   THE WITNESS:  Judge are you inquiring

23             about in the sexual abuse field specifically or all

24             abuse.

25                   THE COURT:   Sexual abuse.

                                                           vld

1              THE WITNESS:  I think that the ratio of

2         female to male is probably 4 to 1.  In favor of many

3         more females because the epidemiology is such that

4         females are sexually abused more than males. They

5         come forward more than males do so there is a

6         predilection to girls, females being evaluated far

7         more often in programs that evaluate child sexual

8         abuse.

9              THE COURT:   There being no objection I

10        do find the doctor an expert in the field of

11        Pediatric Medicine and Child Sexual Abuse.

12             MS. MALIK:  At this time I would ask to

13        introduce the medical records of Ashley Martinez as

14        People's exhibit number 3 under CPLR 4518.

15             THE COURT:  Would you read the

16        certification for the record.

17             MS. MALIK:  Sure, your Honor, the

18        certification states I, Dr. Jamie Hoffman-Rosenfeld

19        112-25 Queens Boulevard.  Forest Hills, New York

20        11375.  Hereby certify that the reports attached is

21        in the custody and is the full complete record and

22        condition, acts, transaction, occurrence or events

23        of that doctors practicing office concerning the

24        doctors treatment of Ashley Martinez, date of birth

25        April 26, 1993 performed on or about June 21 of 2006

1       and July 5 of 2006.

2                   I further certify that the record was

3       made in the regular course of business of this

4       doctors office and that it is in the regular course

5       of business of this doctors office to make such

6       doctors records and that such records are made at

7       the time of the condition, acts, transaction,

8       occurrence or events or within a reasonable time

9       thereafter.

10                  It's signed by Dr. Jamie

11      Hoffman-Rosenfeld.  There is also another

12      certification dated March 19, 2007.  It states, I,

13      Jamie Hoffman-Rosenfeld M.D., medical director of

14      Queens Child Advocacy Center hereby certifies that

15      the records attached is in the custody of and is the

16      full and complete record of condition, acts,

17      occurrence or events of this institution concerning

18      Ashley Martinez of Lauder Hill, Florida.

19                  I further certify that the record was

20      made in the regular course of business of this

21      institution that this is in the regular course of

22      business of this institution to keep such records

23      and that the entry in such records are made or

24      reasonably near the time of the conditions, acts,

25      transaction, occurrences or events described

 1              therein.  It is signed by Dr. Jamie

 2              Hoffman-Rosenfeld.

 3                        THE COURT:  Any objection counsel.

 4                        MR. JOHNSTON:  No.

 5                        THE COURT:  All right.  Subject to any

 6              appropriate redactions of what has been marked

 7              People's Exhibit 3 for identification is now in

 8              evidence as People's 3.

 9                        COURT OFFICER:  People's Exhibit 3 is now

10              moved into evidence.

11         Q.   Dr., can you explain to us how a sexual exam is

12              conducted starting with the history?

13         A.   Obviously, there are some differences depending on

14    the history which is the first part of any medical evaluation

15    is taking a history.

16         Q.   What is a history?

17         A.   It's gathering all the information from the

18    parents.  If there aren't parents or other guardians present

19    plus the child or adolescent if they are able to provide a

20    history that has to do with what is bringing them for care.

21              So in a case of child sexual abuse or assault a

22    history would include the information relating to what

23    happened, when it happened.  What kind of symptoms were

24    experienced during the abuse, what kind of symptoms the child

25    or adolescent currently has and obviously it would be I think

1  malpractice for any physician not to just get that
2  information.

3       I also do a complete history and physical that
4  includes past medical history. Has the child or adolescents
5  ever had any complications of the birth process,
6  hospitalization injuries, allergies, chronic medications or
7  are the immunizations up to date.

8       I take a complete family history for health
9  conditions in the family.  Social history is part of the
10  pediatric health care visit.  Who does the child live with.
11  What kind of you know things is the child exposed to.  How
12  the child functions, behavior, demonstration, any emotional
13  problems. How are they performing in school. This is all part
14  of the history.

15     Q.   Why is it important to take a history?

16     A.   Because in medicine in general the information that
17  you gather in history leads you to the diagnoses particularly
18  in pediatrics more than 95 percent of the time. The details
19  are all in the history.  You cannot possibly make a diagnoses
20  of any kind -- actually, I will -- I have to amend that.

21       If somebody comes into an emergency room from a
22  scene and they cannot speak or they have been you know there
23  has been some kind of a trauma they cannot provide history.
24  Obviously, we have to move forward and make a diagnoses. In
25  general you cannot make a diagnoses without taking the facts

1    or the history in consideration.

2        Q.   You said that a history helps you to have a

3    diagnoses or a medical opinion. How does it help you?

4        A.   Because anything that any condition that you are

5    trying to evaluate there is important information that you

6    have to get to see whether or not the symptoms that were

7    experienced are consistent with that condition.

