1        states that in my experience is that in the vast

2        majority of cases both sexual abuse and even cases

3        of a sexual assault where I see somebody in the

4        acute period there is often and in the majority of

5        cases there is no physical medical admissible

6        evidence of injury to genitalia because of the

7        unique nature of that tissue and it's ability to

8        stretch and the resilience, there is a delay in

9        medical care, I believe that I was examining Ashley

10       after some time had passed from the last abuse.

11              Studies show that if there is an injury,

12          often there is not, whether there is a tear.  The

13          human body is fabulous such that you may not

14          receive any visible residual after that delay.

15   Q.   What about in terms of the amount of penetration of

16   a penis into a vagina is that a fact if there is injury or if

17   the hymenal tissue is lost?

18              THE COURT:   Penis into the vagina as

19          opposed to  -- okay.

20              THE WITNESS:   There are factors that you

21          consider also I don't have any specifics with

22          regards to this case.  In general terms other things

23          can contribute to whether or not there is going to

24          be injuries.  Certainly the degree of force used.

25          The sides of the structure that penetrates through

1              that opening.

2        Q.    What do you mean by the sides of the structure?

3        A.    Well, I think that something, the diameter again I

4    am talking about generically, the diameter of a pencil would

5    be less likely to cause injury than something of the diameter

6    of a cucumber.

7              Also whether or not penetration was just a little

8    bit into the opening or whether it was fully by the use of

9    lubrication.  Potentially all of these things can physically

10   or not you are going to find injury on an examination after

11   an episode or after multiple episodes of abuse and assault.

12   But again most of the time we don't.  That is well

13   substantiated from my experience and the literature.

14       Q.    I would like you to assume the following fact.

15   Assume that Ashley Martinez is 12 years old at the time I am

16   sorry, is 13 years old at the time of your examination?

17             THE COURT:    I thought it was 14 and 2

18        months.

19       Q.    She was 14.  What is the date of birth that you

20        have?

21       A.    April 26 of 92.  I saw her in June of 06.  So that

22   is she had turned 14 two months prior.

23       Q.    Lets assume the following fact.  That Ashley

24   Martinez was 12 years old.  An adult male placed his penis

25   into her vagina and moved up and down and in and out of her

vld

1   vagina. Then he removed his penis from her vagina.

2          Assume that Ashley Martinez is examined

3   approximately a year and a half later and that you cannot

4   visualize any injury or any scarring and you see a hymen.  Do

5   you have an opinion within a reasonable degree of medical

6   certainty that the medical findings in that situation are

7   consistent with allegations of sexual assault?

8       A.    There is absolutely nothing about that scenario

9   that is inconsistent.

10      Q.    So you are saying that that scenario could have

11  happened and you could still not find any evidence of sexual

12  assault?

13      A.    Absolutely.

14      Q.    And are they because of the reasons that you just

15  briefly stated to us?

16      A.    Correct the other thing is that --

17                  MR. JOHNSTON:  Objection, judge I think

18          that the question has been asked and answered.

19                  THE COURT: Yes, but she was about to say

20          another thing. I think that makes her answer more

21          clear.  Go ahead doctor.  Objection overruled.

22                  THE WITNESS:  The other thing is that we

23          never have examiners to do this work before and

24          after photographs. It's possible that genitalia were

25          changed in appearance by those acts.  In a way but I

1       can't say that tissue is diminished meaning smaller

2       than it used to be if I do not know what it looked

3       like before.

4               We can only say what we see in the

5       absence of any clear injury visible to me set that I

6       examined her does not mean that there was no

7       alteration. It does not mean that I do not see any

8       injury.  I could not say unless I have a baseline

9       examination.

10      Q.    Could that be because it's a year and a half later

11            after the incident?

12      A.    Not only that, one would have to do exams of kids

13  before they got abused. And to have that information and say

14  that for sometime later to compare it to after they have been

15  abused. Obviously we do not have that information.

16      Q.    Are there any studies or medical literature that

17  you are aware of that she had a lack of injury or hymenal

18  tissue that is still in tact after vaginal penetration by a

19  penis?

20      A.    Yes.

21      Q.    Can you tell us about that?

22      A.    There was an article published in the general

23  pediatric in 2004 called genital anatomy in pregnant

24  teenagers.  Normal does not mean nothing happened. I don't

25  remember the title right now.  It looked at a little over 30

1   pregnant teenagers and examined their genitalia to see if

2   there was evidence of traumatic injury to their genitalia

3   specifically to their hymen and in the majority of these

4   cases their hymen had no visible injury.

5       Q.    So the hymens were still in tact?

6       A.    I do not use the word in tact.  Because to me it

7   does not -- it has no universal meaning.  I will say that the

8   hymen has no physical evidence of any penetrating injury, no

9   visible injury that it had been torn or broken or anything

10  like that.

11      Q.    And these girls still have hymens?

12      A.    They still had visible hymens that looked like that

13  they had not been traumatized in any way.

14      Q.    Earlier you said that the presence of a hymen is a

15  myth as to whether sexual intercourse has occurred or not.

16  Can you tell us what you meant by that?

17      A.    For all of the reasons that I have already said the

18  notion that there is a test for virginity that you can look

19  at.  That you can look at the hymen and tell if an adult

20  female is a virgin is a myth for all the reasons that I have

21  said.

22          Many, many woman never bleed with first intercourse

23  and certainly so for all the reasons that I said the hymen is

24  not a structure that necessarily gets injured with sexual

25  abuse, sexual assault or voluntary sex.

1                    MS. MALIK:   Thank you.   I have no further

2          questions.

3                    THE COURT:   Mr. Johnston any questions?

4                    MR. JOHNSTON:   Oh, I think so judge.

5    CROSS EXAMINATION

6    BY JOHNSTON:

7          Q.   Doctor Rosenfeld I believe that you told the jury

8    that you are associated with the Queens Child Advocacy

9    organization is that correct?

10         A.   Yes.

11         Q.   The Center?

12         A.   Yes.

13         Q.   You have been associated with them for many years I

14   would assume is that correct?

15         A.   Yes.

16         Q.   How long have you been associated with them?

17         A.   What I said was I was the first doctor there when

18   the program started a little over 2 years ago.

19         Q.   Okay. Now I believe that you also told the jury

20   that you could not recall any other case testifying on behalf

21   of someone who is accused of sexual abuse or sexual

22   intercourse is that correct?

23         A.   Correct.

24         Q.   So you predominantly testified on behalf of the

25   People who are bringing allegations of sexual abuse or sexual

1    intercourse rather than for the defendant is that correct,
2    testified basically for the People?

3        A.    In my role as a physician examining children for
4    possible sex abuse that happens to be what I get called upon
5    to do.  That is the way that this plays out.

6        Q.    Well, lets go over your examination for a minute.
7    On June 21 of the first occasion that you had to see Ashley
8    Martinez is that correct?

9        A.    Correct.

10       Q.    And she was brought there by her grandmother not
11   her mother is that right?

12       A.    Correct.

13       Q.    And you did a preliminary examination. You asked
14   her some questions to get her history.  And did you ever ask
15   her whether or not she had any boyfriends.

16                    MS. MALIK:  Objection your Honor.

17                    THE COURT: Overruled.

18                    THE WITNESS:  The record was taken away

19            from me.  If I can look at it again I can tell you

20            whether or not I asked.

21                    MR. JOHNSTON:  Okay.

22                    THE COURT:   After you look the answer

23            would be either yes or no as to whether or not you

24            answered that question.

25                    THE WITNESS:  Yes I did.

1      Q.   And what was her response?

2      A.   Yes, she has  -- either has or has had a boyfriend.

3      Q.   Did she tell you about how long she had this

4  boyfriend?

5      A.   I do not have that documented here.  I don't know

6  if I asked. I don't know if she told me. It's not documented.

7      Q.   Now as part of that examination on June 21st I

8  believe that you told the jury that you did some physical

9  examination in the way of taking blood and other fluids to

10  determine if the child had any sexually transmitted diseases

11  is that correct?

12      A.   I did not do the exam on the 21st for the reasons

13  that I explained. I did some blood work on the 21st.

14      Q.   Yes, on the 21st you did blood work.  And the

15  results of that blood work was that there was no evidence of

16  any sexually transmitted disease correct?

17      A.   Correct.

18      Q.   Now you then examined her again on July 5th of 2006

19  is that correct?

20      A.   That's correct.

21      Q.   And you used the device with the magnification and

22  the light on it to examine her private parts is that correct?

23      A.   Correct.

24      Q.   This can be magnified up you said 15 times?

25      A.   Correct.

1    Q.    And as a result of that examination is it correct
2  to say that her hymen was pale pink estrogenized with narrow
3  but symmetric rim no focal defect.  What is a focal defect?
4    A.    That would be something focal meaning specific to
5  one location as opposed to involving the entire area.
6    Q.    So did you not see any defects?
7    A.    Correct.
8    Q.    And then you said that you found no scar is that
9  correct?
10   A.    Correct.
11   Q.    And you said that you didn't find any transition is
12 that correct?
13   A.    Yes.
14   Q.    And transition is a tear is that correct?
15   A.    It's a complete transition is a through and through
16 defect in the hymen.  We use tear more to talk about acute
17 findings. Like a fresh tear a transition is what is left over
18 after there has been a through and through here and there has
19 been healing, but the healing has occurred with the resulting
20 defect in the hymen.
21   Q.    And you did not find any evidence of a transition?
22   A.    Correct.
23   Q.    And you found no evidence of ecchymosis?
24   A.    Correct.
25   Q.    Could you tell the jury what ecchymosis is?

1    A.    Bruising.

2    Q.    And you found no evidence of abrasions?

3    A.    Correct.

4    Q.    And would you explain to the jury what abrasion is?

5    A.    It's like a scrape or a scratch.

6    Q.    And you found no evidence of a laceration?

7    A.    Correct.

8    Q.    So would it be correct to say yes or no if you can

9  that as a result of your physical examination of Ashley

10 Martinez you could find no evidence of sexual intercourse or

11 sexual abuse as a result of your physical examination?

12   A.    There was nothing on physical exam. There was no

13 physical evidence correct.

14   Q.    So at that posture were you proceeding on what she

15 told you happened?

16             THE COURT:    Meaning.

17   Q.    As part of her history.

18             THE COURT:    At the point that she made

19        the determination that there was no physical

20        evidence.

21             MR. JOHNSTON:    She took a history from

22        Ashley Martinez. The doctor said that her history is

23        a very important part of the diagnoses.  And what I

24        am trying to find out --

25             MS. MALIK:    Objection your Honor.

1                THE COURT:  All right.  Now that I

2           understand the basis for your question ask your

3           question.

4     Q.  So, after you could find no physical evidence of

5   abuse you were proceeding at that time on what information

6   you had gained from Ashley Martinez as part of her history?

7                THE COURT:  Doctor, was there any  --

8           after you had done your physical examination of the

9           patient was there a determination for you to make,

10          was there anything further that you had done as far

11          as you had done the examination.

12               You formed a conclusion as to whether or

13          not there was any physical supporting evidence of

14          abuse. After you made that finding and come to that

15          decision what was there next for to you do if

16          anything.

17               THE WITNESS:  I proceeded to do the

18          testing for sexually transmitted infections after

19          that.

20               THE COURT:  And after that doctor what

21          was left to do, for you to do if anything.

22               THE WITNESS:  I also which I did not

23          mention I don't believe that I do have teenagers

24          get a pregnancy test no matter what they say. That

25          is standard of care.  And then I document my exam.

1                    I speak to Ashley.  I guess I probably spoke to the

2              grandmother. And I document my exam.

3                         THE COURT: So you speaking with the

4              patient after you made your medical assessment.

5                         THE WITNESS:  Yes.

6         Q.   Well, you actually spoke to her on June 21st to

7    gain the history and you did the physical examination on July

8    5th?

9         A.   I finished the physical exam the part that I was

10   not able to do --

11        Q.   You took the history on June 21st?

12        A.   Yes.

13        Q.   You did the physical exam of the vagina on July

14   5th?

15        A.   Correct.

16        Q.   Now, you told the jury that a reason why there

17   could have been no evidence of sexual abuse for sexual

18   intercourse was because the hymen in a girl of that age is

19   elastic and could stretch and therefore there could be no

20   evidence of an injury is that correct?

21        A.   Correct.

22        Q.   Now what if this child claimed that 3 times a week

23   for a period of 2 and a half years she was having sexual

24   intercourse with someone.  Is it your testimony that that

25   amount of sexual contact and sexual intercourse could leave

1   no physical marks on her genitalia?

2        A.   Yes.

3        Q.   Are you familiar with a Dr. Edward Robert

4   Friedlander?

5        A.   No.

6        Q.   Well, would you agree or disagree with the

7   following statement.  Despite it's normal to be normal I can

8   not believe and I am not aware of any evidence --

9                     MS. MALIK:   Objection your Honor.

10                    THE COURT:   Sustained.

11                    MS. MALIK:   Objection.

12                    THE COURT:   Sustained.

13                    MR. JOHNSTON:   I am going to ask her if

14        she agrees or disagrees with the statement.

15                    MS. MALIK:   Objection your Honor.

16                    THE COURT:   With the statement and no

17        attribution of the statement ask the question but

18        not an attribution of the question.

19       Q.   Just with the statement.  Would you agree or

20   disagree with the statement despite it's normal to be normal

21   I cannot believe --

22                    MS. MALIK:   Objection your Honor.

23                    THE COURT:   Overruled.

24       Q.   And I am not aware of any evidence that penetrating

25   a girl of any age with an erect normal size penis is likely

1    to leave the hymen in tact would you agree with that or

2    disagree with that?

3         A.    Disagree.

4         Q.    Dr., you are very much involved in the area of

5    child sexual abuse is that correct?

6         A.    Correct.

7         Q.    Have you ever came across a case where you decided

8    that there was no evidence of sexual abuse or no evidence of

9    sexual intercourse?

10        A.    Many, many times.

11        Q.    You have?

12        A.    Yes.

13        Q.    Because what you told the jury was that after you

14   took the history and you examined the child and there was

15   absolutely no evidence of any physical sort of injury, scar,

16   laceration, tearing of the hymen in tact you still couldn't

17   rule out the fact that Ashley Martinez was not telling the

18   truth?

19                    MS. MALIK:  Objection.

20                    THE COURT:  Overruled.

21                    THE WITNESS:   I cannot rule out the fact

22            that she was not telling the truth.  I am not sure

23            that I understand the question.  It's too negative.

24            I do not understand the question.

25                    THE COURT:   Agreed.

1        Q.    You examined the child. You took a history. Child
2   said that she was sexually abused and had sexual intercourse
3   with a person and then you examined the child and you did a
4   physical examination and you saw absolutely no physical
5   evidence to corroborate what she told you okay.  We are up to
6    -- okay -- and even though you found no evidence to
7   corroborate what she told you, you still it's funny to word
8   it the right way.  You still could not say that there was no
9   evidence of --
10                THE COURT:  Sustained, sustained.
11           Improper question.
12       Q.    It's a difficult situation?
13                THE COURT: Remember we   -- I think that I
14           know what you want to ask you are not asking it in a
15           way that is clear.
16                MR. JOHNSTON:  I am trying to get the
17           phraseology right judge.
18       Q.    Lets put it a different way.  Even though your
19   physical examination of a child would indicate that there is
20   no physical evidence of child abuse or sexual intercourse you
21   cannot rule out that occurring the sexual abuse and the
22   sexual intercourse you cannot rule that out that as
23   occurring?
24                MS. MALIK:  Objection your Honor.
25                THE COURT:  She has said if I recall that

1       that simply because she found no evidence to support
2       the fact, to support a sexual abuse it does not mean
3       that a sexual abuse did not occur.  Are you asking
4       her whether or not she ruled out whether or not the
5       allegation --
6                   MR. JOHNSTON:  Let me do it this way.
7                   THE COURT:     -- is true or not.
8    Q.   Are you involved in some sort of a crusade for
9       children?
10                  MS. MALIK:  Objection your Honor.
11                  THE COURT:   I don't know if the  -- Dr.,
12      do know what that means.
13                  THE WITNESS:  I am not sure I know what
14      that means.
15                  THE COURT:   Counsel rephrase.
16   Q.   In other words you examined Ashley Martinez.  She
17   told you certain things happened.  You examined her. There
18   was no sexually transmitted diseases.  There was no
19   indication of a scar that might indicate an old injury. There
20   was no laceration. There was no tear. The hymen was in tact
21   and yet you told the jury that it is possible she still could
22   have been sexually abused or been the victim of sexual
23   intercourse because the hymen is elastic is that what you are
24   saying?
25   A.   Correct.

 1     Q.   Even though the child said that she had sexual
 2  intercourse 3 times a week for like 2 and a half years?
 3               MS. MALIK:  Objection your Honor that was
 4          not the testimony.
 5               MR. JOHNSTON:  I believe it was judge.
 6               THE COURT:  Well --
 7               MR. JOHNSTON:  She at least said
 8          frequently.
 9               THE COURT:  I don't know what she told
10          the doctor, but you had asked her whether or not if
11          one had sexual intercourse 3 times a week could one
12          still a year later show no signs of abuse. And she
13          said yes.  It's still possible.
14               MR. JOHNSTON:  I understand that. I am
15          just trying to figure out how she comes to that
16          conclusion.
17               THE COURT:  You can ask her.
18     Q.   Now is there a normal distance between the labia
19  majora, the outer lips and the hymen?
20     A.   Those structures lie right on top of each other in
21  the resting state. So there is no real  -- there is a
22  potential space.  Meaning that I can create a space.
23     Q.   So I mean normally?
24     A.   No, one lies right on top of the other.
25     Q.   And with your colposcopic device and all the

1   examinations that you conducted on Ashley Martinez you could

2   find no physical evidence of sexual abuse or sexual

3   intercourse?

4                    THE COURT:   Asked and answered a few

5              times.

6                    MR. JOHNSTON:   I have no further

7              questions.

8                    THE COURT:   Any other questions.

9                    MS. MALIK:   Yes.

10  REDIRECT EXAMINATION

11  BY MS. MALIK:

12     Q.   Are you familiar with the child sexual abuse

13  professionals in your fields?

14                   THE COURT:   All of them your what are you

15             asking.

16     Q.   Majority of them?

17                   THE WITNESS:   I am a member as I said a

18             member of national organizations including something

19             called the Hepper (ph) Society which is an honorary

20             Society for physicians to do this work.  And I go to

21             their annual conferences.  I have been doing this

22             for many years. Many of us know each other in this

23             field. Do I know all of them I cannot say that I

24             know all of them.

25     Q.   Are you saying that you are familiar with the

1   majority of child sexual abuse experts in your field?

2       A.    Yes.

3       Q.    When I say familiar do you know their names?

4       A.    Their names. Their writings, yes.

5       Q.    As well as their research.  You are familiar with

6   them?

7       A.    Yes.

8       Q.    Never heard of this guy Dr. Edward Robert

9   Friedlander have you?

10      A.    No.

11      Q.    Now I would like you to assume the following facts

12  Dr., assume that Ashley Martinez at the time that she was

13  about 8 or 9 years old had an adult male place his penis into

14  her vagina and there was penis to vaginal penetration every

15  week for more than a year or two.

16          Assume that after that Ashley Martinez was examined

17  at the age of 14 which is years later and assume that the

18  examination as it showed in your position that there was a

19  pale pink estrogenized hymen, no focal defect, no scar, no

20  ecchymosis, no abrasions or lacerations?

21          Do you have an opinion as an expert with a

22  reasonable degree of medical certainty that those findings

23  are consistent with allegations of sexual assault?

24                  MR. JOHNSTON:  Objection I think this is

25              a repeat of direct.

 1             THE COURT: It is different. Overruled.

 2      Q.   Do you have an opinion doctor with a reasonable

 3  degree of medical certainty that those finding given that

 4  scenario are consistent with allegations of sexual assault?

 5      A.   Absolutely.

 6      Q.   Can you tell us what that opinion is?

 7      A.   That there is  -- my exam findings are consistent

 8  and not at all uncontradicted to that scenario that you

 9  posed.

10      Q.   Why is that doctor?

11      A.   For all of --

12             THE COURT:   I am sorry if there is a

13         negative finding is it simply not inconsistent or is

14         it you know consistent.  If one has been sexually

15         assaulted in the past and you find no physical

16         evidence of that assault is it inconsistent with  --

17         what is your term for what that is.

18             Meaning is it inconsistent with a sexual

19         assault or can you use a consistent/inconsistent

20         term. Can you simply say well it is still possible

21         that one was sexually assaulted but there was no

22         physical evidence of it do you follow what I am

23         trying to ask.

24             THE WITNESS:  Yes.  The absence of

25         visible physical findings is not inconsistent with

1            the history.  So I think that equals consistent with

2            the history.

3                      THE COURT:  It's not inconsistent?

4                      THE WITNESS:  That's a double negative. I

5            think it's the same as consistent. I am not saying

6            that I have possible proof of sexual assault. I am

7            saying that the absence of findings does not negate

8            of the possibility of sexual abuse and sexual

9            assault.

10   Q.   Why is that doctor?

11   A.   The female tissue is elastic.  If there has been

12   injury, injury can heal absolutely and perfect without

13   visible injury.  The time delay has to do with the ability

14   for healing. There may not have been injury but if there was

15   injury it could have healed.  It may be injury that as I said

16   before because I do not have a before and after.

17            It's possible that the narrow symmetric rim that I

18   am seeing would look very different if Ashley had not

19   experienced what she experienced. I cannot say that.  I can

20   only deal with that I am seeing at the time that I am seeing

21   it. I cannot say that it would have looked different.  It

22   might have.  Maybe her appearance is the result of her

23   experience. I can only say that there is no visible physical

24   injury, no tear, no scar, et cetera at the time that I am

25   seeing her consistent with my experience.  Consistent with

1   the literature on the topic and I do not have a problem with

2   making sense of the two.  Her history and the examine that I

3   am seeing.