8            Was the on set of symptoms consistent with the

9    diagnoses that you are going to make. Is the character

10   consistent with the diagnoses that you are going to make.

11   You know, is the timing of the symptoms consistent with the

12   diagnoses that you are going to make. There are times within

13   medicine where the history provides us with all the clues to

14   make the diagnoses it is because it may be very little in the

15   way of findings in an exam.

16           A classic description of a migraine headache you

17   have to rely on the symptoms. When does it occur, how long

18   does it last, what brings it on.  That's how you make a

19   diagnoses of a migraine headache.  You do not find anything

20   on a physical exam.  It's all about the information in the

21   history. Every field of medicine considers the history really

22   the foundation for making any diagnoses.

23       Q.   Do you document the history that you receive?

24       A.   Sure.

25       Q.   How do you document it?

1      A.    You write in your medical report or your notes the

2   information that you got in the history.  Most physicians

3   don't write things down verbatim because it would not be time

4   efficient.  You have to write down shorthand. Complains of

5   listing what the complaints might be. It's not typically a

6   complete narrative of everything that the patient said.  But

7   you write that in your medical notes.

8      Q.    Now, do you personally document history you

9   received?

10     A.    Just like that.

11     Q.    After receiving a persons history what do you do

12  next?

13     A.    Well, after getting all the elements of the history

14  as I spoke about before then I proceed to a physical exam.

15     Q.    Can you tell us what the physical exam entails?

16     A.    The physical exam in my hands starts with height,

17  weight, vital signs such as blood pressure.  If there is a

18  basic description of an appearance. If they are in acute

19  distress or in any pain. Then it proceeds from the head down

20  with a careful examination of everything. Of the head, eye,

21  ears, nose the throat.

22          Next the lungs, chest including the cardiac exam,

23  abdomen, breast exam in females who have breasts, genital

24  examination, skin exam, extremities exam.

25          Now the exam that I do of the genitalia and the

vld

1    anus is not exactly what is done in a routine pediatric

2    office. I do use an instrument which assists me in doing that

3    examination by providing a brilliant light source and

4    magnification that is called a colposcope. That is something

5    used only by experts in doing a child or adolescent sexual

6    abuse or assault exam. Everything else that I do is the same

7    as what any general pediatric does when they do a complete

8    physical.

9         Q.   Can you tell us how a genital exam is conducted?

10        A.   The genital exam is conducted by having the patient

11   lie on the table.  Depending on how old and how large in

12   stature the child or adolescent is I will have them either

13    -- I am going to concentrate, I am trying to decide how to

14   do this. Boys and girls or just girls.

15             In general smaller children and adolescents will

16   draw their legs up onto the table in what we call the frog

17   leg peak. They have both the soles of their feet together and

18   drop their knees down towards the table. I do that with boy

19   and girls to examine the genitalia.

20             In an older girl or girls who are too large for

21   that position I pull the stirrups out that are hidden in the

22   table and rest the knees in the stirrups.  That gets them out

23   of the way, out of the field of view essentially and ask

24   again that the knees be dropped down to the side so that I

25   can get an adequate look.

1          Obviously, that is not something -- the stirrups I

2     do not use in male examinations.  First I take a look without

3     touching because I am looking to access what is the stage of

4     the development. We call that Tanner staging.  That goes from

5     Tanner zero or one, essentially the prepubertal child. That's

6     been before there is any effect on the tissues that comes

7     with the process of puberty where the hormones incurs

8     changes.

9          I look at the Tanner stages that are telling me how

10    far advanced they are as you approach puberty.  I am looking

11    to see if there is anything on the skin. Any legions that

12    might be blisters or sources of bruises or cuts, abrasions,

13    lacerations et cetera.  And then discharge also and then I

14    start by separating in a girl the labia which are the majora

15    of the outside lips that's called the labial separation

16    technique. We do that to look at the structures that are deep

17    to the labia that are covered by the labia majora.

18    Q.    Let me stop you there for a second Dr., I would

19    like to show you this.  People's exhibit number 4 for

20    identification directing your attention to People's 4 for

21    identification do you recognize that?

22    A.    It's  -- I have never seen it before.  I know what

23    it is.

24    Q.    Could you tell us what it is?

25    A.    It's a line drawing. It's a drawing by hand. It's

1    not a photograph of female genitalia and by  -- it is more

2    consistent with somebody who is at least entered or started

3    the stage of puberty. There is some pubic hair so this is a

4    reasonable representation of what the early pubertal female

5    genitalia looks like.

6         Q.   Is it a fair and accurate representation of early

7    female prepubertal genitalia would look like?

8         A.   That's pretty good.

9                   MS. MALIK:   At this time your Honor, I

10              would ask that it be entered into evidence as

11              People's number 4.

12                  THE COURT:   Any objection?

13                  MR. JOHNSTON:   No.

14                  THE COURT:   There being no objection what

15              has previously marked for People's 4 for

16              identification is now in evidence as People's 4.