4       Q.   Can you tell us from Ashley's history when she said

5   her menstrual period started?

6                   THE COURT:    That's beyond the scope.

7       Q.   You talked about an estrogenized hymen. What is an

8   estrogenized hymen again?

9                   THE COURT:    Sustained.  Irrelevant and

10          beyond the scope of the cross.

11      Q.   The defense counsel asked you about Ashley talking

12  to you about a boyfriend.  Can you tell us did she say if she

13  had sex with that boyfriend?

14      A.   She told me that she had never had sex with that

15  boyfriend.

16      Q.   What did she say that she did with that boyfriend?

17      A.   That they kissed or had kissed.

18      Q.   Can you tell me about the role of lubrication in

19  non consensual sex?

20                  MR. JOHNSTON:  I am going to object to

21          that.

22                  THE COURT:  Sustained.

23      Q.   Doctor you're an expert in the field of child

24  sexual abuse and pediatric medicine?

25      A.   Yes.

1      Q.   Are you a zealot for children?

2                 THE COURT:   A zealot meaning what.

3                 MS. MALIK:   Well, the defense counsel

4           asked that.

5                 THE COURT:   And the term whether or not

6           it be a zealot or a crusader it has no meaning

7           unless defined and it has not been defined in either

8           case so.

9      Q.   You talked about earlier you never testified for

10   the defense but you have been asked to examine records for

11   defense attorneys?

12     A.   Yes.

13     Q.   And is there a reason why you never testified for

14   the defense?

15     A.   I think that I have only been asked on one

16   occasion.  And I declined because it was not within the scope

17   of my practice it was not a child that I had seen or

18   examined.  It was after I reviewed a medical record and to do

19   that would require me to take time off from work. It's not in

20   the scope of my practice.

21          I cannot  -- it's like a separate job.  I cannot do

22   that. I have a full time job doing what I do.  And I am not

23   interested in taking -- using my free time to do something

24   that is work related.

25     Q.   Can you tell us what the boundary is for

1  penetration into the genitalia in other words where does when
2  you say vagina is that interior outer area of the female
3  genitalia?

4      A.   In common parlance. It's commonly used  -- most
5  people call genitalia the vagina that is the lay term for
6  genitalia, the vagina. So the boundary of the  -- that
7  juncture would be the large lips.  The actual vaginal canal
8  is deep to the hymen.

9              MS. MALIK:  If I can have a moment your
10         Honor. I have no further questions your Honor.

11             THE COURT:   Nothing further Mr.
12         Johnston.

13             MR. JOHNSTON:  No your Honor.

14             THE COURT:   Approach please counsel.

15             (Off the record discussion held).

16             (Whereupon, the court takes a luncheon
17         recess)

18             *****************************

19

20

21

22

23

24

25

1          COURT CLERK:  Recall case on trial.

2     Calendar 1.  Indictment 2147 of 2006.  Abu Khan.

3               THE COURT: Counsel are we ready to go.

4               MS. MALIK:  I apologize. The doctor he

5     was on line. I was waiting for him to go through the

6     line. There was actually a long line.

7               THE COURT:  He is up here now.

8               COURT OFFICER:  Jury entering.

9               COURT CLERK:  For the record both sides

10    stipulate that all jurors are present and properly

11    seated?

12              MR. JOHNSTON:  Yes.

13              MS. MALIK:  Yes.

14              THE COURT:  Call your next witness

15    please.

16              MS. MALIK:  The People call Dr. Don

17    Lewittes.

18  D O C T O R   L E W I T T E S, having been duly sworn, was

19         examined and testified as follows:

20              COURT OFFICER:  People call Dr. Don

21    Lewittes.  L-E-W-I-T-T-E-S.  New York State licensed

22    psychologist.

23  DIRECT EXAMINATION

24  BY MS. MALIK:

25    Q.   Good afternoon.

1        A.    Good afternoon.

2        Q.    Could you tell us what you your profession is?

3        A.    I am a clinical and forensic psychologist.  I work

4   with individuals who had problems such as sexual abuse,

5   sexual assault and I also work when the issues of psychology

6   interacts with the law that's what we call forensic

7   psychology.  Different types of issues in the family and

8   criminal court. I work in different courts as a psychologist.

9        Q.    What is clinical psychology?

10       A.    It's a speciality that you receive specialized

11  training in the area of the human psyche pathology. Where

12  there is problems in living, issues of daily problems.

13  Depression, marital problems, anxiety and special issues as

14  trauma dealing with issues such as sexual assault or again

15  issues having to do specifically with those things that might

16  come up in a legal matter.

17       Q.    Could you tell us the where you are a psychologist?

18       A.    I am in private program. I have offices in New York

19  city and Nassau County.  I also work in New York City with

20  the Agency for Children Services under contract that I

21  routinely evaluate and write reports and at times testify

22  where children and adolescents have been sexually abused

23  traditionally in a family or caretaker situation.

24       Q.    Can you tell us about your background?

25       A.    Under grad at New York University; majored in

1  Psychology. I did graduate level work in the State
2  University at Albany. I received a Ph.D. in Psychology from
3  SUNY at Albany.

4  Q. Do you have any professional licenses?

5  A. Internship at Rutgers; I sat for licenses. I was
6  licensed as a Psychologist of the State of New York in 1978.
7  I maintain that all without interruption until the present
8  time.

9  Q. How long have you been a psychologist?

10  A. Approximately 25 years.

11  Q. Are you a member of any professional associations?

12  A. Yes, I am a member of the American Psychology
13  Society which is an organization of psychologists. Also, the
14  American Profession of Psychology On the Abuse of Children
15  which is a national association dealing with education and
16  training and the prevention of child and adolescent sexual
17  abuse.

18  Q. Are you board certified?

19  A. Yes, I am certified in the area of forensic
20  examination. Also in the area of sexual abuse, child sexual
21  abuse in particular.

22  Q. Can you tell us what is forensic examination.

23  A. Forensic examination is a speciality where using
24  techniques of interview and psychology testing a person is
25  recognized as having an above the degree level of expertise

1   in areas such as forensic examination which would be in the

2   evaluation and examination of cases that have some kind of a

3   legal issue to do with the courts.

4        Q.   Have you ever been published?

5        A.   Yes.

6        Q.   Can you tell us about that?

7        A.   I have been publish in the general field of

8   psychology such as depression. Also a publication having to

9   do with child sexual abuse.

10       Q.   Do you have any specialities?

11       A.   Yes, I started specializing at Rutgers Medical

12  School in the area of child and adolescent abuse. I have

13  developed a speciality in the clinical field during my

14  different jobs as a psychologist which is combined with

15  children and adolescents who were victims of sexual abuse.

16       Q.   Can you tell us how you remain current in your

17  field of child adolescent and sex abuse?

18       A.   I train others. I lecture. I also attend other

19  seminars at Columbia and other professionals. I have reviewed

20  journals.  I also attend different group meetings which deal

21  with the field of Psychology.

22       Q.   You said that you have been a psychologist for

23  approximately 25 years. Is that how long you have been

24  practicing as a clinical psychologist?

25       A.   That's correct.

1    Q.   Have you ever held any teaching facility

2    appointments?

3    A.   Yes, I was on the facility of Albany Medical

4    School. I was a professor here in Queens in St. Johns where I

5    was part of the program having to do with training their Ph.D

6    level Clinical Psychologists.

7    Q.   As a clinical psychologist how many children and

8    adolescents have you evaluated to have been sexually abused

9    by an adult?

10   A.   At this point over one thousand in the last 25

11   years.

12   Q.   How many of those children approximately have been

13   girls?

14   A.   The majority of all children and adolescents have

15   been female. I would say 80 percent approximately.

16   Q.   Have you ever been qualified as an expert.

17   A.   Yes, I have.

18   Q.   How have you been qualified?

19   A.   I have been qualified as an expert in the areas

20   such as clinical psychologist, child clinical psychologist,

21   Sex abuse and other kinds of syndromes.  Domestic violence

22   syndrome.  I have been qualified in all of the courts in the

23   city of New York having to do with the Criminal Court.  I

24   have also been qualified in all the family courts in the

25   area.  I also testified in civil matters throughout New York

1   State.

2        Q.   Have you ever received any if you will awards in

3   connection with your work in psychology?

4        A.   Yes, I did receive some awards having to do with my

5   training in the field of child and adolescent adults from

6   Malloy College, that is a small college in Nassau County.

7   Received it from the work in the program having to do with

8   training professionals going into the field of rape trauma.

9                   MS. MALIK:   At this time I would offer

10              Dr. Lewittes in the expert in the field of clinical

11              psychology and child sexual abuse.

12                   THE COURT:   Any objection.

13                   MR. JOHNSTON:   No objection.

14                   THE COURT:   I do find the doctor an

15              expert in the field of clinical psychology

16              specializing in the area of child adolescent and

17              sexual abuse.

18        Q.   Have you spoken briefly about this case involving?

19   Ashley Martinez?

20        A.   Yes.

21        Q.   Are you being compensated for your time by coming

22   to court today?

23        A.   Yes.

24        Q.   By whom are you being compensated?

25        A.   By the DA's office of Queens County.

vld

1    Q.   Have you ever been hired by a defense attorney?

2    A.   Yes.

3    Q.   Have you ever been hired to consult for the

4  defendant in a case involving the issue of child sex abuse?

5    A.   Yes.

6    Q.   Have you ever been hired by the attorney in this

7  case Robert Johnston?

8    A.   Yes.

9    Q.   So you have done work for him as well?

10   A.   Not in this case, but yes in the past.

11   Q.   Did you ever treat a person by the name of Ashley

12  Martinez?

13   A.   No.

14   Q.   Have you ever had an occasion to meet a child by

15  the name of Ashley Martinez?

16   A.   No.

17   Q.   Did you see her testify in court?

18   A.   No.

19   Q.   Have you read her testimony at all?

20   A.   No.

21   Q.   Are you here to diagnose Ashley Martinez in a

22  clinical sense?

23   A.   Absolutely not.

24   Q.   In the profession of psychology is there a pattern

25  of behavior that has been applied in the evaluation and

1  treatment of those who are alleged to have been sexually

2  abused and raped?

3       A.    Yes, there is.

4       Q.    What is the name of that pattern of behavior?

5       A.    The pattern of behavior that has been identified

6  with large groups of children and adolescents is the child

7  sex abuse syndrome or accomodation syndrome when the sexual

8  abuse occurring through a child or adolescent in a family

9  setting we coin the phrase Intrafamilial, I-N-T-R-A, in the

10 family child adolescent abuse.

11      Q.    How accepted is this syndrome.

12      A.    The syndrome is well accepted as an explanatory

13 concept. That is when we studied a known victim of sexual

14 abuse there are many, many cases that we have seen that there

15 is a pattern of behavior.

16           In general the victim goes through a 5 stage

17 process which has been identified as the syndrome and so over

18 the last approximately 30 years there have been many

19 different authors who discussed different aspects of the

20 child, adolescent and sex abuse syndrome.

21      Q.    Can you tell us how many faces or stages does the

22 child sex abuse syndrome has?

23      A.    It's broken down into five distinct phases.  This

24 is a pattern of behavior that we see in general. Every

25 individual in every case is different.

1          The first stage is the engagement phase.

2   Engagement means that an adult has access and opportunity to

3   a child and they engage the child in what would be normal

4   routine parent/ child over adult/ child behavior.  That is a

5   caretaker routine such as going to sleep at night.

6          The engagement is such that the child thinks this

7   is a regular or usual pattern of behavior, but during the

8   engagement based only on the adults access. Based upon the

9   authority the engagement phase changes from a protective one

10  to one where the adult is attempting to gain some sort of

11  sexual gratification with the child.

12         The engagement again is outside the understanding

13  or is outside the knowledge of a child about why all of a

14  sudden they have become the object of the adults sexual need.

15  But again they are in a relationship where this adult has

16  power, has authority.  And often what happens is that as the

17  adult continues into the second phase which is called the

18  sexual interaction phase the child often becomes passive or

19  submissive.

20         The sexual interaction phase may be gradual over

21  time. The adult may go for more fondling or less interest or

22  activity or more interested behavior such as the demand for

23  sexual intercourse. The sexual phase may be short lived or it

24  may go on over a long period of time specifically having to

25  do with the circumstance of the family and also the

                                                    vld ·

1  circumstance of how the relationship between the child and
2  the adult progresses.

3          The third stage is the secrecy stage. By that we
4  mean that the child is often put in a position where they do
5  not have an access or opportunity to talk to anyone about
6  what has happened to them. They are isolated from others.
7  They do not understand the nature of what is going on.

8          Often they were touched or in some way have sexual
9  contact outside of the witnessing or knowledge or vision of
10 any adult who would be protective of them. Secrecy is a
11 psychological concept that means that the child is feeling
12 guilt ridden, humiliated, ashamed. They feel that they must
13 keep that secret.

14         Often because they do not know how they will be
15 received or how others will react to them, but just a basics
16 issue that they do not want to talk about something as
17 upsetting as being sexually abused.

18         All the secrecy time enforced by a threat that
19 being sometimes the adult states to the child something to
20 the effect don't tell or if you do tell something will
21 happen. So the child  --  a child often feels that they do
22 not have an opportunity and they are frightened to tell and
23 they go over a long period of time being submissive and
24 keeping this secret.

25         The next stage is the disclosure stage. Some

1    children and adolescents never reach the disclosure stage.

2    What we say often is that in many, many cases children are

3    delayed in disclosure as opposed to immediate. Meaning if you

4    have another kind of trauma, if the child fell and hurt

5    themselves you would expect them to cry out for help

6    immediately.

7              With sexual abuse it's different. It's a

8    psychological dynamic that forces the child to go inside of

9    themselves. Rather than feel comfortable expressing

10   themselves and calling out for help they do not know how to,

11   that is from a psychological point of view, so disclosure is

12   delayed months or even years. At times we will find an adult

13   woman who said that they have been abused. Say that unless

14   somebody discovered that they will  -- never would have told

15   anybody. They would have gone to their graves before they

16   actually shared something as humiliating and upsetting as

17   having an incestuous relationship with an adult.

18             Final is repression and suppression. Repression is

19   a psychology concept that means when something occurs in a

20   child in adolescence and it's uncomfortable it's something

21   that they do not like they tend to process it or push it in

22   which means that we try as adults to not think about things

23   that are upsetting or unsettling.

24             We sweep it under the carpet.  Even if given an

25   opportunity to talk about it or even have an examination of a

1   doctor where they might find out something that is wrong with
2   me we do not rush for that.  We tend to avoid those things
3   that will bring back bad memory or produce information that
4   we do not want to know.

5              Repression is a psychology concept that children
6   often go through even after disclosed.  They do not like to
7   think about, talk about or remember all of the events that
8   occurred to them while they were being sexually abused. At
9   times it brings flashbacks or makes them feel like that they
10  are in the situation all over again when they discuss it.

11             So there is the engagement which is access,
12  opportunity and power.  Sexual interaction which go from less
13  intrusive to more intrusive. Secrecy where the child is by
14  them self and unable to reach out and talk to people about
15  what happened. Disclosure which is often delayed. And then
16  repression which is psychology trying to in some way
17  intercept or handle this event or to accommodate to this
18  event even though they would like at some level to talk about
19  it they can't.

20      Q.    Can you discuss piecemeal or full disclosure, the
21  difference?

22      A.    Piecemeal disclosure is at times they will talk
23  about parts of what happened to them. That may be partially
24  due to memory. It has to do often with the most embarrassing
25  or upsetting issues maybe not coming out immediately.

                                                          vld

1          So that the child maybe only wants to talk about

2   those things that have some implications having to do with

3   their experience, but not tell the entire or full disclosure

4   there will be a period of time or until they get comfortable

5   talking about it in general about what happened to them.

6       Q.   Can you discuss delayed disclosure.

7       A.   Delayed disclosure is a common phenomenon.

8   Different children and adolescents respond to the opportunity

9   to talk about abuse in different ways. It's very common that

10  based upon shame, humiliation, a feeling of fear.  A feeling

11  that talking about it might interfere with their family life

12  setting.  For example a child might say what would my mother

13  think if she knew that my father had sex with me. How would

14  that effect our family.

15         It's a delayed disclosure, in general is a dynamic

16  that occurs for many different reasons and may again occur

17  over a long period of time as opposed to a short period of

18  time.

19      Q.   In your experience and your knowledge of dynamics

20  doctor how would it effect disclosure if the perpetrator or

21  the father figure of the victim was the victims mother's

22  boyfriend?

23      A.   As we call it the intrafamilial syndrome.  The

24  dynamics of having a person who has a relationship with you

25  has an effect on talking -- or talking to another parent

1  about the abuse and having that person have a relationship

2  with others is very different than if a stranger had come up

3  to you and had sexually abused or assaulted you.

4          So feeling that a parent figure or a person who

5  lives in your family has sexually abused you has

6  ramifications for future rewards or punishment will effect a

7  child's desire to have a normal childhood.

8          Meaning if they do talk about it they also in lieu

9  of the good what they talk about is the bad so to speak.

10  Again the dynamics of wondering what would happen, what if

11  the mother did not take their side they could be even more

12  vulnerable to some kind of anger or something else that the

13  perpetrator could inflict upon them if he were not taken out

14  of the zone of danger.  This dynamic or pressure on a child

15  in adolescence when the abuse occurs within the family

16  setting.

17          Certainly one of the things that we think about is

18  somebody on the outside is hurting we use the formula a

19  source of support of when incest has taken place that source

20  of power is at minimal, slight, and the entire foundation

21  about what a family does for a child is taken away from them.

22          They are isolated at a young age with a horrible

23  experience not knowing what to do or how to protect

24  themselves. Not even knowing how to talk about it.

25      Q.   Given your experience and the knowledge of the

1   dynamics doctor how about if the child saw the father figure
2   and wanted to be accepted and loved by the father figure how
3   would that effect disclosure?

4       A.   Well, again a child may have conflicts having to do
5   with the fact that they want the normal things that any child
6   would want. They want attention.  They want attention, they
7   want the ability to have a relationship with the parent that
8   is normal. On the other hand they most likely feel frightened
9   or scared in the setting when they go to sleep or where ever
10  the abuse is taking place.

11        The child has to weigh in their own way what the
12  consequences are because again if they do talk about the
13  upsetting parts of the relationship they know that whatever
14  else they need in life, that is the positive side of the
15  relationship, is going to be taken away from them. Which is
16  very different than if a stranger has raped a child.

17        The stranger has none of those potential benefits.
18  There is no reward if you do not talk about.  A parent who
19  sexually abuses a child may also hold out that part of their
20  relationship as the reason why the child should not talk
21  about it.

22      Q.   Now, would threatening the child threats, coming
23  from the abuser, how would that effect disclosure?

24      A.   Certainly any part of the relationship with a
25  person who is more powerful, that is older, bigger, has

vld

1   resource control would intimidate a child clearly and sexual
2   abuse if a child is living with that more powerful figure the
3   power figure may have a threat that does not need to have any
4   kind of specific force associated with it.

5          Meaning they to not need a gun or knife. Just the
6   statement alone of don't tell may be intimidating for a child
7   based upon the relationship of representing that  person and
8   a feeling that the person has control over their consequences
9   including a physical control potentially and other kinds of
10  punishment.

11     Q.   Lets talk about that doctor.  What effect if any
12  doctor does abuse have on disclosure?

13     A.   Well, certainly if one witnesses or sees somebody
14  hurting somebody even if it's not yourself it's the vicarious
15  transmission. You see somebody else and you learn from that
16  situation and that emotion gets transferred to yourself. So
17  if you are in a family setting when somebody else has been
18  hit or beaten that is intimidating.

19          One understands that at a basic level even as a
20  child with the person who is doing the hitting if you will is
21  cable of.  Also the model of another parent for example who
22  is not able to protect themselves is a negative model. We do
23  not as an adult show a child how we can talk or communicate
24  rather than act as victim and victimizer so being and seeing
25  physical abuse can be particularly intimidating for a child

1    if they know that what they are going to say is going to

2    incur accounts of anger or the wrath or potential similar

3    consequences for themselves.

4         Q.    How would prior physical abuse that the child

5    witnesses against his or her own mother and caused by the

6    abuser how would that effect disclosure?

7         A.    That is an example of domestic violence if a child

8    is in a situation where their own parent has been the victim

9    of physical abuse by another parent that whole setting

10   becomes a pressure cooker.

11              Again a child may have utilized that information as

12   a vehicle by which they do not want to talk about it. For

13   example the fear might be if they told the mother that the

14   perpetrator might get into a fight with the mother.  They

15   would have a protective feeling that they do not want to

16   incur that kind of family discord.  Again the child may

17   identify with the victimization of the negative abuse and

18   they have that they are next if the person can hit an adult

19   they can hit a child.

20              Those kinds of modeling experiences or learning

21   experiences weigh heavy on a child before they cross the line

22   and do anything to incur the anger of an adult who has

23   already had access and opportunity to sexually abuse them.

24        Q.    What about prior verbal abuse that the child

25   witnesses against family members caused by the abuse how does

1  that effect disclosure?

2       A.    Verbal abuse and psychological abuse are used in

3  ways that the children learn about the world. If people are

4  angry if they vocalize it, if they listen to each other, if

5  they fight that tends to intimidate a child. Children will

6  naturally shy away from or avoid those conflicting situations

7  if they witnessed them before.

8            That is the style of communication which is an

9  angry hostile argument that will often frighten a child from

10 speaking up or feeling that they can in essence confront

11 somebody who has been sexually abusive to them.

12      Q.    What about if a child witnesses self inflicted

13 violence.   If the abuser harms himself or herself how does

14 that effect disclosure.

15      A.    That is not the most common form of experience. If

16 indeed in that case if nothing else it demonstrates to a

17 child how out of control an adults is.   That they are able to

18 become so angry that they basically change a natural course

19 of feeling and thinking that anger is used as a form of

20 visualization which leads to then this physical abuse even if

21 it's using themselves.