17                  COURT OFFICER:   People's exhibit 4 now

18              moved into evidence.

19        Q.   Dr., would People's exhibit number 4 help you in?

20   Describing the female genitalia to us?

21        A.   Yes. So this is a female lying on their back.   So

22   it's what we call the supine position. Lying on the back,

23   face up. And when we are doing our examination in order  --

24   when we document in our medical records if we find anything

25   such as bruises, a laceration or a tear we use a clock face.

1  Up here is 12 o'clock. Here is 6, 3 and 9.

2        This whole area is considered genitalia. The large

3  lips are the labia majora here.  In order to see the deeper

4  structures you need to separate the large lips.  In addition

5  to that there is a technique called labial tracks where the

6  examiner actually takes the large lips of the labia and pull

7  them outwards to the side slightly downwards and towards the

8  examiner.

9        What this does is this allows for a better

10  visualization of the hymen which is the membranal structure

11  that surrounds the opening to the vagina. It does not cover

12  the opening of the vagina, but surrounds the opening to the

13  vagina.

14     Q.   Can you explain the difference between say a

15  prepubertal and post pubertal hymen?

16     A.   Well, obviously it does not show up here.  I only

17  have this one diagram to work with, but the female hormones

18  that are responsible for puberty that make changes to the

19  hymenal tissue in the prepubertal girl.

20     Q.   Let me ask you what do you mean by prepubertal?

21     A.   That is the young girl who has not started to go

22  through the changes of puberty.

23     Q.   What is puberty?

24     A.   Puberty is that stage that girls typically start

25  entering.  It's sort of a stage of transition from childhood

1   to adulthood. Girls and boys go through it.  They go through
2   it with different changes. Girls typically start around the
3   age of 8.  And are beginning to have changes that represent
4   increased female hormones that is the earliest signs being
5   breast buds, some hair in the armpits, hair on the genitalia
6   and the effect on the hymen itself.

7          Because in a young girl the hymen is a very thin
8   almost  -- sometime it's almost like cellophane that you can
9   see through the tissue itself because it's very thin, but
10  once there is estrogen around it the hymen becomes very
11  boggy. It's not like really swollen. The only way for me to
12  describe it, it's swollen compared to the prepubertal hymen.
13  Has lots of curves and folds and it's very much more elastic
14  and resilient because of the estrogen effects.  Much more
15  stretchable.

16  Q.   What about the other 2 stages of the hymen it's
17  post pubertal?

18  A.   I sort of covered that. There is really  -- I mean
19  there is no absolute.  You do not go from being prepubertal
20  to pubertal overnight. It's a transition that happens
21  gradually.  So you go from being actually infant, looks like
22  pubertal, like they have estrogen.  They have an effect from
23  passive transfer of the mother's estrogen into the fetus.
24  Infant girls often look a little like teenagers in the
25  appearance of their genitalia.  You go from prepubertal and

1    then you enter puberty.  And then you have this now redundant

2    tissue didn't causing a boggy hymen with lots of folds and

3    creases and then post puberty.

4           As you age out of the puberty the exam remains

5    pretty much stable until you become elderly and menopausal

6    and with the withdrawal of the female hormone you are going

7    to have atrophy.

8    Q.    Is there a specific time period for the prepubertal

9    stage and later on?

10   A.    Again, it's a gradual transition that goes from

11   Tanner 1 to Tanner 5.  Once you are at Tanner 5 that is adult

12   like. You stay there. And the girl it's very different how

13   long that takes.  The girls enter puberty at different ages.

14   And as I said the average age is around 8 or 9.  It's gotten

15   younger and younger as studies have shown.

16          Girls are entering puberty at younger ages than

17   they used to. That has to do with improved national status in

18   this day and age as opposed to you know back in the olden

19   days.  But the ages that you enter puberty and the length of

20   that whole transition, the entry of puberty you begin to have

21   changes. A couple of years later, you average 3 years, you

22   begin a menstrual period.  You start to have changes of

23   puberty before your period starts.  And I cannot tell you how

24   many years it takes for the whole process.

25   Q.    What are you looking for in examining a hymen?

1       A.   Well, it's not just a hymen that we are looking at.
2    You are talking in a sexual abuse exam.

3       Q.   Yes.

4       A.   People think that it's the hymen that we are zoning
5    in on as if -- that is the old standard or the answer as to
6    whether or not abuse or assault happened. We look at
7    everything. So I am looking for bruises anywhere.  On this
8    picture I am looking for abrasions, scrapes, scrapes,
9    lacerations, tears.  Scars that might suggest older abuse or
10   chronic ongoing abuse as opposed to a fresh injury which
11   would mean that this girl or teen has come to attention
12   immediately after an episode of abuse. I am looking at
13   everything.