22           So that example would be one that I think would be

23 very intimidating to a child to see that an adult does not

24 have the control that a child would like them to have and

25 also that the person is so out of control that they tend to

1  use physical abuse as an answer to problems and therefore the

2  child might again identify themselves as something that is

3  next in line or possibly even wants to prevent a person from

4  doing it to themselves.

5        Children can be protective of people in their

6  family who abuse them. They do not want any more violence.

7  They do not want to deal with those issues that is they are

8  frightening and overwhelming to them at a young age.

9  Q.    Do the child abuse sexual abuse syndrome dynamics

10  explain why some children fail to disclose even when they are

11  aware of the abuser and living with a non abusing parent?

12  A.    Yes, the term in terms of the fifth phase which is

13  repression.  Even if given an opportunity to talk about the

14  abuse will not necessarily rush to that occasion finds a

15  child feels that they have avoided the abuser or away from

16  him.   Often the child would use that as a vehicle by their

17  own mind minimize or try to sweep it under the carpet.

18        Feeling that they do not have to confront the

19  situation. They do not want to bring it up. Even if they are

20  aware of the abuser often they have might still feel

21  psychologically that they should be submissive and integrate

22  in terms of them self rather than to press it and to

23  basically blow the whole thing in the headlines and deal with

24  it where they do not have to deal with it when they keep

25  their mouths shut.

1    Q.    Does the dynamic of disclosure include family
2    members?

3    A.    Yes, again if they are not in a situation where
4    they have protecting their mother so to speak from having to
5    do with the person who hears the out cry immediately or
6    initially the truth of the matter is that children will often
7    not talk about abuse even if they were with other family
8    members or away at camp.

9          Regardless of the circumstance of geographic or
10   other parties in their lives they do not feel comfortable and
11   cable of really talking about what has happened to them
12   knowing that by talking about it there will be consequences
13   if nothing else the big notoriety and follow up situation
14   which about what they have tried to avoid for so many years.

15   Q.    Can you explain why a child would return to a place
16   where he or she knows that the abuser lives?

17   A.    Children often do not have control over their
18   circumstances the way that an adult would.  One of the things
19   that we talk about is children do not want to raise the red
20   flag.  They did not go back to a routine, here if they did
21   not want to go with the parent anybody might be  --  --
22   people would ask them why. It's not in their repertoire to
23   avoid a situation.

24         An adult might question them why all of a sudden
25   are you changing your pattern.  One of the ways that children

1   would go back they do not want to raise any kind  of

2   attention to the relationship for the fear that is underlying

3   the relationship and also children are somewhat naive.  They

4   often are in such a denial pattern that they because they

5   have gotten older or put on weight or because the person may

6   have gained some sanity or something that in their head makes

7   up a rationalization to say that it will be okay this time.

8   That is what we often do as adults. We rationalize. And we in

9   denial until we have to be confronted with those facts in

10  life that do not go away and we have to deal with them.

11      Q.   Can you explain the concept of acting out?

12      A.    Acting out in general means that a child has a

13  feeling and that if they are able to describe or express that

14  feeling in a positive communication they often act out the

15  feeling meaning that they might become angry rather than talk

16  about what they are angry at.  They will become angry at some

17  other situation.

18          They are having a fight with a person, they do not

19  want to talk about it or cannot control it they would have

20  problems with authority figures in school. They act out and

21  often in school and they transfer what the underlying dynamic

22  is to everyday circumstances acting out feelings rather than

23  talking about them.

24      Q.   If a child were acting out doctor as part of being

25  abused could that effect their willingness to disclose that

1  she is being abused?

2      A.    Absolutely.   The act of acting out will often put a

3  child in a worse place than had they not. Often what happens

4  if a child acts out often they feel that the adult world

5  system is out to get them.   They start doing drugs or start

6  staying out late or they do other things that are rule

7  breaking.   They often incur the wrath of adults in all

8  different ways.

9          If they have already felt that the adult is calling

10 them in essence bad names they may feel less likely that they

11 would be supported if they talk about what is really going on

12 psychologically inside of them. In terms of a child's feeling

13 of comfort and trusting and in being able to confide in adult

14 authority by being in an acting out situation they may not be

15 comfortable in talking about what has happened to them.

16     Q.    How would disclosure be effected if the victim had

17 no contact with the abuser at all?

18     A.    Again if the victim is in a situation where they

19 have no contact it's quite common if they never out cried

20 that they would continue that violence.   They in their own

21 mind tried to accommodate or try to in some way integrate it

22 by telling themselves that it's over.   What do I have to gain

23 by talking about it now. By trying to minimize how much

24 psychological baggage that they are carrying out. Not being

25 in the day to day situation may not encourage a child to

1   reach out but would discourage them to reach out at that
2   stage in life.

3       Q.    What if the abuser sexually abuses the child during
4   some time period and other time periods the abuser treats the
5   child very well how does that effect disclosure?

6       A.    Particularly children deal better with things that
7   are one way or the other.   When you give them a mixed message
8   it's confusing if a person kisses you on one cheek and slaps
9   you on the other so to speak it's really confusing to a
10  child.   How am I going to continue to get the kiss on the one
11  cheek without also getting the slap.

12          Sometimes they pay a price because they do not want
13  to give up the kiss so to speak.   If a child is in a
14  situation where someone that is loving or giving and it's a
15  parent replication you only get one father so to speak. That
16  child may be uncomfortable with giving that up. They do not
17  want to be alone. They do not want to be without a parent.
18  They want a normal childhood.

19          If the abuser stopped or they have accommodated to
20  it they may be reluctant to give up the good stuff.   Which
21  most kids expect to have a parent to take care of them.
22  Children do not understand where the sexual abuser originates
23  from. They get no gratification from it.   They do not know.
24  That's why at 5 or 6 or whatever age they now become the
25  center of sexual gratification for an adult.

1       It's so confusing they do not trust themselves.

2  They remain quiet and confused. Psychologically confused.

3       Q.    How does a child react when they disclose sexual

4  abuse?

5       A.    Differently.   Children will disclose at different

6  times. Depending on what is the spark that set off the

7  disclosure.   Different children have different emotional

8  patterns.   There are times that children may disclose an act

9  that might be more commonly expected.   They will be upset and

10  crying and really show emotion.   And some children in a more

11  controlled situation may not.

12       At this point especially if a family is in a family

13  setting with someone that you trust and they have finally

14  been able to let out what is inside usually they have

15  somewhat  -- emotional disclosure is what happens.

16       Q.    In your experience do children at times refrain

17  from disclosure to adults they trust such as teachers,

18  guidance counselors, friends or other family members?

19       A.    Absolutely.   Children may be trying to maintain a

20  positive face meaning that if they have got a good

21  relationship with the one parent or they have got a good

22  report card in school they do not want to all of a sudden be

23  victimized again.

24       They do not want to be classified as a person who

25  is raped or labeled. They may refrain from discussing what

1   happened to them partially because they do not want to be

2   drawn into the dirt.  They may be a little guilty thinking

3   that they have done something to provoke the adult into using

4   them as a sexual object.  Even though children are in

5   trusting relationships that does not mean that they are going

6   to be able to bridge that secrecy of disclosure stage.  It's

7   too heavy of a load to expect that just because they are in a

8   trusting relationship to feeling that they are ultimately

9   going to be accepted and protected and that life will be

10  better if they talk about it.

11      Q.    Can you explain emotional verses tactical?

12      A.    When a person is in the tactical stage they are

13  expecting something to happen. If you tell a doctor that you

14  have been sexually abused you would expect an examination. If

15  you told a police officer that somebody raped me you would

16  expect them to protect you and hopefully apprehend the

17  perpetrator.  But in an emotional disclosure that does not

18  entail expecting anybody to do anything.

19          Basically it is getting if off your chest.  There

20  is something therapeutic about talking or being able to share

21  with others when you have been hurt.  That means that a child

22  would talk to somebody.  Example; a young child might tell

23  another child in school that they have been touched by her

24  father and say do not tell anybody. The fact that they want

25  to talk to somebody that is an emotional one as opposed to

1   someone who purposefully goes up to find someone that is
2   going to do something they hope.

3       Q.    Based upon your training and experience and the
4   dynamics of a child sexual abuse syndrome does the literature
5   discuss any one reason for disclosure?

6       A.    No, there are many reasons why a child adolescent
7   might disclose.  But you know in general what we say is it
8   has to be some kind of emotional platform that is reached
9   before a child is ready to talk. Meaning that there has got
10  to be some kind of tragic event as opposed to the sexual
11  abuse before the child can break out of that silence.

12          Sometimes age is a factor of disclosure.  What they
13  would not talk about as a younger child they will talk about
14  when they get to be more self confident.  And sometimes
15  something emotional will make them break it.  Something
16  upsetting and they break it.  There are different reasons.
17  Sometimes because somebody found out something.  There is a
18  sexually transmitted disease. That could be a situation that
19  they could not deny that they had sex.  If someone
20  accidentally discovered that there is a behavior associated
21  with sex. Different people have different rational for
22  underlying dynamics that lets them get to that stage.

23      Q.    Could you give some examples that could trigger it?
24      A.    A problem in a family setting. If a child is in an
25  incest situation.  If the family is having internal

1   difficulties.   The child might unleash their experience if
2   indeed the family is under other forms of stress.   And other
3   reasons that might occur would be if a child learns that
4   somebody else has been sexually abused or assaulted they may
5   feel that it's more of a way out of their experience, things
6   that were common to them and that commonality allows a person
7   to join in.

8            Those are the kinds of things that might lead to
9   it. Sometimes education might lead to it.   That gives
10  psychology permission that others know about the things that
11  they are not secreted away and they are encouraged to talk
12  about.   Those are familiar examples that might lead a child
13  adolescent to the next stage that is from the secrecy
14  dynamics explaining why a child would be conflicted in their
15  feelings towards the abuser.

16           Again stranger versus known figure very different.
17  Relative conflicting or being unconflicting with a stranger
18  it would be somewhat dimensional. They are hurt by the
19  stranger, threatened by the stranger.

20           In the family setting it's multiple.   They are hurt
21  by the parent figure but on the other hand the parent figure
22  when they are out of the bedroom was nice to them and take
23  them to the park to play. So yes conflict is a very basic
24  issue for known perpetrators who have relationships who have
25  the ability to control consequences and if those people who

1    are perpetrating against them also have relationships with

2    other people who the child loves which would have a multiple

3    or a crescendo effect if the child told. Those kinds of

4    issues talk about how conflict interferes with the ability to

5    know how to go forward and to talk about it.

6        Q.    Based on your training and experience in your

7    knowledge of dynamics are victims of child sex abuse expected

8    to be able to remember all the dates of the abuse?

9        A.    No what we find is first of all trauma in

10   particular tends to make us focus on central action rather

11   than peripheral. When you are in a situation where you are

12   upset and frightened and anxious you tend to zone in on just

13   the main event.  What did they say, who did what to whom, did

14   the perpetrator touch me or was I was forced to touch him.

15   The peripheral details.

16            The dates or aspect of time of what the person

17   might be wearing.  Those are not necessarily put into memory

18   and not attended to so therefore later on if asked about it

19   the child adolescent might not be able to retrieve it because

20   it was not focused on to begin with. What we say is that

21   memory and attention are effected by being in a trauma

22   situation. We tend to zone in on a body the way that it feels

23   and zone out a lot of peripheral that is on the frame of the

24   main event.

25       Q.    What about if the child is very young when the

1  abuse starts; 5, 6, 7, how does that effect the child's

2  ability to remember the dates of the abuse?

3      A.   Well, clearly if a child is that young a 5 year old

4  cannot tell time necessarily, certainly does not use a

5  calendar.  We have as adults use pegs. We have blackberries.

6  We have notebooks.  We have calendars.  We even use certain

7  prompts if you will to help us with your memory.

8          Children of a young age would not necessarily have

9  the intellectual or cognitive development to help to utilize

10 or remember or make a mark. The older they get we also delay

11 the memory over time the longer the period of time.  If I

12 asked you what did you have for breakfast yesterday if you do

13 not eat the same thing everyday you might not be able to

14 remember.  Two weeks from now if I asked you what you ate on

15 Monday or Tuesday you would not recall unless there is a

16 specific peg. Over time memory decreases.

17     Q.   In the disclosure of a child's sexual abuse years

18 later how could that effect the child's ability to recall

19 certain details?

20     A.   Again if the example is a long period of delay and

21 years after the fact there is decrease potentially. There was

22 the lack of attention at the time.  And also there is what we

23 call the blending effect.  If the child has been abused one

24 time that one incident might be more resonant in their memory

25 for example in terms of abused on their birthday when they

1  were 6.

2           If abused over more than one occasion we tend to

3  blend those events because they are similar and they occurred

4  so frequently.  It's like throwing things in a blender.  By

5  that I mean they come out the blender they have merged

6  together.

7           If the child is young and has multiple events with

8  the same person and they tend to be similar and there is no

9  peg that makes them unique such as going to Disney World that

10  is hard to retrieve all the specifics of each event or

11  occurrence.

12      Q.   As you are talking about peripheral versus central

13  action what about the ability to recall detail as  in what a

14  person is wearing or the size of a penis. How would the

15  dynamics explain the ability to recall those details?

16      A.   Well, you have no memory and memory out.  If a

17  child does not pay attention to a date or time then they can

18  not report on it later.  And if the perpetrator has raped or

19  exposed the penis the child may not have actually looked at

20  it, the member that is being penetrated.

21           The point is that a child if you ask them if they

22  looked you know during the act of a rape will often tell you

23  that they did not look at it.  They do not want to look at a

24  needle when they are getting a shot much the same thing in a

25  rape. They are not going to focus on the thing that is

1   hurting them.  They are going to focus on something else.

2           You ask them about a detail that they have paid

3   attention to at the time of the event. If you do not put

4   money in the bank it's hard to take it out later on.

5       Q.   Can you explain about focusing on something else as

6   the child is being abused can you explain that?

7       A.   When we are in psychological or physical pain we

8   behave in some kind of primitive way. We shut down the

9   external noises and tend to focus on what is occurring to us.

10  What is going on with the body.

11          A person is being raped in a stranger situation

12  they may start thinking about, oh my God, I am going to die.

13  Mind goes off. They have their own fears. So the point being

14  that you do not focus on all the little you know  -- you

15  focus on what your body feels like. Pain. The fear.  The

16  confusion. You do not focus necessarily on anything else. You

17  become very single minded or a tunnel vision we call it with

18  being raped.

19      Q.   What about a child is being abused over a period of

20  time can you talk about whether children focus on other

21  things. In other words they think about other places or other

22  things?

23      A.   Again at this point basically if a child has been

24  abused over time they might try to distract  themselves

25  during the act waiting for it to get over hoping that it goes

1   as fast as possible. But they also might not you know
2   remember any specific event if it occurred in the same place
3   such as the bedroom or if it's the same person.  Memory is a
4   complex issue depending on the specific case and the child's
5   age at the time.
6       Q.   Why would a child be abused over a period of time
7   think about these things as the abuse is happening?
8       A.   Well, you know we talk about where does the mind go
9   and the point is again one of the things that people try to
10  do naturally is to some extent think about something that is
11  distracting. Something that does not make them feel worse so
12  a child might have what we term out of body experience that
13  is reality is too strong.  The point being is that their mind
14  is some place else.
15          They have detached the mind from the body so that
16  they try not to concentrate on what is hurting them.
17      Q.   Doctor can you explain why a child would be able to
18  remember details of the very first time and the very last
19  time that they were abused?
20      A.   Well, studies of memory in general we often talk
21  about the primacy and the recency effects. There is something
22  about memory that we pay attention to those things that have
23  all the kind of buzz words or all the kinds of marks that go
24  and become intelligible. The first time that you had
25  something often has a note in the mind and in the most

1    reasonable time when it has not occurred again is when you
2    can go back and focus on it.

3         Primacy would be the first time something happened
4    or novelty. Event and recency is the closest in time. The
5    last time. Those are pegs that memory often will be hung on
6    both in terms of trauma situation and non trauma situation.

7         Q.   You talked about blending earlier doctor how does
8    blending effect the ability to remember details of incidents
9    of abuse where they have happened over a span of years?

10        A.   Again the more similar the event to the next event
11   that is if the actors are the same, it's the same
12   perpetrator, if the circumstances are the same. Tends to be
13   the same room. If the relationship tends to be the same that
14   is there are not other people who come in your life or there
15   is not some kind of different stage that it's taken place on
16   those kinds of things tends to make a child and adolescent
17   not remember anything distinct, but rather tends to blur the
18   memory and tends to make everything seem somewhat similar.

19        What you remember if something changes.  For
20   example if the man in the sexual interaction stage went from
21   touching or fondling to the act of penetration or rape that
22   might be something that would certainly not be blended
23   meaning if you have been touched a lot of times you
24   categorize that in your mind as one experience.

25        All of a sudden there is an escalation and demand

1  for interaction that would definitely create a notation in
2  the mind. Blending is more similar.  Less distinct details.
3  Less memory for anything that is unique. The more attention
4  that might be paid the more retrieval in the memory that
5  might be possible later on.

6      Q.    Based on your training and experience could you
7  explain why a child would continue to have feelings of love
8  for her abuser?

9      A.    Well, basically human beings, certain children are
10  good at heart.  They really want to have what is normal.  And
11  a child can compartmentalize for a long period of time
12  feelings of positiveness for a parent who is both abusing
13  them so to speak in the night, but in terms of Jykle (ph) and
14  wolf they become a wolf in the night.

15          In the morning they are good parents again.
16  Children have a place in their heart for the goodness. That's
17  what they first experience and that's what they want to
18  remember. So there is often a long period of time before a
19  child is even understanding the total complexity of sex and
20  family and understanding what was done to them from a
21  prospective of being a victim. That it takes a long time
22  it -- sometimes they give up those positive feelings and wish
23  to be loved and wish for the love to be appropriately
24  returned.

25                    MS. MALIK:   Thank you doctor I have no

1        further questions.

2                    THE COURT:   Mr. Johnston.

3                    MR. JOHNSTON:   Thank you judge.

4    CROSS EXAMINATION

5    BY MR. JOHNSTON:

6        Q.   Good afternoon.

7        A.   Good afternoon.

8        Q.   You never actually spoke to Ashley Martinez?

9        A.   That's correct sir.

10       Q.   So what you were telling the jury a few moments ago

11   about in general terms the 5 stages of sexual abuse that was

12   a generalized statement not specific to the Ashley Martinez

13   case is that correct?

14       A.   That's correct.

15       Q.   And would you say that every situation is some what

16   different at least?

17       A.   Yes.

18       Q.   Now when you discussed the disclosure phase you

19   stated quite a number of reasons why a child would not

20   disclose to a teacher, a parent or a grandparent that they

21   were victims of sexual abuse is that right?

22       A.   Correct.

23       Q.   Is it possible that the reason why a child like

24   that did not disclose any allegations of child abuse is

25   because there was no child abuse in the first place?

vld

1      A.   Well, clearly if there is a period of time that the

2  child has never said anything to them, if nothing happened to

3  them.  Obviously you cannot make, you know, hay out of you

4  know something that really was not seeded if nothing

5  happened. There is nothing to talk about.

6      Q.   And as part of your studies, experience and

7  education have there been occasions for false claims of child

8  abuse made by children.

9                  MS. MALIK:  Objection.

10                 THE COURT:  I am sorry.  Restate.

11     Q.   The question is as part of your studies experience

12  And education have there been occasions of false

13  Claims of child abuse made by a child?

14                 THE COURT:  Overruled.

15                 THE WITNESS:  Yes.

16     Q.   And can you tell the jury some of the reasons that

17  you have learned why a child can sometimes making a false

18  claim of sex abuse?

19     A.   From my experience and the research those issues of

20  the child abuse may lead to a false allegation based upon the

21  age of a child. The child might be confused meaning that they

22  may not have really understand that the touching was not

23  sexually motivated. They heard if someone touches you there

24  would be abuse, that would be very  -- for a very young child

25  or the child being malicious or having revenge.

1          It's unusual but the child may feel that this gives

2    them power.  It's a way to get back at somebody who they are

3    angry at and we find that sometimes in custody disputes with

4    young children these things they do not particularly

5    understand the difference between telling the truth or a lie

6    and they may be so bonded with or you know on the side of the

7    parent who tells them to say something false a young age

8    child is more suggestible. Those are some of the issues that

9    I note that might get a false allegation.

10        Q.    In other words a child can sometimes be influenced

11   --

12                    MR. JOHNSTON:  Withdrawn.

13        Q.    A parent can sometimes influence a child to make a

14   false claim of child abuse?

15        A.    Certainly younger children in custodial battles,

16   yes.

17                    THE COURT:    And younger children being.

18                    THE WITNESS:  Below the age of 7.

19        Q.    Are there any other cases that can influence it

20   offhand when there were false allegations of child abuse?

21        A.    Well, as I said confusion.  Some form of revenge.

22   Some kind of suggestibility.  Those are the three major

23   categories. The other would be a very disturbed person. The

24   person is schizophrenic and lost contact with reality.

25          I had cases where people who are on drugs, many

1    times because of the drugs they do not remember what happened
2    to them. That would be another example of some organic brain
3    damage or chemical influences that the person does not
4    understand reality any more.
5                        MR. JOHNSTON:  I have no further
6               questions your Honor.
7                        THE COURT:  Anything further counsel.
8                        MS. MALIK:  No, nothing further.
9                        THE COURT: Thank you doctor.
10                       THE WITNESS: Thank you.
11                       THE COURT:  Ms. Malik any further
12              witnesses.
13                       MS. MALIK:  At this time your Honor the
14              People of the state of New York rests.
15                       THE COURT:  With those words the People
16              rest that means that you have heard all the
17              evidence that the People intend to offer in the
18              charges against the defendant.
19                       Now I have to handle some matters, some
20              legal matters with counsel outside your presence.
21              It's a very warm room. Maybe it's a good time for
22              you all to step into other room where there might
23              be some more air. So we will bring you back in
24              about 10 minutes or so.
25                       (Whereupon, jurors exit the courtroom).