14       And we do look at the hymen to see if it's been
15   disrupted.  If it's any sign that it's been torn. So many
16   people think that.  There is the fact that it's an opening
17   means that it's been penetrated is a myth that has been for
18   centuries. The myth that the hymen is a structure that is an
19   all or none phenomenon. Either there before sex and gone
20   after sex.  That is absolutely not true.

21       The hymen is not a wall of tissues.  It's an
22   angular or crescent shape of tissues. It's all an opening
23   there.  At the time that a girl is born, the size has nothing
24   to do with how relaxed or how many tracts we are putting on
25   the tissue.  So stretching it can make it look really big. I

1   just pull hard.  There is a wall of tissue there which some
2   people believe that is called an imperfect natural hymen.
3   That is an abnormality that has to be corrected.  If there is
4   no opening when the girl reaches puberty there is no way for
5   the blood or secretions to get out.  That could be a sexual
6   emergency.

7       Q.   Are all hymens kind of the same?

8       A.   There are many different shapes. The hymen tissue
9   can go all the way around or it can appear to start at one
10  and then be wider towards the back here at 12 o'clock that is
11  what we call a crescent shaped.  They can be angular or
12  crescent shaped. Sometimes they are very flopping. Sometimes
13  like projections of a flower where they are scalloped. They
14  can flop down on top of themselves. We have to put enough
15  tracture to get a good enough look so that all of that opens
16  up and falls away to look at what the anatomy is.

17              I have use a G tip to confirm the appearance. I
18  pass it into the opening of the vagina and kind of manipulate
19  the hymen all the way around to make sure that I am not
20  missing something.  Sometimes we have to flip the girl over
21  because the hymen can flop or fold on itself. You may not
22  think that you are seeing it and it's really there.  By
23  flipping it over with the help of the gravity it unfurls or
24  unrolls and you see it better so there are many numbers of
25  different techniques that we use to make sure that we really

1   see everything that is there or not there.

2          Q.    Is there an importance to the hymen shape?

3                      THE COURT:    Medically or for the doctor

4                to make a determination of sexual abuse?

5          Q.    Both?

6          A.    The shape is something that we remark on more

7   because as this field, medical field moved from it's infancy

8   back in the late 70's early 80's people started to do a lot

9   of the study about what genitalia in girls looked like. Girls

10  who have not been abused.  Girls who have been abused.  We

11  describe the shape this documentation just because it's part

12  of our description but medically the shape of a hymen does

13  not make a difference. If there is no opening.  If it's

14  imperforate that makes a difference. I would have to send

15  that girl to see a surgeon if I do not see an opening there.

16         Q.    Does the shape of a hymen effect whether it can be

17  injured or not?

18         A.    It's not the shape so much as the obviously

19  whether it looks like there is an estrogen effect.  It also

20  changes in color a little bit.  Inside of see through  --

21  this gets opaque. It moves from a red to a more pale pink.

22  Again the changes that I described and that certainly makes a

23  difference because the effects of estrogen on the tissue make

24  a huge difference in terms of the elasticity in terms of

25  whether it can be stretched out breaking and estrogen can

1   obliterate if there was an old finding of trauma and this has

2   been shown through studies that have done serial examinations

3   of girls.  How they like at 0 it might be difficult if not

4   impossible to see once the girl goes through puberty because

5   of the effects of the estrogen on the tissue.

6        Q.   Is the hymen located on the exterior of the female

7   genitals or the interior of the body?

8        A.   Interior. Well, it's deep to the labia majora.  The

9   labia minora the small lips are outside the hymen. Now you

10  are moving you are taking away the layer and moving further.

11  Then you have the hymen you pass through the hymen the actual

12  anatomic vaginal canal.

13       Q.   Can you explain the rest of the structures in the

14  diagram to us?

15                 THE COURT:   First, doctor if you can for

16            us you know describe what is the most external

17            portion of the vaginal area of a female what it's

18            called.

19                 THE WITNESS:   So the vaginal area and I

20            think that you are describing the entire genitalia.

21            The most exterior is the labia majora.  When a girl

22            is lying down with her legs spread they are usually

23            touching each other and covering the deeper

24            structures.

25                 THE COURT:   So at what point would you

1        make a judgement as to whether or not an object has

2        entered a body meaning would that point be as soon

3        as it passes the outer most portion of the labia.

4                    THE WITNESS:  Judge, I think that is a

5        legal definition as opposed to a medically.

6                    THE COURT:   I am asking medically.  Is

7        there a --

8                    THE WITNESS:  I think that we don't

9        consider internal like internal injury.  Until you

10       are in the vaginal canal that is considered inside

11       the body.  The labia specifically.  The labia majora

12       and minora the hymen are really more external, but

13       it's you know it's sort of the hymen is the gateway

14       to the inside.

15                   THE COURT: Understood.

16       Q.   Could you explain to us the reference of the

17            structure in the female genitalia doctor?

18       A.   This is the urethra which is the opening where the

19  urine comes out.  This is the clitoris which is covered by

20  this piece of skin which is called the clitoral hood. This

21  area back here there is the gutter that is sort of outside of

22  the hymen which is a space where secretions collect where you

23  might see injury is called the fossa.