1           THE COURT:    Approach please counsel.

2           (Off the Record Discussion).

3           THE COURT: All right.  Lets bring the

4      defendant out.

5           THE COURT:    Mr. Johnston, still outside

6      the presence of the jury, this is an opportunity

7      that the defense would have to make motions at the

8      end of the People's case.  Would you reserve your

9      motions to be made at the end of the entire case.

10          MR. JOHNSTON:    Yes, I will reserve the

11     motions at the end of the entire case.

12          THE COURT:    All right. Will your client

13     testify.

14          MR. JOHNSTON:    Yes, he will judge.

15          COURT OFFICER:    Jury entering.

16          COURT CLERK:    Both sides stipulate that

17     all jurors are present and properly seated.

18          MR. JOHNSTON:    Yes.

19          MS. MALIK:    Yes.

20          THE COURT:    I have been advised that

21     there will be a defense case so Mr. Johnston please

22     call your first witness.

23          MR. JOHNSTON:    Judge, at this time Mr.

24     Abu Khan would like to testify in his own behalf.

25     A B U   K H A N, having been duly sworn, was examined and

```
 1                    testified as follows:
 2                         COURT OFFICER:  The defense calls as a
 3                    witness Abu Khan.  K-H-A-N.  A resident of Queens
 4                    county.
 5    DIRECT EXAMINATION
 6    BY MR. JOHNSTON:
 7         Q.   How old are you sir?
 8         A.   40 years old.
 9         Q.   Where were you born?
10         A.   Republic of Trinidad and Tobago.
11         Q.   Did there come a time that you moved to the US?
12         A.   Yes.
13         Q.   When was that?
14         A.   In September of 1986.
15         Q.   And after you arrived in the US did you
16    subsequently enter the military service?
17         A.   Yet.
18         Q.   And what service did you enter?
19         A.   US Marine Corp.
20         Q.   And how long were you in the US Marine Corp?
21         A.   For a total of 4 years.
22         Q.   And were you honorably discharged from the Marine
23    Corp?
24         A.   Yes, sir.
25         Q.   Did you receive any medals?
```

1    A.  Yes, sir.

2    Q.  Which medals did you receive?

3    A.  National Defense Ribbon.

4    Q.  What kind of work did you do in the military?

5    A.  I was infantry which is front line warfare.  And

6    also motor transportation.

7    Q.  Now while you were in the marine reserves in 1993

8    did an incident happen in Florida regarding you being

9    arrested?

10   A.  Yes, sir.

11   Q.  Would you tell the jury about that?

12   A.  I was in college to Totar (ph) Memorial College.  I

13   was working part time for a rental agency, car rental which

14   is right across the street from the college. The guys would

15   borrow the car back and forth to go home, eat lunch.

16        We all did the same for a period of time. I was

17   pulled over and I told the officer that I borrowed the car

18   from the company that I worked for in return I was arrested

19   that day.  I stand the arraignment.  And in arraignment the

20   judge asked me to state what I did.

21        Like I just said. I borrowed a car to go home.  And

22   he said there was no intent to destroy the car that it was in

23   percent condition. So he told me don't let me see you in this

24   courtroom again.  And I left the courtroom that day.

25   Q.  Did you ever have to go back to court on that case?

1    A.    Negative.

2    Q.    Were you ever sentenced to any sort of jail time or

3    probation or anything?

4    A.    Negative.

5    Q.    Now, did there come a time that you began

6    employment in Felix - I am sorry.  Phoenix Refrigeration in

7    Queens?

8    A.    Yes, sir.

9    Q.    When was that?

10   A.    That was in the summer of 1996.

11   Q.    And what type of work did you do for Phoenix

12   Refrigeration?

13   A.    Air condition refrigeration technician.

14   Q.    Had you gone to school for that?

15   A.    I took a year and a half on the job training and

16   after that I took a break from the company and attended APEX

17   Technical School.

18   Q.    By the way how far did you go in college?

19   A.    2 years.

20   Q.    Now do you know Leslie Martinez?

21   A.    Yes, sir.

22   Q.    And when did you first meet Leslie Martinez?

23   A.    Well, Leslie was part of a bridal group when she

24   was the age of 14 I presume. 14 years old.  I can't remember

25   what year that was. I was part of a bridal group also. That

1    was when I first met her, but my family and her family have

2    been friends for a lot of years.

3         Q.   Now, when was it that your relationship with Leslie

4    became more intimate in the nature of having sexual relation?

5         A.   It was actually October 12 of 1997.  My mothers

6    birthday.

7         Q.   And where did this take place?

8         A.   Sexual relationship.

9         Q.   Where did you have the sexual relationship. It was

10   your place. Her place where?

11        A.   No actually it was in my car by her moms house.

12                    MS. MALIK:  Objection your Honor.

13                    THE COURT:  Overruled.

14        Q.   Now at the time that you had sexual relations with

15   her was she married?

16        A.   Yes, sir.

17        Q.   Who was she married to?

18        A.   A fellow named Michael Benn.

19        Q.   And at that time was Leslie living with Michael

20   Benn?

21        A.   Yes she was.

22        Q.   And when was it that you and Leslie began living

23   together?

24        A.   Approximately between the ending of October to

25   November around that time.

1      Q.   Of what year?

2      A.   The year 1997.

3      Q.   And where was that was that in Florida or that was

4  in Queens?

5      A.   That was in Queens.

6      Q.   And where did you -- what location did you move

7  into?

8      A.   Well, we both moved into her moms house at 3- 04

9  121st Street.  College Point.  We both moved in there with

10  her both kids.

11      Q.   And how long did you stay with her mother that is

12  Ann Martinez is that correct?

13      A.   That's correct.

14      Q.   How long did you stay living together there before

15  you moved out?

16      A.   Ariel was born in 98.  It was the year 1999.

17      Q.   And where did you move to when you left Ann

18  Martinez's house?

19      A.   South Ozone Park.

20      Q.   And how long did you live in South Ozone Park,

21  Queens?

22      A.   Approximately one year.  Approximately one year.

23      Q.   And did there come a time that you moved to

24  Florida?

25      A.   Yes, sir.

1       Q.    And when was it that you moved to Florida?

2       A.    We moved to Florida in I think that it was around

3  the month -- May of 2001.

4       Q.    And when you moved to Florida where did you move

5  to?

6       A.    We moved to Lauder Hill, Florida.  Prior to moving

7  there we had took -- I had took 2 weeks vacation where we

8  went down to Florida where I had a cousin living in that

9  apartment complex and she fell in love with the apartment.

10  And what I did I have to I had to I used to live in Florida

11  before so I knew how the job status was.

12           So I applied to Florida Power And Light which is

13  the Con Edison of Florida.  Because I was prior military they

14  gave me first option to taking the testing which I passed.

15                     THE COURT:    Okay.  Now Mr. Khan you are

16              at this point answering the question when you had

17              moved to Florida.  So counsel would you ask him a

18              further question.

19       Q.    All right.  So did you begin in 2001 did you begin

20  working down in Florida for Florida Power And Light?

21       A.    No.

22       Q.    What happened?

23       A.    When I arrived in May they -- I took the test in

24  Miami, Florida which they have transferred the paper work to

25  Fort Lauderdale, Florida which they in turn misplaced. I took

1    a job in the apartment complex.  Because of my prior

2    background in air conditioning I became a maintenance guy in

3    the apartment complex.

4        Q.    How long did you remain as a maintenance person?

5        A.    It was less than a year.

6        Q.    And then after that where were you working or where

7    did you work?

8        A.    After the apartment complex I worked with a small

9    air conditioning company which was actually under the table

10   and I needed the medical benefits so I took another job with

11   another air conditioning company called AA Vance Air which is

12   pretty big in Florida.

13       Q.    How long did you work for them?

14       A.    I worked with them for over a year.  For over a

15   year before coming back to New York City.

16       Q.    Did there come a time in September of 2004 that

17   there was an opportunity for employment up in Queens or in

18   Nassau county?

19       A.    That's correct.

20       Q.    Would you tell the jury about that?

21       A.    In September the beginning of September of 2004 my

22   old company Phoenix Refrigeration which we all kept in

23   contact.  I have been with them since 1996 they called my

24   cellular phone and there was a shortage of manpower and they

25   asked me if I would come backup to New York City for a few

1   months until Christmas and whatever I wanted they were going
2   to pay.

3        In return I asked them to give me a few days. Let
4   me discuss it with my family and get back with them.

5        Q.   And then what happened?

6        A.   Well, I discussed it with Leslie and my kids,
7   actually all 4 of them.  In return they all say go ahead
8   because it was temporary. It was around the Christmas
9   holidays.  And they were all expecting pretty decent gifts.
10  So I called the company back and accepted.

11       Q.   Did you travel to Queens to stay with Ann Martinez
12  Leslie's mother?

13       A.   That's correct.

14       Q.   And when was it that you travelled up to Queens?

15       A.   September 17 of 2004.

16       Q.   And did there come a time around on or about
17  November 29 or so did you receive some news regarding Ashley?

18       A.   It was late November.  I kept in contact with my
19  family; Leslie and my children on a daily basis. 6 AM every
20  morning to make sure that they were up and ready for school.

21       She had told me that Ashley was having a lot of
22  problems and she could not deal with her anymore so she is
23  going to send her to her grandmother's. The date was then
24  told was November 30.

25       Q.   And were you asked to do anything in regards to

1    Ashley coming to New York City?

2        A.    Yes, I was in the process of going back home on

3    December first so they asked me if I could pick her up from

4    the airport.  I told them fine.  That it was okay.

5        Q.    Did you pick Ashley up from the airport on November

6    30 of 2004?

7        A.    Yes I did.

8        Q.    And what happened after you picked Ashley up at the

9    airport?

10       A.    I picked her up at the airport.  Brought her back

11   home to 3-04.  She dropped her luggage off.  She changed from

12   her summer clothes to something pretty warm.  Sweatpants I

13   believe or something like that. And she was hungry. She asked

14   to go to get something to eat.

15             And also she needed some personal, personal stuff

16   and then she wanted to go shopping basically which we did.

17   We sat in the Chinese restaurant right around the area of

18   where we live.  We ate.  Then we went shopping.

19       Q.    Now, you told the jury that you ate at this

20   restaurant is that correct?

21       A.    That's correct.

22       Q.    Did you hear Ashley's testimony when she testified

23   here?

24       A.    Yes I did.

25       Q.    Did you hear her testify that you took out Chinese

1    food and went back to the house?

2        A.    Yes, I did hear that.

3        Q.    Is that correct?

4        A.    No it's not.

5        Q.    After you had the Chinese food at the restaurant

6    what happened next?

7        A.    There is a number of stores on that it's called

8    College Point Boulevard.  There are a number of stores in

9    that area. We spent a while walking around shopping. Picking

10   up some stuff for her. She needed personal hygiene female

11   products. It was that -- her time of the month for her.  She

12   asked me if I could get that. I had some under garments and

13   tank tops.  White T-shirts and some shorts.

14       Q.    What time did you finish shopping and where did you

15   go?

16       A.    It was probably around 4 it was late evening.  Then

17   we walked back home.  Like I said it was in the neighborhood.

18   And went back to the house.  That was that.

19       Q.    Now when you got back to the house was anybody

20   home?

21       A.    No, not at that time.

22       Q.    Did there come a time that people did arrive?

23       A.    Yes it was about an hour for the latest. Not more

24   then that it might be a little less. Mr. Hubert which is Ann

25   Martinez's boyfriend arrived and then Ann Martinez just

1    shortly after that.

2         Q.   And what time was that?

3         A.   That was about 5, maybe around 5, 5:15.

4         Q.   What happened when they arrived back at the house?

5         A.   Well, Ashley was upstairs.  She was upstairs. I was

6    downstairs.  I had a friend that was outside that I spoke to

7    and Ann Martinez walked in and Mr. Hubert, we called him Mr.

8    H., he really didn't have much to say to Ashley and when Ann

9    Martinez walked in first thing she asked was --

10                   MS. MALIK:  Objection your Honor.

11                   THE COURT:  Overruled.

12                   THE WITNESS:  The first thing she asked

13             was where was my granddaughter.  I had said that

14             she was upstairs and they were hugging and kissing.

15             Grandmother, granddaughter stuff.

16        Q.   Now did you have anything to eat at the house?

17        A.   No, no I did not.

18        Q.   What about the others?

19        A.   Yes, Ann Martinez is on a diet.  And she actually

20   makes baked chicken and vegetables. I am not a fond lover of

21   vegetables. So she had dinner.  I didn't.  I normally eat

22   outside working.

23        Q.   Now did there come a time when you Mr. H or Hubert

24   as you call him and Ashley went some where?

25        A.   Yes we went to Mineola, Long Island where I had to

1   return the companies vehicle.  The company -- to drop back

2   off the truck because I was leaving the next day for Florida.

3        Q.    And you said where was that located?

4        A.    Mineola, Long Island.

5        Q.    Now how did you get out there and how did you get

6   back?

7        A.    Mr. Hubert and Ashley followed me.  Mr. Hubert

8   drove.  They followed me in the company vehicle and I dropped

9   it off.  Spoke to my boss.

10        Q.    About how long did that trip take?

11        A.    Back and forth roughly a little less than 2 hours.

12        Q.    Could you estimate for the jury at what time you

13   arrived back at grandma's house in Queens?

14        A.    It was a little before 9 PM.

15        Q.    What happened when you arrived back to grandma's

16   house?

17        A.    I asked Mr. Hubert because I get along pretty good

18   with Mr. Hubert I asked him if it was okay, I normally borrow

19   his vehicle.  A Buick older model series. I asked if I could

20   borrow it and go visit my friend which he knows my friend to

21   say goodbye. Which I did and I went out.

22        Q.    How long did you stay out?

23        A.    Probably until a little before 12 midnight.

24        Q.    So you were not at home at 11, midnight at

25   grandma's house?

1        A.    No.

2        Q.    Who were you with?

3        A.    I was with a friend of mines Wesean (ph).  We went

4   to -- we actually went to a sports bar to play pool but it

5   was closed.  Then we ended up just having dinner.

6        Q.    And you said that you -- withdrawn.

7              What time did you leave your friend and return back

8   to grandma's house?

9        A.    I left him there I cannot pin point the exact time.

10  It was about 10:30, 10:45. Something like that.

11       Q.    No when did you arrived back after you were out

12  with your friend?

13       A.    Oh, when I arrived back at the house.

14       Q.    Yes?

15       A.    It was about 11 PM.  11:30 PM. Somewhere around

16  there.

17       Q.    What happened when you got back to the house?

18       A.    I went straight to bed. There was nobody up.

19  Everybody was sleeping.  We had a busy day the next day for

20  the registration of Ashley.

21       Q.    Did you go into Ashley's room and wake her up and

22  chase her downstairs?

23       A.    Negative.

24       Q.    Did you have any sexual relationship with her that

25  night?

```
 1         A.    Negative.

 2         Q.    What happened the next day when you woke up?

 3         A.    I was awakened by Ann Martinez my mother in law.

 4    We got up had some coffee.  And we took her to the school to

 5    do the registration.

 6         Q.    She was going to go to school up here in Queens?

 7         A.    Yes, sir.

 8         Q.    And did you do that?

 9         A.    Yes, sir I did.

10         Q.    What time was the registration process over with or

11    what happened?

12         A.    Registration process I really can't tell you what

13    time it was over but it was in the AM, I can't remember

14    exactly what time.

15         Q.    After the registration process was over where did

16    you go?

17         A.    We went to Brooklyn.  I drove the same vehicle that

18    I had from the prior night.  I drove Ann Martinez and Ashley.

19    We went to Brooklyn where the grandmother did some shopping

20    and what not. I did some shopping for the kids back in

21    Florida. Toys and Christmas stuff and then we came back.

22               We came back I can't remember if we went straight

23    back to the house or if we went to Ann Martinez's mom's house

24    which is in Jackson Heights.  I don't recall.

25         Q.    Did there come a time that you went to a car
```

```
 1  rental?
 2       A.   Yes.
 3       Q.   What time was that if you recall?
 4       A.   I think that it was in the PM the late PM.  Ann
 5  Martinez rented the vehicle for me because I do not have a
 6  credit card.
 7       Q.   And did you rent a car?
 8       A.   Yes.
 9       Q.   When was it that you left with the car for Florida?
10       A.   That night December first.
11       Q.   And did you drive down to Florida?
12       A.   Yes I did.
13       Q.   How long did it take you?
14       A.   Exactly 16 hours.
15       Q.   And when you arrived at home did you go to where
16  you had been staying with Leslie Martinez?
17       A.   That's correct.
18       Q.   What happened when you got there?
19       A.   There was nobody in the house.  The house was
20  all -- the doors were wide open. The house was in total
21  darkness.  And the house was pretty much trashed.
22       Q.   What?
23       A.   The house was pretty much trashed.
24       Q.   In other words messy?
25                      MS. MALIK:  Objection.
```

1          THE COURT: Sustained.  He said trashed.

2     Q.    What do you mean by trashed?

3     A.    It was dirty. There were broken beds.  Piles and

4    piles of dishes.  Alcohol bottles laying around the table.

5    Pieces of marijuana.

6               MS. MALIK:  Objection your Honor.

7               THE COURT:   Overruled.

8     Q.    So what did you do when you saw all of this?

9     A.    Well first it broke my heart but I took pictures.

10    Q.    You took pictures of the mess?

11    A.    Yes I did.

12    Q.    Why did do you that?

13              MS. MALIK:  Objection your Honor.

14              THE COURT:  Overruled.

15              THE WITNESS:  I did that because while I

16         was in New York I made a phone call like I always

17         did at 6 AM and there was a guy by the name of

18         Nigel in my bedroom.  My little daughter Ariel

19         answered the phone.  And she was crying and I asked

20         her why she was crying. She said --

21              MS. MALIK:  Objection your Honor. I have

22         to object to the relevance for all of this.

23              THE COURT:   Approach please.

24              (Off the Record Discussion).

25              THE COURT:  Sustained.

1    Q.    Mr. Khan, did there come a time on December 10 that

2  there was an incident between you and Leslie?

3    A.    Yes, sir.

4    Q.    And would you tell the jury about that?

5    A.    On December 10 of 2004 I was not living at our

6  house.  I asked.  She needed space so I stood at my sister in

7  Fort Lauderdale.

8          On that morning at December 10 of 2004 I went to

9  the house actually it was 5 AM.  I went to the house in order

10  to try to rekindle which I tried a few days before but it

11  didn't work.  I have tried to rekindle my relationship with

12  Leslie.

13          And upon entering the house I saw my kids sleeping

14  and I saw Leslie and Nigel on my bed.

15    Q.    Did an argument result?

16    A.    No there was no argument.

17    Q.    No argument.

18    A.    No.

19    Q.    Did you pull out a gun and threaten either Leslie

20  or Nigel or anyone else?

21    A.    I never owned a gun in my entire life.

22    Q.    Were the police called?

23    A.    I notified the police department so did she.

24    Q.    Did you stay around for the police to show up?

25    A.    Yes I did.

1    Q.    Did they search you for a gun?

2    A.    They searched me, my vehicle and the entire

3    premises where I was standing.

4    Q.    Did they recover a gun?

5    A.    Negative.

6    Q.    Now, after that incident or even before that

7    incident you did not thereafter live together with Leslie

8    Martinez is that correct?

9    A.    That's correct.

10   Q.    And in January of early January of 2005 did you

11   return to New York?

12   A.    January 2, 2005.

13   Q.    Where did you go to?

14   A.    I returned to New York.  I really do not have any

15   family that lives here in New York.  So I live with my boss

16   for 2 weeks.  And sometimes stood in my van some nights until

17   I got the money together to get my own apartment back.

18   Q.    And where did you get an apartment?

19   A.    I got my apartment in the Bronx.

20   Q.    Now periodically thereafter did you make a trip

21   back to Florida to see your children?

22   A.    On a monthly basis.

23   Q.    By the way how many children were living with

24   Leslie and which ones were your children and which ones were

25   Leslie's from a prior relationship?

1      A.    There were 4 kids living at the house. Ariel and
2  Andrew, the last 2 are my biological, and Ashley and Jaeshawn
3  are her's from a prior marriage.  I basically brought them up
4  when they were little.

5      Q.    Now did you have occasion to attend a fair in March
6  of 2005?

7      A.    Correct.  2006.

8      Q.    I am sorry March of 2006.  Would you tell the jury
9  about that?

10     A.    That weekend I went down to Florida.  I didn't have
11 any idea that there was going to be a fair there.  So her
12 cousin called me, Leslie's cousin who I do still keep in
13 contact with to meet up at that fair.  So me and -- myself,
14 my sisters, my nieces and nephews we all went down.  And a
15 friend of mine from New York City which I work with Tom
16 Popodopolis. He called me on the cellular phone and told me
17 that my kids were right there with them.

18                 MS. MALIK:  Objection your Honor hearsay.

19                 THE COURT:   At the fair.

20                 THE WITNESS:  Yes, sir.

21                 THE COURT:   Overruled.

22                 THE WITNESS:   I approached and probably a

23            distance between me and the jar sitting at the end

24            of the jury where she saw me.  Eye to eye contact.