24            Anyway, this gutter is called the fossa.  And the

25  lip comes around in the back and meet back here is an a lip

                                                              vld

1  of tissue called the posterior fornix. Then you have the
2  perineum now you are on to regular skin.

3           This is the tissue in here that is more sensitive
4  pink skin like the skin inside of your mouth.  That is called
5  mucus membrane. Now this is the perineum which is the normal
6  skin that is the base against the genitalia and the anal
7  opening.

8      Q.    You talked about how you conducted a sexual assault
9  exam. Is there anything else that you do in terms of
10 conducting that exam?

11     A.    Well, you know I mentioned briefly that you use a
12 colposcope. It's an instrument that shines a bright light
13 that allows me to see at 3 different magnifications. 3, 7 and
14 a half, roughly 15 times magnification.  That is an estimate.
15 I use all magnification from low power to high power to make
16 sure that I am not missing anything.  Then I am also
17 documenting with the colposcope it takes digital images of
18 the exam as I am doing it.  This enables me to review my
19 photos on a screen.  I can blow it up even greater to make
20 sure that I am not missing anything.

21          In dealing with an acute sexual assault then there
22 would be element to the exam that has to do with collection
23 of forensic evidence or specimens that is something called a
24 rape kit. We go through them unfortunately that has specific
25 instructions about how to collect from the vagina from the

1    anus from the skin, et cetera.  That is something we only do

2    if we are dealing with again the history of sexual abuse or

3    sexual assault within the last 46 hours. If I do not --

4        Q.   Why is that?

5        A.   The sensitivity of that kit or the likelihood that

6    the kit is going to actually find anything so tiny that it's

7    out made by the trauma to the patient or the victim to do

8    that kit.

9        Q.   What kind of things are you looking to collect when

10   you do a rape kit?

11       A.   Well, you are looking to collect if there is dried

12   secretions that might represent semen from an assailant you

13   would swab that. That gets analyzed then.  Is it semen.

14   Second of all is there  -- did they retrieve any DNA.  You do

15   Q-tips from lots of different areas of the body including the

16   anus and genitalia anything to which you collect samples of

17   pubic hair, head hair samples.

18            Some of these serve as a base line for the

19   pathologist to know the persons own DNA and what is foreign

20   DNA.  The other thing that I do is I access for if there is

21   an indication for sexually transmitted infection.

22       Q.   Can you tell us about that?

23       A.   Sexually transmitted infections are it turns out

24   from our from the science from studies the risk is fairly low

25   in kids, higher in teens. Again it depends on the

1    circumstance.  It depends on whether or not an assailant and

2    or perpetrator is infected obviously.

3          As a general protocol we test if there is a history

4    of contact which might be the kind of contact that could pass

5    infection. We are talking about genitalia to genitalia. Mouth

6    to genitalia. Genitalia to anus. I would do a swab in each

7    location. Looking for gonorrhea and chlamydia in girls I

8    would test for trichomoniasis that is another test that I do

9    with a swab of the vagina.

10          And then I have also I do those tests if I have

11   anybody a girl that says that she has symptoms. Discharge,

12   pain, bleeding, itching that would be a reason to do those

13   tests or if the history suggests to me that there is a

14   possibility of transmission of any of those infections I

15   would do those tests. We test all teenagers. It's just

16   because of that standard of care.  We test for other reasons.

17   If the teenagers are anxious they might have an infection.

18   Even if they are worried out of proportion as to the abuse.

19   Just for reassurance I would do those tests.

20          I also when I am doing those tests take blood work

21   too at the time for the sexually transmitted infection such

22   as syphilis, HIV., hepatitis B and C and I have said it all.

23   Q.    If a purported assailant were infected with a

24   sexually transmitted disease does it mean that it would

25   transfer from an assailant to a victim?

                                                              vld

1        A.    No there is no case where the transmission is one
2    hundred percent.

3        Q.    After you do a sexual assault documentation do you
4    document all of your findings?

5        A.    Yes.

6        Q.    Can you tell us how long a typically sexual assault
7    can last?

8        A.    By the time I take the history from the child or
9    teenager the history from a guardian or a parent and I go
10   through the examine and I do the testing we are talking an
11   hour and a half.  Probably average.

12       Q.    Thank you doctor.  You may sit down.  I would like
13   to direct your attention doctor to June 21 of 2006 were you
14   working on that date at the Queens Child Advocacy Center?

15       A.    Yes I was.

16       Q.    Did you examine a girl by the name of Ashley
17   Martinez on that date?

18       A.    Yes.

19       Q.    Did you obtain a history from Ashley Martinez?

20       A.    Yes.

21       Q.    Without telling us the identity of any individuals
22   what was the history that you obtained from her or from this
23   case?

24       A.    Ashley reported that she had been sexually abused.

25       Q.    Did you receive additional history from other

vld

1  sources, did you interview anyone else?