25                 THE COURT:   She is who.

1                   THE WITNESS:  Leslie Martinez.  And she
2             snatched the kids out of my sisters hands and my
3             nieces hands and made a smart comment and walked
4             away.
5                   THE COURT:  For the record that distance
6             is approximately 19 feet.
7        Q.   Very good your Honor.  And had you been supporting
8    the kids?
9        A.   When I came up here in January of 2005 on a weekly
10   basis I sent $175.00 per week by money order, US postal
11   service money order for a period of approximately 2, 2 and a
12   half months after I received mail coming back to my house
13   with no persons with that address.
14             She relocated.  And the phone number was changed.
15   I had no means of contacting her.  I attempted through her
16   great grandmother.  Leslie's great grandmother.  In return
17   she said to me --
18                   MS. MALIK:  Objection your Honor.
19                   THE COURT:  Sustained.
20       Q.   Do not tell us what anyone else said to you.
21       A.   Okay.
22       Q.   Now, between 1997 and the year 2000 when you were
23   living up here in Queens did you inappropriately touch the
24   breasts of Ashley Martinez or did you at any time put your
25   penis in her hands?

1    A.    No.

2    Q.    Now I do not want you to get embarrassed are you a

3    normal size male.

4                    MS. MALIK:  Objection.

5                    THE COURT:  Sustained.

6    Q.    Now, lastly Abu can you think of any reason why

7    Ashley would make this up about you and falsely accuse you of

8    rape and sexual abuse?

9                    MS. MALIK:  Objection your Honor.

10                   THE COURT: Sustained.

11                   MR. JOHNSTON:  I have no further

12            questions.

13                   THE COURT:  Cross.

14   CROSS EXAMINATION

15   BY MS. MALIK:

16   Q.    Now sir you said that you were with the US Marine

17   Corp?

18   A.    Yes.

19   Q.    Are you a citizen?

20   A.    No I am not.  I am a permanent resident.

21   Q.    You were with the marine corps?

22   A.    Yes, sir.

23   Q.    Now you said that you were honorably discharged?

24   A.    Yes.

25   Q.    Do you remember being dishonorably discharged?

1    A.    No.

2    Q.    I would like for you to take a look at this and see

3    if that refreshes your recollection as to whether you were

4    dishonorably discharge?

5                   MR. JOHNSTON:   Could I see that before we

6              show it to the witness.

7                   THE COURT:   No not yet.  Lets see if

8              this refreshes his recollection.

9                   (Handing).

10                   THE COURT:   First sir if it does just

11              say yes that it does refresh your recollection.

12                   THE WITNESS:   No.

13    Q.    You are saying that this does not refresh your

14    recollection as to being dishonorably discharged from the US

15    Marine Corps?

16    A.    No, Ma'am.

17    Q.    When -- how long were you with the marines?

18    A.    4 years.

19    Q.    Trained in using a gun?

20    A.    M-16.

21    Q.    So did you ever have a gun?

22    A.    No.

23    Q.    Never had a gun?

24    A.    Never owned a gun.

25    Q.    You heard Leslie Martinez testify right?

```
 1        A.    Yes.
 2        Q.    You heard on that -- this December after Christmas
 3   you took out a gun at her house rights?
 4        A.    I heard she said that yes.
 5        Q.    She is mistaken about that?
 6        A.    Yes.
 7        Q.    But you do know how to operate a gun right?
 8        A.    Yes I do.
 9        Q.    You had a car at the time correct?
10        A.    2.
11        Q.    What kind of car did you have?
12        A.    A 2000 Kia Optima. And a 1996 Econo line conversion
13   van.
14        Q.    Isn't it true sir that you were involved in an
15   incident at a bar while you were in the marine corps that
16   called you to be dishonorably discharged from the marines?
17        A.    Not that I can recall.
18        Q.    No you do not remember that?
19        A.    No.
20        Q.    You do drink correct.  You drink alcoholic
21   beverages?
22        A.    Occasionally, yes.
23        Q.    Do you every day?
24        A.    No.
25        Q.    Do you drink weekly?
```

1  A. No I don't.

2  Q. You do not Friday -- every Friday and Saturday

3 night pretty much?

4  A. No.

5  Q. Your name, your first name that means father right?

6  A. Be correct.

7  Q. You were born on December 12, 1966?

8  A. Correct.

9  Q. You are 40 years old now?

10  A. Correct.

11  Q. You are 9 and a half years older than Leslie

12 Martinez?

13  A. That's correct.

14  Q. When you started a romantic relationship with her

15 that was according to your testimony in 1997?

16  A. That's correct.

17  Q. You were 30 years old right?

18  A. Approximately yes.

19  Q. And she was about 21 years old?

20  A. Approximately yes.

21  Q. You found yourself a younger woman right?

22  A. Yes.

23  Q. Fair to say?

24  A. Fair to say.

25  Q. Now, on November 30 of 2004 you were 37 years old

1  right?

2      A.    Yes.

3      Q.    And while you had this relationship with Leslie

4  Martinez had you loved her and she loved you is that correct?

5      A.    That's correct.

6      Q.    And you accepted her children Ashley and Jaeshawn

7  correct?

8      A.    That's correct.

9      Q.    Even though you were not the biological father of

10  those 2 children?

11     A.    Correct.

12     Q.    Now Ashley's date of birth is April 26, 1992?

13     A.    Yes.

14     Q.    When was Jaeshawn born?

15     A.    I can't remember off hand.

16     Q.    It was February of 94?

17     A.    I know that it was February, yes.

18     Q.    Ariel?

19     A.    December 25.

20     Q.    Of what year?

21     A.    1998.

22     Q.    And your son Andrew when was he born?

23     A.    June 26 of 2000.

24     Q.    Now when Ariel was born on Christmas day in 1998 at

25  that point Ashley was about 6 years old correct?

| | | |
|---|---|---|
| 1 | A. | Correct. |
| 2 | Q. | And at that point Jaeshawn was about 4 years old |

3  correct?

4      A.    That's correct.

5      Q.    So Leslie had 2 kids and then she had a child with

6  you, Ariel right?

7      A.    Right.

8      Q.    She is working at the time?

9      A.    No.

10     Q.    She was taking care of the kids at home?

11     A.    Correct.

12     Q.    You were working right?

13     A.    Yes.

14     Q.    And with the 3 young children at home it's fair to

15  say that you were pretty much exhausted all the time because

16  you of course took part in raising them right?

17     A.    Yes, when you say exhausted.

18     Q.    You have a 6 year old, a 4 year old and then a new

19  born right sir?

20     A.    That's correct.

21     Q.    And you are working full time right?

22     A.    Yes I am.

23     Q.    It's part of being a good father you were taking

24  care of those children as well right. You just did not leave

25  it to Leslie did you?

```
 1        A.    No.
 2        Q.    So, is it fair to say that Leslie was taking care
 3    of those 3 young children she was tired all the time?
 4        A.    Not really.
 5        Q.    Not really.
 6        A.    Not really.
 7        Q.    A 6 years old, a 4 year old and a new born you are
 8    saying that Leslie was taking care of them and she was not
 9    tired a lot of the times?
10        A.    Not when I come home.  She was up.  Running around.
11        Q.    She did not have any help taking care of the
12    children right?
13        A.    We were living at her mom's house at that time when
14    Ariel was born.
15        Q.    Her mother was working?
16        A.    Yes.
17        Q.    Her mother was working full time?
18        A.    Correct.
19        Q.    So Leslie was home taking care of the 3 young
20    children by herself right?
21        A.    Okay fair to say yes.
22        Q.    And by the way you worked as a DJ in a club
23    correct?
24        A.    That was in Florida state not here in New York.
25        Q.    So when Leslie was taking care of the kids would
```

1   you hang out with other people?

2       A.    My company is a 24 hour service.  And from day one

3   to present my Nextel is on 24 hours a day.

4       Q.    So you were on call for 24 hours a day?

5       A.    I work 7 days a week Ma'am.

6       Q.    So you are working 7 days a week. You have these 3

7   young children. Leslie is taking care of the children.  Life

8   was hectic for you sir?

9       A.    Not really.

10      Q.    It was not hectic for you?

11      A.    Not really.

12      Q.    You worked 7 days a week. You have a 6 year old, a

13  4 year old and a new born life is not hectic for you?

14      A.    No I made it work.  I enjoyed my job and I loved my

15  family.

16      Q.    How about life for Leslie?

17      A.    She complained a lot, yes.

18      Q.    Would you say that life was stressful at that point

19  having a 6 year old, a 4 year old and and new born in your

20  house?

21      A.    No.

22      Q.    Not at all?

23      A.    No.

24      Q.    You were absolutely fine with it?

25      A.    I was fine.

1    Q.    Your relationship with Leslie started to change
2  after Ariel was born right?
3    A.    Somewhat yes.
4    Q.    Actually even before Ariel was born didn't your
5  relationship start to change with her?
6    A.    When she was pregnant.
7    Q.    Yes?
8    A.    No.
9    Q.    Didn't start to change?
10   A.    Not that I can recall.
11   Q.    She has a 6 year old, a 4 year old. Now she was
12  pregnant with your child and your relationship did not change
13  at all?
14   A.    Not that I can recall.  Because all I did was work.
15  You know try my best.
16   Q.    After your daughter was born your relationship
17  started to change for the worse didn't it?
18   A.    I would not say no because there are times when I
19  did come from work I specifically remember helping her out
20  with the kids.
21        Actually fell asleep with my new born on my chest.
22  You know a lot of times not that I can recall to be honest
23  with you.
24   Q.    Your relationship did not change at all. Did you
25  hear her testify that the relationship started to change once

1  Ariel was born?

2      A.    I heard her testify to that.  I don't recall that.

3      Q.    After Ariel was born you were not having sex with

4  Leslie that often right sir?

5      A.    Yes I was.

6      Q.    You were would you say?

7      A.    Pretty much.

8      Q.    Would you say that you were having the same amount

9  of sex after Ariel was born as to before Ariel was born?

10     A.    Negative, no.

11     Q.    It decreased with a 6 year old, a 4 year old and a

12 new born in the house?

13     A.    It did not have anything to do with the kids if

14 that is what you are trying to get at.

15     Q.    Well did your sexual activity decrease after your

16 daughter was born?

17     A.    It decreased yes.

18     Q.    Now after there was a decrease in that sexual

19 activity with Leslie after your daughter was born you had

20 another son Andrew?

21     A.    Correct.

22     Q.    In 2000?

23     A.    That's correct.

24     Q.    After Andrew was born was life a little more hectic

25 then?

vld

1          A.    No.

2          Q.    No?

3          A.    No.

4          Q.    So let me get this straight by that time you had an

5   8 year old, 6 year old, a 2 year old and a new born and life

6   is still the same for you?

7          A.    Yes,  because I received a large increase in my

8   salary.  Financially we were okay.  And I had my first

9   biological son.  So I was pretty much happy.

10         Q.    But life was not stressful in terms of taking care

11  of the children or anything like that?

12                        THE COURT:    For whom.

13         Q.    For the defendant?

14         A.    No Ma'am.

15         Q.    Did you help in taking care of the children?

16         A.    Yes I did.

17         Q.    So you're saying that life remained the same for

18  you as when you had your 4 children as before you had Andrew

19  and Ariel is that what you are saying?

20         A.    No life changes in a period of time.  With Andrew

21  and Ariel being there it wasn't hectic as pulling your hair

22  off your head, but it did get a little extraneous because of

23  the costs, the income.

24         Q.    After Andrew was born there was even less sex

25  between you and Leslie right because now she is talking care

1    of 4 kids?

2         A.   That's correct, yes.

3         Q.   And you missed that.  You missed that sexual

4    activity in your life didn't you?

5         A.   No actually I was burnt out.

6         Q.   You were burnt out.  I thought that you said life

7    was fine and dandy?

8         A.   Burned out. You asked me about sex. If I was

9    missing it no, I was not.

10        Q.   You weren't?

11        A.   No.

12        Q.   Let me ask you a question who is Maria Echeveria

13   (ph)?

14        A.   That is my present girlfriend.

15        Q.   When did you start seeing her?

16        A.   In 2005 January, February, March.

17        Q.   You sure about that?

18        A.   2005.

19        Q.   Did you know her before 2005?

20        A.   Yes.

21        Q.   And you were not seeing her you didn't have a

22   romantic relationship with her before 2005?

23        A.   No I did  not.

24        Q.   She is your cousin's wife?

25        A.   Ex.

1       Q.    Ex-wife?

2       A.    Not ex-wife. Ex-girlfriend.

3       Q.    She has 2 kids with your cousin?

4       A.    Yes.

5       Q.    So you took your cousins wife or ex-girlfriend?

6       A.    I am sorry.

7       Q.    You took your cousins ex-girlfriend?

8       A.    No I did not take her.

9       Q.    She wanted you right?

10      A.    No she was over here.  She came over here to live

11   in order to go to school and better her life and one thing

12   led to the other.

13      Q.    One thing led to another is that what you said?

14      A.    Yes we were both single and one thing led to

15   another.  We are both adults.

16      Q.    Is she in the courtroom right now. She was been

17   here the whole time for you right?

18      A.    Yes.

19      Q.    The light skinned woman?

20            THE COURT:    Sustained.  Next question.

21      Q.    So, who is Julisa do you know who that is?

22      A.    Who.

23      Q.    Julise or Julisa who is that?

24            MR. JOHNSTON:   Lisa Julian.

25      A.    I don't recall.

1    Q.   You do not know who that is?

2    A.   I don't recall the name off hand.

3    Q.   Is that a girl that lives down the block from you

4  when you were living in College Point?

5              MR. JOHNSTON:  I am going to object to

6         that being --

7              THE COURT:  Approach please.

8              (Off the Record Discussion).

9    Q.   When you were living with Leslie and Ashley and

10  Jaeshawn in Ann Martinez's home in College Point sir you had

11  the bedroom that had the loft that was attached to this

12  correct?

13   A.   Correct.

14   Q.   You shared that bedroom with Leslie Martinez right?

15   A.   Correct.

16   Q.   And in the loft area the spiral staircase that goes

17  to the loft that is where Ashley would sleep?

18   A.   Ashley and Jaeshawn.

19   Q.   Now there were times when you read or you told

20  Ashley a story right?

21   A.   I am not a story teller.

22   Q.   You are not a story teller?

23   A.   No.

24   Q.   You never told Ashley a story?

25   A.   No.

1       Q.    Never in your life?

2       A.    No.

3       Q.    Did you ever tuck her in at night?

4       A.    No.

5       Q.    Never. Did you ever go up into her bedroom at

6    night?

7       A.    No.

8       Q.    You never -- not once ever in your entire 8 year

9    relationship with Leslie you went into Ashley's bedroom is

10   that what your testimony is?

11      A.    Ashley's bedroom is our bedroom.

12      Q.    Ashley's bedroom is your bedroom.  I am talking

13   about the loft area?

14      A.    Correct.

15      Q.    Where Ashley slept?

16      A.    Yes that is one room.

17      Q.    Is there a reason why you're smiling by the way do

18   you find that funny?

19      A.    No I am trying to establish something with the loft

20   because the question was asked about the loft.  The loft

21   floor where we slept on the bottom. The loft floor is wood

22   that is separated.  You can actually see through from the

23   bottom to the top.

24      Q.    You have to go up a spiral stair case about 10 or

25   12 steps to get to the loft area from where you slept?

1      A.    That's correct.

2      Q.    So could you not see everything that was going on

3  if you were standing in the bedroom below right?

4      A.    7 and a half feet from the bottom to the top.

5      Q.    My question to you sir is you could not see

6  everything that was going on in the loft room from the bottom

7  bedroom right?

8      A.    Yes you could.

9      Q.    You could?

10     A.    Yes.

11     Q.    Not if you were sleeping?

12     A.    Everybody was not -- if you were sleeping no.

13     Q.    There were times that you and Ashley were alone to

14  go in the house right?

15     A.    That's correct.

16     Q.    And there were times that she would be sleeping up

17  in the loft bedroom right when you were in the house as well

18  correct?

19     A.    Possibly I can't recall being alone with her in

20  1997.

21     Q.    You do not remember any time that were alone with

22  Ashley?

23                 THE COURT:   He said in 97.

24     Q.    1997?

25     A.    I don't recall.

1    Q.    Did there come a time in 1997 and 2000 that you

2  were alone with Ashley right?

3    A.    Possibly yes.

4    Q.    You wear boxer shorts correct?

5    A.    Yes, I do.

6    Q.    And in those times that you were alone with Ashley

7  from the period of 1997 to about 2000 there were times when

8  you were up in the loft of bedroom with her right?

9    A.    Negative.

10    Q.    Never not one single time?

11    A.    Not with Ashley or Jaeshawn alone.

12    Q.    Well you were a good father to them correct?

13    A.    I tried my best.

14    Q.    And as a good father you would take them out. Go to

15  the movies right?

16    A.    No I was not into the movie thing with kids. That

17  was my bad part.  I would let the moms go with them and pick

18  them up but I did not could not take the noise with the kids

19  in the movie theatre.

20    Q.    Did you ever take them to the park?

21    A.    Yes.

22    Q.    Did you ever take them to birthday parties?

23    A.    Yes.

24    Q.    Did you ever take Ashley shopping?

25    A.    Yes.

```
 1        Q.   Did you ever give her money?

 2        A.   Money no.

 3        Q.   You never gave her any money?

 4        A.   I never give none of the kids money.

 5        Q.   Did you ever buy her something that she really

 6   wanted?

 7        A.   Yes.

 8        Q.   Did you ever take her to the buy bras?

 9        A.   No.

10        Q.   Did you of go to family parties with her?

11        A.   Family get together's, yes.

12        Q.   Did you ever make her a meal?

13        A.   I cooked for the whole entire family.

14        Q.   Did you ever take her to the bathroom?

15        A.   No.

16        Q.   Never?

17        A.   No.

18        Q.   At 6 years old you never took a 6 year old Ashley

19   to the bathroom?

20        A.   No I never took my biological daughter to the

21   bathroom or my son.

22        Q.   Is that because you might molest them.

23                   MR. JOHNSTON:  Objection.

24                   THE COURT:  Sustained.

25                   MR. JOHNSTON:  Judge, I am going to ask
```

```
 1            for a mistrial.
 2                    THE COURT:   Denied.
 3       Q.   Did you in all of those times that you did things
 4   for Ashley tell us what other things that you would do with
 5   her?
 6       A.   I can't say what I would do for Ashley by herself
 7   because if I do that for any one of the other kids I treat
 8   them all equally.  I can use one example if that is okay with
 9   you.
10       Q.   Go ahead?
11       A.   Food shopping.  If I take my son or my step son
12   alone to go food shopping it was a problem with her.  I have
13   to take all or none.
14                    THE COURT:   I am sorry. You said it was
15            a problem for her who.
16                    THE WITNESS:  Ashley Martinez.  If I have
17            to take one kid I have to take all. Just if I buy
18            one pair of sneakers I have to buy 4 pairs of
19            sneakers.
20       Q.   Did you ever tell a story to Jaeshawn?
21       A.   I tell -- I don't know if I told a story to
22   Jaeshawn.  I don't recall.
23       Q.   You can't recall if you ever told a story to
24   Jaeshawn?
25       A.   No.
```

```
 1        Q.   What about to Ariel. Did you ever tell her a story?
 2        A.   No.
 3        Q.   You never told -- what about Andrew ever told him a
 4   story?
 5        A.   No I just like to hug Andrew and play with him.
 6   Wrestle with him.
 7        Q.   You never told any of those 4 children any kinds of
 8   a story?
 9        A.   No stories that I can remember no.
10        Q.   Did you remember tell a story about a girl putting
11   a star on a Christmas tree to Ashley?
12        A.   No I don't even know that story.
13        Q.   Are you saying that never happened?
14        A.   No Ma'am.
15        Q.   Your relationship with Ashley you were her father
16   figure correct?
17        A.   That's correct.
18        Q.   She loved you very much right?
19        A.   I loved her very much too.
20        Q.   She looked up to you right?
21        A.   Yes.
22        Q.   She adored you?
23        A.   That's correct.
24        Q.   Where ever you wanted to go she wanted to go?
25        A.   That's correct.
```

1      Q.    And you treated her like your own daughter right?

2      A.    That's correct.

3      Q.    You were the only father that she ever knew right

4  sir?

5      A.    Biologically speaking no but that is what she says.

6  I am the only father that she would know.

7      Q.    She called you daddy right?

8      A.    She also called Mike daddy at one point.

9      Q.    I am asking about you for the 8 years that you were

10  with Leslie Martinez, Ashley Martinez called you daddy?

11      A.    After a period of time her mom spoke to her about

12  that yes.

13      Q.    That is not my question?

14      A.    Yes she did.

15      Q.    So from about 5 or 6 years old until the time that

16  she is about 12 or 13 she called you daddy right?

17      A.    Correct.

18      Q.    Do you have a tattoo on the side of neck?

19      A.    Yes.

20      Q.    What is that?

21      A.    It's the Egyptian eye.

22      Q.    What is the significance of that?

23      A.    Good luck.

24      Q.    What about the tattoo the mark of the cobra on your

25  calf?

1    A.    Yes I do.

2    Q.    What calf is that on?

3    A.    On my left.

4    Q.    Your left.  What is the significance of that?

5    A.    No significance.  I just liked it.

6    Q.    You just liked it?

7    A.    Correct.

8    Q.    What about the other tattoos  that you have.

9                    MR. JOHNSTON:  Objection.

10                   THE COURT: Sustained.

11   Q.    When you picked up Ashley at the airport on

12 November 30 of 2004 you said later on that day you went home

13 to Ann Martinez's house right?

14   A.    That's correct.

15   Q.    And you went to see a friend what was his name?

16   A.    Wasean.

17   Q.    Where did you go with Wasean?

18   A.    We went to a friend of mines that I serviced the

19 air conditioner at a sports bar on Jamaica Avenue, but he was

20 closed for business to play pool. He was closed for business.

21   Q.    Now what is Wasean's last name?

22   A.    Bali Khan.

23   Q.    And you said that you left his louse at about 10:45

24 PM?

25   A.    Approximately.  Approximately.  It was late in the

1    night.

2        Q.    Where does he live?

3        A.    He lives off of Jamaica Avenue right on the corner

4    of Jamaica Avenue and Van Wyck Expressway.