2      A.   Yes.

3      Q.   Who did you interview?

4      A.   I had received some information from Detective Luz

5  Figueora at the time that she made the referral.  She was the

6  one who called me and said I would like to set up an

7  appointment for Ashley.

8          Ashley was also accompanied to the visit by her

9  grandmother Ms. Martinez who also provided me with some

10 information.

11     Q.   Is that Ann Martinez?

12     A.   Yes.

13     Q.   Now when you received the history did you document

14 that information that you received?

15     A.   Yes.

16     Q.   And after obtaining the history what did you do

17 next with Ashley?

18     A.   I did the physical exam.

19     Q.   Can you explain to us how the physical exam is done

20 on Ashley?

21     A.   The exam started with her height and weight and

22 then I proceeded to examine her head, eyes, ears, nose,

23 throat.  Next lungs, breasts, cardiovascular, abdomen, the

24 skin extremities.

25          On of the initial date I was not able to do her

vld

1   anal genital exam.  I do not have documented why, but I
2   believe that I asked her to come back because I was out of
3   the  -- I had some stocking problems. I believe that some of
4   the testing materials that I needed were actually out of
5   stock.

6       Q.    You mean some materials in stock not stocking as in
7   panty hose?

8       A.    No some of the materials that I keep at the center
9   to do tests I have to order when I am running low and if I am
10  surprised by a number of emergency cases and my materials
11  that I have get used up and I am waiting for a delivery.
12  Sometimes that happens.

13      Q.    Did you order any test for Ashley Martinez that
14  day?

15      A.    On that day I took care the blood test that I
16  explained that I do looking for sexually transmitted
17  infections.

18      Q.    Now I would like to direct your attention to July 5
19  of 2006 were you working at approximately 8:30 AM on that
20  date at the Queens Child Advocacy Center?

21      A.    On July 5th?

22      Q.    Yes.

23      A.    I am not sure what time, but I was there.

24      Q.    Did you meet with Ashley Martinez on that date?

25      A.    Yes I did.

1      Q.   Can you tell us what was the purpose for you

2   meeting her on that date?

3      A.   She returned so that I could complete the anal

4   genital exam and do any additional testing that I felt

5   appropriate.

6      Q.   What does anal genital mean?

7      A.   That is just a word that takes care of the whole

8   area in question. The genitalia and the anus.

9      Q.   Did you conduct a test, do a test on that date?

10      A.   Yes.

11      Q.   Can you tell us what you did in terms of conducting

12   an anal genital exam on Ashley Martinez on July 5 of 2006?

13      A.   As explained before I laid her on the back in the

14   supine face up position.  I used the stirrups to hold her

15   feet because Ashley clearly has, stature wise, the size of an

16   adult female. I would have to do that.  Use those to assist

17   me to get a good look.  Then I did the exam as I described. I

18   looked at her carefully.  I did a careful labial track.  I

19   used a Q-tip.  I inserted a speculum.

20          A speculum is an instrument that we use to get a

21   look at the internal tissues to see if there is evidence of

22   infection for examination or if there is any legions,

23   blisters or anything so by inserting a speculum it gets -- it

24   enables me to look in the actual vaginal canal up to the

25   cervix because that is where we might find things like

1    genital warts for example. You might miss it if you do not

2    actually look inside. It's inserted into the speculum.

3        Q.    You said that there was  -- you used an adult

4    speculum on Ashley Martinez.  Are there different sizes of

5    speculums?

6        A.    There are actually pediatric specimens. I do not

7    keep them in stock. I would do a speculum exam on a child who

8    was awake and alert.  Those are actually only used for a

9    child who is under sedation or anesthesia if for some reason

10   it has to be surgery or something to that area of the body or

11   an examination. But then there are various adult size

12   speculums.  Really sort of a smaller and a larger.

13       Q.    Which adult speculum did you use on Ashley

14   Martinez?

15       A.    Larger.

16       Q.    Why?

17       A.    Because Ashley's size told me that I would not have

18   any difficulties and the examination that I did just by

19   separating the labia I could see that the opening of the

20   vagina was able to allow me to pass the larger of the 2

21   speculum without encountering any difficulties. The larger

22   the speculum that you put in the more room that you are

23   giving yourself to adequately visually see what you need to

24   see.

25       Q.    I would like to show you what has been previously

1  marked as People's exhibit number 5 for identification do you

2  recognize that there?

3      A.   Yes, it's a speculum.

4      Q.   Tell us what that is?

5      A.   It's a vaginal speculum.

6      Q.   Is that speculum the same size and the one that you

7  used on Ashley Martinez?

8      A.   Yes.

9      Q.   Is it a fair and accurate representation of the

10 adult size speculum that you used on Ashley Martinez?

11     A.   Yes.

12              MS. MALIK:   I would ask it be entered

13          into evidence, exhibit 5, for demonstrative

14          purposes.