5        Q.    What is his address?

6        A.    I don't know off hand.

7        Q.    What is his phone number?

8        A.    It's in my cellular.  He has a cellular phone.

9        Q.    Are you saying that you are at Wasean's house at

10   the time that Ashley is saying that you raped her?

11       A.    I don't know what time she is stating it but I was

12   at Wasean's to pick him up and we went out.  And I dropped

13   him back home.

14       Q.    You heard that she said that she said that it was

15   about 11 o'clock at night right she testified. You were here

16   when she testified?

17       A.    I was here.  I did not hear the time I am sorry.

18       Q.    So you were home by 11 o'clock on the night of

19   November 30 of 2004?

20       A.    It was a little after 11.

21       Q.    A little after 11.  How much after 11?

22                  THE COURT:    If you know sir.

23                  THE WITNESS:   I don't recall 11:30.  I

24          don't recall.

25       Q.    When you came home you saw Ashley correct?

1          A.    No everybody was asleep.

2          Q.    Everybody was asleep?

3          A.    That's correct.

4          Q.    So when was the next time according to your

5    testimony that you saw Ashley?

6          A.    At 7 AM the next morning was awakened by Ann

7    Martinez to go -- to do the registration at the school.

8          Q.    Now --

9                      THE COURT:    I am sorry are you saying

10               that you had seen everyone in the house asleep or

11               you just assumed that everyone in the house was

12               asleep.

13                     THE WITNESS:    I assumed that everyone was

14               asleep. The doors were all closed.

15         Q.    Now you said that you sent $175.00 a week for about

16   2 to 2 and a half months to Leslie Martinez in January of

17   2005?

18         A.    Correct.

19         Q.    At the time that you sent that money to her

20   according to your testimony what was your relationship like

21   with her?

22         A.    Well, it was just we just talked. It was nothing to

23   say establish a relationship. I talked to her because of the

24   kids.  I got over what ever. Let it go.

25         Q.    So in January of 2005 there was animosity between

1    you and Leslie Martinez right?

2         A.    Negative.

3         Q.    And you said that you were sending $175.00 a week

4    to her what was that for?

5         A.    That was for Andrew and Ariel schools aftercare

6    program. It was a little less than that. I rounded off the --

7    because of my like I said I was looking for an apartment.  I

8    was kind of homeless.

9         Q.    You were what?

10        A.    Homeless.

11        Q.    Well, didn't you live in the Bronx?

12        A.    January of 2005.

13        Q.    Where did you live before that?

14        A.    Florida.

15        Q.    You have family in Florida right?

16        A.    That's correct.

17        Q.    Your sister Michelle Khan lives in Florida?

18        A.    Yes.

19        Q.    Your sister Lisa?

20        A.    Yes.

21        Q.    Your mother Jamella Khan?

22        A.    Yes.

23        Q.    So you were not homeless?

24        A.    I was in New York City.

25        Q.    When you were in Florida you were not homeless?

```
 1          A.    Yes.
 2          Q.    You chose to leave Florida and come back up here to
 3    New York City?
 4          A.    That's correct.
 5          Q.    You had then a friend Wasean?
 6          A.    Correct.
 7          Q.    So there were places that you were staying correct.
 8          A.    My bosses house as I stated for 2 weeks.  My van
 9    off and on.  Until the end of January of 2005 I got -- I paid
10    for my apartment in the Bronx.
11          Q.    And you knew Marie at that time?
12          A.    I knew her way before that.
13          Q.    And you stayed at 742  123rd Street in Richmond
14    Hills, right?
15          A.    That's where I resided in 2005, December of 2005.
16    I got that -- that was my second apartment from the Bronx.
17          Q.    You knew other people in New York City that you
18    could stay with right?
19                     THE COURT:    Sustained.  Move on.
20          Q.    So it's your testimony that you were sending
21    $175.00 a week to Leslie for the care of Andrew and Ariel?
22          A.    That's correct.
23          Q.    Did you ever talk to her about that money?
24          A.    Yes I did.
25          Q.    And according to your testimony she was happy with
```

1    that money?

2         A.   Well, no she wanted more.  But she even -- I mean

3    we worked things out in a way that even she made a phone call

4    on one time and asked if I could just send 2 checks in one

5    shot overnight express which I did through the US Postal

6    service.  But otherwise regarding getting more money after

7    the fact that the phone was changed and her address was

8    changed no she called me with a restricted number.

9         Q.   So you are telling us that let me understand the

10   logic of this.  She wanted more money, but yet according to

11   you she moved.  Changed the phone number and you could not

12   get in touch with her?

13        A.   That's correct.

14        Q.   Even though she wanted more money out of you?

15        A.   That's correct.

16        Q.   She never took you to court to get more money out

17   of you?

18        A.   I asked her to.

19        Q.   My question is that she never took you to court to

20   get more money out of you?

21        A.   Not that I know of.

22        Q.   You never received papers in the mail from court

23   right?

24        A.   Right.

25        Q.   Telling you to appear in court for child support

1    issues correct?

2        A.    That's correct.

3        Q.    Shy never sued you or anything like that correct

4    for any kind of child support?

5        A.    No.

6        Q.    That is because she did not want any child support

7    from you isn't that right?

8        A.    I am sorry.

9        Q.    That is because she did not want any child support

10   from you right?

11                    THE COURT:  Sustained.

12       Q.    Leslie Martinez moved on with her life after you

13   left and moved to -- went to work at Phoenix Refrigeration on

14   September of 2004?

15       A.    No, we were still sometimes together.  I was

16   depositing money in a joint bank account, Washington Mutual.

17   I was paying through -- mortgage through her mom's which is

18   her uncle who owns the house a total of $860.00 a month. I

19   was paying, the car payment for the 2001 Kia.

20            Paying the insurance for the 2001 Kia.  All from

21   New York City and also saving money because the purpose of me

22   coming back to New York City in September of 2004 was to try

23   to repurchase the house from her uncle.

24       Q.    To this date Leslie Martinez has never tried to get

25   any child support from you.

```
 1                         MR. JOHNSTON:  Objection.

 2                         THE COURT:  Sustained.

 3         Q.    To date Leslie Martinez has never garnished your

 4    wages for child support right?

 5                         MR. JOHNSTON:  Objection.

 6                         THE COURT:  Overruled.

 7                         THE WITNESS:  No.

 8         Q.    Isn't it true that after December 2004 Leslie

 9    Martinez did not want to have anything to do with you any

10    more?

11         A.    After December 10 of 2004 that's correct.

12         Q.    In fact you wanted to get back with her right?

13                         THE COURT:  When.

14         Q.    December -- after December 10 of 2004?

15         A.    No not after December 10 of 2004.

16         Q.    No you never wanted to get back with her?

17         A.    No I found her in bed with somebody else.

18         Q.    You never called Ann Martinez and asked her for

19    advice on your relationship with Leslie?

20                         THE COURT:  After.

21         Q.    After December 10 of 2004?

22         A.    Nope Ma'am.

23         Q.    Never called her up crying about your relationship

24    with Leslie Martinez?

25         A.    No I called her up and 2 times actually the first
```

1    time was just to say hello and see how the kids were doing.

2                    THE COURT:    I am sorry you called who

3           up.

4                    THE WITNESS:    Ann Martinez, Leslie

5           Martinez's mom.    And the second time I called it

6           was actually she called me out on the phone.    And

7           that was it. I never picked up the phone to call

8           her again.

9       Q.   When you went to Leslie Martinez's house at 5 AM on

10   in December of 2004 your intention was to go there to

11   rekindle the relationship right?

12      A.   That's correct.

13      Q.   But things ended badly right?

14                   THE COURT:    Badly meaning.

15      Q.   Well, you saw her in bed with Nigel correct?

16      A.   Yes.

17      Q.   That is her boyfriend even to today?

18      A.   That's correct.

19      Q.   You did not like that did you?

20      A.   We knew him it's a cousin by marriage.

21      Q.   I am sorry?

22      A.   It's her cousin by marriage.

23      Q.   It's her cousin by marriage.    Mike -- Maria

24   Echeveria is your cousin by marriage?

25                   MR. JOHNSTON:    Objection.

| 1 | THE COURT: Sustained. |

2    Q.    So things between you and Leslie were a little

3    tense at that point correct?

4    A.    December 10 correct.

5    Q.    She didn't know that you were coming in that night

6    right?

7    A.    No she did not.

8    Q.    She had not invited you right?

9    A.    No.

10    Q.    You didn't call first correct?

11    A.    That's correct.

12    Q.    And you did not knock or ring the doorbell did you?

13    A.    I still have keys to the house. I still have my

14    stuff there, my tools, my clothes.

15    Q.    You walked in at 5 AM into a house full of sleeping

16    people right?

17    A.    That's correct.

18    Q.    You saw your wife, you saw Leslie Martinez with

19    another man in bed and you're saying that you did nothing to

20    start an arguments?

21    A.    Nothing. She opened -- I turned the lights on.

22    She opened her eyes. She got up. She sat up. What, the

23    obscene language, you doing here. I said I still live here.

24    What is he doing here. And he woke him up. When the cops

25    was notified at 6 AM they arrived he was still in the bed

1  with her.  They didn't get up off the bed.

2      Q.   When you said that they were in the bed they were

3  not having sex?

4      A.   No they were not no.

5      Q.   You are saying that you were innocently there?

6                  THE COURT:  Innocently where.

7      Q.   At the house. At 5 AM in the morning?

8                  MR. JOHNSTON:  Objection.

9                  THE COURT:  Sustained.  Rephrase.

10     Q.   Well, your relationship was over at that point?

11     A.   No it was not Ma'am.

12     Q.   Didn't she tell you when you went back up to New

13 York in September of 2004 that she did not want to have

14 anything to do with you any more?

15     A.   No she did not.  Like I said when my company called

16 me in the early beginning of September I said let me discuss

17 this with my wife and my kids.  They decided that this was

18 their decision to be made if I should go or stay.

19          They said go ahead. It's just temporary for a few

20 months and you make a good salary.  You make a good salary.

21 With that I took a leave of absence from AA Vance where I was

22 employed and I went to New York City.

23     Q.   So you are saying that it was their decision as to

24 whether you went to New York City or not?

25     A.   That's correct.

vld

1        Q.   It was not your decision?

2        A.   It was a shock for me to hear that too.

3        Q.   You had no role in deciding whether to go back to

4    New York or not?

5        A.   That's because since living in Florida I had a job

6    that took me out of the state to Tennessee. I was tired of

7    going out of state actually. But the money was good.  Florida

8    is a pretty hard city to live in with 4 kids and a wife.

9        Q.   My question was it was not your decision to come up

10   to New York. You left that decision up to Leslie Martinez and

11   the 4 children?

12       A.   Right.

13       Q.   You played no role with that?

14       A.   Right.

15       Q.   When you walked into the house and you were there

16   from 5 AM in the morning of December according to your

17   testimony it was everyone else's fault that trouble broke out

18   that day?

19                    MR. JOHNSTON:   I am going to object.

20                    THE COURT:   Sustained.

21       Q.   Did Leslie Martinez cause any trouble that day

22   according to your testimony?

23       A.   No she did not.

24       Q.   Well let me get this straight.  You come in at 5 AM

25   in the morning unannounced to Leslie Martinez's house?

1        A.    To our house.

2        Q.    You find her in bed with another man right?

3        A.    Correct.

4        Q.    That made you angry didn't it?

5        A.    More hurt to be honest with you. It was more pain

6   because I expected it when I was in New York city.

7        Q.    Well, aren't you a jealous man?

8        A.    Like everybody else to a point.

9        Q.    And you didn't like the fact that Leslie would be

10  seen talking to other male friends?

11                      THE COURT:    Sustained.

12                      MR. JOHNSTON:  Objection.

13                      THE COURT: Sustained.

14       Q.    So you are saying that you were just hurt when you

15  caught her in bed with another man is that your testimony?

16       A.    Yes.

17       Q.    And you are saying that you did not get angry at

18  all.

19                      MR. JOHNSTON:  Objection.

20                      THE COURT:    Overruled.

21                      THE WITNESS:   There was anger, yes.

22       Q.    And is it your testimony that you did not use a gun

23  that morning?

24       A.    I can put my hands on the Bible for that.

25       Q.    Well, isn't it true that you pointed a gun right at

1   Nigel's face when you saw him?

2                   THE COURT:   Asked and answered.

3        Q.   Ashley Martinez is not your biological daughter

4   right?

5        A.   Correct.

6        Q.   Neither is Jaeshawn Benn he is not your biological

7   son?

8        A.   Correct.

9        Q.   Jaeshawn's father Michael Benn has been involved in

10  Jaeshawn's life correct?

11       A.   Correct.

12       Q.   Ashley has no contact with her biological father

13  right?

14       A.   That's correct.

15       Q.   Isn't it true that it upsets you that Michael Benn,

16  Jaeshawn's father was still involved in Leslie and Jaeshawn's

17  life?

18                  MR. JOHNSTON:   Objection relevance.

19                  THE COURT: Sustained.

20       Q.   Well you knew that he was involved in Leslie and

21  Jaeshawn's life?

22                  MR. JOHNSTON:   Objection.

23                  THE COURT:   Asked and answered.

24       Q.   As Ashley's father figure sir you were stronger

25  correct than she was?

```
 1              MR. JOHNSTON:  Objection.

 2              THE COURT: Stronger meaning what.

 3      Q.    You were physically stronger than Ashley Martinez

 4   right?

 5      A.    Yes.

 6      Q.    You were older than her correct?

 7      A.    Correct.

 8      Q.    You are wiser than her correct?

 9      A.    Correct.

10      Q.    You are more experienced than she ever was right?

11              MR. JOHNSTON:  Objection experienced in

12            what.

13      Q.    Life experience?

14      A.    In life correct.

15      Q.    And you for 8 years of Ashley's life you were the

16   man of the house right?

17      A.    Correct.

18      Q.    What ever you asked her to do she did correct?

19      A.    Basically.

20      Q.    You did not have the same things with Leslie right

21   what ever you told her to do you could not control her

22   correct?

23      A.    With Leslie.

24      Q.    Yes?

25      A.    To some point.
```

1       Q.   Well you knew that Leslie had been obviously
2   involved with other relationships because she had 2 other
3   children with two different men right?
4       A.   Yes.
5       Q.   And Ashley was a constant reminder of that to you
6   right wasn't it?
7                    MR. JOHNSTON:   Objection.
8                    THE COURT:   Sustained. Approach please.
9                    (Off the Record Discussion).
10       Q.   Sir you were the first man sexually for Ashley
11   Martinez weren't you?
12                    MR. JOHNSTON:   Objection.
13                    THE COURT:   I am sorry.
14       Q.   You were the first man sexually for Ashley Martinez
15   weren't you?
16                    MR. JOHNSTON:   What does that mean.
17                    THE COURT: Sustained.
18       Q.   You subjected Ashley Martinez to sexual contact.
19   You were the first person to do that in her life weren't you?
20       A.   No Ma'am.
21       Q.   Well, after your daughter Ariel was born right
22   around the time that she was born when Leslie was pregnant
23   you started touching Ashley didn't you?
24       A.   I never disrespected any of my kids.
25       Q.   You were not getting it from Leslie so you had to

 1    be getting from somewhere.

 2                    MR. JOHNSTON:   Objection your Honor.

 3                    THE COURT:   Sustained.

 4        Q.   Didn't you tell her not to tell what was going on?

 5        A.   I never had any discussion with Ashley about sex,

 6    period.

 7        Q.   You never had any discussion with Ashley about sex?

 8        A.   Nothing.  I figured that is the mom's job to do

 9    that stuff right.

10        Q.   So it's your testimony that you never had any

11    discussion with Ashley about sex, but yet you knew that she

12    had her period on November 30 of 2004 is that your testimony?

13        A.   Because she asked me to get her sanitary pads.

14        Q.   Isn't it true that you told little Ashley Martinez

15    that her mother would not believe her if she told her mother

16    what you were doing to her?

17        A.   No Ma'am.

18        Q.   Isn't it true sir that you sought the thrill of

19    knowing that other people were asleep in the house when you

20    were molesting your step daughter isn't that true?

21        A.   No Ma'am.

22        Q.   That is not true?

23        A.   No Ma'am.  I have not done anything to Ashley.

24        Q.   You talked about the first time that you had sex

25    with Leslie Martinez right?

                                                            vld

1      A.   Yes.

2                     MR. JOHNSTON:  Objection.

3      Q.   You talked about the first time having sex with her

4  in a car correct?

5      A.   That's where we had it.

6      Q.   Where did you have it?

7                     THE COURT:  Sustained.

8      Q.   It was thrilling to you to have sex in the car?

9                     MR. JOHNSTON:  Objection.

10                    THE COURT:  Sustained.

11                    Could approach please.

12                    (Off the Record Discussion).

13     Q.   Sir you sat here for the past week you had all the

14  opportunity to listen to every single witness testify in this

15  case right sir?

16     A.   That's correct.

17     Q.   And you will agree with me that you have the most

18  at stake in this case right?

19     A.   Correct.

20     Q.   And in fact you're the most interested witness in

21  case correct?

22     A.   I guess so.

23     Q.   Is that a question?

24     A.   Yes.

25                    MS. MALIK:  I have no further questions

1       your Honor.

2                   THE COURT:    Anything further.

3                   MR. JOHNSTON:   Nothing further judge.

4                   THE COURT:    Thank you sir.  Ms. Johnston

5       any further witnesses?

6                   MR. JOHNSTON:   No further witnesses your

7       Honor.

8                   THE COURT:    The defense rests.

9                   MR. JOHNSTON:   Yes the defense rests

10      judge.

11                  THE COURT: All right.  I know that we

12      have gone a little past 5 today.  I had reason to

13      think that there would not be any further witnesses

14      offered by either side in this case.  And I wanted

15      you to hear from all the witnesses in one day

16      rather than hearing a piece of it tomorrow.

17                  So thank you for being patient with us

18      and waiting after 5.  Now I have some further legal

19      matters to handle with counsel. Nothing more to do

20      with you.  Follow the instructions of the officer.

21                  Come in at 10 AM tomorrow morning. We

22      expect to have -- I expect that we will have

23      summations of counsel and you will hear my charge

24      on the law.  So again thank you for your patience.

25      See you tomorrow morning at 10 AM.

1           (Whereupon, jury exits the courtroom)

2           THE COURT: Mr. Johnston motions at the

3    end of both the People's case and the entire case.

4           MR. JOHNSTON: Yes, judge at the end of

5    the entire case the defendant would move for a

6    trial order of dismissal.  I don't believe that a

7    reasonable jury based on the evidence that we heard

8    could render a verdict of guilty.

9           THE COURT: I feel that based on the

10   evidence that I have heard that it's really an

11   issue of fact as to whether or not the defendant is

12   guilty or not guilty of the charges.  And that is a

13   question to be with -- that finding will be

14   resolved by the jury.

15           So your motion at the end of both the

16   People's case and entire case are respectfully

17   denied.

18           A charge conference.  I would like to do

19   that now so that you know what the charges will be

20   when you come in tomorrow.  Is there anything

21   special that you would want me to charge.

22           MR. JOHNSTON:  Judge, I assume that you

23   are going to charge all 4 counts in the indictment.

24           THE COURT:  Yes.  Anything special.  I

25   will give all the standard charges, falsus in uno

                                                  vld

1    and the charge on burden of proof.  I will -- I

2    think that -- certainly the defendant testified.

3    It will be an interested witness charge.  I will

4    give a single witness ID charge.  I will also

5    advise the jury that the evidence that they have

6    heard relative to what had happened in Florida is I

7    will give them an instruction that that came in not

8    on the issue of the defendants guilt as far as

9    these counts are concerned.  They are not to

10   consider those, what they have heard as far as the

11   assault that may have been committed in Florida.

12          They are not to decide that.  They are

13   only to decide the issues that surround the counts

14   of this indictment.  I will phrase it much more

15   fully during the course of the evening.  Certainly

16   that is an instruction.  Is there anything else

17   that you can think of.

18          MR. JOHNSTON:  At this posture judge I do

19   not have anything extraordinary.

20          THE COURT:  People.

21          MS. MALIK:  I have to give you a charge

22   relative to a stipulation, I am sorry.  A charge on

23   expert witness.

24          MR. JOHNSTON:  Okay.

25          THE COURT:  So I will give expert

vld

1    witness.  Single witness.  Interested witness

2    anything else People.

3             MS. MALIK:  The charge about I believe

4    the defense attorney asked one of the People's

5    witnesses I think that it was Ashley Martinez about

6    speaking to the ADA and having conversations about

7    the case with me. I would ask for the charge on

8    that whole issue.

9             THE COURT: Okay.  So that it is not

10   unlawful for a witness to discuss their testimony

11   with that attorney prior to their testifying in

12   court.  I will give that.

13            MS. MALIK:  Thank you your Honor.

14            THE COURT:   If there is anything else

15   that you can think of between now and the morning

16   tomorrow make sure that you get in early enough so

17   that you can advise your adversary and me of that

18   request.

19            MR. JOHNSTON:  Thank you.

20            THE COURT:   That said. Nothing more to

21   be done today.

22            MS. MALIK:  No your Honor.

23            THE COURT:   All right.  See you in the

24   morning folks.

25            (Whereupon, the case is adjourned to

1              tomorrow March 28 at 10 AM.)