15              THE COURT:   Any objection.

16              MR. JOHNSTON:   Yes, I do not see the

17          relevance.

18              MS. MALIK:   We talked about this offer.

19              THE COURT:   Over the objection of the

20          defense what has been previously marked as People's

21          5 for identification is now in evidence as People's

22          5.

23              COURT OFFICER:   People's exhibit 5 has

24          now been moved into evidence.

25     Q.   Doctor, directing your attention to People's

1          exhibit number 5 which is in evidence can you take

2          that out of the plastic bag please.

3     A.    Okay.

4     Q.    Can you tell us how it works and how you used it on

5  Ashley Martinez?

6     A.    What you do, again the purpose is that you insert

7  this through the hymenal it's not through the hymen. It's

8  through the opening in the hymen into the vaginal canal.  You

9  leave it closed while you are inserting.  As you are

10 inserting it you open it up because now you have to find the

11 cervix.  You are opening it and you are looking through it. I

12 also have a light that turns on and plugs in here. The light

13 is being transmitted intravaginally.

14              THE COURT: For the record what is being

15          demonstrated this object as it's held by the doctor

16          roughly simulates the appears of a handgun with the

17          item that she is describing as being inserted

18          through the hymen.  Like the barrel of what would

19          have been a toy handgun.

20   Q.    Doctor, you talked about a cervix that you used the

21          speculum to analyze the cervix what is the cervix?

22   A.    That's the anatomic structure at the very top at

23 the end of the vaginal canal.  We think the top is when a

24 female is standing up.  It's at the top which is the entrance

25 to the uterus. It represents the gateway to the uterus.

1    Q.   In People's exhibit number 4 can you see the that

2    in that diagram?

3    A.   No.

4    Q.   Can you show us where it would be?

5    A.   So what I would be doing is taking this and putting

6    it through the vaginal opening into the vaginal canal and

7    opening up as I am doing that.  And then I am looking up

8    inside, but the vaginal canal we are talking about several

9    centimeters up.  It's clearly an internal structure.

10   Q.   Thank you doctor.  Can you tell us what your

11   examination of Ashley Martinez's vagina and hymen showed you?

12   A.   Ashley had a pale pink estrogenized hymen. She was

13   1 of 5 in development.  That means the most advanced stage of

14   puberty.  Clearly adult females like in her development her

15   hymen membrane was narrow but symmetric.  And there was no

16   obvious scar or tear or transition. There are no fresh

17   findings such as bruises or abrasions or lacerations.

18   Q.   You talked about a colposcope earlier did you use

19   that on Ashley Martinez?

20   A.   Yes.

21   Q.   Can you tell us again what that is?

22   A.   That is the light that I push up. It does not

23   enter. It's for an external look so that I can get it into

24   position and I look through it either looking through the eye

25   piece or looking at the monitor screen because the images are

1  being captured on the computer monitor.

2      Q.   Does it magnify the area that you are looking at?

3      A.   Yes.

4      Q.   Do you know the magnification?

5      A.   I use it at 3 different magnifications I think it's

6  3.75, 7 and a half and 15 or it's 3.75, 7 and a half  -- I am

7  not sure.  It's a little over 3.  A little over 7 and 15.

8      Q.   On that date July 5 of 2006 did you take

9  photographs using the colposcope of Ashley Martinez's

10 genitalia?

11     A.   Yes.

12     Q.   Can you tell us what kind of a picture that you

13 took?

14     A.   These were digital photographs using the colposcope

15 of her genitalia. 3 different magnifications. Also

16 demonstrating her in a resting state and also demonstrating a

17 better look at the structure while I am putting tracture on

18 the labia.  Separating first the labia and tracks on the

19 labia in the way that I previously described.

20     Q.   Can you see the hymen in those photographs?

21     A.   Some of them.  Some of the higher power photographs

22 I have may not be directly at the hymen. It's also looking at

23 the whole area.  So, not all of the photographs are directly

24 at the hymen. I always take a low power shot of the entire

25 genitalia because that is how I document the pattern of the

1    hair growth so that is the determination one of the things

2    that are used to term what Tanner stage is.

3         Q.   I would like to direct your attention to March 12

4    of this year did you meet with Ashley Martinez on that

5    morning?

6         A.   Yes.

7         Q.   Can you tell us where you met with her?

8         A.   She came to the Child Advocacy Center.

9         Q.   What was the purpose for you meeting with her?

10        A.   It was a follow up exam.

11        Q.   Did you perform an anal genital exam on her on that

12   date?

13        A.   Yes.

14        Q.   Can you tell us what you did on March 12 of 07 in

15   terms of conducting that exam?

16        A.   The exam was sequentially the same. The only thing

17   that I did differently was that there is a technique that we

18   use in pubertal girls to help us to see the hymen because as

19   I said it's very flopping. It can flop in or out and be

20   difficult to examine.

21             There are ways that we use a structure to have the

22   hymen kind of hug it so that we get a better look at it. It's

23   almost like if you put your head through a turtleneck shirt.