2

3    ***************************************************************

4         *******************************************

5              **********************

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF QUEENS:  CRIMINAL TERM:  Part K-20

 3

 4   ----------------------------------------x   Indictment No.
     THE PEOPLE OF THE STATE OF NEW YORK    :    2147/2006
 5

 6            -against-                      :

 7                                           :

 8   ABU KHAN                                :

 9                     Defendant             :

10   ----------------------------------------x

11                          March 28, 2007

12                          125-01 Queens Boulevard
                            Kew Gardens, New York 11415
13

14   B E F O R E:  THE HONORABLE  RONALD HOLLIE,
                                          Justice
15

16   A P P E A R A N C E S:

17               Honorable Richard A. Brown
                 For the People:
18               District Attorney - Queens County
                 125-01 Queens Boulevard
19               Kew Gardens, New York 11415
                 BY:  MINA MALIK, ESQ.
20                    Assistant District Attorney

21

22               For the Defendant:
                 ROBERT JOHNSTON, ESQ.
                 Defense Counsel
23

24

25                              Viola L. Dunnom, SCR
```

1              COURT CLERK:  Calendar 1.  Abu Khan.

2        Indictment 124 of 06.

3              THE COURT: All counsel are present as is

4        the defendant outside the presence the jury. Are we

5        ready to go.

6              MR. JOHNSTON:  Yes your Honor.

7              MS. MALIK:  Yes your Honor.  Your Honor

8        can we approach on one matter.

9              THE COURT:  Sure.

10             (Whereupon, an off the record discussion

11        was held at the bench.)

12             COURT OFFICER:  Jury entering.

13             COURT CLERK:  Both sides stipulate that

14        the jurors are present and properly seated.

15             MR. JOHNSTON:  Yes.

16             MS. MALIK:  Yes.

17             THE COURT:  We are ready to proceed with

18        the closing statements of counsel beginning first

19        with counsel for the defendant Mr. Johnston.

20             MR. JOHNSTON:  Thank you your Honor.

21   SUMMATIONS

22   BY MR. JOHNSTON:

23             MR. JOHNSTON:  Good morning folks.  At

24        this time the law gives me the opportunity to make

25        what is commonly called a summation or a closing

vld

1       argument to the jury.  Now, what I am going to tell

2       you right now is not evidence and when the ADA

3       makes her, summation, what she says to you is not

4       evidence.

5                During the course of the trial I

6       attempted to make some notes about various

7       testimony and during the course of my summations I

8       will be referring to some of the testimony,

9       obviously not all of it.  I tried to be as accurate

10      as possible in my recollection of the testimony.

11      But if I say something during the course of my

12      summation that does not agree with your

13      recollection of the testimony it's your

14      recollection of the testimony that controls and not

15      mine because you folks are the triers of the facts.

16               Now the first thing that I would like to

17      do is to remind you about some of the things that

18      we discussed when you were selected as jurors.  One

19      of the things that we discussed is that the

20      defendant is presumed to be innocent.  And that

21      it's the People's burden to prove the defendants

22      guilt beyond a reasonable doubt.  And you told us

23      that you would not allow sympathy or prejudice to

24      enter into your deliberations.

25               And we also discussed with a lot of

1      jurors the fact that allegations of rape and sexual

2      abuse carry a certain amount of emotional baggage

3      along with it.  The mere fact that they are alleged

4      there is a certain amount of emotional effect to

5      that. Even though that is an obvious fact you folks

6      would judge this case on the evidence and the law

7      and not make or not allow the mere allegations to

8      sway you in this particular case.

9              You also were told by the judge that the

10     fact that somebody is arrested or indicted is not

11     evidence in a case.

12             Now, the Peoples case consisted of 6

13     witnesses.  I am only going to refer to the

14     testimony of 4 of those 6 witnesses.  Because I

15     feel 2 of the witnesses really had nothing

16     important to say regarding your deliberations of

17     the issues in this particular case.  And the

18     defendant only called himself as a witness.

19             Well, the judge is going to tell you in

20     his final instructions that it's the quality of the

21     evidence that controls and not the number of

22     witnesses that are called.  This is not a baseball

23     game where if you have more runs or witnesses you

24     win and the other sides loses. It's the quality of

25     the evidence that is important not the quantity or

1     number of witnesses.

2              Now when you boil this case down it

3     really boils down to what he said, she said

4     situation.  Because there is absolutely no evidence

5     to corroborate Ashley Martinez's testimony.

6              Now lets discuss her testimony for a

7     minute.  She told you that she first met Abu in

8     1996 or 1997 while she was living with her mother

9     in and fellow by the name of Michael Benn.  And her

10    mother Leslie Martinez was legally married to

11    Michael Benn.  And there came a time that for one

12    reason or another Michael Benn was out of the

13    picture and the defendant moved in with her mother

14    Leslie Martinez.  And they lived in various

15    locations in Queens for about 3 years from 1997 to

16    2000.  And there came a time in early 2001 that the

17    family unit moved down to Florida.

18             They stayed in Florida.  She stayed --

19    actually Ashley stayed in Florida until around

20    December first of 2004 when she became difficult to

21    handle. She was not doing well in school.  And her

22    mother decided to send her up to stay with grandma

23    up in Queens.  And she stayed in Queens until the

24    summer of 2005 while the defendant was down in

25    Florida and that she then returned back to Florida

1    and resumed living down in Florida.

2              When she returned to Florida by that time

3    Abu Khan was no longer living with her mother.

4    There was a new man in her mothers life by the name

5    of Nigel.

6              Now, the first thing that you are going

7    to have to do is decide whether or not her

8    testimony in this case was credible. Was it

9    believable.  Well, did it make sense.  One of the

10   things that you have to be concerned with is this

11   delay in her saying anything to anybody.

12             Now she did not say anything to anybody

13   for almost 10 years.  She didn't say anything to

14   any of the teachers at school.  She didn't say

15   anything to her mother.  She didn't say anything to

16   her grandmother when she was living up in South

17   Ozone Park, Queens for that 9 month period when he

18   was down in Florida.  Nothing was said to anyone.

19   Nothing was said to a best friend.  Nothing like

20   that at all.

21             So you say well she claimed on the stand

22   under oath that the reason why she didn't say

23   anything to anyone was because she was afraid of

24   Abu.  She was afraid that he might do something to

25   her. He might do something to her mother.  He might

vld

1    do something to himself even.

2              Well, does that add up.  I suggest to you

3    it don't because Richie as they call him made

4    frequent trips out of state while they were living

5    in Florida. He was away from the household. Not

6    living with the family.  Why would she be afraid of

7    him under those circumstances.  Then she is living

8    with grandmother.  Richie's down in Florida.  Why

9    would she be afraid of Richie at that time.

10             When she returned to Florida Richie was

11   out the picture. Why would she be afraid of Richie

12   at that time.

13             In addition she told you something very

14   interesting.  She told you that on or about

15   November 30 of 2004 she found out that her mother

16   wanted her to return to Queens.  She knew Richie --

17             MR. VIRUET:   May it please the court I

18   would like to straighten the name out.  It's Jimmy

19   not Richie for the record.

20             MR. JOHNSTON: Oh, Jimmy.  Jimmy.  When I

21   said Richie I meant Jimmy.  I think that you knew.

22             So anyhow when she found out her mother

23   wanted her to live in Queens she knew that he was

24   going to meet her at the airport.  She knew that he

25   was going to go drive her to grandma's house.  She

1    knew that he was living there at least for one day.

2    But what is most telling of all is the part about

3    going to drop off the refrigeration truck.  If she

4    was actually afraid of him and that's why she did

5    not report anything to anyone you would think that

6    the last person that she would want to be around

7    was him.

8              Yet the testimony was that evening he had

9    to return the refrigeration truck out to Mineola

10   and low and behold who came along with them but

11   Ashley. You would think that she would want to stay

12   home with grandma and be safe if she really thought

13   that Jimmy was a threat and she was really afraid

14   of him.

15             But no she did not stay home with

16   grandma.  She went out to Mineola with them. Helped

17   drop off the truck and they all returned together

18   back to Queens.  What she said to you about being

19   afraid of him really does not add up when you

20   analyze the testimony.

21             Now would Ashley say this if it weren't

22   true.  Well, there must have been some animosity

23   between Leslie Martinez and Abu after he left the

24   house.  Because you recall it was testimony that

25   every one met at a fair down in Florida in March of

1    2006 and when Leslie found out that Abu was there

2    without, according to everybody's testimony without

3    any fan fair she just snatched up the kids and took

4    them all away.  And this is in March before Ashley

5    supposedly tells her mother on Easter Sunday that

6    she has been the victim of sexual abuse.

7              So why would mom do that. Why wouldn't

8    she want the natural father to be able to see his

9    own children and the 2 children that she had with

10   another person.  Doesn't make sense to me.

11             Ashley also told you that she had

12   frequent intercourse down in Florida with the

13   defendant over a period of years.  My recollection

14   is that she said something like 3 times a week.

15   Now how does that jibe with Dr. Rosenfeld's

16   testimony that there was no evidence of any sort of

17   sexual penetration, sexual abuse old injury,

18   scarring, tearing whatsoever in her vagina.

19             Now the judge is going to tell you about

20   how you should consider expert testimony.  The

21   bottom line is that just because someone is an

22   expert does not mean that the jury has to accept

23   their opinion. That's what an expert does.  An

24   expert is allowed to give their opinion on a

25   matter.  Ordinarily a witness would testify about

vld

1        what they saw.  What they heard.  What they

2        touched.  An expert can give their opinion. Just

3        because an expert gives you a certain opinion that

4        does not jibe with your common sense and your

5        opinion you do not have to accept that opinion.

6                  You have a right to reject that opinion.

7        I urge you to do that in this particular case.

8                  Now what about Leslie Martinez.  Well,

9        it's observe from her testimony she had a number of

10       men in her life.  Ashley's father I forgot his

11       name.  He wasn't in the picture too long.  When she

12       took up with a fellow by the name of Nigel she told

13       you that Abu made several trips north on business

14       and he would be away for a period of months.  Ample

15       opportunity for Ashley to have told her mother

16       something if something had in fact really happened.

17       That was never done.  She claimed that he did not

18       support her or the children.  And that is in

19       contradiction to what the defendant told you that

20       he tried and he did send monthly money orders down

21       there to Florida.

22                  There came a time that she moved he did

23       not have her new address. He did not have her new

24       phone number. He was unable to send her any more

25       postal money orders.  She admitted that in March of

                                                        vld

1    2006 she did meet him and she refused to allow him

2    to see the children.  She didn't give a reason why.

3              Now, we come to Dr. Rosenfeld.  Well, the

4    first thing that the first thing Dr. Rosenfeld or

5    one of the first things that she told you was that

6    she was working for the last 12 years for an

7    organization called the Queens Child Advocacy

8    Center. It's not the independent investigation of

9    allegation of sexual abuse center.

10             MS. MALIK:  Objection your Honor.

11             THE COURT:  Overruled.

12             MR. JOHNSTON:  It's the Queens Child

13   Advocacy Center.  So you can tell just by the name

14   that there is a bias there.

15             MS. MALIK:  Objection your Honor.

16             THE COURT: Sustained.

17             MR. JOHNSTON:  Well, lets talk about what

18   she said.  She said on June 21 Ashley's grandmother

19   not her mother, her grandmother took her to the

20   office to the doctors office and she was only able

21   to do a partial examination because of the fact

22   that she ran out of supplies, whatever.

23             So she did some blood work.  She wanted

24   to find out if there was any evidence of any sexual

25   communicable disease which would indicate that

1    perhaps the child had sexual intercourse.

2              Well, the result of that examination was

3    that there was no evidence whatsoever of any sort

4    of communicable disease, sexual disease. Gonorrhea

5    or chlamydia or one of the other sexually

6    transmitted diseases. She did take a history which

7    she seemed to rely on very heavily which is

8    basically a recitation of what Ashley Martinez told

9    her.

10             One other thing was that when Ashley took

11   the witness stand she denied having a boyfriend.

12   Never had a boyfriend. She told Dr. Rosenfeld that

13   she had a boyfriend. She did not remember if it was

14   one boyfriend or several boyfriends.  But the

15   relationship was that just a kissing stage.

16             It's not important that she has

17   boyfriends.  What is important is that she did not

18   tell the truth about it the first time. She denied

19   it when I asked her but admitted it when the DA

20   refreshed her recollection with Dr. Rosenfeld's

21   report.  So you have to be concerned about whether

22   or not Ashley Martinez was honest with you and

23   truthful with you.

24             If she was going to tell a falsehood

25   about whether or not she had a boyfriend how much

1 | can you rely on what she told you about other

2 | things.

3 | Now the second physical exam was on July

4 | 5. And this was the exam that Dr. Rosenfeld did

5 | with what they called it a colposcopic exam. That's

6 | where she is using the colposcope and it has a big

7 | light on it. It has magnifying glass and the

8 | observe purpose of that device is to make a

9 | thorough complete examination to see if there is

10 | absolutely any trace at all of any sort of injury

11 | to the vagina or any part around there. And what

12 | was the result. The result was everything was

13 | normal. The hymen was in tact. There was no

14 | evidence of any disease. There was no scarring

15 | which might indicate an old injury that had healed.

16 | There was no ecchymosis any of sort of dried blood.

17 | There was no tear in the hymen.

18 | You know after that physical exam you

19 | would think that well that's it. Case closed. But

20 | not so. Not so at all. There is a reason why.

21 | Well, the hymen is elastic. That's what she told

22 | you. It stretches. It stretches. It stretches. So

23 | therefore and this is important to focus on. What

24 | she said was that the lack of any physical evidence

25 | of abuse was not inconsistent with an allegation of

1    sexual abuse.

2         However, it is also consistent with a

3    lack of sexual abuse. If you do not see any injury

4    that's consistent with the fact that it never

5    happened. Now, you would think that this is sort of

6    a catch 22 situation.  Girl walks into the Child

7    Advocacy Center.  Claims to be sexually abused. The

8    doctor examines the child. Absolutely no evidence

9    of sexual abuse.  You would think that would be the

10   end of it.

11        Oh, no. We have a reason why. The hymen

12   is elastic. Therefore we believe the girl not the

13   accused but --

14        MS. MALIK:  Objection your Honor.

15        THE COURT: Sustained.

16        MR. JOHNSTON:  Now, I suggest to you that

17   you view Dr.  Rosenfeld's testimony with a good

18   deal of skepticism. She testified I think she said

19   about 500 times maybe even more.  Not once has she

20   ever testified for a defendant.  So that is a

21   potential bias to her testimony.

22        MS. MALIK:  Objection your Honor.

23        THE COURT: Overruled.

24        MR. JOHNSTON:  Now the next doctor that

25   or expert that testified was Dr. Lewittes.  And he

1     testified in general terms as to the child abuse

2     syndrome and he gave you the 5 stages of child

3     abuse and he also told you that each case is

4     somewhat different.  That his testimony was not

5     specific to the Ashley Martinez's situation, but a

6     general syndrome of child abuse.

7              He also said during the course of his

8     studies and his education and his training and

9     experience that he comes across instances where

10    children have made up false allegations of sexual

11    abuse.  And I asked him about well you know what

12    was some of the reasons that might have been a

13    child falsely accuses someone in the family or

14    someone else of sexual abuse.  He told you that

15    there was a number of things.  Could be jealousy.

16    It could be revenge.  It could be some sort of

17    mental disease.  There are a myriad of reasons why

18    someone would make up these allegations when they

19    are not true.

20             Now what about the defendants case.  Well

21    the defendant testified you seen him I am not going

22    to go into great detail. He was born in Trinidad.

23    Came to the US.  Had some menial jobs. Went into

24    the marine corps.  Was honorably discharged from

25    the marine corps.  Even got a medal when he was

vld

1    discharged.  He his worked in refrigeration. Seems

2    like a hard working guy. Trying the best for his

3    family. Is willing to leave them to go north to get

4    a better paying job in the area of refrigeration.

5            Never had a problem with the kids.  Never

6    touched the kids.  Told you that he did not pull

7    out a gun on Ashley and Nigel when he went back to

8    Florida.  That's not what he said.  He told you

9    that the police -- he knew the police were coming

10   not only did Leslie called them. He called them.

11   He remained there. They searched him.  They

12   searched, his van, the whole area around the house.

13   They did not recover anything. Nothing was taken.

14   No one was arrested.  That was the end of that

15   particular case.

16           Now, as I indicated before a few minutes

17   ago the judge is going to tell, you give you

18   detailed instructions on expert testimony.  I ask

19   you to listen to them very carefully. And follow

20   his instructions on the law and in that respect.

21   And the bottom line is that just because an expert

22   is a so called expert you do not have to accept

23   their opinion on the situation.

24           Now this is my last opportunity to speak

25   to you folks.  Under the rules of our system once I

1      sit down I cannot get back up later on after the

2      ADA talks to you and make further argument.  So I

3      am done.  Once I finish so -- I ask you when she

4      makes her argument to you and refers to the

5      testimony what she I am sure she is going to do

6      that you will pay close attention to it of course.

7      Also say to yourself whether or not what she is

8      telling you jibes with the evidence and whether it

9      makes sense or whether it's reasonable and what

10     conclusions she is asking you to draw from this

11     statement or argument.

12              Now in conclusion ladies and gentlemen

13     remember that the defendant even as he sits here

14     right now and you have heard all the evidence is

15     presumed innocent.  And it's the People's burden

16     from the evidence to prove his guilt beyond a

17     reasonable doubt.  And I suggest to you that based

18     on the evidence that you have heard in this

19     particular case there is certainly reasonable doubt

20     in this particular case.  And I ask you to return a

21     verdict of not guilty.  Thank you.

22              THE COURT: Thank you Mr. Johnston. Ms.

23     Malik.

24  SUMMATION

25  BY MS. MALIK:

1          MS. MALIK:  Thank you your Honor.  Good

2     morning ladies and gentlemen of the jury. This case

3     reminds me of when I was in law school. And law

4     school professors told me if you do not have the

5     facts on your side then you do not have the law on

6     your side.

7          Blame the victim. Blame the victim

8     because that is what you would have to do. Being a

9     victim of child sexual abuse is a nightmare ladies

10    and gentlemen of the jury. Fortunately it's not a

11    nightmare for most of us. You hope that if

12    something like that were to happen to a child that

13    a child would reach out to somebody and tell.

14    Ashley Martinez was one of many children who did

15    not tell for a long time. And as you learned from

16    Dr. Lewittes there are children who never tell.

17    Who always keeps that burden inside within them for

18    years and years and years.

19          Now, I agree with defense counsel. The

20    question for you to decide in this case is if

21    Ashley Martinez is telling you the truth.  Is she

22    being be truthful with you.  And I submit to you

23    that the answer is yes for a myriad of reasons.

24    But before we go into that I want to talk to you

25    about everything that is not in dispute. Things

1        that are not in question.

2                Things that the defense or the defendant

3        and his testimony has agreed upon and that is first

4        of all the defendant was older. He was wise.  He

5        was more powerful.  In his testimony he said that

6        he was very close to Ashley.  He did a lot of

7        things for her.  They did things together.  He

8        brought her things. He took her places.  He loved

9        her and she loved him.  So, it's not in dispute

10       that there is no animosity between Ashley and the

11       defendant.

12               He loved her and she loved him.  And he

13       was her father figure for 8 years out of her young

14       life.  He was her father figure.  What else is not

15       in dispute.  Even though the defense counsel says

16       that oh, there was some sort of animosity between

17       Leslie and the defendant do you really think that

18       is true.  She moved on with her life. She moved on

19       with her life and she went with this new guy Nigel

20       and she moved on.  She did not want to have

21       anything to do with the defendant.

22               Initially in the opening statement Mr.

23       Johnston got up and said this is about money and

24       child support.  Did any of that come out in the

25       real evidence that you heard.  Was there any

1        evidence that Leslie Martinez went after him for

2        child support. File any kind of papers in court for

3        child support.  Tried to sue him for child support.

4        Garnished his wages, anything like that.

5                The defendant admitted yesterday none of

6        that happened. She wanted nothing to do with the

7        guy.  She just wanted him out of her life.  So

8        despite the fact that the defense attorney gets up

9        here and says oh there was animosity between Leslie

10       and the defendant.  Why would Leslie not want the

11       defendant to see his own children. That does not

12       make any sense if you look from a common sense view

13       of the evidence that is just a distraction for you.

14               What else do we know that is not in

15       dispute. The defendant had access and opportunity

16       to Ashley from the years of 1997 to 2000.  For

17       those years they were living together.  He was in

18       the household. He had access and opportunity to

19       Ashley on November 30 of 2004.  So none of that is

20       at all in dispute.  But the distractions that the

21       defense attorney tries to throw out there for you

22       ladies and gentlemen of the jury I am going to go

23       ask you to discount those.

24               One of them which was an occurring theme

25       in this case is Leslie Martinez's lifestyle.  Now

1   you might have had an up bringing where as you

2   marry one person.  You have children with that

3   person. You stay with that person.  And that's it.

4   Or you do not marry 2 or 3 people.  You are not

5   with 2 or 3 people. You do not have children by all

6   of these different men.  You may not agree with the

7   lifestyle of Leslie Martinez.  Do not hold that

8   against Ashley Martinez.

9            The sins that Leslie Martinez may have

10  committed in the past should not be the cross that

11  Ashley Martinez has to bare.  So, I invite you to

12  conclude that it's just a distraction meant to

13  anger you towards Leslie Martinez.

14           If you do not like her and if you do not

15  like Leslie Martinez and you do not like the

16  lifestyle that she was living do not hold it

17  against Ashley Martinez.  Do not let your feelings

18  get in the way of what her mother did. She should

19  not have to pay for what her mother did.

20           Another distraction ladies and gentlemen

21  that Mr. Johnston just threw out there is that

22  Ashley said on the stand that she did not have a

23  boyfriend. Well, she is 14 years old. She testified

24  in this courtroom full of strangers.  She does not

25  know any of you. She does not really know me.   She

vld

1    does not know the other people in the courtroom.

2    She is under fire by Mr. Johnston asking question

3    after question asking about having sex with her

4    step-father.

5              Then she is asked the question about a

6    boyfriend.  Well she is 14 years old. She is being