24   The way that the turtleneck is stretched out so that you can

25   get a better look at the turtleneck because of the way that

1   the head is stretching the turtleneck.

2              Not only do we use a G- tip some people use a foley

3   catheter.  You blow up a balloon.  As you draw the balloon

4   out you see how the hymen hugs the balloon so that there are

5   no areas that are folded or are flopped in.

6              I use the adult speculum in the same way to this

7   purpose to get a really good look for the hymenal structure

8   using this speculum to essentially stretch the hymen out so

9   much it's not folded or flopped in so that I can make sure

10  that I am seeing every single millimeter.

11       Q.    On March 12 of 2007 you used an adult speculum like

12  People's exhibit number 5 on Ashley Martinez again?

13       A.    Yes.

14       Q.    What else, other tools did you use on her on that

15  date?

16       A.    I also used a swab, the swab technique.  It helps

17  me to see better and outline the structure by subsequently

18  manipulating and moving things around.

19       Q.    On July 5 of 06 did you use swabs on Ashley

20  Martinez on that date as well?

21       A.    Yes.

22       Q.    For what purpose did you use swabs on that date?

23       A.    I used it as a tool during the exam. I use it for

24  testing for sexually transmitted infection.  I did do a G-tip

25  test for gonorrhea, Chlamydia and trichomoniasis.

1     Q.   Can you tell us about how you went about using a

2  G-tip to do the test on July 5 of 2006?

3     A.   Well, for the genital G-tip for gonorrhea,

4  chlamydia, it's a G-tip from the cervix itself. Looks way up

5  the canal and seeing the cervix at the top and there is a

6  small opening called a cervical.  I use the G-tip and place

7  it in and roll it. I put that in specifically designed for 2

8  different things.

9         One for chlamydia and gonorrhea and then  to the

10  lab.  I use the G-tip in the anus. Each one of those go into

11  a separate medium testing for gonorrhea and chlamydia and for

12  the throat looking for gonorrhea there.

13     Q.   What were your findings with respect to the exam

14  that you conducted on March 12 of this year?

15     A.   The findings were unchanged from when I had seen

16  her in July that she had an uninterrupted posterior hymen

17  rim.  Posterior meaning the area at the bottom so we consider

18  anything from the 3 o'clock position all the way around to

19  the 9 o'clock position the lower half that is posterior. She

20  had an uninterrupted narrow hymenal rim.

21     Q.   Were your findings the same as they were on July 5

22  of 2006?

23     A.   Yes.

24     Q.   So in either exam did Ashley Martinez have any

25  injury whatsoever?

1            THE COURT:   Injury where?

2            MS. MALIK:   To her genitalia.

3       A.   She did not have any visible injury, no.

4       Q.   In your expert medical opinion with a reasonable

5  degree of medical certainty doctor is it your opinion that

6  Ashley Martinez given that she had no injury does that lack

7  of finding injury inconsistent with a penetration of a vagina

8  by a penis?

9       A.   Absolutely not.  In fact that is from both from my

10  experience and from the literature we know that in the

11  majority of instances woman, teenagers and woman will have

12   -- who have reported sex either voluntary sex or sexual

13  assaults report on their examination will have no evidence of

14  traumatic injury to the genitalia.  This is due to the

15  elasticity and the resilience of that tissue.

16       Q.   Which tissues are you talking about?

17       A.   The hymenal tissue is the tissue that we focus on

18  here.  That is the tissue that is required to stretch with

19  penetration of the vagina, but because it's so elastic and so

20  resilient it often stretches without any injury.  In addition

21  to that we know that from studies in the literature that in

22  my own personal experiences when there is injury it can heal

23  over time and leave absolutely nothing visible to be seen

24  sometime later.

25            If there is a delay in the medical exam such that

1  weeks, days, months or weeks past, months pass in between the

2  time of the assault or the abuse and the exam that even if

3  there had been injury there that healing can be complete

4  without any visible residual.

5      Q.    So doctor is the lack of injury within your expert

6  opinion and within a reasonable degree of medical certainty

7  the lack of injury or the fact that there is still hymenal

8  tissue is that still consistent with allegations of sexual?

9                     MR. JOHNSTON:  I will object to that.

10                    THE COURT:   Injury observed?

11                    MS. MALIK:  Yes.

12                    THE COURT:  Overruled.

13     Q.   Is the lack of injury observed and the fact that

14         hymenal tissue is still in place is that still

15         consistent

16 With allegations of sexual assault in your expert opinion?

17     A.   Absolutely.  Without question.

18     Q.   And can you explain the basis of your opinion in

19  that regard?

20                    MR. JOHNSTON:  Objection I think that's

21         been asked and answered.

22                    THE COURT:   Overruled.

23                    THE WITNESS:  The base of my opinion

24         first comes from experience.  And from my knowledge

25         of the medical literature about this topic.  Which