7    asked about sex and then she is being asked about a

8    boyfriend. Do you think that there is a possibility

9    maybe in her 14 year old mind I do not have a

10   boyfriend that I have sex with. She said in the

11   medical notes that she had a boyfriend and there

12   was no sex. It was only kissing.  But yet the

13   defense counsel wants to throw that out there as a

14   distraction because she said that she did not have

15   a boyfriend in the middle of cross examination by a

16   very seasoned and experienced defense attorney

17   that's why you should not believe what she has to

18   say.  Another distraction ladies and gentlemen of

19   the jury that you can just throw out the window.

20             Now, lets talk about how you know Ashley

21   Martinez is being truthful.  First of all there is

22   no reason for her to come into this courtroom to

23   make up such a degrading humiliating and

24   embarrassing story. What is her motive. There is no

25   particular evaluation in evaluating truthfulness

1    for the testimony of a witness.  When I talked to

2    you in voir dire I told you and I talked to you

3    about bringing your collective experiences and your

4    years of wealth and wisdom between the 14 of you to

5    decide this case.

6              I talked about that there was no jury

7    school.  You decide the truthfulness of the

8    statements made to you by other people in your

9    everyday life.  And I ask you to use those

10   statements, factors in this case. It's no

11   different.  And what are those factors.  Listen to

12   his Honor when he talks to you about the factors of

13   credibility that you should take into

14   consideration. First of all the ability to recall

15   details.

16             Ashley Martinez took that witness stand.

17   She told you about the first time that the

18   defendant touched her and she told you about the

19   details of not being able to sleep.  Remember that

20   because she had seen a scary movie called Candyman.

21   She went downstairs because she could not sleep and

22   she was scared. She went to find somebody. She

23   found the defendant who took her back upstairs to

24   her bed.

25             Put her in bed.  He laid down next to her

1       and started telling her a story about a little girl

2       putting a star on a Christmas tree and how while he

3       was telling her the story he took her hand and he

4       put her hand on his penis and started rubbing his

5       penis with her hands. Do you remember that. Do you

6       think that she is making that up.  That detail.  Or

7       do you think that she was being truthful with you.

8                    And then the time when he slept with her

9       ladies and gentlemen.  Had slept with her and raped

10      her in her grandmothers house. How she left and

11      went downstairs because he started hurting her and

12      trying to touch her.  How she went downstairs to

13      the other TV in the living room to get away from

14      him.  Where she is on the recliner and he comes and

15      he starts touching her breasts.  She is not wearing

16      a bra.

17                   He took off his clothes and he takes off

18      her clothes and he puts his penis into her vagina

19      and he rapes her.  And then he takes out his penis

20      and you remember what she said. She saw white stuff

21      come out of his penis and he puts it in a napkin

22      and then he went to wash himself off.  And he went

23      back to sleep.  She sat there put back on her

24      clothes and then she cried.

25                   Do you think that kind of detail is

                                                    vld

1    coming from a girl who is being dishonest with you.

2    I submit to you that it's not ladies and gentlemen.

3    She's got no motive to lie.  She loved this man

4    sitting behind me. That was her father figure. He

5    treated her well.  Both of them said that when they

6    testified.  There is no reason for her to make this

7    up.  What benefit does she have to gain to come in

8    this courtroom and take this witness stand in front

9    of a room full of strangers and tell what happened

10   to her.  What benefit.  She gets no benefit from

11   testifying here.  She does not get anything. She

12   does not get any money. She does not get a father

13   figure back.  She does not get anything.  And I ask

14   you to look at that carefully.  Because there was

15   no benefit that Ashley Martinez gets for coming in

16   here and testifying. There is no sort of solution

17   between Ashley Martinez and her mother.

18            And that's another occurrence, recurring

19   event that the defense is throwing out there. There

20   is no conclusion. There is no evidence of that

21   whatsoever. She cared for him.  There is no bias.

22   There is no ill will by Ashley Martinez towards

23   him.  Remember when I asked her how she felt about

24   the defendant.  One of my last questions to her she

25   said that she did not like him because of what he

1       had done to her.  Even after that.  Even after that

2       question she said that she did not want to see

3       anything bad happen to him. She wanted to see him

4       get the help that he needs. I think that is very

5       telling as to the credibility of her.  She has been

6       consistent throughout time.

7              You heard that she went and she spoke to

8       the detectives down in Florida. She came up here to

9       New York and she spoke to a detective from special

10      victims unit.  She had spoken to ADA Brian Lee. She

11      met with ADA Erica Rosengarden. She met with me.

12      She testified in a Grand Jury and she came into the

13      courtroom and consistently through time her version

14      of events has not changed.

15             If it had you would have found out about

16      it.  And it has not changed.  What is the most

17      telling about Ashley Martinez and how you know that

18      she is credible. What is the biggest factor that

19      you can take into consideration. Remember when she

20      took the stand and started talking about what

21      happened to her all of those years.  Do you

22      remember her demeanor.  Do you remember the way

23      that she testified. Do you think that she was happy

24      to be here.  Or do you think that it pained her.

25      Remember how she started crying uncontrollably.

1       Crying so hard that her entire body shook. You all

2       had a better view than I did from standing back

3       here.  Even from where I was I could see it.

4              Do you think that is the demeanor or

5       behavior of a girl who is making something up.  If

6       you do you know what give her an academy award and

7       send her on her way. I submit to you that she is 14

8       years old. She is not savvy enough to do that.

9       There is no reason for her to do that.  She got up

10      there on that stand and she had to relive that

11      horrible nightmare that her stepfather a man she

12      trusted put her through.  And that was the reaction

13      that she gets. That's how she reacts when she

14      remembers all of those horrible events.

15             That's how she reacts when she has to

16      come in and talk to strangers about what happened

17      to her.  That's how you know that she was telling

18      the truth ladies and gentlemen.  What is she

19      accomplishing by lying. Absolutely nothing.  And if

20      she is lying why pick this.  Why pick this kind of

21      a case.  You have to be some sick demented young

22      girl if you are lying about this. Because this is

23      the worse crime that you can accuse a father figure

24      of.  You really think that Ashley Martinez is that

25      sick and demented.

1              I submit to you that she is not.  She is

2         not. There is no reason for her to make any of this

3         up.   There is no reason for her come in here and

4         tell you and that she is lying.  She is not lying

5         ladies and gentlemen.  If you look at all of those

6         factors and listen to the judge when he talks to

7         you about those factors you will see if you look at

8         her with your collective experience.  If you look

9         at her with your common sense you will see that the

10        girl is not lying.  How else do you know that

11        Ashley is being truthful.  Look past what she had

12        to go through.  Lets talk about that for a moment.

13             You know that she told her mother about

14        this on Easter Sunday of last year.  Almost a year

15        ago.  What did she do.  She went to the Lauder Hill

16        police station. From there she had to go over to

17        the Broward County Sheriffs Office. After that

18        where did she to go from there. She had to go to

19        the Broward County Sexual Assault Treatment Center.

20             After that she had to come to New York

21        and talk to Detective Figueroa of the DA's sexual

22        bureau unit.  She had to talk to countless people

23        about the most embarrassing and humiliating

24        experience.  To detective, to an ADA, to doctors,

25        to a sexual assault treatment examiner in Florida.

1        She had to go to the Grand Jury. She had

2    to come in here to a courtroom full of strangers

3    and recount all of this.  And she had to be

4    examined not once ladies and gentlemen of the jury

5    not twice but 4 times.  4 times she was examined.

6    Once at the Broward County Sexual Assault Treatment

7    Center.  You remember her talking about that.  How

8    they took a metal tool and put it in her vagina.

9    And they were examining her private parts.  How

10   comfortable do you think that felt for her as a 14

11   year old girl. After that she came up here and not

12   only did she to have one examination by Dr. Jamie

13   she had to have 2 other examinations by Dr. Jamie.

14   And what did she tell you. That she came up here

15   and Dr. Jamie took one of these things because Dr.

16   Jamie was talking to you about the speculum. How

17   she had to put it into her vagina to do the

18   examination to open her up.  And how she had to

19   have swabs put in her vagina for the testing and

20   into her anus for the STD testing.

21        Do you think that this 14 year old girl

22   would be going through all of that because she is

23   lying. I submit to you ladies and gentlemen if you

24   think that then you are not using your common

25   sense.  And you are not looking at this with an

vld

1    objective eye.  Because what girl would go through

2    all of that for nothing.  For absolutely nothing.

3              How else do you know that had happened

4    the way that Ashley says that this happened.  Well,

5    her testimony coincided with all the time line of

6    events starting in 1997.  You have the benefit here

7    of having all the pieces of this puzzle and looking

8    at the entire picture.  Nobody else had that

9    benefit.

10             In 1997 through 1998 Ashley is a 5 or 6

11   years old. That is when the defendant began

12   touching her.  Touching her breasts. Her body. In

13   December of 1998 that is when baby Ariel comes into

14   the picture. The defendant's first kid with

15   Martinez.  She said that they began having problems

16   around that time when baby Ariel was born. The

17   defendant said there was less sexual activity

18   between them. That is understandable.

19             Now you have a 6 year old, a 4 year old

20   and a new born in the house. Mom is taking care of

21   the 3 kids. Dad is working 7 days a week. When is

22   there time for pleasure.  In 2000 baby Andrew was

23   born. More problems according to the defendant.

24             Now they have an 8 year old, a 6 year

25   old, a 2 year old and a new born.  And around that

1    time when Ashley is 8 or 9 years old they are

2    living in Florida that is when she says that he

3    start raping her. That's when she says that he

4    started having sex with her.  And sometime shortly

5    after that is when Leslie Martinez tells you that

6    Ashley starts acting out.

7            Ashley told you that as well. She does

8    badly in school. She is fighting with her mother.

9    She cannot keep friends. She becomes withdrawn. She

10   was gains an excessive amount of weight. At 11

11   years old she is 140 pounds.  And remember Dr.

12   Lewittes what he talked about yesterday. How that

13   is a manifestation of what is going on in an abused

14   child's life. That is part of the dynamics of the

15   child sexual abuse syndrome.  Remember that.

16           Now you can see the pieces of the puzzle

17   all fitting together. You see the picture coming

18   together. Why is she acting out. She was acting out

19   because this man is raping her.  She is a kid.  She

20   does not know how to deal with it.  She acts out so

21   much it brings us to November of 2004.

22           When she gets suspended for cursing out

23   the teacher she knows at that point that the

24   defendant is coming back from New York to live in

25   Florida.  She is down in Florida.  She told you or

1   Leslie Martinez told you that Ashley wanted to go

2   live in New York with grandma until at least

3   college.  Why do you think that is.  Why do you

4   think that this girl would want to be away from her

5   brother and her sister.  And away from her mother

6   and go live with grandma in New York through to

7   college.

8            I submit to you ladies and gentlemen of

9   the jury because she had enough at that point. She

10  knew that he was coming back down to Florida.  And

11  she wanted to get away from him.  She does not want

12  to be near the defendant at that point.  She does

13  not ask to get her plane ticket changed that may be

14  a question in your mind.  Remember Dr. Lewittes

15  yesterday.  He talked about children do not want to

16  raise red flags. They avoid that.  As part of the

17  child sexual abuse syndrome. They avoid raising red

18  flags. What do you think would have happened if

19  Ashley Martinez said to her mother you know what I

20  do not want to go right now.  I think that I want

21  to go next week.  You don't think that Leslie

22  Martinez would have said why. I am sending you up

23  now. You want to go live with your grandmother so

24  better go ahead.

25           Do you not think that would have raised a

1    red flag at least in Ashley's mind. You have to

2    look at this.  She does not have the loving

3    experiences that all of us have in this courtroom.

4    You have to look at it from her prospective the

5    eyes of after child.  The eyes of a child of a 5,

6    6, 7, 8 year old little girl at age 12. You cannot

7    expect her to sit there and say you know what I am

8    not going to New York right now.  I am going to

9    tell my mom I am going to tell the guidance

10   counselor at school. I am going to tell everybody

11   what is going on. But she does have the mind of a

12   child.  And that's how you have to look at all of

13   this.

14          Think back to being 5 or 6 years old. 8,

15   9, 10, 11.  Did you have all the wealth of

16   experience that you do now.  That's why she comes

17   to New York even though she knows that he is up

18   here.  She knows that he is picking her up from the

19   airport.  What did she tell you. She said you know

20   what I endured this so long.  It's going to be one

21   last time.  At least I know that he is leaving.  He

22   was leaving the very next day.  That's the mind of

23   a 12 year old. That's their way of rationalizing.

24          If she is making this up don't you think

25   that she would have taken care of all of those

1    problems. I submit to you that is how you know that

2    she is not making this up. That's how you know that

3    she is being truthful to you.  And truthful with

4    you.  And that's why when she came back up here on

5    November 30 of 2004.

6            Now, remember what Leslie Martinez said

7    now. She said she told the defendant of course the

8    defendant according to him the decision was left up

9    to his children and Leslie Martinez. She said that

10   she told the defendant if you go back up to New

11   York don't bother coming back.  Because she is

12   tired.  She was tired of the treatment she was

13   getting from him. She was tired that he was going

14   back and forth between New York and Florida for the

15   Phoenix Refrigeration Business. As if there was not

16   enough air conditioning jobs down in Florida she

17   was tired of that. That's what she told him.  The

18   defendant said that he didn't have no power over

19   Leslie.  She is done about the relationship. She

20   wanted him out.  He said that he had an inkling

21   that there was something going on with Nigel.

22           He knew that she was through with him.

23   So he decided that he was going to have his way

24   with Ashley one last time.  One last time.  He had

25   no power over Leslie so he used his power and

1    exerted it on Ashley.  And that is when he violated

2    her one last time in her own grandmothers house.

3                Now the defense attorney made this big

4    deal about why Ashley didn't tell.  Why Ashley

5    didn't tell. For over 10 years or about 10 years

6    she didn't tell.  Well, it's about 8 or 9 years

7    before she tells mom what is going on.  She told

8    you all the reasons why she didn't tell.  She

9    didn't tell first of all because of her age. She is

10   a child.  And again I am asking you to look at it

11   through this prospective.  Not the prospective that

12   we would look at it.  She told you that he was the

13   only father figure in her life. That she wanted

14   acceptance.  She wanted to be loved. She was not

15   close to her mom.  She told you that out the 4

16   children he was closest to her.  Remember that.

17   She told you that she is humiliated.  Degraded and

18   embarrassed.

19                She was scared because she saw the

20   domestic violence between the defendant and her

21   mother. The name calling. Fat ass.  Shut up.

22   Faggot.  Do you remember all of those.  She saw the

23   physical abuse.  She saw the defendant hit her

24   mother.  And push her.  And she saw the defendant

25   inflict violence upon himself.  When she -- what

1    she was talking about him breaking a bottle because

2    he was jealous that mom was talking to another guy

3    at a kid Halloween party.  And he starts stabbing

4    himself.  She witnessed that.

5         She told you that if he could do that to

6    her and he could do that to himself how much more

7    could he do to me a little girl.  She told you

8    about the threats that he had made to her.  That

9    the defendant said if you tell mom I am going to

10   get you. She is not going to believe you anyway. So

11   don't even bother telling her.  She did not want to

12   break up the family. She did not think that mom

13   would believe her.  One of the biggest reasons that

14   she didn't tell. Why wouldn't she think that mom

15   would believe her.  Because she said that mom was

16   so in love with the defendant that he would let her

17   abuse her.  Why would I tell my mother anything

18   like this.  I did not think that she would believe

19   me. I thought that she would take his side over

20   mine.  If she lets him do that to her then why

21   would she believe me.

22        That's through the eyes of a child.  And

23   remember Dr. Lewittes ladies and gentlemen when he

24   talked about the 5 stages of sexual abuse syndrome.

25   He is board certified clinical psychologist for 5

1    years.  Had a lot of child sex abuse victims. He

2    even worked for defense counsel Mr. Johnston.  He

3    talked about all the classic reasons why a child

4    would not disclose and all of the reasons that

5    Ashley Martinez gave you about not telling mom or

6    not telling anybody.  All the reasons that Dr.

7    Lewittes talked about yesterday.  Defense counsel

8    brought up the reasons why children falsely report.

9    And I know that you were paying attention but I

10   wanted to read them off to you.

11            He talked about peoples children falsely

12   reporting allegations of sexual abuse because of

13   confusion which we do not have here.  There is no

14   confusion about it. Because they are being

15   malicious. Which we do not here because Ashley had

16   nothing to gain and there is no motive for her to

17   lie.

18            For a custody disputes. But we do not

19   have that here.  There is no custody or child

20   support issue going on here.  Because of

21   suggestibility that a parent can influence a child.

22   And he said a child under 7.  Not a child of 14, 13

23   years of age. And finally a disturbed person. Does

24   Ashley Martinez strike you as a disturbed mental

25   patient.  No.  So all of those reasons that Mr.

1    Johnston threw out there they do not apply to this

2    case.  These are not all allegations of sexual

3    abuse.

4              I want to talk to you about the medical

5    evidence ladies and gentlemen.  You heard from Dr.

6    Hoffman-Rosenfeld. A doctor for 25 years. She is

7    the medical director of the Child Advocacy Center.

8    She was one of the chiefs at Long Island Jewish

9    Schneider Children's Hospital one of the most

10   respected hospitals in the country.  And she is an

11   expert in pediatric medicine and child sexual

12   abuse.  Defense counsel got up here and said reject

13   her opinion outright.  You do not have any other

14   opinion.  You have her opinion.  And there is no

15   reason for you to reject it outright.  There is no

16   bias on her part ladies and gentlemen.  She told

17   you that she determined where cases where there was

18   false allegations of child sexual abuse. You know

19   what those cases do not get written up.  Those

20   cases are not prosecuted.

21             What did she tell you about examining

22   Ashley Martinez 3 times.  She said that Ashley has

23   a hymen. She said that the hymen is elastic because

24   it's estrogenized.  She said that estrogen

25   production starts before menstruation. If you look

1    at the medical records you will see that Ashley

2    began menstruation at the age of 10.  She testified

3    that estrogen starts production a couple of years

4    before menstruation actually begins.  That would

5    make Ashley 8 years old when her hymen begins to

6    thicken and get estrogenized and it starts to

7    stretch more and become elastic.

8            If you do not remember that it's all in

9    black and white and you can ask for that on direct

10   examination. That's when the sex started that's

11   when the defendant started raping Ashley Martinez.

12   When she is about 8 or 9 years old. Right around

13   the time her hymen starts to get estrogenized.

14   Again you have all the pieces of this puzzle here.

15   You can look at them and fit them all together.

16   And look at the whole picture.  She also said that

17   the lack of injury depends on penetration. How far

18   the length of the penis goes into the vagina.  She

19   talked about lubrication. She said that it could be

20   past injury that could heal acute scars and that's

21   how you know that Ashley's hymen is so elastic. I

22   know that you were all with paying attention.

23           Actually the women, how do you know that

24   it's so elastic and so stretchable because Dr.

25   Jamie took this and she told you about how she

1       inserted this into Ashley's vagina to do the exam.

2       And you saw how she opened it up look how wide this

3       opens.  Look how wide this speculum opens ladies

4       and gentlemen. And she still has a hymen.  What

5       does that tell you.  Do you think that tells you

6       that Dr. Jamie a just making things up and

7       testifying for the prosecution.

8              Do you think that she would put her

9       reputation on the line like that.  She talked to

10      you about studies where there were 30 pregnant

11      teenagers and they had normal exams. Where they had

12      hymens. That is how you know that the defendant was

13      raping Ashley Martinez.  And how her hymen still

14      appeared normal ladies and gentlemen of the jury.

15             Because you have this speculum that was

16      inserted into her on at least 3 different

17      occasions.  And the hymen remained the same.  So

18      now that I have shown you how Ashley is credible

19      and her version coincides with the time line in

20      this case.

21             I will ask you to listen to the judges

22      instructions on the law regarding the crime in this

23      case. And you will see from the judges instruction

24      on the law regarding rape in the first degree that

25      the defendant did engage in sex with Ashley

1    Martinez when she was under the age of 13 and he

2    was over the age of 18. She was 12. He was 37 years

3    old. He admitted that he was 37 years old on

4    November 30 of 2004.

5        You also know that sexual intercourse

6    happened because it happens when the penis goes

7    into the vagina. The vaginal opening and it's

8    penetration however slight. I do not have to prove

9    to you that the whole thing went in. I do not have

10   to prove to you that it went in one hundredth of

11   and inch or half way. All I have to prove to you is

12   that his penis entered her vagina. And that's what

13   she said happened ladies and gentlemen. She said

14   that he put his penis into her vagina when she was

15   there in her grandmothers house reclining on the

16   couch.

17       With respect to November 30 of 2004 also

18   ladies and gentlemen the defendant is going to be

19   guilty of sexual abuse in the second degree because

20   he had sexual contact with Ashley Martinez when she

21   was 12 years old under the age of 14. When he

22   started touching her breasts with his hand right

23   before he raped her. So that should not be a

24   question for you either ladies and gentlemen when

25   you get to that charge.

vld

1         And endangering the welfare of a child

2    obviously all of these acts are going to

3    endangering the physical and moral or mental being

4    of a child.

5         Finally the course of conduct in the

6    second degree. For the acts that the defendant

7    committed against her from 1997 to 2000. Over a

8    time period of not less than 3 months committed 2

9    or more acts of sexual conduct.  When she was 5 to

10   8 years old.  And the sexual conduct being touching

11   her breasts with his hand and putting her hand on

12   his penis.  Remember what she told you when she

13   talked about those acts.  She talked to you and

14   said that happened about 5 times.  Between 1997 and

15   2000.  So when you get to that charge ladies and

16   gentlemen there should be no question there.

17        In a few minutes you are going to have

18   this case.  You are going to start deliberating on

19   it.  When you go back in there I am going to ask

20   you again to remember Ashley Martinez.  Remember

21   her looking at this situation through her eye.

22   Remember her innocence being taken away by the so

23   called man that is sitting behind me and how

24   difficult it was for her to take the stand and

25   testify before you. Remember all of that.